**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| IN RE AVANTOR, INC. SECURITIES LITIGATION | Civil Action No. 1:26-cv-00215-GBW |
| This Document Relates To: All Actions | |

**AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**
**FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

I. NATURE OF THE ACTION ........ 1

II. JURISDICTION AND VENUE ........ 7

III. PARTIES ........ 8

A. Plaintiffs ........ 8

B. Defendants ........ 9

IV. RELEVANT NON-PARTIES ........ 11

V. SUBSTANTIVE ALLEGATIONS ........ 16

A. Company Background ........ 16

B. Defendants Announce A Transformational Reorganization And Cost-Cutting Initiative Shortly Before The Class Period ........ 19

C. During the Class Period, Defendants Assured Investors That The Business Model Reorganization and Cost-Cutting Initiative Were Successes ........ 23

1. Defendants Praised Avantor's Supply Chain And Operational Excellence ........ 24

2. Defendants Characterized the Reorganization As A Value Driver That Enhanced Accountability ........ 25

3. Defendants Reported That Avantor's Cost-Cutting Initiative Was Generating Material Savings and Not Disrupting Operations ........ 26

4. Defendants Represented That Destocking Was Subsiding And Demand Was Returning, And Touted Avantor's Competitive Position And Market Share ........ 27

5. The Company Reported No Goodwill Impairment ........ 28

D. Defendants Concealed The Failing Reorganization, "Self-Inflicted" Operational Failures, And Reckless and Harmful Cost-Cutting ........ 29

1. Avantor's Supply Chain And Distribution Suffered Known Flaws By The Start Of, And Continuing Throughout, The Class Period ........ 30

2. The Reorganization Ignored Customer Needs And Worsened Accountability ........ 45

3. Defendants Engaged In Reckless And Ineffective Cost-Cutting That Backfired and Negatively Impacted Operational Efficiency ........... 68

4. Destocking Continued and Market Share Fell, Contrary to Defendants' Assurances ........... 76

E. Based On Avantor's Struggles, Defendants Should Have Undertaken An Interim Goodwill Impairment Test And Taken A Goodwill Impairment Charge Pursuant To GAAP Standards ........... 96

1. Applicable GAAP Standards for Goodwill ........... 97

2. Defendants Knew Of Triggering Events That Required A Goodwill Impairment Charge By The First Quarter of 2024 And Continuing Throughout The Class Period ........... 103

3. Defendants Violated GAAP By Not Recording A Goodwill Impairment Charge In The Company's 2024 Quarterly Results ........... 115

4. Defendants Violated GAAP By Not Recording A Goodwill Impairment Charge In The Company's 2024 Annual Report ........... 116

5. Ongoing Triggering Events Continued To Require Defendants Take A Goodwill Impairment Charge During The First And Second Quarters Of 2025 ........... 117

6. Defendants Violated GAAP By Failing To Take A Goodwill Impairment Charge During The First Two Quarters Of 2025 ........... 118

VI. THE TRUTH GRADUALLY BEGINS TO EMERGE ........... 118

A. The Truth Is Partially Revealed on April 25, 2025 ........... 118

B. The Truth is Further Partially Revealed on August 1, 2025 ........... 122

C. The Truth is Further Revealed on October 29, 2025 ........... 125

D. The Full Truth is Revealed on February 11, 2026 ........... 132

VII. MATERIALLY FALSE OR MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD ........... 135

A. Defendants' Materially False Or Misleading Statements And Omissions About The Company's Supply Chain And Distribution ........... 135

B. Defendants' Materially False Or Misleading Statements and Omissions About the Effects and Success of the Company's Reorganization ........... 144

C. Defendants' Materially False Or Misleading Statements And Omissions About The Company's Cost-Cutting Initiative ........ 159

D. Defendants' Materially False Or Misleading Statements and Omissions About the Company's Demand, Destocking, Competitive Position, And Market Share ........ 176

E. Defendants' Materially False Or Misleading Statements and Omissions About the Company's Goodwill ........ 194

1. Materially False Statements About The Value of Goodwill Reported In 2024 Quarterly And Annual Reporting ........ 194

2. Additional Materially False Statements About "No Impairment" Being Identified "Before and After the Reorganization" in the Company's 2024 Annual and Quarterly Filings ........ 201

3. Materially False Statements About the Carrying Value of the Company's Goodwill Balances in FY 2024 Annual Reporting ........ 202

4. Materially False Statements About the Company's Goodwill In Form 10-Q Filings for the First Two Fiscal Quarters of 2025 ........ 203

F. Defendants' Materially False Or Misleading Statements and Omissions About the Company's SOX Certifications ........ 205

VIII. ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER ........ 206

A. Defendants Knew Or Had Access To Information Contradicting Their Public Statements And Indicating Damage To Avantor's Goodwill And Brand Equity, Including From Defendants' Own Cost-Cutting And Other Practices ........ 207

1. Defendant Stubblefield and Other Senior Leadership Knew, Or Had Information Sufficient To Inform Them, That The Cost-Cutting Initiative Resulted In The Cancellation of Needed Infrastructure Projects ........ 207

2. Defendants And Other Senior Avantor Leadership Attended Regular Monthly Meetings Informing Them Of Inventory Issues And Still Ongoing Efforts To Report Performance After The Reorganization ........ 209

3. The Company's Retention Of Consulting Firms To Address Supply Chain And Other Issues Later Admitted To Plague Avantor Further Evidences Defendants' Knowledge Or Access To Knowledge ........ 211

4. Senior Leadership Knew, Or Had Information Sufficient To Inform Them Of, Documented Issues With Avantor Customers ........... 213

5. Defendants Implemented And Oversaw Key Performance Indicators........ 214

6. It Is Further Reasonable To Infer That Stubblefield Had Knowledge Of Or Access To The Truth From His Direct Reports ........ 216

B. The Nature, Size, And Timing Of The Goodwill Impairment Further Bolsters The Strong Inference Of Scienter ........ 218

C. Admissions By Defendants Further Bolster The Strong Evidence of Scienter ........ 221

1. Admissions About Supply Chain and Distribution Issues........ 221

2. Admissions About Failed And Harmful Cost-Cutting........ 222

3. Admissions That The Reorganized Operating Structure Confused Customers And Inhibited Accountability ........ 223

4. Admissions As To Avantor's Market And Competitive Weakness ....... 223

D. The Public Letter From Engine Capital Further Bolsters The Strong Inference Of Scienter ........ 224

E. The Departures of Avantor Senior Executives Support a Finding of Scienter ........ 225

F. Defendants' Personal Involvement In Causing LSS To Lack Leadership At A Crucial Time Further Bolsters The Inference Of Scienter........ 227

G. Defendants' Fraud Concerned The Most Significant Initiative And Pressing Issues Facing The Company........ 228

H. Given Their Importance, Defendants Publicly Touted Their Visibility Into And Closely Monitored The Operations At Issue........ 232

I. The Individual Defendants' Fraudulent Conduct Allowed Them to Retain Their Executive Positions and Collect Millions in Incentive Compensation ..... 234

J. Suspiciously Timed Changes In Goodwill Disclosures Further Bolsters The Strong Inference Of Scienter ........ 238

K. Defendants' Carousel of Reporting Segments and Reporting Units Further Bolsters The Strong Inference Of Scienter ........ 239

L. Enhanced Reporting Requirements Imposed Just Before The Start Of The Class Period Further Bolster The Strong Inference Of Scienter ......................... 243

M. Defendant Eck Sold Avantor Shares at Prices Inflated by the Alleged Fraud ............................................................................................................ 244

IX. LOSS CAUSATION/ECONOMIC LOSS ..................................................................... 245

X. APPLICABILITY OF PRESUMPTION OF RELIANCE ............................................ 248

XI. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR .................................. 249

XII. CLASS ACTION ALLEGATIONS ............................................................................. 250

COUNT I For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Against Avantor and the Individual Defendants............................................................ 252

COUNT II For Violations of Section 20(a) of the Exchange Act Against the Individual Defendants ........................................................................................................... 253

COUNT III For Violations of Section 20A of the Exchange Act Against Defendant Eck ....... 255

PRAYER FOR RELIEF ........................................................................................................ 256

DEMAND FOR JURY TRIAL .............................................................................................. 256

**APPENDIX A:** CHART OF FALSE AND MISLEADING STATEMENTS AND OMISSIONS

Court-appointed Plaintiffs MercLan S.A. (MercLan - Very Defensive Portfolio, MercLan - Growth Portfolio, MercLan - Defensive Portfolio, MercLan - Balanced Portfolio), MercLan Institutional Fund (MercLan - Institutional Equity Fund DBI-RDT), Kempen International Funds (Kempen International Funds - MercLan Global Equity, Kempen International Funds - MercLan Patrimonium), and Macomb County Employees' Retirement System ("Lead Plaintiffs" or "Plaintiffs"), individually and on behalf of all others similarly situated, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts and upon information and belief as to all other matters based on the investigation conducted by and through counsel, which included, among other things, a review of the public U.S. Securities and Exchange Commission ("SEC") filings of Avantor, Inc. ("Avantor" or the "Company"), Company press releases, conference call transcripts, investor presentations, analyst and media reports, and other public reports and information regarding the Company. Plaintiffs believe that substantial additional evidentiary support exists for the allegations set forth herein, which evidence will be developed after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1. This is a federal securities class action brought on behalf of all persons and entities that purchased or otherwise acquired the publicly traded common stock of Avantor, Inc. ("Avantor" or the "Company") from March 5, 2024 through February 10, 2026, inclusive (the "Class Period"), against Avantor and certain of its current and former officers and directors (collectively, "Defendants") for violations of Sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2. Avantor is a Radnor, Pennsylvania-based laboratory supply company that manufactures and distributes consumables, chemicals, lab equipment, and other scientific products to customers in pharmaceutical, biotechnology, education, and other industries. Throughout most

of 2020 and all of 2021, Avantor experienced a surge in demand for its goods driven by COVID-era supply constraints and pandemic-related demand for its medical- and-research-adjacent products. By the start of the Class Period, however, demand for Avantor's products had subsided and the Company's sales and order volumes declined sharply as customers—having accumulated during the pandemic—underwent a prolonged period of destocking.

3. In December 2023, just before the Class Period, Defendants announced an ambitious plan to transform the Company by reorganizing into two new business segments—Laboratory Solutions ("LSS") and Bioscience Production ("BPS")—while simultaneously launching a multi-year cost-savings initiative projected to deliver approximately $300 million in annual gross run-rate savings. Defendants told investors these changes would drive growth and margin expansion, unlock productivity, strengthen performance, and sharpen focus on the Company's customers. Analysts reacted resoundingly positively, widely crediting Defendants' assurances.

4. The Class Period begins on March 5, 2024, as Defendants neared completion of the first financial period under their new operating model. Beginning that day and continuing throughout the Class Period, Defendants repeatedly assured investors that the Company was well-positioned for accelerated and sustained long-term growth.

5. ***First***, Defendants told the market that Avantor had "a leading supply chain that supports a really agile, global business model"; that the Company had made "purposeful" investments to its supply chain and further that Defendants would "continue to invest aggressively" in infrastructure "to maintain the service levels that our customers have come to expect from us."

6. ***Second***, Defendants told investors that the Company's reorganized operating model was "in place" and that Defendants are already "seeing the benefits of our new business segments," including enhancements to "operational rigor and forecasting."

7. ***Third***, Defendants assured investors they had a "disciplined execution" in their cost-savings initiative, and even further that they were "ahead of plan" and had already driven "margin expansion" from their cost-cutting from the start of the Class Period.

8. ***Fourth***, Defendants told investors that the Company's market share and competitive positioning was strong, with Avantor able to make gains on its pricing and customer destocking normalizing and ultimately essentially concluding by no later than late 2024.

9. ***Finally***, throughout Defendants conveyed to investors in their reported financial statements that the Company's largest asset on its balance sheet—its reported goodwill—had suffered no meaningful impairment, and continued to have billions of dollars in value for the Company. This was particularly significant because it indicated the continuing value from the Company's history of inorganic growth, as Avantor had undertaken billions of dollars in acquisitions over the prior years under the leadership of Defendants Stubblefield and Peacock. These acquisitions included most prominently the Company's transformative $6.4 billion 2017 acquisition of VWR, a major global distributor and provider of laboratory products and supply chain solutions. In the ensuing years, Avantor had continued to fuel its growth through additional acquisitions, such as the July 2021 acquisition of Ritter GmbH and the November 2021 acquisition of Masterflex LLC. Each of these businesses sold products that were in high demand during the pandemic, including PPE and materials and technologies for COVID tests, vaccines, and therapies. All told, by the start of the Class Period, the Company reported to investors that it had billions of dollars in value of goodwill from these and other acquisitions. Given the significance of the

Company's acquisition-driven growth, this reported goodwill conveyed to investors that the Company continued to report billions of dollars in value from those acquisitions—a particularly significant signal because this unchanged acquisition carrying value persisted despite the Company's admittedly otherwise declining performance in the period leading up to the start of the Class Period.

10. However, unknown to investors—but ultimately revealed by the Company—Defendants' assurances misrepresented and misled investors.

11. ***First***, contrary to Defendants' assurances, the Company's supply chain and distribution systems had been plagued for years with unresolved issues by the start of the Class Period, and those issues persisted throughout the Class Period. Further, rather than investing in supply chain operations—as Defendants publicly claimed—in reality, Defendants had cancelled critical and planned investments. In addition, the Company lacked basic inventory governance processes, leaving the Company overstocked with excess inventory it could not sell from the start of the Class Period and throughout.

12. ***Second***, while Defendants claimed that their reorganized operating model was in place and aligned with the Company's customers, in reality the sweeping reorganization was arbitrary and incomplete, causing customer frustration, upending reporting structures, and creating critical leadership vacuums that left the segment providing most of the Company's revenue without a permanent leader for more than nine months.

13. ***Third***, contrary to Defendants' assurances, the Company did ***not*** have a serious plan for achieving the cost-savings initiative. Defendants instead engaged in reckless and unsustainable cost-cutting that crippled Avantor's already strained operations through the

cancellation of critical investments and mass layoffs that gutted institutional knowledge and creating numerous operational inefficiencies that harmed the Company.

14. ***Fourth***, contrary to Defendants' assurances, demand for Avantor's products collapsed as customers continued to engage in destocking through at least mid-2025—well after Defendants assured investors that customer destocking was behind the Company. At the same time, the Company was left with excess COVID-era and other aging inventory that it was unable to sell, or could only sell at steep discounts or negative margins, and the Company was increasingly reliant on unsustainable pricing concessions and rebates to defend its market share, materially eroding margins from revenues and cash flow.

15. ***Finally***, hundreds of millions of dollars in value for the Company's single largest asset—its reported goodwill, representing the success of its acquisition-driven growth and operations—had been destroyed, and Defendants had improperly inflated Avantor's reported goodwill throughout the Class Period. Defendants' failure to properly report impairment to the Company's goodwill particularly misled investors because, as noted above, the significant amount of goodwill reported by the Company communicated to investors that Avantor's history of acquisitions, including VWR, Ritter, and Masterflex, still provided and had continued to retain substantial value, even as the Company's performance otherwise deteriorated. In reality, as admitted when the Company belatedly recognized an impairment in October 2025, nearly $800 million in value needed to be wiped clean from the Company's balance sheet, shattering a key premise underlying Avantor's business proposition and foundational growth strategy and revealing significant destruction to the acquisitions underpinning Avantor's business.

16. The truth concealed by Defendants' fraud was revealed through a series of four corrective disclosures that caused the price of Avantor common stock to plummet. ***First***, on April

25, 2025, the Company admitted the need for immediate and significant remedial changes to its supply chain, fulfillment, and inventory operations—the very systems Defendants had championed throughout the Class Period—and also partially began to reveal that Avantor was facing heightened competition for new accounts. Avantor's stock price declined $2.57 per share, or 16.6%.

17. ***Second***, on August 1, 2025, Avantor reported dismal financial results attributable to, among other things, "increased supply chain expense[s]," and further revealed that the Company had been forced to undertake competitive actions to grow market share that had "come at the cost of margin," including a ***$100 million*** reduction in free cash flow guidance to account for previously undisclosed rebates to retain existing accounts. Avantor's stock price declined $2.08 per share, or 15.5%.

18. ***Third***, on October 29, 2025, new CEO Emmanuel Ligner—replacing Defendant Stubblefield—bluntly admitted that the Company had "dropped the ball" and suffered from "self-inflicted" operational failures. That day, the Company was forced to admit the destruction of $785 million from the Company's assets in a non-cash impairment charge to its recorded goodwill. Tellingly, Defendants attributed the impairment to "margin headwinds"—*i.e.*, the very conditions about which Defendants had assured investors of improvement throughout the Class Period. In reality, the Company had been suffering substantially the same declines throughout the Class Period that Avantor now attributed as the cause for the impairment, thus indicating that in fact the significant value destruction existed throughout the Class Period. On this news, Avantor's stock price declined $4.03 per share, or 26.7%, over two trading days.

19. ***Fourth***, on February 11, 2026, Avantor disclosed that it was eliminating the LSS and BPS segments entirely and undertaking yet another fundamental reorganization. Indeed, while

Defendants had claimed throughout the Class Period that their new operating model aligned with customer needs, the Company's new CEO came clean and revealed that he encountered sweeping customer confusion about the reorganization in just the few months since his tenure began, contradicting Defendants' repeated assurances throughout the Class Period that the reorganization had aligned the Company to its customers. Avantor's stock price declined an additional $1.52 per share, or 13.6%.

20. As a result of Defendants' materially false or misleading statements and omissions, Plaintiffs and the other members of the Class purchased Avantor common stock at artificially inflated prices and suffered significant losses and damages when the truth was revealed. All told, by the end of the Class Period, the price of Avantor stock had fallen to $9.64, a 65% decline from its Class Period high of $28.00.

## II. JURISDICTION AND VENUE

21. The claims asserted herein arise under Sections 10(b), 20(a), and 20A of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a), 78t-1) and Rule 10b-5 promulgated thereunder by the SEC (*see* 17 C.F.R. § 240.10b-5).

22. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

23. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). The Company was incorporated in this district and substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this District. Defendants' wrongful acts also arose in, emanated from, and caused harm in this District. Such acts include the dissemination of false and misleading statements into this District. Additionally, venue is proper in light of the purchase of the Company's stock by members of the Class who reside in this District.

24. In connection with the acts, transactions, and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, the United States mail, interstate telephone communications, and the facilities of a national securities exchange, the New York Stock Exchange.

## III. PARTIES

### A. Plaintiffs

25. Lead Plaintiff MercLan S.A. (MercLan - Very Defensive Portfolio, MercLan - Growth Portfolio, MercLan - Defensive Portfolio, MercLan - Balanced Portfolio) ("MercLan S.A."), purchased or otherwise acquired Avantor common stock during the Class Period, as reflected in the certification attached to its motion for appointment as lead plaintiff in this action (ECF No. 8-4),[1] and was injured as a result of Defendants' false and misleading statements and omissions. MercLan S.A. is a Belgian SICAV with multiple compartments or sub-funds.

26. Lead Plaintiff MercLan Institutional Fund (MercLan - Institutional Equity Fund DBI-RDT) ("MIF"), purchased or otherwise acquired Avantor common stock during the Class Period, as reflected in the certification attached to its motion for appointment as lead plaintiff in this action (ECF No. 8-4), and was injured as a result of Defendants' false and misleading statements and omissions. MIF is a Belgian SICAV with a single compartment or sub-fund.

27. Lead Plaintiff Kempen International Funds (Kempen International Funds - MercLan Global Equity, Kempen International Funds - MercLan Patrimonium) ("KIF"), purchased or otherwise acquired Avantor common stock during the Class Period, as reflected in the certification attached to its motion for appointment as lead plaintiff in this action (ECF No. 8-

[1] For the avoidance of doubt, this certification states MercLan S.A.'s, MIF's, and KIF's relevant transactions for the Class Period as defined in this Amended Complaint.

4), and was injured as a result of Defendants' false and misleading statements and omissions. KIF are a Luxembourg investment company with their respective compartments or sub-funds.

28. Lead Plaintiff Macomb County Employees' Retirement System ("Macomb County ERS") purchased or otherwise acquired Avantor common stock during the Class Period, as reflected in the certification attached to its motion for appointment as lead plaintiff in this action (ECF No. 17-1),[2] and was injured as a result of Defendants' false and misleading statements and omissions. Macomb County Employees' Retirement System is a single employer defined public pension fund located in Mount Clemens, Michigan, that oversees more than $1 billion in total assets on behalf of more than 3,200 retirees and 1,200 active members.

29. On January 13, 2026, the Honorable Gerald A. McHugh of the United States District Court for the Eastern District of Pennsylvania granted MercLan S.A., MIF, KIF, and Macomb County ERS's motion for appointment as Plaintiffs, finding that Plaintiffs "have the largest financial interest, have asserted claims typical of the proposed Class, and as sophisticated institutional investors have the ability to pursue and supervise this litigation." (ECF No. 23.) On March 2, 2026, this case was transferred to this Court. (ECF No. 40.)

**B. Defendants**

30. Defendant Avantor is a global provider of products and services to customers in several end markets, including biopharma, healthcare, education, government, advanced technologies, and applied materials. Avantor expanded through a series of large acquisitions. In 2016, Avantor merged with NuSil, a supplier of high-purity silicone products for the medical device and aerospace industries that was founded in 1985. In 2017, Avantor acquired VWR, a global manufacturer and distributor of laboratory and production products and services founded in

[2] For the avoidance of doubt, this certification states Maccomb's relevant transactions for the Class Period as defined in this Amended Complaint.

1852. Avantor was incorporated in the state of Delaware in May 2017, in anticipation of the VWR acquisition. Avantor completed its initial public offering and listed its shares on the New York Stock Exchange ("NYSE") in May 2019 under the ticker symbol "AVTR."

31. Defendant Michael Stubblefield ("Stubblefield") had served as Avantor's President and Chief Executive Officer ("CEO") since May 2014. Stubblefield had also served as a Director on Avantor's Board of Directors since 2017. On April 25, 2025, Avantor announced that Stubblefield "intends to step down" from his positions "upon the appointment of a successor." Avantor admitted in March 2026 that the Company had fired Stubblefield.

32. Defendant R. Brent Jones ("Jones") joined Avantor as the Company's Executive Vice President and Chief Financial Officer in August 2023. On April 1, 2026 (after the end of the Class Period), Avantor announced that Jones would be leaving the Company on or before June 24, 2026, and that Defendant Eck would serve as interim CFO pending appointment of a successor. According to the July 13, 2023 Avantor press release announcing Jones as Avantor's CFO, Jones previously worked as an executive and CFO for other companies, "spent the first 15 years of his career in investment banking with several firms including Merrill Lynch, Bank of America, and corporate law with Cravath, Swaine, & Moore," and has a J.D. from Yale Law School.

33. Defendant Jonathan Peacock ("Peacock") served on Avantor's Board of Directors from 2017 to approximately December 31, 2025, and had served as Chairman starting in May 2022. Specifically, at the time of Avantor's IPO, Peacock reportedly served as the Chair of the Audit and Finance Committee, and he has worked, over the course of his career, as a CFO at pharmaceutical entities Amgen Inc. and Novartis AG, served as a partner at management consulting firm McKinsey & Company, and was also a partner at PricewaterhouseCoopers. Peacock has also served on the Audit and Finance Committee of Kite Pharma (2014 to 2017). As

stated in Amendment No. 1 to Avantor's Form S-1 filing for the IPO, Peacock has "expertise in finance, strategy, and financial accounting (including qualification as an audit committee financial expert)." On October 13, 2025, Avantor announced that Peacock was leaving the Company.

34. Defendant Steven Eck ("Eck") joined Avantor in 2019 as the Company's Chief Accounting Officer ("CAO") and in that capacity signed the Company's publicly filed financials under Forms 10-K and 10-Q. The Company announced that Eck would serve as Interim CFO once Defendant Jones leaves the Company (by June 24, 2026). Prior to joining Avantor, Eck held senior finance roles at Fidelity, General Electric, and Deloitte.

35. Defendants Stubblefield, Jones, Peacock, and Eck are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Avantor's reports to the SEC, press releases, and presentations to securities analysts, money portfolio managers and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from, the public, and that the positive representations which were being made were then materially false or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## IV. RELEVANT NON-PARTIES

36. Corey Walker ("Walker") has served as Avantor's President, Laboratory Solutions Segment since, upon information and belief, March or April 2025. Walker previously served in

various roles at Avantor from 2016 through 2020, with a final title of Executive Vice President, Americas, Biomaterials and Electronic Materials. Prior to rejoining Avantor, Walker served as Chief Executive Officer of ILC Dover, a global biopharma and medical device supplier, from November 2021 until June 20, 2024. Avantor announced that Walker had assumed the role of President, Laboratory Solutions Segment on June 21, 2024, but Walker was enjoined from assuming this role for one year after his former employer Ingersoll Rand, an Avantor competitor that had purchased ILC Dover, successfully sought an injunction on account of a lucrative non-compete agreement that Walker had only just signed with Ingersoll Rand—a fact which Defendants knew in 2024. *Infra* V.D.2.c. Walker reports directly to the CEO.

37. Randy Stone ("Stone") served as Avantor's Executive Vice President, Laboratory Solutions Segment from January 1, 2024 until June 20, 2024. Before that role, Stone served as Avantor's Executive Vice President, Proprietary Research Products and Materials, from April 2023 through January 2024. He exited the Company to be replaced by Walker who, as noted above, could not start at Avantor for nearly a year, and Laboratory Solutions thus had no leader during this time.

38. Frederic Vanderhaegen ("Vanderhaegen") served as Avantor's Executive Vice President, Europe from September 2020 until his departure in June 2024. In that role, Vanderhaegen reported directly to Defendant Stubblefield. At other times during his tenure at Avantor, which began in 2018, Vanderhaegen served as Executive Vice President, Americas and the head of Avantor's global Laboratory Products Group. Vanderhaegen is currently the CEO of Biotage, a company offering products and technologies to support drug development.

39. Sheri Lewis ("Lewis") served as Avantor's Executive Vice President, Global Operations and Supply Chain from January 2021 until her departure in April 2024. Lewis reported directly to Defendant Stubblefield.

40. Michael Wondrasch ("Wondrasch") served as Avantor's Executive Vice President and Chief Information Officer from 2018 until his departure from the Company in April 2025. According to his public LinkedIn profile, Wondrasch was "[r]esponsible for all aspects of the company's global information technology and digital strategies inclusive of eCommerce[.]" Wondrasch reported directly to Defendant Stubblefield.

41. Emmanuel Ligner ("Ligner") is the current President and CEO of Avantor, who succeeded Defendant Stubblefield beginning on August 18, 2025.

42. FE-1[3] was previously employed by Avantor from before the Class Period until the first quarter of 2025 as Senior Director of Global Planning, working with Avantor's supply chain in Europe and North America.

43. FE-2 was employed by Avantor for approximately ten years until the end of 2025, most recently as Biopharma Sales and Portfolio Manager. FE-2 explained that, following the reorganization, he reported directly to the Vice President Controlled Environment (the controlled environment leader), who was two levels from Executive Vice President, Europe Frederic Vanderhaegen, who reported to Stubblefield.

44. FE-3 was employed by Avantor and VWR in a variety of roles from January 2011 until March 2025. FE-3 was most recently a Senior Supply Chain Business Analytics Partner, Global Supply Chain Analytics & Insights, which he assumed in 2019. FE-3 was a supply chain

[3] Individuals referenced herein as "FEs" or "Former Employees" refer to Avantor's former employees interviewed as part of Lead Counsel's investigation of Plaintiffs' claims. In order to protect their identities, the FEs are referred to with male pronouns regardless of their gender.

analyst role supporting operations at Avantor's North American distribution centers, which included locations in the U.S., Canada, Mexico, and Puerto Rico. According to FE-3, as a part of his role, he provided data to senior leadership related to distribution activities for daily, weekly, monthly, quarterly, and yearly reviews.

45. FE-4 was employed by Avantor from May 2023 until September 2025 as a Senior Manager, Supply Chain OpEx. FE-4 explained that he reported to Jared Guckenberger, Vice President of Global Supply Chain, who reported to former Executive Vice President Global Operations and Supply Chain Sheri Lewis and then current SVP, Global Supply Chain & Distribution Operations Patricio Espinosa, following Lewis' departure.

46. FE-5 was employed by Avantor as a Global Relationship Manager from July 2025 until December 2025. FE-5 explained that he worked on the Bioscience Production ("BPS") segment of the organization. FE-5 was responsible for several of Avantor's largest accounts during his tenure, including several large multinational medical tech companies, as well as Thermo Fisher—which was also a direct competitor of Avantor's.

47. FE-6 was employed by Avantor for over 15 years until May 2024 in a variety of roles and most recently was a Global Supply Chain Leader from October 2020 until his departure from the Company in May 2024. FE-6 explained that he was primarily responsible for the shipment of goods to customers and reported directly to the former Executive Vice President Global Operations and Supply Chain Sheri Lewis, who reported to the C-Suite.

48. FE-7 was employed at Avantor and previously VWR from September 2013 until March 2025 in a variety of roles in Europe. FE-7 explained that his final two positions were Director Distribution Centers East from April 2018 until March 2021 and Distribution Excellence Manager from April 2021 until his departure in March 2025. FE-7 explained that in his role as

Distribution Excellence Manager that he was a part of a team of nine that carried out several different tasks in support of the distribution teams. According to FE-7, in his final role he reported to former European Distribution Excellence Director Dirk Asselman, who reported to former Vice President Distribution Europe Jonathan De Deken, who reported to former Executive Vice President Global Operations and Supply Chain Sheri Lewis.

49. FE-8 was employed by Avantor as a Sales Representative from April 2020 until April 2025. FE-8 explained that he worked in Canada and his portfolio of customers involved primarily government customers and healthcare adjacent customers, such as medical laboratories.

50. FE-9 was employed by Avantor from October 2020 until May 2024. FE-9 was initially employed as a Supply Chain Manager from October 2020 until he transitioned to Senior Manager, Global Supply Chain - Single Use in June 2022, a role he occupied until his departure. FE-9 explained that he was responsible for a team of approximately 10 to 12 employees and he reported to current Senior Director – Supply Chain Operations Tripp Tyner. According to FE-9, his group ultimately reported to former Executive Vice President Global Operations and Supply Chain Sheri Lewis.

51. FE-10 was employed by Avantor from October 2022 until December 2024 as a Head of Procurement. According to FE-10, he was the Head of Procurement at Avantor's Hillegom, Netherlands facility and was responsible for two manufacturing environments related to fluid handling and medical equipment.

52. FE-11 was employed by Avantor as a Director of Sales from June 2022 until April 2025. FE-11 explained that he was the North American Director for Controlled Environment and was responsible for a team of approximately seven specialists and his portfolio represented approximately $400 million in sales annually. FE-11 reported directly to Vice President of Sales,

Applications and Technology Peter Seisel, who in turn engaged with segment leaders such as former Executive Vice President, Laboratory Solutions Randy Stone and current Executive Vice President, Bioscience Production Benoit Gourdier.

53. FE-12 was employed by Avantor from before the Class Period until 2025, most recently as Director in the Americas.

54. FE-13 was employed by Avantor from March 2022 until May 2025 as the Head of Events, Europe. FE-13 explained that his role dealt with Avantor hosting and attending trade shows, such as analytica, and sales conferences, such as the Pan-European Sales Conference. FE-13 explained that during his tenure Avantor did not have a Marketing Team and he reported into "Comms" (Communications), in which each portfolio had a corresponding team.

## V. SUBSTANTIVE ALLEGATIONS

### A. Company Background

55. Avantor is a Radnor, Pennsylvania-based laboratory supply company that manufactures and distributes consumables[4], chemicals, lab equipment, and other scientific products to customers in pharmaceutical, biotechnology, education, and other industries.

56. In the years leading up to the Class Period and under the leadership of Defendants Stubblefield and Peacock, Avantor grew through a series of mergers and acquisitions, including most prominently its $6.4 billion 2017 acquisition of VWR, a European-based major global distributor and provider of product, supply chain, and service solutions to laboratory and production customers. Avantor claimed that the VWR transaction made Avantor a global

[4] Consumables are consumer goods that are used up and/or replaced after a period of use. Consumables sold by Avantor include certain types of chemicals, PPE such as masks and gloves, and laboratory consumables such as glassware, beakers, filters, plasticware, crucibles, syringes, and liquid handling solutions.

distribution platform that reportedly served tens of thousands of customers worldwide with millions of products.

57. In Avantor's registration statement filed with the SEC on May 16, 2019, Avantor reported total goodwill of approximately $2.8 billion, including goodwill of approximately $2.6 billion attributable to its acquisition of VWR. Goodwill is an intangible asset that results from the purchase of another business; in essence, goodwill is the amount of the purchase attributed to the "reputation" of the business acquired, and its value is reflected as a line item on a company's balance sheet. At the time of Avantor's IPO and in its FY 2019 10-K, the $2,581.3 million in goodwill from the VWR acquisition was reportedly allocated (as of October 1, 2018) to Avantor's three then-existing post-IPO segments: the Americas ($1,412.1 million), Europe ($1,156.9 million), and AMEA[5] ($12.3 million). Based upon post-Class Period statements in Avantor's March 2026 Annual Proxy Statement, some or all of VWR's goodwill was ultimately allocated to the LSS segment in connection with the reorganization announced just before the Class Period.

58. Throughout most of 2020 and all of 2021, Avantor experienced a surge in demand for its goods that was the byproduct of COVID-era supply constraints coupled with the pandemic-driven need for Avantor's medical- and research-adjacent products, including Personal Protective Equipment ("PPE") such as masks, gloves, and booties sold through VWR. During this time, Avantor continued to fuel its growth through additional acquisitions, such as the approximately $1 billion July 2021 acquisition of Ritter GmbH ("Ritter"), a German-based manufacturer of high-precision plastic consumables, and the approximately $2.9 billion November 2021 acquisition of Masterflex LLC ("Masterflex"), a leading global manufacturer of peristaltic pumps and aseptic

[5] AMEA refers to Asia, the Middle East, and Africa.

single-use fluid transfer technologies.[6] Ritter and Masterflex each supplied highly sought after products in connection with the pandemic—for example, Ritter's consumables were used in COVID PCR tests, and Masterflex's technologies supported COVID therapy and vaccine manufacturing. Avantor's surge in sales and demand, coupled with inorganic growth, positively impacted Avantor's stock price, which reached a record high of $42.48 per share on December 31, 2021.

59. However, demand for Avantor's products subsided by late 2023 and the Company's sales and order volumes fell dramatically as customers, which had accumulated significant inventory of many of Avantor's products during the pandemic, underwent a prolonged period of destocking. The Ritter acquisition also proved costly, and in the second quarter of 2023, Avantor reported a $54 million impairment charge on Ritter's property, plant, and equipment and also recorded a $106.40 million impairment charge on Ritter's intangible assets, wiping out more than $160 million in the Company's only recently acquired assets. The Company attributed these charges to "persistently high customer inventory in the end markets served by Ritter and an overall slowdown in research activity."

60. By October 30, 2023, Avantor's stock price had plummeted to $16.63 per share, its lowest point since its 2020 COVID-era ascent, and an approximately 61% fall from its 2021 high.

---

[6] According to the FY 2023 10-K, as of the end of fiscal 2023, Ritter, and its $807 million in goodwill, was part of Avantor's Europe reporting segment/unit. As indicated herein, based upon statements in the Company's FY 2024 10-K at F-29, as of the time of the reorganization, the operations of Ritter were linked by Avantor to the LSS segment, whether in whole or in part. As to Masterflex, Avantor allocated $2.2 billion in goodwill from the $2,865.6 million acquisition to the Americas segment before the reorganization, and upon information and belief, to the BPS segment after the reorganization. The basis of this assertion is that in the March 2026 Proxy Statement, at page 6, summarizing the post-Class Period re-reorganization and reshuffling of segments, Avantor referred to Masterflex the "Bioscience and Medtech Products" segment, which had meaningful carryover from BPS.

61. Investors were concerned about Avantor's performance compared to its peers. For example, during an interview with Defendant Stubblefield during the Evercore ISI HealthCONx Conference on November 28, 2023, an analyst noted that most of Avantor's peers "were contemplating maybe like flattish sort of organic for fiscal 2023 for the base business," but Avantor was "contemplating mid-singles declines," and asked Stubblefield "why is Avantor sort of that down mid-singles for the base versus like flattish for peers?" In response, Stubblefield attributed this poor performance to outsized destocking, stating that "coming out of the supply chain constraints and challenges associated with the pandemic, we've obviously encountered a significant amount of inventory destocking, both on the lab side of our business as well as on the production side of our business."

### B. Defendants Announce A Transformational Reorganization And Cost-Cutting Initiative Shortly Before The Class Period

62. Against this backdrop of performance that had plummeted from record highs just two years earlier, on December 7, 2023, in advance of the Company's December 8, 2023 Investor Day Conference, Avantor issued a press release announcing seismic "plans to transform the business by implementing a new operating model and advancing a multi-year cost optimization initiative." Defendants claimed that these changes would "driv[e] growth and margin expansion in laboratory and production environments," "unlock productivity," "strengthen our performance," "sharpen[] our focus on our customers' needs and bring[] clear accountability for performance," and "unlock significant operating efficiencies." Three of the relevant changes are summarized below:

63. ***First***, the Company announced a new operating model that would transition Avantor from three ***geographic*** operating and reporting segments (Americas, Europe, and AMEA) to two new, purportedly customer-focused operating and reporting segments: the Laboratory

Solutions segment (known as "LSS") and the Bioscience Production segment (known as "BPS"), effective January 1, 2024. This re-segmentation marked a drastic change from the regional-based operating segments approach generally used by Avantor throughout its post-IPO existence.

64. According to the Company, LSS, which would represent approximately $4.7 billion in annual revenues (67% of total revenues), was to provide "mission-critical" materials, equipment, instrumentation, and services through a global distribution network to over 300,000 labs in approximately 180 countries. Further, BPS, which included Avantor's legacy production business), would represent approximately $2.3B in annual revenues (33% of Avantor's total revenues) and would supply chemicals and other materials for bioprocessing and various healthcare applications.

65. As later disclosed, this business model shift also caused the Company to reorganize its reporting units "for the purpose of goodwill impairment testing." Avantor previously generally had geographic-based reporting units tracking its segments: the Americas, Europe, and AMEA.[7] In its Q1 2024 10-Q, its first Form 10-Q filed after the reorganization, Avantor stated that it now allocated the goodwill for impairment purposes across six distinct reporting comprising the two new operating segments: Manufactured Products, Buy Sell Production, NuSil, Buy Sell Lab (later revealed to have been renamed to Distribution, without explanation), Proprietary Lab, and Services. No explanation of the reporting units was provided, including how much goodwill was allocated to each reporting unit, and how goodwill was allocated to each reporting unit. In the Form 10-Q, the Company stated that it "tested goodwill for impairment immediately before and after the realignment; no impairment was identified."

---

[7] At times, Avantor also had a separate reporting unit for NuSil.

66. ***Second***, in connection with the reorganization, the Company announced several changes in its leadership effective January 1, 2024:

- LSS would be led by new LSS Executive Vice President Randy Stone, who until this time was Executive Vice President, Proprietary Research Products and Materials;
- BPS would be led by new BPS Executive Vice President Benoit Gourdier, who until this time, was Executive Vice President, Biopharma Production;
- The current Executive Vice President of the sales organization in the Americas, Jim Bramwell, would now serve as Executive Vice President of all Sales;
- The Executive Vice President of Global Supply Chain, Sheri Lewis, and Executive Vice President of Europe, Frederic Vanderhaegen, would depart Avantor in 2024 after "supporting the transition to the new operating model."

67. ***Third***, Avantor announced a "***global cost optimization initiative***" that aimed to "further enhance productivity through increased organizational efficiency, footprint optimization, reduced cost-to-serve and procurement savings that are expected to generate approximately $300 million in run rate cost savings by the end of 2026."

68. During Avantor's Investor Day the following day (December 8, 2023), Stubblefield told investors that the "transformation" would "strengthen our performance both in the near term as well over the long term" by, among other things, the reorganization "provid[ing] a greater degree of transparency and enable[ing] a better understanding of our business" that "will position us for growth over the long term." In particular, Stubblefield stated that transformation coincided

with the anticipated end of destocking and normalization of demand, telling investors that in the next one to two years, "Destocking will subside. Our end market demand will normalize. Our mix and our operating leverage will be restored, and we'll realize the benefits of the cost transformation that we've just discussed."

69. Defendant Stubblefield also stated that the Company would offset inflation "with an appropriate price increase" and touted the competitive positioning of the Company, informing investors that, "[w]ithout exception and across the board, we've either maintained or grown [market] share throughout 2023, and we would expect that to continue."

70. Defendant Jones and executives Randy Stone and Benoit Gourdier also spoke at the Investor Day, with Jones stating that the reorganization enabled the Company to execute on "delivery and service levels, making sure we're delighting our customers, meeting the appropriate lead times, having what they need when they need it"; "price, making sure we get our entitlement against inflation, not just on our third-party products, but also for our produce products"; and "cost out, which is part of our DNA and which is something we're going to accelerate." Jones also clearly linked the reorganization to the cost-savings initiative, stating that "the segment clarity really is driving clarity on our cost structure." Finally, Jones stated that Defendants had "done a very, very careful assessment and spent a lot of time thinking about" the $300 million in cost savings.

71. Analysts reacted positively to the reorganization and cost-savings initiative, noting its potential to galvanize the Company's long-term growth. For example, TD Cowen upgraded Avantor to "[o]utperform" because "several items make us more bullish," particularly "a material cost cut program that creates margin upside, [and] a new operating structure that improves transparency and supports growth[.]" Similarly, UBS stated that "we view positively the

announced structural cost actions and business reorganization, and these actions motivated us to increase our 2025+ forecasts." Goldman Sachs viewed the new operating model "as a positive" that "increase[ed] transparency" and provided "a clearer view into the end markets the company serves." Goldman analysts also described their view that "the inventory de-stocking dynamic [was] mainly a 2023 event," and "when this [destocking] turns, [Avantor] is positioned well to benefit from the restoration of favorable product mix and operating leverage given the operating model changes and cost saving initiatives."

### C. During the Class Period, Defendants Assured Investors That The Business Model Reorganization and Cost-Cutting Initiative Were Successes

72. The Class Period began on March 5, 2024, as Defendants neared completion of their first quarter under the reorganization and cost-cutting initiative. During this time, Avantor and the Individual Defendants disseminated a consistent narrative—through quarterly earnings releases and conference calls, approximately a dozen investor conferences, Avantor's 2024 and 2025 shareholder meetings, and the Company's Forms 10-Q and 10-K—portraying Avantor as an operationally superior, strategically realigned enterprise whose transformational reorganization and cost-cutting initiative had delivered, and were continuing to deliver, results and performance. That narrative rested on several interlocking representations: for example, that Avantor's supply chain operations were not only normalized, but industry-leading; that the new LSS/BPS operating model was unlocking and driving material efficiencies; and that Avantor's $300 million—and later $400 million—cost-cutting initiative was generating significant savings and proceeding "without disruption." In addition, the Company represented strong, organic demand, asserting that post-COVID customer destocking had subsided, and that the Company was gaining share amid a strong competitive backdrop. Finally, throughout the Class Period, Avantor's financial statements reinforced these representations by reporting no goodwill impairment and identifying no triggering

events requiring interim impairment testing, thereby leaving intact the largest asset on the Company's balance sheet. Each of those representations was materially false or misleading, as detailed below.

### 1. Defendants Praised Avantor's Supply Chain And Operational Excellence

73. On the first day of the Class Period, Defendant Stubblefield told attendees at the TD Cowen Health Care Conference that Avantor would "continue to invest aggressively not only in the physical infrastructure to maintain the service levels that our customers have come to expect from us, but also in the digital infrastructure that can create so many efficiencies and further ingrain us in our customers' workflows." At the May 9, 2024 Annual Meeting of Stockholders, Defendant Peacock emphasized "purposeful strategic investments in manufacturing capacity, supply chain innovation and digital capabilities to drive efficiencies and position the company for future growth."

74. Defendants continued to tout the strength of Avantor's supply chain through 2024 and into 2025. At the October 25, 2024 Q3 2024 Earnings Call, Defendant Stubblefield reported that Avantor "continue[d] to improve the efficiency and productivity of our supply chain operations," and at the December 3, 2024 Evercore ISI HealthCONx Conference, he described the Company as having "a leading supply chain that supports a really agile, global business model." On January 15, 2025, Defendant Stubblefield stated that "we think that with the [supply chain] investments that we're making in that regard and the focus we have in 2025, that this will be a real differentiator for us." On February 7, 2025 in connection with the Q4 2024 Earnings Release, the Company's Slide Deck highlighted "[r]ecord investments in supply chain and bioprocessing efficiency and capacity."

75. As late as May 13, 2025, Defendant Stubblefield assured attendees at the Bank of America Global Healthcare Conference that Avantor had undertaken "record levels of investments in footprint, optimizations and expansions, investments in digitization, robotics, automation," and that the supply chain served "more than 300,000 customers reliably around the world."

### 2. Defendants Characterized the Reorganization As A Value Driver That Enhanced Accountability

76. Throughout the Class Period, Defendants framed the Company's reorganization from a geographic-based operating and reporting structure to a new, purportedly customer-based LSS/BPS operating and reporting structure as a mature, well-executed evolution that was near-instantly producing commercial and operational benefits. On the Q1 2024 Earnings Call on April 26, 2024, for example, Stubblefield told investors that the new segments "enhance our focus on customers' needs . . . position us for accelerated long-term growth and unlock significant operating efficiencies," and produce "operational rigor and improved forecasting that comes from a more simplified and . . . more logical . . . structure to the business." And on June 11, 2024, at the Goldman Sachs Healthcare Industry Conference, Stubblefield further touted that the new structure provided a "much clearer line of sight to and a performance accountability and certainly much more streamlined, way to run the business."

77. Defendants maintained this narrative through 2025. For example, the Company's January 2025 JP Morgan Healthcare Conference slideshow stated that Avantor's "Operating model transformation is strengthening performance and productivity," and listed "2024 proof points" that included "Streamlined accountability and operating rhythm." Likewise, at Avantor's May 8, 2025 Annual General Meeting, Defendant Peacock reported that the reorganized structure had "sharpened our focus on customers, laboratory and production needs and unlocking additional efficiencies and better positioning Avantor to focus on improving growth and performance."

78. Avantor's reorganization also encompassed a complete redesign of its e-commerce platform, which Defendants promoted as a key driver of growth and customer engagement. For example, during the Q1 2024 Earnings Call on April 26, 2024, Defendant Stubblefield highlighted "a lot of investments in our digital platform to position our business for sustained long-term growth[.]" And on March 5, 2025, Stubblefield reiterated that the Company had "launched a new e-commerce platform that will further enhance the experience with our customers," describing it as "an offering that's pretty compelling for our customers."

**3. Defendants Reported That Avantor's Cost-Cutting Initiative Was Generating Material Savings and Not Disrupting Operations**

79. Throughout the Class Period, Defendants portrayed Avantor's cost-cutting initiative as driving meaningful improvements to the Company's bottom line and executed in a disciplined manner. For example, on April 26, 2024, in the Company's Q1 2024 Earnings Release, Defendant Stubblefield stated that Avantor was "out of the gate strong with our cost transformation initiative," with savings "ahead of plan" and already visible "in our cost structure and margins." During the accompanying earnings call on April 26, 2024, Stubblefield assured investors that "there's nothing that we're doing that prevents us from growing the business as it returns." At the Bank of America Global Healthcare Conference on May 14, 2024, Stubblefield distinguished Avantor's cost-cutting initiative from a blunt workforce reduction, stating that "[t]his isn't just simply, oh, let's just go cut 5% of the workforce and reset cost instantly," and represented the initiative instead as "fundamentally changing the way that the business is working and . . . finding smarter and better ways to do it." Stubblefield also touted the cost-cutting initiative's impact to the Company's bottom line, stating that Avantor was making "really good traction with our cost transformation initiative where we were able to pull forward some of the savings into Q1."

80. Defendant Jones likewise assured investors that the cost-cutting initiative was being implemented in a measured, non-disruptive way. During Avantor's Q2 2024 Earnings Call on July 26, 2024, Jones attributed Avantor's financial performance to the cost-cutting initiative's "execution," "getting at the top line," and being "really prudent about it" while hitting "the right areas at the right times." During the Q1 2025 Earnings Call on April 25, 2025, Jones stated that, with respect to, cost-cutting "we think [it] has been done really clean, hasn't led to any disruption," and that it "[had] been carefully designed and executed to ensure that our critical capabilities remain intact." During the same call, Defendant Jones announced an expansion of the initiative to at least $400 million in cost savings by 2027.

**4. Defendants Represented That Destocking Was Subsiding And Demand Was Returning, And Touted Avantor's Competitive Position And Market Share**

81. Defendants also represented throughout the Class Period that the post-COVID destocking cycle was nearing completion—or had already concluded—and that underlying demand was rebounding. Defendants repeatedly updated investors on this purported progress. For example, on the Q1 2024 Earnings Call on April 26, 2024, Defendant Stubblefield described "nice acceleration" in LSS that was "reflective of the destocking trends that we're seeing and the improvement of inventory health." On the October 25, 2024 Q3 2024 Earnings Call, Stubblefield declared that "demand remains great . . . as the destocking subsides," and that "the destocking is pretty much behind us, and for the most part inventories have normalized," with customers "managing their inventories in line with their activity levels." On December 3, 2024, Stubblefield reiterated that "destocking has essentially got behind us and we're seeing production levels better match demand." He continued to advance this narrative at the January 15, 2025 JP Morgan Healthcare Conference, stating that "[w]e've seen virtually all of that [destocking] kind of work through the system." Again, on the February 7, 2025 Q4 2024 Earnings Call, Defendant

Stubblefield represented that "destocking has largely subsided." And on May 13, 2025, Defendant Stubblefield informed investors at a Bank of America Conference that "destocking has essentially been eliminated, return to normal" and that order patterns had returned to "current quarter" visibility.

82. In tandem with these assurances, Defendants projected sustained competitive strength and characterized pricing as a key driver of margin expansion. For example, on the Q1 2024 Earnings Call on April 26, 2024, Stubblefield stated that he was "pretty pleased about where we're at from a pricing standpoint and certainly, one of the favorable drivers of margin that we do see." On the Q2 2024 Earnings Call on July 26, 2024, Defendant Stubblefield said that Avantor's "lab business stacks up well against every number that . . . we've seen" and that the Company was "really confident in our value proposition and our competitive position." On the Q3 2024 Earnings Call on October 25, 2024, Stubblefield described "a platform here that continues to outperform" with "a nice share story," and, at the December 3, 2024 Evercore ISI HealthCONx Conference, Stubblefield stated Avantor was "performing at the top of our peer set in the lab business" and had "a best-in-class lab platform." And even when acknowledging competitive headwinds (at least in part), Defendants portrayed them as limited and contained. For example, on the Q1 2025 Earnings Call on April 25, 2025, even as Defendant Stubblefield admitted that Avantor faced "increased competitive intensity," he emphasized that the Company was not relying on price actions to protect share, stating that, "for the business that we have today and for the contracted customers, pricing has played out."

**5. The Company Reported No Goodwill Impairment**

83. Throughout the Class Period, Avantor's periodic SEC filings reported only de minimis impairments and no triggering events requiring interim impairment testing, thus leaving intact more than $5 billion of recorded net goodwill, the largest single asset on its balance sheet.

Avantor's 2024 Q1, Q2, and Q3 Form 10-Qs, and the 2024 Form 10-K, further represented that the Company had "reassigned goodwill as of January 1, 2024 to align to our new segment structure by using a relative fair value approach"[8] and had "tested goodwill for impairment immediately before and after the reorganization of our reporting structure; no impairment was identified." Each of those filings was signed by Senior Vice President and Chief Accounting Officer Steven Eck and accompanied by Sarbanes-Oxley § 906 certifications from Defendants Stubblefield and Jones.

### D. Defendants Concealed The Failing Reorganization, "Self-Inflicted" Operational Failures, And Reckless and Harmful Cost-Cutting

84. Taken together, Defendants' Class Period representations were a sustained and pervasive narrative of operational excellence, strategic execution, competitive strength, and prudent financial reporting. As detailed further below, however, Defendants and the Company's new CEO Emmanuel Ligner revealed that each of these representations was materially false or misleading when made, or omitted material information necessary to make the statements not misleading.

85. By the start of the Class Period and throughout, as detailed at length based on the extensive accounts from more than a dozen, well-placed former employees at Avantor, Defendants understood that the Company's supply chain and distribution systems were plagued by longstanding deficiencies—including outdated infrastructure, fragmented technology and data systems, and inefficient warehousing—that degraded performance, impaired fulfillment, and strained customer relationships. Inventory management and forecasting were likewise materially flawed, with excess stock and no meaningful governance processes in place. Rather than addressing these issues, Defendants' poorly conceived cost-savings initiative exacerbated them by eliminating key personnel, canceling critical investments, and imposing a structure ill-suited to

[8] In the 2024 Form 10-K, the language included the clause "as required under GAAP."

Avantor's operations, resulting in disjointed "tagging" and reporting structures, arbitrary and unclear revenue attribution, and weakened customer service. The rollout of a nonfunctional e-commerce platform and the absence of key leadership, particularly within LSS, further disrupted operations. At the same time, demand collapsed amid a prolonged destocking cycle, eroding Avantor's competitive position—conditions that existed at the start of the Class Period and lasted into at least mid-2025, but which Defendants concealed.

86. Ultimately, subsequent admissions by Defendants (including the Company's new CEO) corroborate the existence of these conditions and "self-inflicted" harms: for example, Avantor slashed its cash flow guidance by $100 million to account for rebates used to defend its market share, acknowledged that VWR "cut too many specialists" in the throes of layoffs, and identified the need for serious investments its supply chain and e-commerce systems. Further, Avantor admitted to gaps in its forecasting and inventory management, that the Company had lost multiple large accounts, and that customers had directly expressed "confusion" about the LSS-BPS segmentation. Acknowledging that the reorganization was an unequivocal failure, the LSS and BPS segments were dismantled just two years after their heralded arrival and the Company undertook a re-reorganization into yet more new operating segments, which in part attempted to restore the VWR brand after years of neglect by Defendants. Further, Ligner admitted, the purported "savings" from the Company's cost-cutting initiative were also a failure and did not "adequately fall[] through to the bottom line," despite Defendants' repeated assurances otherwise during the Class Period.

### 1. Avantor's Supply Chain And Distribution Suffered Known Flaws By The Start Of, And Continuing Throughout, The Class Period

87. Unknown to investors—but as Defendants would ultimately admit—problems throughout the Class Period plagued the Company's supply chain, inventory, and forecasting

infrastructure, which required "immediate and significant" changes around "improving data accuracy, accelerating fulfillment speeds and optimizing inventory" with "[g]aps in sales and operating processes [] contributing to inventory and forecasting challenges." Although Defendants touted throughout the Class Period that Avantor, *e.g.*, had "***a leading supply chain that supports a really agile, global business model***," and an "***industry-leading portfolio, resilient supply chain, and relentless efficiency***," ultimately, new leadership was forced to admit that Avantor was plagued by supply chain, inventory, and forecasting problems.

#### a. By The Start Of The Class Period, Supply Chain Issues Plagued Avantor, With Years Of Needed Overhaul

88. According to FE-9, who was employed by Avantor from October 2020 until May 2024, most recently as Senior Manager, Global Supply Chain - Single Use, it was virtually impossible to get any momentum within the supply chain organization, and the Company was "constantly late" in fulfilling orders with key customers.

89. FE-4, who was employed by Avantor from May 2023 until September 2025 as a Senior Manager, Supply Chain OpEx, explained that the "biggest hurdle" the supply chain organization at Avantor faced was fixing their internal communications issues between the supply chain and manufacturing organizations. According to FE-4, for example, customer service was the group ultimately responsible for delegating orders and operated for both manufacturing and distribution. FE-4 explained that there was no personnel at the Company specifically dedicated to allocation for internal groups, so allocation led to "in fighting" within the supply chain organization.

90. FE-4 explained that Avantor hired McKinsey in approximately August or September 2024, by no later than which time it was clear internally that the supply chain organization was not aligned. FE-4 recounted that McKinsey was helping to increase automation

and was working with the data analytics team to recalibrate OTIF (on time and in full), a key performance indicator.

(1) Supply chain issues included that the company inefficiently depended on multiple reports from multiple data systems.

91. FE-1, who was employed by Avantor from before the Class Period until the first quarter of 2025 as Senior Director of Global Planning, worked with Avantor's supply chain. FE-1 explained that Avantor was missing a "cohesive" strategy to link sales and inventory management.

92. According to FE-1, both before and following the reorganization, financial reporting and inventory data had to be collected from multiple reports over different systems, as there was no single common ERP interface and no single place to access all of the data that was needed, and there were two instances of SAP[9] configured differently across Europe and North America, which made financial reporting and inventory data collection even more difficult. As a result, FE-1 explained that the data had to be collected from these different sources and then uploaded into the QlikView[10] program for financial and inventory reporting. FE-1 further noted that comparing different SAP data sets could be tricky, as there were differences in the systems. FE-1 stated that the Company was still trying to address SAP inefficiencies at the time of his departure.

93. FE-3, who was employed by Avantor and VWR in a variety of roles from January 2011 until March 2025, most recently a Senior Supply Chain Business Analytics Partner, Global Supply Chain Analytics & Insights, explained that his role required monitoring a number of KPIs (key performance indicators), including labor related productivity data that looked at how

[9] SAP is an Enterprise Resource Planning ("ERP") software. According to SAP's website, SAP's "integrated applications connect all parts of a business into an intelligent suite on a fully digital platform."

[10] QlikView is a guided analytics and data visualization solution.

effectively the Company was moving product out the door without sacrificing service and quality. According to FE-3, other KPIs included DPMO (defective per million opportunities) that focused on quality, and OTIF (On time in Full). FE-3 added that OTIF related to, for example, if a customer ordered 10 different lines of product, will these products all be able to be sent out at the same time. FE-3 explained that, in order to pull the data necessary for these reports, he had to manually pull data each morning from approximately ten different systems, including SAP, Workday[11], and various other digital warehouses. He reported on this data beginning in 2021 until the time he left in March 2025. FE-3 explained that at the time of his departure the Company was working on a new and more centralized data warehouse, but that implementation was not completed at the time of his departure.

94. FE-5, who was employed by Avantor as a Global Relationship Manager from July 2025 until December 2025, explained that Avantor had multiple systems that did not speak to each other, and Avantor relied on programs like PowerBI[12] to serve as a bridge and communicate between systems. FE-5 added that this approach had "a lot of cracks."

95. According to FE-7, who was employed at Avantor and previously at VWR in a variety of roles, most recently as Distribution Excellence Manager, from September 2013 until March 2025, the legacy Ritter team was resistant to SAP integration with Avantor. FE-7 added that the overall integration of Ritter "didn't really work."

[11] Workday is an ERP software.
[12] Microsoft Power BI is data visualization software.

(2) Supply chain issues also included the company's use of warehousing that led to long lead times and drove customers away.

96. FE-7 explained that VWR had a twenty-five-year-old system that was "tailor-made" for the business, while Avantor came in with no system and "no clue" about the distribution side of the business.

97. According to FE-7, the Company did not invest in new processes. For example, FE-7 explained that the Company was still using a twenty-five-year-old version of SAP and continued to try to build on this platform rather than investing in a new one. FE-7 recalled that there was a business case put together advocating for a "state of the art" version of SAP and work was conducted to gather quotes, but the implementation never occurred.

98. FE-7 explained that Avantor did not keep inventory in warehouses near where top purchasing customers were located. Additionally, in Europe, the Company's European Central Planning group did not have visibility into inventory levels in local distribution centers, and inventory could not be moved between local distribution centers without first going to a central distribution center. FE-7 was personally involved in developing initiatives to determine the reasons for long lead times in the distribution process from warehouse to warehouse. FE-7 explained that there are three Central Distribution Centers ("CDCs") in Europe and then additional Regional Distribution Centers ("RDCs") and Local Distribution Centers ("LDCs"). FE-7 explained that products needed to be sent back to the Central Distribution Centers if they were to be sent to a different customer. According to FE-7, for example, if an item was overstocked in Austria, it was a "huge effort" to move that inventory elsewhere. FE-7 recalled instances where an item had been in stock for 10 years in one location but still purchased in another country because of the difficulty in moving stock country to country.

99. FE-7 further recalled that there was no initiative or centralized list for employees across locations to have insight into what stock the others had. According to FE-7, European Central Planning, which operated out of Belgium and was responsible for all warehouses, was not looking at the inventory of LDCs and only had visibility into inventory levels of the CDCs and RDCs. FE-7 noted that the LDCs did not have visibility into overstock elsewhere and there was no ability to move inventory between the LDCs without product first going to a CDC. According to FE-7, the CDC in Belgium was the only facility with a special process in place through SAP that could fulfill orders that required OTIF (on-time, in-full). FE-7 explained that if a customer needed an order to be OTIF then the goods first needed to go to the CDC in Belgium. FE-7 added that requests to fulfill orders as OTIF needed to be made to the specialized team working at the CDC in Belgium for approval.

(3) The company suffered unaddressed inefficiencies in fulfillment from undisclosed practices that further caused inventory to swell.

100. FE-10 recalled that Avantor was willing to purchase one-off inventory for a specific customer, even when that resulted in excess inventory being ordered that was unable to be reallocated. He explained that Avantor's willingness to purchase specific inventory for a specific customer made it "almost impossible" to sell that inventory to a different customer. FE-10 recalled that Avantor did not have agreements to return inventory to suppliers in the event a component or product was no longer needed by a customer. FE-10 added that Avantor was carrying out the same practices in the U.S. as in Europe, where one-off components were purchased for a customer and the additional volume purchased due to minimum supplier requirements were leftover.

101. According to FE-7, the Company purchased one-off products at the request of singular customers and did not negotiate with suppliers to return product if this customer canceled their order. FE-7 further explained that Avantor had insufficient SAP entries for these products,

which made it difficult to have enough details regarding specifications to try to sell the product to other customers.

102. FE-7 conducted analysis on inventory levels and re-order points and determined that inventory was often out of stock when it came to orders not being successfully fulfilled, issues that continued through the end of his tenure. FE-7 explained that commercial teams came to him and asked why this occurred so often and additional complaints were received by Central Planning. FE-7 further explained that while Avantor had four million items or more in their systems, only approximately 100,000 of the SKUs were "at stock level." According to FE-7, for example, a number of items in the system were composed of one-off purchases made by customers that were not actively kept in stock. FE-7 explained that these issues with inventory out of stock and orders not being successfully fulfilled were a routine occurrence throughout his tenure. FE-7 noted that he was responsible for six distribution centers and was regularly checking inventory levels.

103. According to FE-1, when customers came to Avantor to potentially buy a certain product that Avantor does not already carry in inventory that the response from the sales organization was to set up a new supply chain for that item. FE-1 explained that this was the case even when Avantor may have carried five different versions of that same item, but the customer wanted a sixth. FE-1 noted that not only does this contribute to residual inventory issues but also can cannibalize the sales prospects of existing inventory.

104. FE-1 explained that this desire by customers did not align with operational efficiency and the Company could not increase flexibility while simultaneously cutting resources available for transportation costs, as an example. FE-1 recalled receiving further pushback regarding destocking when it was suggested that if a product is bought once a week in one location, once a month in another, and once every three months in a third, that it may not make sense to

keep that item stocked in all three. FE-1 noted that again pushback from the commercial teams were centered on the idea that if a customer wants a product and it is not available that the sale will be lost. According to FE-1, when it came to goods with long shelf-lives that there was no policy on how long sitting in inventory was "too long."

105. According to FE-1, there was a lack of oversight into the Company's portfolio products, and this extended to redundant offerings. FE-1 explained that, for example, the Company might have multiple versions of a single product, such as screwdrivers. FE-1 explained that as the portfolio of products increases that residual inventory becomes a greater problem. FE-1 added that this became a "massive" problem during COVID, particularly with PPE equipment that customers were "sourcing from everywhere." According to FE-1, towards the end of his tenure in discussions around the prospect of restricting portfolio sizes, he received pushback from the commercial teams.

(4) <u>Supply chain issues also involved failures to manage excess inventory that further contributed to concealed inefficiencies and escalating costs.</u>

106. FE-1 explained that he was aware of meetings with Sheri Lewis and members of the Portfolio and Sourcing Teams in late 2022 or early 2023 that focused on Avantor's approach to stocking strategy. FE-1 stated that he was aware that these meetings focused on an approach to stocking volume and efficiency while considering stocking levels in different locations. FE-1 stated that he was aware that Sheri Lewis received feedback from the C-Suite that was delivered to the stocking strategy meetings, and the feedback was that those meetings with the C-Suite had gone well, and that there was interest in the stocking strategy plan that the group was putting together.

107. FE-10, who was employed by Avantor from October 2022 until December 2024 as a Head of Procurement, recalled that there was a "big" stock of inventory at the time he joined Avantor and at the time of his departure the warehouses were "fully packed" with inventory.

According to FE-10, there was a "lot of inventory we [Avantor] couldn't sell." FE-10 recalled "huge" stocks at the end of his tenure in December 2024 that could not be used. FE-10 explained that employees in the U.S. were aware of the inventory issues as he brought it up in his regular communications with them.

108. FE-10 recalled that during the middle of his tenure, towards the end of 2023, U.S. operations made the decision, following a manufacturing closure in the U.S., to move all remaining stock to the Netherlands. FE-10 further recalled that this was a mixture of "lots and lots" of parcels of stock with varying levels of quality, including items in open bags. FE-10 explained that the logistics system received "pallets from the U.S." that needed to be sorted one by one. According to FE-10 it took months to "clean up" the inventory and to sort through differences in U.S. product numbers, EU product numbers, supplier product numbers, and instances where no product numbers were available at all. FE-10 explained that it was a lot of work and the decision to send the inventory was "stupid" because employees in the U.S. were aware of concerns around expiration dates, change notifications, and instances where inventory was left over from old customers that were not customers in Europe. FE-10 explained that the stock system was "not connected" to the Dutch engineering system and the inventory was "totally lost" as engineers could not check inventory levels in their system without having to use a third system (in addition to administrative system), which was a quality system. FE-10 further explained that the inventory was a "waste of money" as it was sent to a continent with different regulations and ultimately cost the Company time, money, and was useless. According to FE-10, the inventory was not needed or wanted by customers in U.S., so they knew that it would not be able to be sold in Europe and in Europe they "didn't use any of it." FE-10 recalled that the "buying value," or the price Avantor had paid initially for the inventory, was hundreds of thousands of dollars.

109. FE-10 added that Avantor decided to throw away "lots of product" that went from "production to the dustbin" costing tens of thousands of dollars per month at a minimum.

110. According to FE-10, he voiced concerns related to inventory levels during "board meetings" he attended weekly with his counterpart in the U.S. in charge of procurement, two to three "qualified persons," and two to three engineers from the U.S., among others.

111. FE-7 explained that, as a member of the Distribution Excellence Team, he was tasked with the growing inventory situation. FE-7 was personally involved in developing inventory scrapping initiatives and initiatives to determine the reasons for long lead times in the distribution process from warehouse to warehouse. FE-7 explained that a project to develop a companywide inventory scrapping initiative began in 2023 and he continued to work on it until the time of his departure. FE-7 explained that there were millions of tons of product in Europe, totaling approximately €100 million, that needed to be sold off. According to FE-7, the avenues available for getting rid of the overstocked products were either to offer promotions or scrapping. FE-7 explained that he produced reports in PowerBI to identify progress and identify products to be scrapped while a colleague in the UK worked on developing a solution to monitor the progress of products that were not selling. FE-7 stated that he was looking at the entire stock throughout Europe and trends were tracked in SAP.

112. FE-7 explained that the sell-off initiatives were not successful and even with the scrapping initiatives implemented stock still "grew and grew." FE-7 stated that there was "no buy-in" from the commercial teams and they did not seem interested in pursuing sales of the overstocked inventory, as there was no benefit to them from a compensation standpoint in selling lower priced inventory. According to FE-7, the problems continued to increase until the end of his tenure [in March 2025] because certain products had expiration dates, Avantor had a poor

webstore, and sales representatives were not incentivized to sell products at a discount. FE-7 explained that sales were focused on "core" products that included a picture and a description, but these details were not included for one-off purchases that had been made on behalf of customers. FE-7 further explained that sales representatives did not want to sell and were not incentivized to sell products that were discounted because their bonuses were determined by margin.

113. FE-7 noted that concerns about this growing overstock were raised to former European Distribution Excellence Director Dirk Asselman, who reported to former Vice President Distribution Europe Jonathan De Deken, who reported to former Executive Vice President Global Operations and Supply Chain Sheri Lewis. Asselman brought the concerns about the overstock to leadership working in the United States. FE-7 explained that this project to address the growing inventory situation was known on a "high level" within Avantor, reaching at minimum Sheri Lewis, and further that Asselman informed FE-7 that information about the growing overstock had been escalated and the initiative was "tracked by the highest levels."

114. According to FE-7, Avantor's leadership had "tunnel vision" and a short-sighted approach to the excess inventory. FE-7 said that no root cause analysis was conducted to determine why there was so much overstock.

115. FE-7 explained that products in high demand during COVID, such as masks and gloves, also contributed to the overstocked inventory. FE-7 also recalled a "huge" overstock of Merck products because of an agreement that Avantor had with Merck. According to FE-7, this inventory was moved to Italy and reached the point where the Company had to rent an external warehouse to hold it. FE-7 explained that when he assessed the data for previous months, he could see that stock was growing, and that the Company had no initiatives to solve the growing inventory problem.

(5) <u>Multiple third-party consultants hired by the company failed to meaningfully address Avantor's supply chain issues, with each firm diverting employee resources and advancing proposals that were ultimately unworkable.</u>

116. FE-1 was aware of in initial engagement conversations with Ernst & Young ("EY") beginning in October or November 2023, with EY's work beginning in approximately February 2024. According to FE-1, EY was hired to assist with Avantor's sales and inventory strategies, including how to address obsolete inventory. FE-1 explained that holding onto inventory may prove more expensive than getting rid of it, even in situations where it is ultimately sold at a later date.

117. FE-1 recalled that Lewis and the Portfolio and Sourcing Teams' recommendations regarding inventory, *see* ¶106, were the "precursor" to EY being brought in as consultants.

118. FE-1 recalled that initially these recommendations were expanded through EY and then suspended when McKinsey was brought in and took things in a different direction. According to FE-1, the McKinsey software was "very clunky" and not easily integrated in SAP. Further, according to FE-1, the McKinsey tool related to inventory management but did not easily link with sales strategy and never would have been adopted completely.

119. FE-1 explained that Avantor was missing a "cohesive" strategy to link sales and inventory management, and had been since he started at the Company. McKinsey's software did not address this missing link, and it is his understanding that it was never adopted. At the time of FE-1's departure, VP of Global Supply Chain Jared Guckenberger was pushing to apply the same principles with yet another platform, different than McKinsey's.

120. FE-4 explained that Avantor hired McKinsey in approximately August or September 2024, by no later than which time it was clear internally that the supply chain organization was not aligned. FE-4 recalled that similar data was presented to McKinsey.as was

presented to Senior Director, Chemical Manufacturing Supply Chain, Avantor Performance Materials Mark Pizov—who reported under Executive Vice President, BPS Gourdier—and other manufacturing/BPS attendees at an S&OE meeting in Spring or Summer 2025 to help convince leadership that the distribution and supply chain organization needed additional resources allocated to it. FE-4 explained that the data presented by the distribution team was trying to display the size of orders and when they were placed and the impact of the smaller orders that are occurring routinely and the cumulative value versus single large orders. He explained that nothing changed as a result of this presentation.

(6) <u>The company relied on error-prone forecasts.</u>

121. FE-3 explained that it was "always hard" to get accurate forecasts from the distribution centers as it was difficult to know what orders were coming and the expectation demand would level out was "wishful thinking," rather than a fact that was supported.

122. FE-5 explained that the Company was built on acquisitions and was trying to spin fifteen plates at once while another fifteen plates were coming at them in the form of problems that they were not prepared for. FE-5 further explained that this made it difficult to construct accurate forecasts. FE-5 explained that each company acquired by Avantor brought their own infrastructure and own systems, which were in addition to region-to-region differences throughout Avantor.

123. FE-2, who was employed by Avantor for approximately ten years until the end of 2025, most recently as Biopharma Sales and Portfolio Manager, explained that if a customer purchased disinfectants in 2023 that his team allocated the same product with a slightly increased volume for the following year and would not sell that product to a new customer at the detriment of supply being available for the existing. FE-2 recalled this instruction being set out during COVID.

124. FE-1 explained that prior to Sheri Lewis joining the Company that the supply chain function was owned by the commercial team and existed as the execution arm of the team. FE-1 continued to say that some of the practices—that were more commercially focused rather than being supply chain best practice—presenting themselves during his tenure were ingrained during the period in which the commercial team had ownership over supply chain.

125. FE-1 further explained that in the absence of a specific sales forecast from the commercial teams on future sales, Avantor's inventory forecasts were "driven" by historical data. FE-1 recalled that the process of producing forecasts at Avantor was not sophisticated and the Company did not have the ability to disaggregate different customer behaviors. For example, FE-1 explained that, if 10 to 15 customers all stopped purchasing at the same time, it was not possible for Avantor to get the necessary information from each one to determine the reasoning. FE-1 further recalled that Avantor did not have the capability to view composite data, and only various groups knew only parts of the story. FE-1 added as an example that in one sales conversation it was explained that one country had three main industries, which was helpful, but there was not the data available to know what kind of products that those industries used. FE-1 explained that both investment and improved capabilities from a data system perspective were required at Avantor.

126. FE-1 explained that lack of discussions or definitive determination regarding stock locations or duration in inventory added to the lack of sophisticated analysis available for forecasting. According to FE-1, forecasts were then more so determined by "intuition" and the overall business model at Avantor. FE-1 explained that at Avantor the sales approach was that there was no such thing as a bad sale, which does not help in making planning easier. FE-1 recalled discussing this issue with the supply chain leadership team.

127. Referring to inventory levels, FE-1 noted that the longer you make the tail, the harder it is and that Avantor had an "absolutely long tail." According to FE-1, at most 20% of Avantor's product offerings moved with regularity which created difficulty in terms of supply planning. FE-1 explained that Avantor's inventory levels were an aircraft carrier and not a cruiser and that it was very difficult to turn them around. FE-1 continued to explain that, for example, if inventory had not been sold during the previous two years, it was still very difficult to determine whether it would not be sold in the future. According to FE-1, it was harder for Avantor to "back into" customer behavior based on trends to get a better handle on planning. FE-1 explained that there was a lack of knowledge about what customers are doing "in the background," in terms of inventory usage and relationships with multiple suppliers.

128. FE-1 noted that COVID "disrupted" the baseline assumptions and made forecasting "really difficult" and more difficult to understand what certain customer groups were doing in terms of order habits. According to FE-1, the number of customers, number of order lines, and number of units can be counted and then observe changes based on whether a customer typically buys every month over the past 24 months, four times over the past year, once over the past year, etc. FE-1 explained that this became trickier during COVID as buying patterns were "all over the place," which made it "very difficult" to identify the big changes and how to respond. FE-1 noted that it is not ideal to respond based on just one month of data and it is more useful to observe several months to interpret trends.

129. FE-1 noted that some assumptions made during COVID, such as when customers would reduce their stock needs did not play out as the Company had thought. FE-1 further explained that the Company could only infer about inventory levels. According to FE-1, customers

then began destocking and sales declined as a result, adding that this behavior was difficult to predict.

130. FE-1 explained he was aware of monthly inventory reviews that had been established via a business review that began prior to his arrival and through the end of his tenure. FE-1 was aware that finance employees, leaders from finance, manufacturing, supply chain, and commercial teams were attending the meetings, including in particular former CFO Szlosek and his replacement, CFO R. Brent Jones. FE-1 explained that he was aware that, when these meetings began, the focus was on information that the Company had "direct visibility" into, such as what inventory is where and what the value of the inventory is. FE-1 further was aware that in the second year of these meetings, answers to questions that had previously been unknown—questions that related to why that inventory is there and what is its purpose—were now able to be addressed, and was aware that these conversations as becoming more "mature" over time.

### 2. The Reorganization Ignored Customer Needs And Worsened Accountability

131. Contrary to Defendants' representations that Avantor's Reorganization—shifting from geographic-oriented to product-oriented operations—was "***enhanc[ing] our focus on customers' needs in the lab and production environments, position[ing] us for accelerated long-term growth***," "***unlock[ing] significant operating efficiencies***," and "***giv[ing] us much clear[er] line of sight to and a performance accountability and certainly much more streamlined, way to run the business***," in reality, the reorganization failed to achieve those aims and materially crippled the Company's operations. The accounts of former employees below show that that Avantor's reorganization created significant operation dysfunction and misaligned the Company with how its customers, suppliers, and internal teams actually operated. These accounts accord with the later admissions by Ligner, the Company's new CEO, that the reorganization made

Avantor "overly complex with unnecessary centralization, which inhibits frontline staff from most effectively meeting our customers and supplier needs and expectations." Indeed, only two years after the corporate reorganization launch, Avantor eliminated the new LSS and BPS, and Avantor undertook yet another reorganization—the latest in a carousel of reporting changes.

**a. Defendants' Change From Regional To Global Operations Caused Internal And Customer Frustration**

132. Following the reorganization, the Company's supply chain globally supported both LSS and BPS, generating inefficiencies given the markedly different fulfillment requirements of each segment. FE-6, who was employed by Avantor for over 15 years until May 2024, most recently as a Global Supply Chain Leader, explained that prior to the reorganization announced in 2023 that he was responsible for distribution in Europe and had counterparts in North America and Asia. FE-6 further explained that in this role he was a part of the Global Supply Chain Team under the direction of Lewis and he did engage with colleagues from the sales team. According to FE-6, following the reorganization, the European, North American, and Asian distribution leads were consolidated into a single global position and his role was eliminated.

133. According to FE-6, following the reorganization into two business units, Laboratory Solutions ("LSS") and Bioscience Production ("BPS"), the Company used one supply chain to support both segments. It was FE-6's perspective that the Company needed separate supply chains and distribution teams for each segment. FE-6 explained that LSS required more flexibility. FE-6 further explained that LSS served smaller customers that mostly need small quantities quickly. FE-6 explained that BPS mostly served customers in production, which ordered weeks or months ahead in large quantities with exact delivery dates and quality specifications that needed to be met. FE-6 stated that he raised his concerns about the need for LSS to have greater flexibility to Sheri Lewis and other leaders at every relevant opportunity. FE-6 recalled discussions

with Lewis taking place in quarterly meetings and then follow-up meetings with employees, including from IT, that were more involved in day-to-day operations.

134. FE-6 recalled that Lewis "tried to help," and had organizational meetings with former Executive Vice President and Chief Information Officer Michael Wondrasch where FE-6's complaints that LSS needed more flexibility were raised. FE-6 described this inflexibility as LSS being prevented from taking any actions unless carried out on Avantor's systems. FE-6 explained that there was a need for a flexible system because without that, there could not be a flexible process as it related to the supply chain and distribution activities for LSS.

135. FE-13, who was employed by Avantor from March 2022 until May 2025 as the Head of Events, Europe, stated that Avantor's reorganization announced in December 2023 suffered significant operational difficulties from the very start because, among other things, it imposed a fundamentally United States-centric approach onto a geographical and regional business that had been built by inorganic growth. FE-13 explained that the transformation meant that that management would be much more U.S. centric. However, according to FE-13, the U.S. approach did not translate to Europe where there are multiple languages, currencies, and regional differences. FE-13 explained that by contrast, in the U.S. there are no questions as to which languages the company should market in or other country-level differences to take into consideration. FE-13 explained that there was a "desire" to do everything in English. According to FE-13, the perspective of leadership was "we know how to do this" and to "copy and paste" the approach that had been applied in the U.S.

136. FE-5 explained that there was no consistency with the ordering process across countries, as each region had its own ordering systems and further those ordering systems in Europe differed from those of their counterparts in the US. FE-5 explained that, as a result, the

various systems did not “talk” with each other, and the Company attempted to use PowerBI as a “catch all” to mitigate this problem—but, FE-5 stated, using PowerBI for this purpose was like “digging a canal with a serving spoon.” As an example, FE-5 explained that, when one of FE-5’s largest accounts, a large multinational medical tech company, asked for information on purchases, FE-5 had to pull data from all the different Avantor systems, as this account consisted of a global entity as well as hundreds of local entities that were spread across all systems at Avantor.

137. FE-1 recalled that the global operations model, with a regional focus, had become “muscle memory” but now the LSS and BPS approaches were changing the Company’s approach to customers. FE-1 explained that Avantor made assumptions that their customers operated as Avantor intended to, on a global level, rather than regionally. FE-1 further explained that while companies such as Pfizer and Roche are global entities, they are set up to operate regionally and Avantor’s change in approach created issues. FE-1 noted that additionally, not all customers saw themselves as an Avantor did, and did not fall into the business unit categories that the Company had constructed.

138. FE-1 explained that based on conversations with supply chain leadership, it did not appear that many conversations with relevant internal personnel within supply chain organization had occurred beforehand regarding the reorganization. FE-1 stated that the changes from the reorganization came as a surprise, and that his surprise further increased with the departures of Lewis in April 2024 and Vanderhaegen in June 2024.

139. FE-4 explained that the internal communications issues between the supply chain/distribution and manufacturing organizations were “huge,” and, according to FE-4, the reorganization made the disconnect between distribution and manufacturing a bigger issue— when manufacturing planning and distribution planning were separated and had separate managers,

customers, and goals, and one joint function became two organizations that did not work together for supply chain purposes. FE-4 explained that following the December 2023 reorganization, manufacturing [BPS] and distribution [within Avantor's LSS segment] had separate projects and separate goals. For example, FE-4 recalled that there were distinct iterations of both S&OP ("Sales and Operations Planning") and S&OE ("Sales and Operations Execution") meetings for the distribution and manufacturing organizations and that those meetings were not collaborative between the two groups. FE-4 noted that these meetings occurred siloed and separately even though there was one supply chain that served both distribution and manufacturing after the reorganization. FE-4 also recalled that while most big customers had a dedicated Avantor CSR (customer service representative) to assist with reservations and allocations, there was no personnel at the Company specifically dedicated to allocation for internal groups, which led to "infighting" within the supply chain organization.

140. FE-4 recalled that the internal communications issues between the supply chain/distribution and manufacturing organizations—as well as the lack of personnel at the Company specifically dedicated to allocation—"came to a head" in Summer 2024 as the manufacturing organization was not communicating effectively or supporting S&OE efforts. FE-4 further recalled that concerns were escalated to the Customer Service organization, as well as to Jared Guckenberger, and, ultimately, assigning internal CSRs for distribution, or dedicating personnel specifically to allocation, was deemed "not necessary." According to FE-4, Guckenberger was aware of the disconnect between organizations and was really "working on it [resolving the issues]." FE-4 further recalled there was a meeting between distribution and manufacturing in an attempt to work through issues.

141. FE-4 added that following the reorganization current Senior Director, Chemical Manufacturing Supply Chain, Avantor Performance Materials Mark Pizov's reporting line changed and began reporting under current Executive Vice President, Bioscience Production Benoit Gourdier, whereas prior to the organization he had reported to Senior Vice President Global Supply Chain Janie Parker. FE-4 explained that data was presented to Pizov and other manufacturing/BPS attendees at an S&OE meeting in Spring or Summer 2025 to help convince leadership that the distribution and supply chain organization needed additional resources allocated to it. FE-4 recalled that there was "favoritism" towards the manufacturing business. FE-4 recalled presenting data detailing cumulative order volume being achieved by distribution. FE-4 further explained that while BPS, or manufacturing, had higher margin one-time orders, distribution had routine replenishment orders that cumulatively were worth much more than when looking at those orders in isolation. FE-4 explained that the data presented by the distribution team was trying to display the size of orders and when they were placed and the impact of the smaller orders that are occurring routinely and the cumulative value versus single large orders. As a high-level example, FE-4 explained, if one order in distribution is worth $10 while another is $1,000 in manufacturing, that is one thing, but if you add them up, given the recurring replenishment of distribution orders, the need for distribution is bigger. FE-4 explained this data was presented to Pizov and the customer service organization to change the manner in which resources were allocated and to allocate additional resources to the distribution team. FE-4 recalled that similar data was also presented to McKinsey. He explained that nothing changed as a result of this presentation.

142. FE-1 also explained how the reorganization did not make sense from a supply chain perspective as without regional distinctions it created issues at central distribution facilities, including with assigning a sales event to an item of inventory instead of looking at it from the

perspective of a storage location. FE-1 explained that relationships with carriers were also based on geographic areas and there was no global carrier that was used. FE-1 further explained that it became difficult to identify the location of shipments based on the BPS and LSS distinctions. FE-1 also described that the LSS and BPS approaches were changing the Company's approach to customers. For example, pre-reorganization, a customer had a key contact person at Avantor that handled all needs from that customer, but post-reorganization that contact person had been assigned to BPS and the customer was now to use Avantor's webstore for LSS purchases.

#### b. Defendants Caused Confusion And Inefficiencies By Improperly Implementing The Reorganization

(1) The Reorganization inhibited accountability and created confusion with unclear divisions between the segments.

143. Discussing the re-organization of the Company into two operating units that was announced in December 2023, FE-2 recalled that he heard from senior leadership in Europe that the reorganization was done to provide clarity to investors as to where their money was being used. However, FE-2 stated that the reorganization caused confusion amongst internal staff, and FE-2 further stated the Company deployed a "lot of smoke and mirrors" both externally and internally related to the reorganization, which FE-2 noted impacted both investors and employees. FE-2 stated that there was "no real plan" or structure in the approach to LSS and goals changed from quarter to quarter. Regarding changes in quarterly goals, FE-2 explained that his team was provided with fifteen different focus areas and bonus opportunities were withdrawn after having been previously offered. FE-2 explained that these decisions came from senior leadership and were reported downward to his position.

144. FE-2 recalled suppliers expressing concerns and nervousness about Avantor's direction following the reorganization and implementation of the cost-saving initiative that were announced in December 2023. FE-2 explained that, following the reorganization, his portfolio was

not being "driven as fluidly" and manufacturers, including "Tier 1" suppliers, had concerns about who was pushing their products to customers and around rumors that Avantor may be sold. FE-2 added that, as a result, suppliers questioned why they should deal with Avantor when other distributors were available. FE-2 also explained that high turnover customers received the majority of Avantor's focus while other customers were neglected and considered options elsewhere. FE-2 explained that while the portfolio of products he was responsible for was "critical" to customers, there was still a "major effect" and relationships "dwindled" following the restructuring. FE-2 recalled manufacturing customers asking him, "what is going on at Avantor?" and expressing to him that they were becoming nervous. FE-2 recalled having to provide customers with the same "smoke and mirror" explanations about how the restructuring will be good just as management had been saying to him. FE-2 recalled, however, that truthfully, he did not know what was going to happen to the Company.

145. FE-1 explained that his understanding of the intended goal of the Avantor reorganization announced in December 2023, which reorganized Avantor into two operating units, LSS and BPS, was to provide business leaders with clear responsibility over products, prices, and customers and then be able to grow the groups they were responsible for. FE-1 explained that, with respect to those intended goals, the reorganization became more difficult for those down the ladder, mid and lower-level managers. FE-1 explained, for example, that for these employees there were months in which they were unsure of their "piece of the puzzle" and did not know what was "in their bag," in terms of products they were responsible for. FE-1 noted that the reorganization made certain discussions less efficient because discussions could previously be discussed in relation to a geographical location, such as inventory levels in a local warehouse. However, after the reorganization, discussion needed instead to be in relation to LSS or BPS, even when not as

efficient to do so. FE-1 explained that the data handling steps remained the same in the sense of getting the data, but it was more time consuming to translate and understand what was happening "in the background."

146. According to FE-1, the global perspective still needed to be distilled down to Europe and the Americas to adequately discuss figures pertaining to LSS and BPS. FE-1 noted that certain units remained separate from LSS and BPS, including NuSil.

147. FE-11, who was employed by Avantor as a Director of Sales from June 2022 until April 2025, stated that there was no clear indication of where his group was assigned following the reorganization into Laboratory Solutions ("LSS") and ("BPS") that was announced in December 2023, with discussions that changed multiple times. FE-11 explained that there were continuous talks regarding where his group would land, whether in LSS or BPS. According to FE-11, because there was no clear direction as to where his group fit after the reorganization, his role and approach just continued as it had prior to the reorganization. FE-11 further noted that former colleagues have informed him that to date, they continue to be unsure of where their group falls, whether in LSS or BPS.

148. FE-11 further explained that the lack of clarity on where items are assigned, in terms of portfolio or business unit, created uncertainty for employees about whether the products they are selling are ultimately helping them individually in terms of bonuses and compensation. FE-11 stated that, with no apparatus for where things went, employees were tasked with having to "manage the unmanageable" and most employees seemed to just "throw their hands up."

149. FE-12, who was employed by Avantor from before the Class Period until 2025, most recently as Director in the Americas, recalled that LSS and BPS were introduced as the two reporting segments in early 2024 but the changes in reporting at a management level were not

implemented until approximately January or February 2025. FE-12 added that he was under Laboratory Solutions and noted that the communication around the BPS and manufacturing organization was "difficult to decipher."

150. Additionally, according to FE-5, Avantor wanted to be a company with a global approach but was "so local" that it did not have the infrastructure to join up information across the organization. According to FE-5, despite the reorganization into LSS and BPS, the reporting structures were still siloed. FE-5 further explained that business units did not want to work together.

151. FE-13 stated that there was uncertainty as to where certain portfolios fit within the two newly established business units and recalled that some portfolios were left out of LSS and BPS. FE-13 explained that this problem was apparent when attempting to get portfolios on board for conventions corresponding with either with BPS or LSS. FE-13 recalled asking relevant leaders for guidance on whether certain portfolios were under BPS and being told "no," while subsequently being told that the portfolio was not under LSS either. FE-13 recalled, for example, this being an issue with the clean room portfolio and the business unit responsible for clean rooms remained unclear through the time of his departure. FE-13 explained that with clean room, there was "real confusion on where it fit," and up until he left, he still had no definitive answer whether clean room was BPS or LSS. FE-13 noted that there was a "lot of uncertainty" regarding business unit designations and that at Avantor there was "not a lot of people with a backbone" who were willing to make definitive decisions. According to FE-13, as a result of this lack of clarity, Avantor lost out on the opportunity to be present at multiple trade shows. FE-13 recalled that the reorganization was not yet completed in Europe at the time of his departure in May 2025.

(2) The Reorganization obscured performance reporting.

152. FE-1 explained that following the reorganization into LSS and BPS that there were no digital "tags" available and no tagging process in place to mark sales as belonging to one of the new verticals. FE-1 explained that every product has a SKU that is a fixed identifier, but those SKUs are then associated with and arranged into "families" in the "master data." FE-1 further explained that this tag is used for reporting purposes, to identify where revenue and costs are to be assigned and the reorganization "disrupted" this process. According to FE-1, tags were previously based on geographic regions, but where a product was or came from was less relevant with respect to reporting the reporting of sales following the reorganization. FE-1 continued to explain that product "mapping" and tagging had to be completed now for assignment into LSS and BPS, which did not previously exist.

153. FE-1 described the reorganization as a "very significant change" and explained that LSS and BPS did not appear to be aligned. According to FE-1, the reorganization and tagging process created more difficulties when it came to reporting on sales, costs, and determining compensation for sales staff. FE-1 noted that these processes were more involved than just moving product onto or off the shelf.

154. FE-1 explained that some sales were easy to place into LSS or BPS, but many overlapped into LSS and BPS. FE-1 continued to say that, for example, there were customers that were BPS customers who also bought LSS lab consumables.

155. FE-1 described further complications that existed, such as "a lot of haggling" between LSS and BPS to get higher margin and attractive items into a business unit while trying to limit low margin and unattractive items. FE-1 added that it was also difficult to assign some units into either LSS or BPS that did not fit directly or immediately. According to FE-1, the process of making those determinations takes time, during which there is a chunk of revenue and costs that

it is not clear which unit they should be assigned to. FE-1 continued to say that the division of the business units was ultimately arbitrary, all of which created "confusion" and "uncertainty."

156. FE-1 further explained that some transactions had portions that were ultimately unclear which bucket they belonged to and likened it to cutting a cake and the crumbs leftover cannot be put back into the piece. FE-1 continued to explain that if those crumbs represent a fraction of a percent and are immaterial it is one thing, but if those crumbs add up to a greater percentage per month and that occurs month after month then it could be greater problem. FE-1 recalled that this process of mapping and tagging took a long time and multiple passes. According to FE-1, he would not be surprised if the process of tagging and allocating products into their respective business units was still ongoing.

157. FE-1 explained that the reorganization could make it more difficult to interpret reports and examine the profit of a particular product group or customer group. FE-1 further explained that during this time decisions may be made on a group of, for example, 1,000 items but following further tagging or reassigning that product group may have, for example, 1,200 items or 750 items because the LSS and BPS distinctions were "moved around."

158. According to FE-1, the process of comparing expected versus actual results did not become more difficult but rather more time consuming and inefficient and created more questions to "validate people's understanding." FE-1 added that "some organizational learning" was required following the reorganization and that it created "extra levels" of questions and the process of learning and trying to understand the data, which was time consuming.

159. FE-1 recalled that Avantor's reporting applied decoders that attempted to impose the still-evolving LSS and BPS reporting units onto data. From his perspective, the process of filtering results took place over approximately three to six months following the reorganization

with gradual progress. FE-1 further recalled being told that the Company was going to start operating under the new structures and that there was a need to begin thinking about reporting in a different way. FE-1 explained that the reports needed to be taken and reformatted with the new "decoder key" and then see what the results were. FE-1 explained that traditional monthly reporting was conducted followed by a group conducting "gap analysis." According to FE-1 the process of reviewing data on a regional level never completely stopped.

160. FE-1 explained further that, in connection with this project, Avantor's previous and current monthly reports were not comparable for at least five or six months following the reorganization, because Avantor's internal mechanisms for financial reporting remained the same during that time as the systems had been pre-reorganization, *i.e.*, not based around the new BPS and LSS reporting units. As a result, reviews and discussions at the regular inventory meetings took place during that time about how the numbers would look using filters and decoders that attempted to impose the still-evolving reporting units onto the data.

161. FE-1 recalled that when he was preparing to depart the Company, the reorganization into LSS and BPS was looking at how to standardize data and reporting more between groups. FE-1 further recalled that the Company had also reached this stage under the previous structure with common formats across groups in order to present data in a more comprehensive format and to promote standard reporting. FE-1 explained that while this was underway at the time of his departure there was still carryover from the previous reporting structure in terms of inventory and the Company was not yet fully looking at inventory from a LSS/BPS perspective. FE-1 noted that this transition was particularly complicated for revenue, margin, and inventory value.

162. FE-1 was aware that both former CFO Tom Szlosek as well as his successor, current CFO R. Brent Jones, attended or at least called into monthly inventory review meetings in which reorganization efforts were discussed. FE-1 was aware that Jones called into these meetings while the reorganization processes were underway, including discussions around progress towards being able to report performance in terms of LSS and BPS. Further, according to FE-1, he was aware there was a project being carried out following the reorganization to reflect financial reporting under LSS and BPS that was discussed during these meetings that was the responsibility of the finance department and took at least 12 months to complete. FE-1 was also aware that Jones was present for discussions on how close the Company was to being able to discuss reporting in terms of LSS and BPS and the problems that accompanied the mapping efforts.

163. FE-2 also explained that the products in his portfolio extended to both LSS and BPS and the delineation was not clear and caused a lot of confusion. FE-2 explained that, prior to the reorganization, reporting had been "extremely divided" by geographic location. For example, as to his portfolio, revenue was reported into the European segment, which consisted of Northern, Eastern, and Western Europe, each led by an EVP. After the reorganization, however, FE-2 explained that his portfolio "straddled" both LSS and BPS, and he was unaware how his sales figures were ultimately reported. For example, FE-2 stated that one portion of his portfolio (related to the Clean Room) had one reporting line, while the remainder of his portfolio had another; he noted that he did not know which revenues from his portfolio were reported into where, whether into the LSS segment or BPS segment.

**c. The Reorganization Created A Leadership Vacuum**

164. The reorganization and cost-savings initiative also led to significant turnover and left a leadership vacuum that caused turmoil for employees and customers, much of which continued to be unaddressed throughout the Class Period.

165. For example, Sheri Lewis, Executive Vice President Global Operations and Supply Chain, left Avantor in April 2024 as a part of the reorganization. According to FE-4, following Lewis' departure, "nobody replaced her [Lewis]" and there was not a "one-to-one" replacement brought in. Lewis's departure and lack of replacement had a domino effect throughout the rest of the supply chain organization. FE-4 explained that prior to the reorganization being announced in December 2023, Senior Vice President Global Supply Chain Janie Parker reported to Lewis. FE-4 recalled that current Guckenberger replaced Parker following her departure post-reorganization and eventually reported to current Senior Vice President, Global Supply Chain & Distribution Operations Patricio Espinosa once he assumed responsibility for both distribution and planning following the departure of former Senior Vice President, Global Supply Chain Operations Brian Magerkurth, who previously had been responsible for distribution. FE-4 noted that Guckenberger did not have a boss "for the longest time."

166. FE-7 further explained that once the VP of Logistics role moved to the US in connection with the reorganization announced in December 2023, the new leadership had "no clue" about business in Europe. According to FE-7, there was no communication with reporting lines in the US following the reorganization and there was "no leadership anywhere."

167. FE-6 stated that the leadership changes in the Company's supply chain organization in the five years prior to the end of his tenure was a major issue, as the lack of continuity and frequent turnover contributed to project abandonment in all functions of the Company. FE-6 stated that these issues worsened following the announcement of the reorganization and cost-cutting initiative in December 2023. For example, FE-6 explained that former Senior VP, Global Planning Anne Helmstetter (03/20 – 03/22) was responsible for planning and began implementing initiatives but left prior to them being implemented and those projects ended. FE-6 described a similar trend

with Helmstetter's replacement, Parker (04/22 – 04/24), who also started, and made progress on, initiatives, until the Company eliminated Parker's role following the reorganization. As another example, FE-6 explained former Senior Vice President and Chief Digital Officer Sukshma Rajagopalan (03/20 – 06/2023) had begun a "big initiative" with PowerBI but did not "get it going" or set up properly before leaving and results were not realized.

168. FE-13 also recalled that several "very key" sales personnel departed the Company on their own or were let go as a result of disagreeing with the Company's direction in connection with the reorganization. FE-13 explained that it was his understanding that these departures likely led to taking accounts to competitors, such as Thermo Fisher. FE-13 explained that he was aware of one employee leaving Avantor for Thermo Fisher and additional employees leaving for other competitors.

169. Avantor's leadership vacuum was no more glaring than with respect to LSS: after Randy Stone lasted ***only six months*** in his role at the helm of LSS, the Company's announced replacement, Corey Walker, did not assume his position until March or April 2025, leaving LSS ***without a leader for more than nine months***—a critical time in seeing through the implementation and operation of one of the Company's new business units. According to multiple FEs, this leadership vacuum led to confusion and inefficiencies within LSS.

170. On December 7, 2023, the Company announced that Stone would serve as Executive Vice President of LSS. The next day, during Avantor's Investor Day 2023 Presentation launching the reorganization, Stone spoke extensively about the Company's plans for LSS, expressing to investors that he was "so excited to get the business started, I'm so excited to be a part of it, and I know we've got a great opportunity in front of us and ***I can't wait to update the investment community further next year***."

171. In fact, Stone did not get the opportunity to update the investment community further the following year. On June 21, 2024, Avantor announced that "Corey Walker has rejoined the company as President of Avantor's Laboratory Solutions business" and would "succeed[] Randy Stone." The press release also noted that Walker most recently "was Chief Executive Officer of ILC Dover [a subsidiary of Ingersoll Rand], a global supplier to the biopharma and medical device end markets." Walker also had previous experience at Avantor, and the press release further announced that, "[f]rom 2016 to 2020, he was an Executive Vice President at Avantor and led the Americas region as well as the global Biomaterials and Electronic Materials businesses."

172. Despite being announced as Stone's successor concurrently with Stone's departure, Walker did not begin at Avantor until March or April 2025 after being ***enjoined from serving at Avantor for a year***. In 2020, Walker left Avantor to go to ILC Dover, where he served as CEO. On March 23, 2024, Walker executed an employment agreement with Ingersoll Rand—a competitor of Avantor—in connection with Ingersoll Rand's acquisition of ILC Dover. Walker's execution of this employment agreement was a condition to the signing of the merger agreement between ILC Dover and Ingersoll Rand and a requirement of closing the acquisition. On June 3, 2024, Ingersoll Rand's acquisition of ILC Dover closed, and Walker's employment agreement took effect. He was now Ingersoll Rand's Senior Vice President and General Manager for Precision & Science Technologies Life Sciences.

173. Walker's employment agreement contained a non-competition provision expressly stating, for a period of 12 months, that Walker was "prohibit[ed] . . . from working in a Prohibited Capacity for ***Avantor*** or any of its parents, subsidiaries, or affiliated companies." [13]

174. On June 19, 2024, Walker signed an employment agreement with Avantor to head LSS. On June 20, 2024, less than three weeks after his employment agreement with Ingersoll Rand took effect, Walker resigned from Ingersoll Rand to join Avantor and was announced as Executive Vice President of LSS on June 21, 2024. Three days later, on June 24, 2024, Ingersoll Rand sued Walker and Avantor in Colorado State Court for breach of Walker's non-competition agreement.[14] On September 5, 2024, the Court issued a preliminary injunction enjoining Walker from serving at Avantor until June 20, 2025. [15] Avantor did not publicly announce or discuss the fact that there was no LSS head between Stone's departure in June 2024 until, at earliest, Walker's return to the Company in March or April 2025.

175. According to multiple FEs, LSS had no leader between the departure of Stone in June 2024 and Walker's start at Avantor in March or April 2025. FE-2 stated that it was understood internally that anyone attempting to stand up to Stubblefield was "gone soon thereafter." As an example, FE-2 recalled learning that former Executive Vice President, Laboratory Solutions Randy Stone did not like the approach Avantor was taking with LSS after the reorganization, and that it was FE-2's understanding that, in turn, Stone "was asked to stand on a cliff" and was given

---

[13] "Prohibited Capacity" was defined as: "a capacity: (i) involving duties or responsibilities substantially similar to those of Employee's position with the Company at any time during the last twelve (12) months of Employee's employment with the Company; (ii) involving management, sales, or marketing; or (iii) reasonably likely to involve the use or disclosure of Confidential Information." Emphasis added in quoted text in the body.

[14] *Ingersoll-Rand et al. v. Walker et al.*, 2024-cv-31985, Dkt. No. 27.

[15] *See* Findings of Fact and Conclusions of Law and Order, *Ingersoll-Rand et al. v. Walker et al.*, 2024-cv-31985, Dkt. No. 320, ¶¶7-12, 15-18, 38-39, available at https://bit.ly/4vDN8T4.

two choices, "jump or be pushed," and ultimately departed the Company. According to FE-2, there was no interim lead of LSS in the period between Stone's departure in mid-2024 and the official start date for Corey Walker.

176. FE-13 recalled that for about a year, "nobody was there" (in the role formerly held by Randy Stone). FE-13 added that during this period there was "no guidance" and "no support" and employees were "running left and right" to just show that they were doing something.

177. FE-1 added that Stone appeared to have ideas of what he wanted to do, what direction he wanted the organization to move in, etc. and his successor came in with different views and ideas. FE-1 explained that he worked on two projects sponsored by Stone including one discussing holding customers more accountable to the contracts they had signed with Avantor and another looking at reducing the time to set up contracts and short-form contracts. FE-1 further recalled that Stone wanted to prioritize certain products and customers that the Company had experience with and knew were reliable to be able to complete sales faster. FE-1 added that Stone was looking to hold customers more accountable to the forecasts they provided to Avantor and the commitments they had made. FE-1 noted that this was met with pushback from the commercial teams who advocated for an extension of credit terms to customers and argued that if they were unable to purchase from Avantor that they would just go elsewhere.

178. According to FE-1, Stone appeared to be attempting to change the sales structure and the direction of the organization. FE-1 explained that the model was that there was no such thing as a bad sale whereas Stone advocated for greater scrutiny and exploring the possibility of passing on sales if they did not suit the best interest of Avantor, such as channel sales. FE-1 further explained that this change was going to require a lot of focus and attention. FE-1 added that a challenge in this approach was the fact that the sales organization had never been asked to make

these kinds of qualified judgments before. According to FE-1, Stone departed the Company prior to the implementation of his ideas and "whatever grip we had on the principle of sales accountability went away."

179. According to FE-1, Stone then departed and Corey Walker had not yet started. FE-1 explained that during that period, meetings concerning customer data continued but it became increasingly unclear on where data was going and there was not a lot of feedback provided during that time. FE-1 added that initially the plan was that Corey Walker would provide some guidance but then following issues with his non-compete, he was not involved at all. FE-1 noted that Corey Walker's tenure had not yet begun at the time of his departure in April 2025.

180. The foregoing accounts of leadership upheaval are further corroborated by the findings of investment firm Engine Capital LP ("Engine Capital"), based on its own investigation.[16] Former employees interviewed by Engine Capital "were also very critical of Avantor's geographically distributed leadership structure," questioning "how a company can be effectively run with the CEO working from Allentown, PA, senior leaders working from Boston, Washington D.C. or Radnor, PA, and legal being run out of the New York metro area." Engine Capital further criticized the Company's "botched succession planning" with respect to the hiring of Corey Walker to lead LSS, observing that "the Board and CEO's decisions left the business without a permanent leader, delaying the turnaround and exposing the Company to unnecessary operational risks for an extended period during a crucial time." The Engine Capital letter further discussed its finding that "internal 'turf wars' … further exacerbated the dysfunction," consistent

[16] Notably, Engine Capital's letter is informed by former Avantor employees and industry participants, stating "[t]o better understand Avantor's subpar performance, ***we spoke with more than 20 former senior employees and industry participants*** … these discussions made clear that many of the Company's issues are the result of poor decision-making and execution."

with and corroborating the accounts of former employees alleged above. *See* ¶¶139-140, 143, 150, 155.

#### d. The Reorganization Harmed The Company's Performance And Relationships By Effectively Leaving It Without A Viable E-Commerce Storefront

181. Defendants redesigned the Company's e-commerce platform and storefront in connection with the reorganization. While Defendants repeatedly boasted to investors that the redesign was a success, and they had, *inter alia*, built a "***leading digital platform***," made "***a lot of investments in our digital platform to position our business for sustained long-term growth***," "***made purposeful strategic investments in . . . digital capabilities***" and "***continue to make the right investments in this business [including by launching] a new e-commerce platform that will further enhance the experience with our customers***," Defendants eventually were forced to acknowledge frantic needs to "accelerate[] digital enhancements to our platform . . . to further streamline the customer experience" and that "e-commerce is one of [the barriers]" to retaining and gaining customers. By the end of the Class Period, these failures forced new leadership to make even more investments in the Company's e-commerce platform and recruit a new C-suite executive in efforts to salvage this key component.

182. FE-2 recalled problems with Avantor's technology and noted that a new website had been created at the same time as the restructuring and had cost "millions of dollars." FE-2 explained that the website did not function correctly and he was receiving customer complaints saying that it was worse than it had been before. FE-2 added that the CRM system used by Avantor was a "basic off the shelf" solution and was "very clunky."

183. FE-2 stated that the website redesign had been led by former Executive Vice President and Chief Information Officer Michael Wondrasch. FE-2 explained that issues with the website were a regular talking point in weekly meetings with his team. FE-2 specifically recalled

attending meetings as late as mid-2025 in which customers voiced complaints about the website, and FE-2 was informed that the website was now worse than it had been before. FE-2 stated that he has learned that Ligner acknowledged issues with the website during the European Sales Conference held in Barcelona in February 2026.

184. Regarding Avantor's website, FE-12 noted that the website "needed a lot of work." FE-12 recalled multiple discussions about the list prices shown on the website that exceeded the prices that customers could actually purchase those products from Avantor for. FE-12 explained when there was a feeling prices on the website were too high it was concerning because those views would be those of prospective customers, rather than existing customers who would be aware of actual available pricing. FE-12 also recalled functionality problems, such as customers logging in and not being shown correct prices based on their contracts and incorrect search results being returned. FE-12 further recalled that concerns were raised and "resolutions took longer than anyone would've liked," noting that the website problems were "a real headache."

185. FE-8, who was employed by Avantor as a Sales Representative from April 2020 until April 2025, recalled that Avantor rolled out its redesigned website during the Annual Sales Meeting that occurred in approximately January 2024, in tandem with the Company's reorganization. FE-8 explained that the website had many issues that caused customer confusion and threatened customer retention. FE-8 recalled that Canada was a "test site" or "guinea pig" for the new Avantor website, given it was a smaller market, and it allowed Avantor the opportunity to see what worked and what did not. FE-8 explained that customers had been familiar with the previous version of the website and the new version was a "complete redesign." According to FE-8, the new version of the website "tried to be more than it needed to be" and was "busy," while customers wanted a website that was "basic" and which would provide a straightforward way to

get their products. FE-8 added that the new version of the website included more options, tools, and drop-downs.

186. For example, FE-8 recalled that the website had pricing issues, which made customers "uncomfortable" with the new website; one of the reasons for this was that the website had a problem with pulling in accurate pricing for Avantor's products, causing customer confusion and threatening customer retention. According to FE-8, customers were provided with a login that was then supposed to display pricing that reflected their agreements; however, there was an issue correctly pulling this data. Additionally, FE-8 explained that a "huge issue" was that on the Canadian version of the website, the list prices for products frequently listed multiple times higher than what the Company could (and did) actually sell them for. FE-8 explained that, for example, a box of gloves would be listed at a price that was 500% higher than what customers would actually purchase them for based on actual sales figures. FE-8 further explained that from a customer's perspective, it became hard to trust any numbers that they were seeing on the website. According to FE-8, Avantor had the ability to lower the price in conversations with customers, but that this created "distrust." FE-8 recalled that he is sure that he lost sales because of pricing information contained on the Canadian version of the website in instances where, for example, a $50,000 machine was listed on the website for $300,000.

187. According to FE-8, his perspective on the high list prices was that they were intended to make the Company look more profitable, but in reality, the high prices scared customers away from making purchases and damaged the prospect of maintaining long-term relationships with customers who did make purchases. FE-8 recalled that he was not provided with an explanation that "made sense" and that attempts were made to explain the reason for the price disparity but it "never made sense." According to FE-8, it was his perspective that the only "real

reason" for the decision is that customers without accounts will make purchases and if Avantor "gets caught" they will lower prices and if not, they will "take the margin and run." Indeed, FE-8 explained that if a customer called to complain that Avantor did work with them to provide a lower price. FE-8 recalled spending less time on sales and more time "putting out fires" and doing "a lot" of computer, or administrative, work, including re-billing.

188. FE-8 recalled the high list prices prompting customers to look elsewhere for more competitive prices. FE-8 recalled having to handle daily calls from customers complaining about prices once they became aware that the listed high prices were not competitive. According to FE-8, employees raised concerns regarding the website pricing, but large sales were celebrated and encouraged during team meetings and yearly performance reviews. FE-8 added that the approach to website pricing was short-sighted.

189. FE-8 added that the website was still a problem at the time of his departure [in April 2025].

190. The former employee accounts regarding Avantor's deficient e-commerce platform are further corroborated by Engine Capital, which reported that "[f]ormer employees have also raised concerns that Avantor's ecommerce platform lags peers." Engine Capital emphasized that "[a]s digital channels become increasingly important to customer engagement and sales, bringing the platform up to best-in-class standards should be a strategic priority."

### 3. Defendants Engaged In Reckless And Ineffective Cost-Cutting That Backfired and Negatively Impacted Operational Efficiency

191. Although Defendants repeatedly touted during the Class Period that they would, *inter alia*, make "***purposeful strategic investments in manufacturing capacity [and] supply chain innovation***" and "***invest aggressively [] in the physical infrastructure***," while also representing that the cost-cutting initiative "***has been done really clean, hasn't led to any disruption***" and had

been undertaken in a "***prudent***" manner, the accounts of former employees indicate that—as later acknowledged by the Company—the cost-cutting imposed by Defendants, in the form of, among other things, severe underinvestment and mass layoffs, crippled the Company's already-strained supply chain and distribution, halted years of nascent efforts to address supply chain issues, and caused new problems.

192. FE-6, who was employed by Avantor for over 15 years and most recently was a Global Supply Chain Leader, explained that the Company did not have a "serious plan" for achieving the cost-savings initiative aside from layoffs or holding off on infrastructure improvements or upgrades. He added that this lack of plan by the Company to achieve the cost-savings initiative beyond layoffs and delayed infrastructure continued through the end of his tenure.

**a. The Company's Reorganization And Cost-Savings Initiative Resulted In The Cancellation Of Critical And Necessary Investments**

193. FE-6 recalled that Avantor's supply chain organization prepared several proposals for investment in distribution infrastructure, including transport initiatives and a plan to reduce the number of local sites. FE-6 personally led investment pitches to advocate for improvements at Avantor's supply chain and distribution facilities. These pitches included meetings in Microsoft Teams with former CEO Defendant Stubblefield, former CFO Tom Szlosek, and former Executive Vice President and Chief Information Officer Michael Wondrasch.

194. FE-6 stated that, in his experience, Stubblefield, Szlosek, and Wondrasch had typically been open to these and other proposals for investment in distribution infrastructure prior to the December 2023 announcement of the Company's reorganization into Laboratory Solutions and Bioscience Production business units and the cost-savings initiative. After that announcement,

however, investment in distribution “abruptly” ended. FE-6 noted that at the time of the cost-savings initiative, Szlosek had departed and was replaced by outgoing CFO R. Brent Jones.

195. FE-6 recalled that one such investment was a “major project” for the renovation of Avantor’s site in Leuven, Belgium. FE-6 explained that the inside of the warehouse had not been upgraded in approximately 25 years, including from a technology perspective, and FE-6 noted that it was his perspective that these upgrades at Leuven were critical. According to FE-6, Stubblefield personally acknowledged that this Leuven facility was facing challenges. FE-6 further stated that Stubblefield had spoken positively about the project in Belgium and personally acknowledged that facilities in Leuven were severely lacking. FE-6 explained that discussions had been ongoing for approximately eight months. FE-6 added that the project was moving in a “good direction,” and he had been expecting it to be approved.

196. FE-6 added that, for example, the facility had cranes that were over thirty years old and relied on parts that were no longer available in the event that parts needed replacing. FE-6 explained that his pitch for the Leuven facility had been well received; however, the Leuven project was one of multiple projects that was not completed due to lack of investment following the December 2023 announcement of the cost-savings initiative.

197. FE-6 recalled that he tried to make the project work within the new framework of the cost cutting initiative, but it was not approved. FE-6 further explained that cost-savings from the upgrades at Leuven would have been realized in two-and-a-half to three years, but in stopping the project, the Company instead took a shorter-term approach and prioritized more immediate savings.

198. FE-1 recalled that when he joined the Company there were good things being proposed to have impact on the supply chain organization and the presumption that the money was

there to implement them. FE-1 further recalled discussions about a new planning tool and the process of putting together proposals were underway. FE-1 added that there was a recognition that an investment in planning tools and capabilities, such as hiring data scientists, was needed. FE-1 explained that there was also the desire to pay for these improvements, and a few employees with data science backgrounds were hired.

199. According to FE-1, following the reorganization, some of the spending programs for planning tools and platforms were cut back. FE-1 noted that it made sense to him that current CEO Emmanuel Ligner has since acknowledged that investment into supply chain / distribution was needed after the Company had elected to not follow through with planned investment during his tenure. FE-1 added that the need for investment was not a "new discovery" and that it had been acknowledged previously.

**b. The Cost-cutting Involved Mass Layoffs That Created Numerous Operational Inefficiencies That Harmed The Company**

200. FE-1 explained that once the cost-savings goal was announced that the "requirement" to generate cost savings then appeared to take priority. FE-1 further explained that this meant it was indirect functions in support services, advice, guidance, and optimization that were impacted most by layoffs. FE-1 explained, that for example, a program that was run once a week, like reviewing "stuck orders" or aging inventory might be reduced to every two weeks.

201. FE-1 explained that the cost-cutting initiatives that accompanied the restructuring led to a reduction in the employees tasked with optimization efforts. According to FE-1, this contributed to a loss of focus, expertise, and experience amongst employees and projects suffered as a result. FE-1 noted that optimization efforts became harder to implement with less employees available. FE-1 recalled that departures, other than very senior employees, were not broadcast at the Company and he could go for two or three weeks before knowing that an employee key to

supporting optimization efforts had been let go. FE-1 added that it was not always employees he worked with directly, but at times those two or three levels below that supported those employees who now had less time to focus on cross-team efforts.

202. According to FE-1, following the reorganization, a number of positions were eliminated, including his own. FE-1 explained that he still may have needed to speak to two people to get the information he needed but now that process was more difficult and more so in light of layoffs with workloads being increased following redistribution of responsibilities. FE-1 continued to say that difference now was that the decisions were informed by different business units and to interpret data and determine who to speak to now required more time. FE-1 continued to explain that speaking to those two people now took even longer. FE-1 recalled situations where an information source or employee had left the business. FE-1 added that at times the people who were available were relatively new and that added further complications.

203. FE-9 explained the reorganization into Laboratory Solutions and Bioscience Production along with cost-cutting measures were announced in December 2023 and accompanied by an offer to employees to voluntarily depart the Company with a severance package. FE-9 further explained that at this point he knew what was coming as his division had "nothing from a demand standpoint" and a huge escalation in layoffs followed. FE-9 recalled a lot of confusion on his team about the future and many employees were concerned about layoffs.

204. According to FE-7, a significant number of employees departed Avantor during 2024 and 2025, either on their own or due to redundancies from the cost-saving initiative announced in December 2023. FE-7 explained that as a result, the Company lost core competencies and knowledge as more employees realized the Company was no longer right for them and there was less money available for improvements or trainings as specific examples. FE-7 noted that

there had previously been money available for training, but that budget had become less and less over the final years of his tenure.

205. FE-2 recalled that following the December 2023 announcement when the Company publicized plans to reorganize into the two business segments and save $300 million in costs, executives including former CEO Michael Stubblefield attended the European Sales Conference in February 2024 in Portugal. According to FE-2, an hour after Stubblefield had addressed attendees about how well Avantor was doing, a global e-mail was sent announcing that employees in America were going to be impacted by layoffs. FE-2 explained that employees in the UK were assured that they would not be impacted, but in May 2024 FE-2 was informed that he had to choose half of his team to be made redundant. FE-2 recalled being made aware that redundancies were going to occur on May 8, 2024, and he was given until June to decide which members of his team to make redundant. According to FE-2, those employees exited the Company by the end of September.

206. According to FE-2, following the reorganization and cost-saving initiative the Portfolio Team was reduced from six Product Specialists to three and the remaining three were responsible for double the territory and double the number of customers than they had been previously. FE-2 explained that this reduction along with the relocation of back-office roles offshore created an environment where there was not enough support for customers and the workloads for Product Specialists had become "insane." FE-2 noted that the employees located offshore lacked the necessary levels of industry knowledge. FE-2 added that this delayed response times to customers and had a negative impact on sales performance.

207. According to FE-2, other regions experienced similar reductions in product specialists with Germany's total being reduced from twelve to five, and France's total being

reduced from six to five. Further, FE-2 stated that, previously, the Company had six European Portfolio Managers, but that the number of portfolio managers was reduced to just two after the reorganization and implementation of the cost-saving initiative. As another example, FE-2 described that Avantor reduced from 62 Controlled Environment and Safety Specialists to only 25 specialists after the reorganization and implementation of the cost-saving initiative. FE-2 also recalled that his direct reports were reduced from nine to seven and then down to three following layoffs, and that as a result his team could no longer proactively engage customers. He recalled that suppliers were no longer seeing the return on their investments.

208. FE-2 explained that suppliers were vocal about their concerns regarding the direction of Avantor following the reorganization and the decision to reduce the number of specialists across Europe. According to FE-2, Avantor was still expecting results and increasing sales despite this reduction. FE-2 noted that these staff reductions also impacted how fluidly his portfolio was driven as there were now less employees available to service customers and pursue sales.

209. FE-2 stated that an observable correlation between reduction in personnel and declining sales was materializing by no later than the end of 2024. FE-2 stated his opinion that the correlation was clear between declining sales performance and the insufficient staffing following the reorganization and cost- transformation initiative, and further stated that it is difficult for him to believe that Avantor's leadership did not grasp that correlation.

210. FE-11 explained that, as part of the cost savings initiative, Avantor reduced employee count in Europe on the rationale that the number of local employees that spoke various languages were no longer necessary given that all markets primarily conducted business in English.

### c. The Company Offshored Critical Positions, Causing Internal And Customer Confusion

211. FE-2 further explained that he observed additional decisions post-reorganization that also impacted Avantor's ability to retain customers. FE-2 recalled that in a "last gasp" to save money, Avantor's customer service operations were removed from regional office and relocated to India. According to FE-2, this took place approximately 18 to 24 months before his departure (December 2023 – June 2024) and the employees now tasked with dealing with customers were not properly trained and not able to provide the level of customer service that Avantor's customer required or expected. FE-2 explained that the personal touch with customers was lost and sales-facing associates on his team were left doing so much back-office work that was not being done by the new customer service groups. FE-2 recalled that this decision had a "massive impact" across Europe and explained that these employees in India did not understand the nature of the business or its terminology and did not know how to speak with customers.

212. FE-7 recalled that conversations routinely focused on cost reduction. FE-7 explained that, for example, the Company would not provide money for external trainings and relocated key positions to India. For example, FE-7 explained that the entire accounting department was fired simultaneously. FE-7 recalled that Avantor had a 600-person accounting team in the Czech Republic that was there one day and the next had been relocated to India. According to FE-7, while the employees in India were technically proficient, they lacked an understanding of the business to effectively interpret the work they were provided. FE-7 recalled that following the relocation, communications with the employees located in India consisted of "a lot of communications issues" and was a "nightmare." FE-7 further recalled problems with the procurement and problems with supply invoices where there were a lot of misunderstandings when it came to invoices written in German. According to FE-7, the previous accounting team located

in the Czech Republic was better in this regard and had a different cultural understanding and perspective than their replacements in India.

213. FE-7 further recalled that part of the IT function at Avantor was also relocated to India and while employees in these roles were proficient in the technology aspects of their role that they did not understand the business. FE-7 explained that it was difficult to make progress on requests for systems. FE-7 added that employees in India "just did what they were told" but did not understand it.

214. FE-3 recalled that approximately one year prior to his departure [which was in March 2025, so approximately March 2024] there was turnover amongst the EU-based staff with positions involving data analysis being relocated to India. FE-3 explained that while the employees in India had "technical expertise," they struggled explaining what the data meant and did not have the necessary supply chain and distribution experience to effectively understand key metrics and explain the data they were handling. According to FE-3, employees in India handled a "wide range" of data, including data pertaining to purchasing and distribution.

### 4. Destocking Continued and Market Share Fell, Contrary to Defendants' Assurances

215. Throughout the Class Period, Defendants misrepresented the dire state of Avantor's post-COVID business as demand collapsed under the weight of widespread customer destocking, falling order volumes, and swollen excess inventory. As described below, the accounts of former employees raise the reasonable inference that—contrary to Defendants' claims during the Class Period—demand had plummeted; Avantor's customers continued to engage in a prolonged destocking cycle that persisted through at least mid-2025; and although internal metrics and forecasts that were reported upwards reflected declining volumes, purchase orders, and warehouse

movement, leadership relied on juiced forecasts, conjured inflated projections, and unobtainable sales targets.

216. Likewise, while Defendants represented that Avantor was a competitively advantaged, disciplined business capable of driving price and margin expansion in the market, but multiple former employees described a different reality: a Company under severe competitive strain and increasingly reliant on unsustainable pricing and discounting concessions—including transacting at negative margins—to not only grow, but defend, market share, and materially eroding margins, revenues, and cash flow in the process. Indeed, in late 2023, just before the Class Period, European leadership expressly issued a "sell for what you can" directive, underscoring the severity of the Company's weakening commercial positioning. At the same time, the operational breakdowns described in Section V.D.1–3—including supply chain and e-commerce dysfunction, mass layoffs and leadership vacuums, and other internal disarray—directly impaired Avantor's ability to compete, further compounding competitive pressure. And the loss of market share came at the particular expense of VWR, as its defining features were hollowed after much neglect by leadership, particularly by Defendant Stubblefield. As the Company's incoming leadership was forced to admit, demand did not rebound, and such "***softness***" indeed impaired the Company, including by "***pressur[ing] our ability to get price, which . . . meaningfully impacted margins*** **[by causing]** ***lower volumes and related absorption***."

**a. Avantor Experienced Declining Demand**

217. FE-8 described that his sales portfolio to his customer base peaked during the peak of COVID (*i.e.*, 2020 – 2023), but that after COVID, *i.e.*, in 2024 and 2025, FE-8's sales targets became "unobtainable." According to FE-8, during his tenure at Avantor, he was responsible for bringing in $3.5 to $4.0 million in revenue each year, with profit margins of approximately 25%. FE-8 explained that during COVID (2020-2023), FE-8's revenues peaked at approximately $4.2

million and then normalized at around $3.5 million in 2023. FE-8 further explained that he was unable to effectively grow his portfolio post-COVID, through 2024 and 2025. FE-8 recalled that following his sales performance peaking during COVID, those same sales targets became "unobtainable" throughout the province in which he was based in Canada after COVID and through the end of his tenure at the Company.

218. FE-3 observed a "drop" in business in approximately 2023 because customers had bought so much inventory during COVID that they no longer needed to place additional orders and were undertaking destocking. FE-3 also recalled routinely being told that customers had bought so much inventory during COVID that they no longer needed to place additional orders. According to FE-3, during the period of time that followed the December 2023 reorganization announcement, the KPI that was most negatively impacted was total volume. FE-3 also recalled former Senior Vice President, Global Supply Chain Operations Brian Magerkurth acknowledging that volume was down. According to FE-3, there was an expectation that demand would level out, but the volume of product moved through the distribution centers just kept dropping and was "always dropping" from this point until his departure [in March 2025].

219. FE-3 added that the volumes impacted included PPE equipment (personal protective equipment), *i.e.*, "critical" items such as gloves, booties, and masks, with purchases being made in pallet-sized orders. FE-3 also stated that volume of other products declined, such as chemicals. FE-3 explained that the thinking was that volume would drop to pre-COVID levels, but it continued to drop beyond those figures. FE-3 described that FE-3 and other employees were instructed by Magerkurth to maintain the ship.

220. FE-3 explained that, for example, at Avantor's Bridgeport, New Jersey distribution facility in 2018, the facility averaged 3,500 lines per day.[17] According to FE-3, this figure grew to approximately 4,100 lines per day in 2022 before beginning to decline to approximately 3,500 lines in 2023 and further declined to approximately 3,200 or 3,100 lines in 2024. FE-3 noted the volume of lines observed in 2024 were below figures from 2018 and below the ten-year average prior to COVID. FE-3 added that other locations followed suit in declining volumes of lines and that this trend was consistent at the other Avantor locations. According to FE-3, additional distribution center locations included Visalia, California; Batavia, Illinois; Suwanee, Georgia; Edmonton, Alberta; Mexico City, Mexico; Tempe, AZ; Rochester, NY; Mississauga, Ontario; Puerto Rico; and outside Dallas, TX, as well as others.

221. FE-3 explained that the decline in volume created a mood of "concern" internally at the Company, including in meetings with Brian Magerkurth, Avantor's Senior Vice President, Global Supply Chain Operations. According to FE-3, "a lot of times" it was said that volume was lower than previous years and noted that, for example, there was acknowledgment of 10% year-over-year declines. FE-3 further noted that these meetings occurred in 2024 and 2025.

222. FE-3 recalled that the "lines per day" volume declines were discussed in meetings with Magerkurth, and that the "lines per day" and other Key Performance Indicators that were reported to Magerkurth were then "cascaded up" to the Executive Leadership Team.[18]

---

[17] According to FE-3, Avantor measured volume in terms of "lines," meaning unique products that were shipped. FE-3 further explained that, for example, if a customer purchased three products, that was considered three lines, regardless of the number of units of each product that was ordered. FE-3 continued to explain that if 100 units of the same product were ordered, that was still characterized as one line.

[18] According to Avantor's public filings, both the CEO and CFO—*i.e.*, Defendant Jones and Defendant Stubblefield during the relevant times—are on Avantor's Executive Leadership Team. *See* Avantor, Inc., Schedule 14A (Proxy Statement), at 27 (Mar. 28, 2025) ("Avantor's executive

223. FE-6 stated that he started to observe the workload for distribution decreasing beginning in 2022, as COVID waned. FE-6 explained that this correlation was observed through several KPIs (key performance indicators) including order entries and number of delivery lines. FE-6 observed and measured the decreased workload by looking at a number of data points, including the number of delivery lines through the warehouses and the sales value of order entry lines. FE-6 explained that the correlation between these figures and the decrease in workload was apparent and was "known and seen by everyone." FE-6 further explained that this was discussed with leadership and the sales team, and it was known that customers were destocking and orders were decreasing. FE-6 recalled specifically that the decreased workload was discussed in meetings with Lewis.

224. FE-2 recalled that when he joined Avantor in 2016 the portfolio was growing on average £3m per year and his portfolio peaked at approximately at £31 million during COVID before receding to approximately £25 million at the time of his departure. According to FE-2, his group was able to hit their numbers in 2024 as they worked through their backlog, but once that was complete there was a steady decline.

225. FE-2 stated that Vanderhaegen ultimately made former Vice President, Critical Environment Solutions & Safety EMEA/APAC Frank Braun the "scapegoat" for Avantor's declining European sales performance that took place following COVID, and that as a result Braun left the Company in 2024. FE-2 explained that, prior to Braun's departure, Braun reported two levels below Vanderhaegen, who reported to Stubblefield.

---

leadership team [is] comprised of Avantor's CEO, CFO and executives from across the company[.]").

226. FE-2 recalled that he ran monthly sales reports in QlikView, that included data detailed down to the product and end user level. FE-2 explained that he provided these reports to his boss, account managers, and senior managers monthly and the sales declines were visible in this data. FE-2 noted that QlikView was accessible to all salespeople at Avantor, with varying levels of restrictions, for example he had access to information pertaining to the UK and Ireland, whereas more senior level employees had global visibility. FE-2 explained that given his portfolio fell underneath European leadership he presumed that this data was escalated further upwards.

227. FE-2 recalled that declining sales performance was discussed in monthly European Portfolio meetings with employees from across Europe, including his boss, the Vice President Controlled Environment. According to FE-2, other regions were experiencing similar difficulties to those observed in the UK. FE-2 explained that in these meetings sales figures were discussed, in addition to new product introductions, and upcoming future plans. FE-2 recalled that the excess inventory of £4 million in gloves across Europe was a regular discussion in these meetings and that there were regular conversations on how to sell that inventory prior to it having to be destroyed.

228. FE-9 explained that during his tenure, demand went from there being so much to the well being completely dry. FE-9 continued to explain that when he joined the Company through COVID-19 shots being available in 2021, it was a "complete [expletive]show" with the volume of demand and the Company accumulated a backlog that took upwards of 18 months to get through. FE-9 recalled that the backlog recovery continued through 2022 and approximately the first quarter of 2023 before demand "fell off a cliff." FE-9 further explained that his division had "nothing from a demand standpoint" and a huge escalation in layoffs followed.

229. FE-4 saw a decline in orders due to fulfillment issues from the time he joined the Company in May 2023. FE-4 explained that he was aware orders had declined based on the order volume figures that he had access to given his role at Avantor. FE-4 explained that he had access to order volume data for 2023 and 2024. FE-4 continued to explain that in this data he was able to see order figures declining over those two years.

230. FE-10 recalled that approximately one year after he joined the Company [he joined in October 2022] demand had changed in the post-COVID market. FE-10 explained that demand changed post-COVID in approximately October 2023 and was visible in sales data beginning in December 2023. FE-10 further recalled the “biggest” customers reducing orders or stopping altogether. FE-10 added that a “few” big customers followed this trajectory. FE-10 explained that orders were going down.

231. FE-10 recalled that when he joined Avantor in October 2022 and began conducting forecasts he brought two assistant buyers with him when he joined because there was so much work. FE-10 further recalled that business performance declined from there, after backlogs had been worked through by the end of 2023 and demand declined. FE-10 explained that demand was “skyrocketing” and then “stopped” and “huge” customers were there one day and gone the next.

232. FE-3 also recalled routinely being told that customers had bought so much inventory during COVID that they no longer needed to place additional orders.

233. Former employee allegations regarding the demand environment are corroborated by the findings of Engine Capital. Specifically, Engine Capital highlighted that Avantor spent a total of $3.8 billion to acquire Ritter GmbH, Masterflex, and RIM Bio[19]—all of which significantly

[19] Avantor announced that it had acquired RIM Bio, a China-based manufacturer of single-use bioprocess bags and assemblies for biopharmaceutical manufacturing applications, in June 2021.

underperformed revenue and EBITDA expectations in their first year under the Company's ownership. Engine Capital noted that the acquisitions were "purchased through auction processes near the peak of COVID demand levels and at exceptionally high multiples." Ultimately, Avantor acknowledged that it had misjudged the extent of COVID overearnings. Further illustrating the extent of the Company's poor capital allocation, Engine Capital explained that "if these businesses were valued at Avantor's global multiple (approximately 10x EBITDA)" rather than "their acquisition multiples of around 28x EBITDA, this implies that ***over $2.4 billion of value has been destroyed***." The above accounts are further corroborated by Engine Capital's findings in its own investigation (including interviews with former Avantor employees) of "***reports of contracts being entered into at unattractively low renewal rates simply to meet revenue and EBITDA targets – at the expense of appropriate return on capital***."

#### b. Contrary to Defendants' Representations, Avantor's Customers Engaged In Destocking That Did Not Subside Until At Least Mid-2025

234. Asked about public statements made by Company executives that overall destocking had subsided by January 2025, FE-2 stated that those statements are inaccurate based on what he was seeing in his portfolio. FE-2 stated that he was responsible for the Controlled Environment and Safety portfolio in his territory, and that the products in his portfolio included single-use consumables and consumables such as masks, gloves, and coveralls. FE-2 conducted business with a wide variety of customers, including vaccine manufacturers, pharmaceutical manufacturers such as Bio Products Laboratory Limited, biotechnology companies such as Allergy Therapeutics, research universities—such as University College London, University of Manchester, University of Glasgow, Imperial College London, University of Oxford, and Cambridge University—and other major strategic partners of Avantor including GlaxoSmithKline and AstraZeneca.

235. FE-2 explained that his portfolio was one of the most in-demand portfolios during COVID—specifically, gloves, masks, and coveralls. However, FE-2 explained, the Company continued to receive inventory for these products past the peak of COVID demand, for which the company had paid a premium to purchase during COVID but which now accumulated as excess inventory that the company could not meaningfully sell, as end users had stockpiled during COVID and had inventory available for approximately 12-18 months. FE-2 recalled that the Company held and had issues with selling the excess inventory of the products in his portfolio from approximately the end of 2023, through 2024 and through early-2025. FE-2 recalled that Avantor was still sitting on thousands of boxes of gloves in January 2025.

236. Meanwhile, FE-2 explained, customers also held excess inventory of his portfolio generally, recalling as an example that universities had "tens of pallets" containing 600 boxes of gloves each.

237. FE-2 stated that customers had not worked through their supplies of the consumables in his portfolio, including masks and gloves, by January 2025. FE-2 further recalled that when demand was high during COVID, that it exceeded what was possible from a production standpoint and customers "bought anything from anywhere," including products that did not meet strict European and UK regulations. According to FE-2, destocking continued until approximately mid- to- late-2025.

238. FE-2 explained that he attended regular monthly calls with former Executive Vice President, Laboratory Solutions Randy Stone (until his departure), Country Portfolio Leaders and Managers, as well as specialists, including specialists that reported directly to FE-2. FE-2 stated that the messaging on these calls that was communicated to Stone and leadership was that "we're [Avantor] overstocked" on gloves. FE-2 also recalled discussing during these regular calls

promotions, leaflets, and sales incentives for employees in determining ways to reduce inventory. FE-2 further explained that such information (*i.e.*, inventory overstock and needs to reduce inventory) and other similar sorts of information from these meetings was then reported upward to Vanderhaegen. FE-2 explained that Vanderhaegen reported to Defendant Stubblefield.

239. FE-11 stated that customers had not successfully completed destocking as of January 2025. According to FE-11, his customers possessed "ample inventory," and destocking was "still prevalent" as late as March 2025. FE-11 explained that he learned this information from the sellers reporting to him that came directly from customers.

**c. Avantor Leadership Obscured Deteriorating Demand Conditions With Manipulated Forecasting**

240. According to FE-12, the Company's forecasts were artificially inflated by leadership to feature unreachable, "unobtainable" targets, and did not reflect the Company's significantly weakened post-COVID demand. FE-12 recalled that forecasts remained high and were "unobtainable" following demand declines post-COVID. According to FE-12, his region produced their own forecasts based on what they saw in the market and conversations with sales representatives and provided those figures to Poenisch who then "negotiated" the upcoming yearly targets with Executive Vice President, LSS Corey Walker and previously Executive Vice President, Sales and Customer Excellence Jim Bramwell. FE-12 explained that the forecasts returned to his region were then approximately "double or more" in comparison to the forecasts produced at the region level. According to FE-12, targets were "totally unobtainable" and "we just couldn't meet them."

241. FE-8 explained that following the reorganization, he was required to provide more forecasting information, adding that this information was "never verified" and did not need to be proven. FE-8 further explained that "everyone" always made forecasts seem a little better than

they were. According to FE-8, the forecasts were an "educated guess" and employees "don't really know what's coming" in terms of future sales. FE-8 noted that it was "next to impossible" to predict. FE-8 also recalled you needed to show your boss that you had opportunities and that there was "always something" on the way in the pipeline. FE-8 explained that he provided forecasts for top line sales and additional information related to potential larger opportunities that included who the opportunity was with, what it was worth, and the margin. According to FE-8, he supplied this forecasting information on a monthly basis.

242. According to FE-9, Avantor made decisions based on the Company's performance during COVID-19 and assumptions that demand would continue. According to FE-9, Avantor was slow to react to changing demand and it was evident that demand was drying up as the backlog was worked through in 2022. FE-9 explained that it took the Company until late 2023 and even in 2024 to react to the changes in demand from customers that were clear to him from data that showed a "drastic" decline in purchase orders and warehouse movement.

243. FE-9 added that the outlook that had been incredibly strong during COVID which led to demand projections being based on that performance until the "rug was pulled out" and demand "drove off a cliff." FE-9 further recalled "growth conversations" where projections for his division, which did approximately $100 million business, were being set at values exceeding half a billion dollars in revenue. According to FE-9, this messaging became less specific and more generic without exact figures and transitioned more towards that "we'll [the division] will be fine." FE-9 explained that "he could see the iceberg before the captain" and had concerns about where the business was heading.

244. Similarly, FE-2 further recalled that following growth resulting from the needs of customers during COVID that the Company never adjusted to the post-COVID environment and

were still operating as if those revenue figures, and additional growth, were obtainable. FE-2 noted that expectations following COVID were unrealistic.

### d. Defendants Faced Weak Demand And Intense Competition, Forcing Significant Pricing Discounts And Rebates

245. FE-2 recalled that, in Europe, former Executive Vice President, Europe, Global Portfolio and Sourcing Frederic Vanderhaegen issued a directive at the end of 2023 to shift product and "sell for what you can." FE-2 recalled that the Company held and had issues with selling the excess inventory of the products in his portfolio from approximately the end of 2023, through 2024 and through early 2025. FE-2 stated as an example that Avantor had £5 million worth of gloves in inventory that, throughout 2024 and into 2025, it was trying to sell for whatever price it could get. FE-2 added that Avantor competitor Thermo Fisher also had excess glove inventory—FE-2 recalled Thermo Fisher having an even greater amount of excess inventory than did Avantor, and the "market bottomed out" as the two companies tried to sell that inventory. According to FE-2, Avantor's competitors, including Thermo Fisher, sold the same products—and purchased from the same manufacturers—as much of his portfolio.

246. FE-2 explained that, as to the excess inventory, it was "all about price." He recalled that Avantor initially struggled to "get near" the prices Thermo Fisher and other competitors could offer, needing to reduce prices as low as those competitors in order to sell product. FE-2 often recalled selling products at negative profit margins. As an example of selling products at a negative profit margins, FE-2 recalled selling gloves to University College London for £1 per box that the Company had paid £15-£16 per box for during COVID.

247. FE-12 recalled discounts as steep as 90% to move product that had been in high demand during COVID. FE-12 further recalled that masks were a major product impacted as were gloves.

248. FE-12 further explained that in response to Avantor's acquisition of Ritter that competitors such as PerkinElmer, Hamilton, and Thermo Fisher "came in hot" with price reductions to maintain customers. FE-12 added that the overall competitive landscape had grown more competitive over the years.

249. FE-5's responsibilities also included managing pricing requests for his customers, which FE-5 stated was "chaos" and "so unmanageable." FE-5 explained that overall, Avantor was not set up infrastructurally to succeed. According to FE-5, "the right and left hand did not know what the other was doing" and not a day went by that it was not "mayhem" at Avantor. According to FE-5, when he joined Avantor in 2025, he found that there was not a lot of support for streamlining processes and employees were expected to "wear many hats" and create those processes. FE-5 recalled a sales manager informing him that "we [Avantor] have no idea what we're doing with pricing" and acknowledged that no one in leadership at Avantor knew how the Company compared on prices versus competitors. FE-5 described further confusion around price stemming from the "walls" and "silos" in place at Avantor and the differences between indirect and direct prices that were offered. FE-5 recalled instances where he had conversations with customers during which FE-5 did not even know what pricing options were available to offer or if customers had received previous pricing estimates from within Avantor. FE-5 explained that Avantor had their own direct sales representatives and also worked with sales representatives from distributors that were "at arm's length," as Avantor was selling to the same customers both directly and indirectly, and this created confusion and misalignment regarding price. For example, FE-5 explained, Avantor sold certain products to one of FE-5's largest accounts, a large multinational medical tech company, and also sold those same products directly to a top competitor of Avantor, Thermo Fisher—which also sold directly to that same large multinational medical tech company.

250. For example, FE-5 received a call from Avantor's Accounts Receivable group about one of FE-5's largest accounts, a large multinational medical tech company, that was behind on payment. FE-5 recalled that when he reached out to the customer, they informed him that they were changing their payment terms from net 30 to net 60 and when their ability to do so was disputed by FE-5, the customer pushed back and asked him to show where in their contract it said that could not be done. FE-5 explained that so many different people had touched the account in various aspects and without a centralized system he could not find the documentation that was needed. FE-5 added that Avantor did not have a contract group, and employees were expected to know how to negotiate contracts "sight unseen."

251. FE-5 recalled one of his largest accounts, a large multinational medical tech company, submitting approximately 200 items for their Annual Price Review. Responding to this request required FE-5 to speak to 45 different employees, yet even despite speaking with so many people, FE-5 stated that he was still unable to speak with certain people that were necessary. FE-5 further recalled asking who determined the pricing last year and being informed that no one had done this because this account had not made a similar request in the past; rather, the individual entities that comprised this company had each directly contacted the relevant Avantor personnel—and had now requested a global price review to mirror Avantor's global approach (*i.e.*, following the reorganization). FE-5 recalled asking colleagues about historical pricing offered and receiving answers like "well. It depends." Ultimately, FE-5 stated, he had to rely on his "gut" to provide pricing and that decision was his to make—despite having his short tenure at the Company. FE-5 explained that after providing pricing information to this account, the Company received feedback on that pricing which stated that Avantor was competitive on some products but upwards of 700% above competitors' prices on others.

252. According to FE-5, customer complaints were escalated to the C-Suite "all the time" and that it was a "constant." FE-5 described his role as the "escalation point" just below the executive level concerning customer complaints that had progressed through customer service, managers, division leaders, and regional leaders. FE-5 explained that those customer complaints escalated to him included deliveries not being on time; quality not meeting expectations; Avantor not responding to customers in a timely manner; invoicing issues; purchase order alignment; and other issues. FE-5 explained that same customers had the same problems "over and over." FE-5 further explained that the C-Suite was "very aware" of problems facing customers. According to FE-5, problems with customers were "common knowledge" and were acknowledged by current CEO Emmanuel Ligner during approximately two or three Town Hall Meetings that FE-5 attended.

253. FE-5 recalled being "pounded" with customer complaints at an "unfathomable" volume, with customer complaints to discuss in the meetings he attended regularly. According to FE-5, there was at least one escalation call per week. FE-5 stated that "all problems bubbled up to him," yet he had no support. FE-5 also stated that he lacked the authority necessary to correct issues and was merely able to provide advice on next steps. FE-5 recalled having a lot of key performance indicators, goals, and thresholds to meet but he was unable to focus on them due to the volume of customer complaints and resolutions he was handling day to day.

254. FE-5 recalled preparing weekly reports documenting customer problems that were provided to his boss, the Senior Director of Relationship Management, and then escalated upwards from there. FE-5 stated that the C-suite had to know about these problems, which were common knowledge. According to FE-5, customer complaint reports were updated weekly, monthly, or quarterly depending on the problem.

255. FE-5 said that executive leadership from customers sought meetings with Avantor's executive leadership to discuss complaints. According to FE-5, he was required to prepare executive summaries that were provided to Avantor executives in advance of these meetings as well as in connection with other interactions with customers, such as at events like the Drug, Chemical, & Associated Technologies Association. FE-5 explained that he was responsible for working with the admins of leadership to arrange meetings and facilitate talking points. FE-5 explained that the executive summaries he prepared contained a "snapshot" of the relationship with the customer and included the past, present, and where the relationship was going in the future, and FE-5 also explained that the executive summaries summarized customer issues. FE-5 stated that he would spend hours every week trying to get whoever needed to be on the meeting. FE-5 added that reports were provided to whoever had requested them, including at times administrative assistants to the C-Suite.

256. FE-5 explained that meetings between Avantor executives and customer executives did not have happy endings, and that during those meetings action items were established. FE-5 further explained that specific employees were then assigned "ownership over those items" and a directive to follow up in a few weeks. FE-5 noted that promises were made to customers and Avantor either delivered or did not, and that this process served as a way to "kick the can down the road." FE-5 added that he did hear that some customers had left Avantor as a result of complaints not being adequately resolved.

257. FE-5 explained that it was difficult to develop new business with his customer base when Avantor was actively failing to meet their expectations for existing orders. FE-5 added that his job was "all defense," or addressing issues; given the volume of issues, he had no time for

offense or generating new business. FE-5 further noted that employees were "firefighting and not bellringing."

258. The foregoing former employee accounts regarding Avantor's competitive positioning, market share losses, and pricing dysfunction are further corroborated by the findings of Engine Capital, which asserted that "Avantor has faced sustained operational and financial challenges, including repeated reductions to its financial guidance and consistent underperformance versus investor expectations." Engine Capital stated that "a significant portion of LSS's historical underperformance and market share loss has been self-inflicted and driven by organizational dysfunction," observing that since at least 2018, Merck and Thermo Fisher's competing businesses "grew by roughly 3-5x as much as LSS," resulting in LSS losing approximately 4% of relative market share. Engine Capital further described how "[m]any former employees were sharply critical of the Company's matrix structure," "[s]ervice levels were reportedly below customer expectations," and that the Company "lacked a coherent pricing philosophy and discipline that caused it to discount price excessively over the years, resulting in further margin erosion."

259. Engine Capital also documented the toll of competitive dynamics on Avantor's margins, observing that LSS margins "reached an all-time low, and are well below historical and Thermo's levels," while the margin gap between LSS and Thermo's comparable Laboratory Products and Biopharma Services division reached "an all-time high of ~450 basis points." Engine Capital noted that "Thermo's LPBS has not experienced the margin degradation that LSS has experienced during the last few years" and that "Thermo's LPBS margins have been stable." Citing former employees, Engine Capital explained that the gap could be "meaningfully closed through better commercial discipline and stronger cost controls." Engine Capital further observed that,

although management had "announc[ed] $400 million of cost-cutting initiatives, very little of these savings have reached the bottom line," noting that in 2024, "SG&A as a percentage of revenue increased by approximately 120 basis points, despite the Company's claims of significant cost reductions totaling $130 million."

260. Given Avantor's operational and competitive challenges, Engine Capital criticized Avantor's statements to investors regarding market share, stating that Defendants' statements have "eroded investor trust." For example, Engine Capital stated that "[i]n addition to poor operating performance, ***shareholders are deeply frustrated with the communication regarding LSS's market share losses***," adding "***[d]espite mounting evidence to the contrary, Avantor insisted it was not losing market share – only reversing its position after additional disclosures by Thermo forced the Company to acknowledge the issue on its 1Q 2025 earnings call***." Engine Capital highlighted Defendant Stubblefield's statements on October 25, 2024[20] discussing Avantor's market share, stating "the disconnect between management's messaging and observable market trends has ***eroded investor trust*** and further contributed to the Company's valuation discount relative to peers."

261. Engine Capital also explicitly stated that Defendants knew or should have known about operational issues and market share losses before such issues were communicated to the market. For example, Engine Capital stated "in 2023, the Board should have known that Avantor's LSS segment was losing share even before it became apparent to the market. At the time, Thermo had not begun reporting its distribution revenue separately, and Avantor was still publicly asserting that it had maintained share." Engine Capital further stated that "in 2023" the Board possessed

---

[20] "We're confident we certainly have a leading [lab solutions] platform here and we remain focused on leveraging our capabilities to continue to grow share. And I think there's certainly a lot of data points here to support our view here that we've got a nice share story." *See* ¶457.

"***internal knowledge of operational underperformance and market share losses at LSS***," which was "simply inexcusable and contributes to a perception of insularity and a lack of accountability." Engine Capital further stated that "the Board is responsible for Avantor's underperformance," and has "failed to adequately oversee the Company's operations, management, capital allocation and succession planning." Engine Capital stated that the Company adopted a complacent, self-congratulatory culture where internal scorecards were "all green" despite missing revenue and margin targets and continuing to lose market share.

**e. Avantor's Systemic Neglect of VWR Harmed Customer And Supplier Relationships**

262. FE-2 explained that Avantor leadership suffocated and sucked the life out of the VWR brand, and further that that the VWR brand had been "hidden away" under Stubblefield's leadership. According to FE-2, the VWR name was well-known throughout Europe, whereas Avantor itself was not. Nonetheless, FE-2 stated that Avantor did not utilize the VWR brand and instead heavily marketed as "Avantor," which did not have the same level of brand recognition in Europe as VWR did. FE-2 further stated that Stubblefield and US leadership approached the European market as though it were the same as the US, but this was not the case. According to FE-2, the decisions made by Avantor "100%" eroded VWR's reputation and its ability to generate future revenue. FE-2 noted that he observed VWR's reputational erosion happening during his tenure.

263. Further, according to FE-2, no one in Europe or the UK was familiar with Avantor and it was VWR that was a "powerhouse" in the region. FE-2 explained that the decisions made by Avantor had "sucked the life" out of the associates working for the Company and eroded the reputation of VWR in the process.

264. FE-2 stated that former CEO Michael Stubblefield was more focused on BPS than on LSS, and that Stubblefield wanted LSS to achieve higher margins, more in line with BPS' performance. FE-2 stated that the higher margins that Stubblefield wanted LSS to achieve were not possible because of the competition facing LSS.

265. Additionally, the Company's neglect of its clinical services business, part of VWR, resulted in its divestiture and sale, and causing "massive problems" with customers. On October 17, 2024, Avantor closed its sale of its clinical services business. FE-2 explained that Avantor's clinical services business was a "very unique service to VWR." FE-2 explained that leadership did not try to understand the clinical services business and there was "never" any investment in it. FE-2 stated that Avantor sold off the clinical services business in 2024 because senior leadership saw the profit the sale represented but did not realize the wider impact of the sale.

266. FE-2 recalled that the clinical services business was sold to private equity company Audax and rebranded as Resonant, and clauses in the contracts governing the sale of the clinical services business required leads and customers to be handed over to Resonant until approximately the end of 2024.

267. According to FE-2, the sale of Avantor's clinical services business caused "massive problems" with significant pharmaceutical customers. FE-2 added that pharmaceutical companies needed approximately eight months to onboard a new supplier and "we gave them three weeks." FE-2 explained that products sold through the clinical services business were worth approximately $5 million in his portfolio, and that the sale had a direct impact on his portfolio.

268. Ultimately, at the end of the Class Period, Avantor's new CEO tacitly acknowledged the importance of the VWR brand and the Company's systemic neglect of this

invaluable asset, acknowledging that "[s]ome [customers] ***even say, well, we didn't know that VWR was part of Avantor***" and the Company had eliminated "***too many specialists***" from VWR.

### E. Based On Avantor's Struggles, Defendants Should Have Undertaken An Interim Goodwill Impairment Test And Taken A Goodwill Impairment Charge Pursuant To GAAP Standards

269. Beginning before and continuing throughout the Class Period, goodwill comprised nearly half of the Company's total reported assets on its balance sheet.

| | Q1 2023 | Q2 2023 | Q3 2023 | Q4 2023 | Q1 2024 | Q2 2024 | Q3 2024 | Q4 2024 | Q1 2025 | Q2 2025 | Q3 2025 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Goodwill | $ 5,682.5 | $ 5,693.9 | $ 5,637.7 | $ 5,716.7 | $ 5,672.0 | $ 5,659.6 | $ 5,670.6 | $ 5,539.2 | $ 5,609.1 | $ 5,762.2 | $ 4,984.7 |
| Total Assets | $13,395.9 | $13,063.3 | $12,798.1 | $12,972.7 | $12,763.4 | $12,693.5 | $12,840.6 | $12,114.5 | $12,326.4 | $12,776.9 | $11,675.9 |
| Ratio | 42.4% | 43.6% | 44.1% | 44.1% | 44.4% | 44.6% | 44.2% | 45.7% | 45.5% | 45.1% | 42.7% |

270. Goodwill is an intangible asset that emanates from and is associated with the purchase of one business by another. Specifically, goodwill is the excess of the purchase price when compared to the net fair value of all of the assets purchased and liabilities assumed in the acquisition. Essentially, once the fair value of assets and liabilities acquired in a business combination is determined, goodwill is the residual or plug amount to balance the equation. Goodwill is carried as an asset on the acquiror's balance sheet, is carried at fair value, and therefore must be analyzed periodically to determine whether the amount at which it is being carried and reflected on the balance sheet is not overstated relative to its fair value.

271. Goodwill impairment arises when there is deterioration in the capabilities to generate the cash flows anticipated at the time of the acquisition, and which support the carrying value of the goodwill asset—*i.e.*, the fair value, generally determined by a measure of projected future cash flows, dips below its book value. When impairment is identified, a company is required to write off the difference between the carrying value and its fair value in order to reflect the change, and to continue assessing for impairment no less than annually (but more frequently if events arise to suggest the carrying value may be overstated).

272. Here, although Defendants knew that events had occurred to suggest the carrying value of goodwill, Avantor's largest asset, had been impaired, and that results were consistently declining, they unreasonably delayed and avoided an impairment charge for over a year and a half during the Class Period. As a result of Defendants' unreasonable failure to properly write-down its goodwill, Defendants materially overstated Avantor's goodwill, operating income, net income and earnings per share ("EPS") in the Company's SEC Filings issued for at least the fiscal year ended December 31, 2024, and in each of the SEC Filings issued for fiscal quarters ended March 31, 2024, June 30, 2024, September 30, 2024, March 31, 2025, and June 30, 2025 during which its goodwill was overstated.

**1. Applicable GAAP Standards for Goodwill**

273. As a U.S. public company, Avantor is required by the SEC to comply with U.S. Generally Accepted Accounting Principles ("GAAP"). Beginning in 2009, the Financial Accounting Standards Board ("FASB"), the governing body for GAAP, codified then-existing accounting literature and governing principles into a consolidated index it referred to as the Accounting Standards Codification ("ASC"). The ASC framework is the current source of authoritative GAAP. Rules and interpretive releases of the SEC are also sources of authoritative GAAP for SEC registrants and often woven into or referenced by the ASC framework. *See* ASC Topic 105 – Generally Accepted Accounting Principles. These principles ensure that a company's financial statements are complete, consistent, and comparable, make it easier for investors to analyze and extract useful information from a company's financial statements, and facilitate the comparison of financial information across different companies.

274. Defendants were responsible during the Class Period for issuing, and fairly presenting, Avantor's consolidated financial statements in SEC Filings in accordance with GAAP and SEC rules. *See also* AS 1001.03 (the "fair presentation of financial statements in conformity

with generally accepted accounting principles is an implicit and integral part of management's responsibility."). SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) provides that financial statements filed with the SEC that are not prepared in conformity with GAAP are presumed to be misleading and inaccurate.

275. In addition, SEC Filings required certifications pursuant to section 302 of the Sarbanes-Oxley Act of 2002 ("SOX Certifications") certifying that, here, Defendants Stubblefield and Jones, as CEO and CFO, had reviewed the SEC Filings, would affirm that they had been prepared in accordance with GAAP, and separately that they had taken steps to establish, maintain, and test Avantor's system of disclosure controls and procedures and internal controls over financial reporting. As a member of Avantor's Board of Directors ("Board") and a signatory to its FY 2024 Form 10-K filing, Defendant Peacock was also responsible for overseeing Avantor's management, including Defendants Stubblefield, Eck, who signed each of the relevant SEC Filings during the Class Period, and Jones.

276. The GAAP provisions for goodwill are presented in ASC 350, Intangibles – Goodwill and Other. Public companies like Avantor are required to test for goodwill at least annually. ASC 350-20-35-1 and 35-28. According to Avantor annual reports, the Company assessed goodwill for impairment as of October 1 of each fiscal year, which falls during the fourth quarter of Avantor's fiscal year.

277. However, goodwill should also be tested for impairment between annual tests when certain red flags, or impairment triggers, are present, such as adverse changes in the acquired asset that might negatively impact the value of that asset/reporting unit. Interim goodwill impairment testing is therefore required if relevant events and circumstances exist that indicate that it is more

likely than not that a goodwill impairment exists. *See* ASC 350-20-35-30. *See also, e.g.*, ASC 350-20-35-3E; ASC 350-20-35-3F & 3G, ASC 350-20-35-4—35-8.

278. Indeed, Defendants understood the need to conduct interim goodwill impairment testing if certain red flags or triggers were present, as they acknowledged in their FY 2023 10-K and FY 2024 10-K, which each stated that the Company would conduct interim testing in response to "impairment indicators."

279. ASC 350 outlines a multi-step process for assessing whether goodwill is impaired, and requires goodwill impairment testing to be performed for each "reporting unit" identified by the entity. Here, in connection with the reorganization just before the start of the Class Period in which the Company had changed from regional-based reporting units to two new operating segments, LSS and BPS, the Company opaquely allocated its then-existing goodwill across six new reporting units: (1) Manufactured Products; (2) Buy Sell Production; (3) NuSil; (4) Buy Sell Lab (which the Company later announces is renamed Distribution); (5) Proprietary Lab; and (6) Services.

280. ASC 350 provides two steps for assessing whether goodwill is impaired. First, during the Class Period, ASC 350 permitted companies to conduct a threshold qualitative assessment of goodwill as a preliminary step to evaluate whether or not the carrying amount (*i.e.*, book value) of a reporting unit was more likely than not greater than its fair value. If the fair value of the reporting unit was more likely than not greater than its carrying amount, then no impairment was deemed to exist, and no further assessment was necessary. If, however, the carrying amount was more likely than not greater than the fair value of the asset (*i.e.*, that the known or identified events and circumstances indicated such), then ASC 350 requires more rigorous quantitative testing as a second step.

281. Although Avantor's FY 2024 10-K filing refers to the qualitative test as "optional," the qualitative assessment is still part of ASC 350, as GAAP contemplates a two-step process (qualitative and then quantitative).

282. Neither GAAP nor ASC 350 permit a company to ignore the triggering events in the qualitative test but rather permit a company to move to the second test, quantitative, directly if circumstances of impairment are essentially so obvious that they signal the company to proceed directly to the quantitative test. As set forth herein, Plaintiffs assert that Avantor would not have had to proceed far into a qualitative test to know, at each day, during the Class Period, and certainly at the time of issuing quarterly financial statements throughout that timeframe, that there were identifiable triggering events which mandated a quantitative test, and ultimately an earlier recording of $785 million in goodwill impairment ultimately taken in October 2025. These triggering events were ongoing from the start of, during, and at the end of the Class Period as set out Section V.E.2 below.

**a. The Qualitative Assessment**

283. ASC 350 contemplates impairment testing for any quarter when certain qualitative factors of impairment are present "that would more likely than not reduce the fair value of a reporting unit below its carrying amount." ASC 350-20-35-30. These qualitative factors are often referred to as "triggers," "triggering events," or "impairment indicators." Pursuant to ASC 350-20- 35-3C, examples of such triggering events include, but are not limited to:

> Industry and market considerations such as a deterioration in the environment in which an entity operates, an increased competitive environment, a decline in market-dependent multiples or metrics (consider in both absolute terms and relative to peers), a change in the market for an entity's products or services, or a regulatory or political development[;]
>
> …

> Cost factors such as increases in raw materials, labor, or other costs that have negative effect on earnings and cash flows[;]
>
> . . .
>
> Overall financial performance such as negative or declining cash flows or a decline in actual or planned revenue or earnings compared with actual and projected results of relevant prior periods[;]
>
> … entity-specific events such as changes in management, key personnel, strategy, or customers; contemplation of bankruptcy; or litigation[;]
>
> … Events affecting a reporting unit such as a change in the composition or carrying amount of its net assets, a more-likely-than-not expectation of selling or disposing of all, or a portion, of a reporting unit, the testing for recoverability of a significant asset group within a reporting unit, or recognition of a goodwill impairment loss in the financial statements of a subsidiary that is a component of a reporting unit[; and]
>
> … a sustained decrease in share price (consider in both absolute terms and relative to peers)[.]

284. ASC 350-20-35-3E required Defendants to test for goodwill impairment if any triggering events, including but not limited to any of the examples above, alone ***or*** in combination, made it more likely than not that the fair value of a reporting unit was less than its reported carrying amount.

285. Thus, ASC 350-20-35-3E also provides that the triggering events must be considered holistically, or in "totality."

286. In other words, even if no individual triggering event is sufficient, on its own, to make it more likely than not that the fair value of the reporting unit has declined below its book value, if the "totality" of the events and circumstances described above made it more likely than not that the fair value of a reporting unit during an interim quarter was less than its carrying amount, Defendants were required to perform a goodwill impairment test—and to measure the

amount of a goodwill impairment loss to be recognized. *See* ASC 350-20-35-3; *see also* ASC 350-20-35-4 through 35-20-35-8.

**b. The Quantitative Goodwill Impairment Test**

287. The quantitative goodwill impairment test starts with comparing the fair value of a reporting unit with its carrying amount, including goodwill. ASC 350-20- 35-4. The fair value of a reporting unit refers to the price that would be received to sell the unit as a whole in an orderly transaction between market participants at the measurement date. [21] If the carrying amount of a reporting unit exceeds its fair value, a further step of the goodwill impairment test shall be performed to measure the amount of impairment loss, if any. ASC 350-20-35-5 (directing to the guidance in ASC 350-20-35-22 through 35-24 in determining the fair value of a reporting unit); *see also* ASC 350-20-35-8. If information is not available to determine the selling price of the reporting unit from comparable prior sales, entities must perform projections of future cash flows, using recognized methods, to arrive at a measure of fair value for the reporting unit.

288. In its FY 2023 and FY 2024 Forms 10-K, Avantor stated that it measured fair value using "a weighted average of two valuation methods based on a discounted cash flows method and a guideline public company method,"[22] in which management assessed, among other things,

---

[21] *See also* ASC 350-20-35-22 (noting that the "fair value of a reporting unit refers to the price that would be received to sell the unit as a whole in an orderly transaction between market participants at the measurement date"); ASC 350-20-35-23 (setting out differences in valuations due to control premiums); and ASC 350-20-35-24 (noting, among other things, that "[i]n estimating the fair value of a reporting unit, a valuation technique based on multiples of earnings or revenue or a similar performance measure may be used if that technique is consistent with the objective of measuring fair value").

[22] The discounted cash flow model ("DCF") or method allows for valuation of company's current value by "analyzing financial forecasts of its profits, typically through dividends or cash flows." *See e.g.* Brad Einstein, *Discounted Cash Flow (DCF) Formula: What It Is & How to Use It*, HARV. BUS. SCH. (Mar. 4, 2025), https://online.hbs.edu/blog/post/discounted-cash-flow (last visited Apr. 24, 2026). As applied herein, the DCF would be understood to refer to Avantor estimating cash flows into the future for the subject reporting unit. In contrast, "[t]he guideline public company

"historical trends, management's knowledge and experience and . . . projections of future earnings potential."

### 2. Defendants Knew Of Triggering Events That Required A Goodwill Impairment Charge By The First Quarter of 2024 And Continuing Throughout The Class Period

289. Here, Defendants had actual knowledge of multiple red flags that constituted impairment triggers, as described in specific detail below. These circumstances indicated that it was more likely than not that the goodwill for LSS—and in particular goodwill associated with its Distribution reporting unit, which primarily related to its VWR operations—was impaired during, and certainly at the end of, the first quarter of 2024 as the Class Period starts. Specifically, by that point, Avantor's business had declined substantially, it had lost market share to competitors, the Company's stock price and market capitalization had declined significantly, and the Company had lost key personnel. These facts were clear evidence of impairment triggers that made it more likely than not that the carrying value of at least the LSS goodwill was greater than its carrying value (and thus Defendants were required under GAAP to perform impairment testing and, ultimately, write down the carrying value of this goodwill).

290. Indeed, these circumstances and those described below sufficed to constitute triggering events that warranted interim testing and impairment further evidenced by the fact that these conditions are substantially the same as those that the Company ultimately admitted required an interim test and impairment in October 2025.

---

method identifies the stock prices of public companies that are comparable to the reporting unit being tested. Performance metrics, such as price-to-revenues or price-to-EBITDA, are calculated for the comparable public companies and applied to the subject reporting unit's applicable performance metrics to estimate the reporting unit's fair value." *Business combinations and noncontrolling interests*, PwC (Feb. 2026), https://viewpoint.pwc.com/dt/us/en/pwc/accounting_guides/business_combination/assets/pwcbuscombguide0226.pdf (last visited April 24, 2026).

**a. Poor Financial Performance And Operating Results**

291. Pursuant to GAAP, as set out in ASC 350, negative financial performance and operating results must be considered both as a triggering factor requiring interim testing and also generally inform the assessment of fair value in testing impairment. *See, e.g.*, ASC 350-20-35-3C. Indeed, Avantor stated that it identified the impairment recognized in October 2025 on the basis of an interim test conducted in part "as a result of . . . ***changes in the operating results*** of our Distribution reporting unit, formerly referred to as our Buy Sell Lab reporting unit." Notably, those operating results were eerily similar to the results within LSS for the prior six or even ten quarters.

292. As described above, Defendants knew—but concealed from investors—of significant performance issues throughout the Class Period that destroyed the value of the Company's goodwill asset. These performance issues included issues relating in particular to the Company's VWR operations, including for example as described by FE-7 (¶96) and FE-2 (¶¶262-65), and as further corroborated by the Company's later admissions, including, *e.g.*, that "[s]ome [customers] even say, well, we didn't know that VWR was part of Avantor" and the Company had eliminated "too many specialists" from VWR.

293. Such performance degradation with respect to VWR is particularly meaningful because that acquisition provided over $2 billion in recorded goodwill at acquisition. Based on information and belief, all or nearly of this goodwill (to the extent remaining since the 2017 acquisition) was allocated by the Company during the reorganization to the LSS segment and in particular to the "Distribution" reporting unit, consistent with the nature of the VWR acquisition generally and further corroborated by the Company's post-Class Period disclosure that it was

reorganizing yet again to transform LSS, in meaningful part, into "VWR Distribution and Services."[23]

294. More broadly, the extensive allegations above demonstrate still further the fact of broad deteriorating operating conditions indicative of declining fair value, as further corroborated by the key indicators that Defendants themselves stated they monitored and used to evaluate their performance. These results show comparable negative changes in operating results already occurring by the start of the Class Period and continuing throughout. Key metrics identified by the Company itself showed sustained and steep decline, including most notably the Company's adjusted operating income—the metric that Avantor stated was used by Defendant Stubblefield, as the Chief Operating Decision Maker pursuant to ASU 2023-07, to assess segment performance.

295. The following chart displays the ongoing decline in adjusting operating income during each of the fiscal quarters during the Class Period, whether compared to the prior fiscal year's three-month quarterly period, six-month quarterly period, or nine-month quarterly period:[24]

---

[23] *See* Avantor's March 2026 Annual Proxy Statement, stating: "Our Laboratory Solutions Segment is now VWR Distribution and Services. The guiding principle for the VWR Distribution and Services segment is a product agnostic channel, primarily composed of third-party content. Over 90% of this segment is our channel business with the balance being our services offerings."

[24] The source data for the financial results in this chart come from Avantor's Q1 2024 10-Q, Q2 2024 10-Q, FY 2024 10-K, Q1 2025 10-Q, Q2 2025 10-Q, Q3 2025 10-Q, and FY 2025 10-K, but the identified changes in amounts or percentages were not listed by Avantor.

296. Further corroborating these continuing declines is the Company's annual performance:

| **Period** | **Q 1 2024** | **Q1 2023** | ***Change*** | ***%change*** | **Q2 2024** | **Q2 2023** | ***Change*** | ***%change*** | **Q3 2024** | **Q3 2023** | ***Change*** | ***%change*** | **Q4 2024** | **Q4 2023** | ***Change*** | ***%change*** | | ***Change*** | ***%change*** |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net Sales | | | | | | | | | | | | | | | | | | | |
| Laboratory Solutions | $1,157.1 | $1,203.0 | (45.9) | -3.8% | $1,155.7 | $1,193.8 | (38.1) | -3.2% | $1,171.5 | $1,159.5 | 12.0 | 1.0% | $1,125.8 | $1,182.0 | (56.2) | -4.8% | | | |
| Bioscience Production | 522.7 | 577.3 | (54.6) | -9.5% | 547.1 | 550.1 | (3.0) | -0.5% | 542.9 | 561.1 | (18.2) | -3.2% | 560.8 | 540.4 | 20.4 | 3.8% | | | |
| Total | $1,679.8 | $1,780.3 | (100.5) | -5.6% | 1,702.8 | 1,743.9 | (41.1) | -2.4% | $1,714.4 | $1,720.6 | (6.2) | -0.4% | $1,686.6 | $1,722.4 | (35.8) | -2.1% | | | |
| Adjusted Operating Income | | | | | | | | | | | | | | | | | | | |
| Laboratory Solutions | $ 148.2 | $ 172.2 | (24.0) | -13.9% | $ 150.9 | $ 179.7 | (28.8) | -16.0% | $ 151.5 | $ 159.1 | (7.6) | -4.8% | $ 147.4 | $ 157.3 | (9.9) | -6.3% | | | |
| Bioscience Production | 126.9 | 167.5 | (40.6) | -24.2% | 144.0 | 154.2 | (10.2) | -6.6% | 138.1 | 148.2 | (10.1) | -6.8% | 149.2 | 132.0 | 17.2 | 13.0% | | | |
| Total | $ 275.1 | $ 339.7 | (64.6) | -19.0% | $ 294.9 | $ 333.9 | (39.0) | -11.7% | $ 289.6 | $ 307.3 | (17.7) | -5.8% | $ 296.6 | $ 289.3 | 7.3 | 2.5% | | | |
| **Year-to-Date** | | | | | **6 mos. Ended** | | | | **9 mos. Ended** | | | | **Annual** | | | | **2022** | | |
| Net Sales | | | | | | | | | | | | | | | | | | | |
| Laboratory Solutions | | | | | $2,312.8 | $2,396.8 | (84.0) | -3.5% | $3,484.3 | $3,555.9 | (71.6) | -2.0% | $4,610.1 | $4,738.3 | (128.2) | -2.7% | $5,002.4 | (264.1) | -5.3% |
| Bioscience Production | | | | | 1,069.8 | 1,127.4 | (57.6) | -5.1% | 1,612.7 | 1,688.5 | (75.8) | -4.5% | 2,173.5 | 2,228.9 | (55.4) | -2.5% | 2,510.0 | (281.1) | -11.2% |
| Total | | | | | $3,382.6 | $3,524.2 | (141.6) | -4.0% | $5,097.0 | $5,244.4 | (147.4) | -2.8% | $6,783.6 | $6,967.2 | (183.6) | -2.6% | $7,512.4 | (545.2) | -7.3% |
| Adjusted Operating Income | | | | | | | | | | | | | | | | | | | |
| Laboratory Solutions | | | | | $ 299.1 | $ 351.9 | (52.8) | -15.0% | $ 450.7 | $ 511.0 | (60.3) | -11.8% | $ 598.0 | $ 668.3 | (70.3) | -10.5% | $ 764.7 | (96.4) | -12.6% |
| Bioscience Production | | | | | 270.9 | 321.7 | (50.8) | -15.8% | 409.0 | 469.9 | (60.9) | -13.0% | 558.2 | 601.9 | (43.7) | -7.3% | 778.9 | (177.0) | -22.7% |
| Total | | | | | $ 570.0 | $ 673.6 | (103.6) | -15.4% | $ 859.7 | $ 980.9 | (121.2) | -12.4% | $1,156.2 | $1,270.2 | (114.0) | -9.0% | $1,543.6 | (273.4) | -17.7% |

- Adjusted Operating Income for 2023 versus 2022, declined $265.5 million (or 17.97%), and from 2024 versus 2023, declined $122.0 million (or 10.06%).[25]

- Adjusted EBITDA for 2023 versus 2022, declined $261.6 million (or 16.55%), and from 2024 versus 2023, declined $110.3 million (or 8.43%).

- Net Sales for 2023 versus 2022, declined $545.2 million (or 7.26%), and from 2024 versus 2023, declined $183.6 million (or 2.6%).

297. These and other declines in key metrics are further graphically shown in the Executive Summary chart in the FY 2024 10-K as follows[26]:

[25] All percentages set out by Plaintiffs in this complaint, and not provided by Avantor, are rounded up to the nearest hundredths.

[26] In text below the Executive Summary Chart at page 33 of the FY 2024 10-K, Defendants stated, among other things, that "***[i]n 2024, the net sales decline was driven by decreases in both segments primarily due to reduced customer demand***. . . and that, "[i]n 2023, the net sales decline was driven ***primarily by reduced customer demand, the impact of customer destocking, and COVID-19 related headwinds***."

*Executive summary*

| *(dollars in millions)* | Year ended December 31, 2024 | 2023 | 2022 | 2024 vs. 2023 | 2023 vs. 2022 |
|---|---|---|---|---|---|
| Net sales | $ 6,783.6 | $ 6,967.2 | $ 7,512.4 | $ (183.6) | $ (545.2) |
| Gross margin | 33.6 % | 33.9 % | 34.6 % | (30) bps | (70) bps |
| Operating income | $ 1,084.8 | $ 696.4 | $ 1,130.2 | $ 388.4 | $ (433.8) |
| Operating income margin | 16.0 % | 10.0 % | 15.0 % | 600 bps | (500) bps |
| Net income | $ 711.5 | $ 321.1 | $ 686.5 | $ 390.4 | $ (365.4) |
| Net income margin | 10.5 % | 4.6 % | 9.1 % | 590 bps | (450) bps |
| Adjusted EBITDA | $ 1,198.8 | $ 1,309.1 | $ 1,570.7 | $ (110.3) | $ (261.6) |
| Adjusted EBITDA margin | 17.7 % | 18.8 % | 20.9 % | (110) bps | (210) bps |
| Adjusted Operating Income | $ 1,089.8 | $ 1,211.8 | $ 1,477.3 | $ (122.0) | $ (265.5) |
| Adjusted Operating Income margin | 16.1 % | 17.4 % | 19.7 % | (130) bps | (230) bps |

298. Likewise, the FY 2024 10-K, at pages 33 to 40, sets forth other reported information reflecting the ongoing poor performance at each of the operating segments in 2024, further corroborating the existence of performance degradation that should have served as triggering events for interim goodwill testing during this time. Specifically, page 34 of the FY 2024 Form 10-K contains two charts showing a reconciliation of the declines in net sales growth to organic net sales growth for the LSS and BPS segments from fiscal year end ("FYE") 2023 to FYE 2024 and FYE 2022 to FYE 2023 as follows:

| *(in millions)* | Year ended December 31, 2024 | 2023 | Reconciliation of net sales growth (decline) to organic net sales growth (decline): Net sales growth (decline) | Foreign currency impact | Divestiture impact | Organic net sales growth (decline) |
|---|---|---|---|---|---|---|
| Laboratory Solutions | $ 4,610.1 | $ 4,738.3 | $ (128.2) | $ 5.5 | $ (42.4) | $ (91.3) |
| Bioscience Production | 2,173.5 | 2,228.9 | (55.4) | 1.8 | — | (57.2) |
| Total | $ 6,783.6 | $ 6,967.2 | $ (183.6) | $ 7.3 | $ (42.4) | $ (148.5) |

| *(in millions)* | Year ended December 31, 2023 | 2022 | Reconciliation of net sales growth (decline) to organic net sales growth (decline): Net sales growth (decline) | Foreign currency impact | Organic net sales growth (decline) |
|---|---|---|---|---|---|
| Laboratory Solutions | $ 4,738.3 | $ 5,002.4 | $ (264.1) | $ 30.8 | $ (294.9) |
| Bioscience Production | 2,228.9 | 2,510.0 | (281.1) | 10.4 | (291.5) |
| Total | $ 6,967.2 | $ 7,512.4 | $ (545.2) | $ 41.2 | $ (586.4) |

299. In addition, the FY 2024 Form 10-K illustrates the declining Adjusted Operating Income (as well as the declining Adjusted Operating Income margin) in the following two charts at page 37 of the FY 2024 Form 10-K:

*Adjusted Operating Income and Adjusted Operating Income margin*

For a reconciliation of Adjusted Operating Income and Adjusted Operating Income margin to net income and net income margin, respectively, the most directly comparable measures under GAAP, see "Reconciliations of non-GAAP financial measures."

| | Year ended December 31, | | |
|---|---|---|---|
| *(dollars in millions)* | 2024 | 2023 | Change |
| Adjusted Operating Income: | | | |
| Laboratory Solutions | $ 598.0 | $ 668.3 | $ (70.3) |
| Bioscience Production | 558.2 | 601.9 | (43.7) |
| Corporate | (66.4) | (58.4) | (8.0) |
| Total | $ 1,089.8 | $ 1,211.8 | $ (122.0) |
| Adjusted Operating Income margin | 16.1 % | 17.4 % | (130) bps |

| | Year ended December 31, | | |
|---|---|---|---|
| *(dollars in millions)* | 2023 | 2022 | Change |
| Adjusted Operating Income: | | | |
| Laboratory Solutions | $ 668.3 | $ 764.7 | $ (96.4) |
| Bioscience Production | 601.9 | 778.9 | (177.0) |
| Corporate | (58.4) | (66.3) | 7.9 |
| Total | $ 1,211.8 | $ 1,477.3 | $ (265.5) |
| Adjusted Operating Income margin | 17.4 % | 19.7 % | (230) bps |

300. Further corroborating the existence of changes in operating conditions and results that indicated impairment is the known poor performance following and related to the Ritter acquisition. The Company acquired Ritter in 2021, from which the Company recognized approximately $807 million in goodwill just before the start of the Class Period. In 2023, Avantor took a $160 million non-cash impairment expense to reflect a reduction in the fair value of certain of its Ritter assets, admitting that the impairment was "driven by persistently high customer inventory in the end markets served by Ritter and an overall slowdown in the research spending environment."[27] This included a $106.4 million in impairment to Ritter's finite-lived intangible assets, which Defendants attributed to Ritter's "revenues declin[ing] in 2023 compared to prior expectations, primarily from reduced customer demand for medical fluid handling tips due to a decrease in COVID-19 testing," with "sustained declines" in revenues. These circumstances had

[27] The impairment analysis for these assets was itself a trigger for analyzing the Ritter goodwill, and the goodwill for whichever reporting unit subsumed the Ritter operations. Equally, as stated in the FY 2024 10-K, certain of the Ritter charges from 2Q 2023 "impacted" Avantor's "Laboratory Solutions reportable segment." As noted, the belatedly announced "Distribution" unit in which the $785 million impairment charge was untimely recorded in 3Q 2025, is also claimed by Avantor to be within the LSS (Laboratory Solutions) segment.

necessitated interim goodwill testing that identified the impairment. Indeed, impairment triggers for finite-lived intangible assets mirror in key respects the triggering events for goodwill impairment analysis. *See* ASC 350-30-35-14, and ASC 360-10-35-21(c) (emphasis added), "[a] significant **adverse change** in legal factors or in the **business climate . . .);** ASC 360-10-35-21(e) (emphasis added), a "**current-period operating or cash flow loss combined with a history of operating or cash flow losses or a projection or forecast that demonstrates continuing losses . . . .**"

301. The accounts of multiple former employees support the reasonable inference that Ritter's poor performance raised ongoing concerns as to the value of the goodwill.

(a) FE-2 explained that former Executive Vice President, Europe, Global Portfolio and Sourcing Frederic Vanderhaegen led the "charge" as to the Ritter acquisition, and had approached Avantor's Board about acquiring Ritter. FE-2 further explained that Vanderhaegen's familiarity with Ritter originated from Vanderhaegen's work at a previous employer of which Ritter was a competitor. With respect to Ritter, FE-2 explained that he and his colleagues in the UK and Europe knew nothing about Ritter's products but were asked to "push" them to their customer bases. According to FE-2, his team was asked to mention Ritter and Masterflex to customers despite these products not readily fitting in his portfolio and employees lacking knowledge about these products. According to FE-2, the instruction was to pass Ritter leads that were generated to the Life Sciences Team. He recalled that he and his colleagues received no information or training from leadership about selling Ritter's products. FE-2 noted that Ritter's business, primarily with respect to tips, was not of interest to his customers. FE-2 noted that he could not recall any return on the time he or his colleagues invested in trying to sell Ritter products.

(b) FE-12 explained that Ritter was one of the least successful acquisitions during her tenure and that Ritter had a "broken portfolio." FE-12 explained that for example, Ritter had a 10-milliliter version of a specific product but not a 100 milliliter and customers wanted to be able to purchase an entire portfolio from a single company. According to FE-12, there was an emphasis in 2022 and 2023 on selling Ritter products following the acquisition and selling Ritter products became a part of the compensation plans for sales representatives. FE-12 explained that by 2024, discussions on selling Ritter products had just been "done away with" and no targets were established for Ritter products in 2024 or 2025.

(c) FE-8 explained that the Company had invested a lot of money into the Ritter acquisition, and there was a big push to get Ritter into every conversation with customers. FE-8 recalled that Ritter products were introduced into his portfolio in approximately 2022 or 2023 and recalled that financial incentives related to selling Ritter products were included in the compensation for employees—he recalled it was part of the bonus structure at one point—and he was required to record opportunities pertaining to potential sales of Ritter products. According to FE-8, Ritter opportunities included any of his customers that used machines that would work with Ritter tips, including those produced by Tecan and Hamilton. According to FE-8, incentives for salespeople were introduced specifically for Ritter products and during monthly reviews, FE-8 was required to show a certain number of Ritter opportunities in his pipeline. However, FE-8 stated that these opportunities were "all for show" and little ever came of them. FE-8 recalled being asked about Ritter opportunities up until he departed the Company in April 2025. FE-8 explained that pushing Ritter products on customers was like "beating a dead horse." FE-8 explained that customers were comfortable using the tips made by the same company that made their units and that it was difficult to convert customers to switch to Ritter. FE-8 noted that health companies

needed to validate their SOPs (standard operating procedures) when changing to a new machine and that takes money and manpower. FE-8 recalled providing samples of Ritter products to customers and customers noting that they "didn't work as well" and customers were instructed to change settings to improve performance. FE-8 added that this was viewed as a waste of time and a risk from a customer perspective when they already had a product they were already comfortable with. He explained that customers had the viewpoint that, you're not saving any money if you have to go through a variety of steps just to make sure the [Ritter] product worked properly.

302. Thus, the existence of such similar factors sufficient to identify impairment of certain of the finite-lived assets from the Ritter acquisition further bolster the existence of triggering events and value destruction to goodwill within at least the Laboratory Solutions reporting segment (and whichever specific reporting units were subsumed thereby, which is unclear from Avantor's public filings) throughout the Class Period.

**b. Loss of Market Share**

303. ASC 350-20-35-3C(b) expressly provides that "[i]ndustry and market considerations such as . . . an increased competitive environment," can be a key triggering circumstance requiring testing for goodwill impairment.

304. As indicated above, substantial evidence indicates that Avantor lost significant market share to competitors by as early as the first quarter of 2024. *See* Section V.D.4. This includes, among other facts, that Avantor lost key customer accounts (¶¶230-21, 256) as well as the conclusions of Engine Capital in its August 11, 2025 public letter finding that Avantor must have known "mounting evidence" of "self-inflicted" market share loss by at least 2023. ¶¶258, 260.

305. Further, Avantor was plagued with aging and/or obsolete inventory as set out in Section V.D.1, which was another impairment trigger under the provisions of ASC 350.

306. In addition to, or as a component of, the decreasing customer demand and excess inventory, as set forth in Sections V.D.1 and V.D.4, Avantor also engaged in substantial discounting of products to customers, often selling at negative margin, or including incentives or rebates, beginning and continuing throughout the Class Period.

**c. Loss of Key Executives and Other Employees**

307. ASC 350-20-35-3C(e) states that "[o]ther relevant entity-specific events such as changes in management [or] key personnel" can be a key triggering circumstance requiring testing for goodwill impairment.

308. Management and key personnel of the LSS, of which the Distribution Unit was seemingly a part, experienced significant upheaval during the Class Period. Specifically, Randy Stone departed from his position as the Executive Vice President of LSS, and the Company secured current LSS President Corey Walker. Walker was reportedly hired as President of LSS as of June 2024[28], but due to litigation with his former employer (Ingersoll Rand) that occurred during the Class Period, Walker reportedly did not start work at Avantor until at least March or April 2025.[29] During the period between Stone's departure and Walker's ability to work at Avantor, upon information and belief, no interim manager was hired to fulfill the duties of Stone. As set forth in

[28] *See* "Avantor® Appoints Corey Walker as President of Laboratory Solutions," https://news.avantorsciences.com/2024-06-21-Avantor-R-Appoints-Corey-Walker-as-President-of-Laboratory-Solutions (last visited April 24, 2026). According to Avantor, Walker joined Avantor after serving as the "Chief Executive Officer of ILC Dover, a global supplier to the biopharma and medical device end markets." *See id.* Avantor also disclosed that from "2016 to 2020, [Walker] was an Executive Vice President at Avantor and led the Americas region as well as the global Biomaterials and Electronic Materials businesses." *Id.*

[29] As set forth in Section V.D.2.c above, on June 24, 2024, Ingersoll Rand sued Walker and Avantor in Colorado State Court for breaching his non-competition agreement. On September 5, 2024, the Court issued a preliminary injunction enjoining Walker from serving at Avantor until June 20, 2025. According to multiple FEs, LSS had no leader between the departure of Stone in June 2024 and Walker's start at Avantor at some point around March or April 2025.

Section V.D.2.c, Avantor did not publicly announce or discuss the fact that there was no LSS head between Stone's departure in June 2024 until, at earliest, Walker's return to the Company in March or April 2025.

309. Further, Sheri Lewis, the company's Executive Vice President, Global Supply Chain, and Frederic Vanderhaegen, the company's Executive Vice President, Europe, among others, also left Avantor in 2024. Section V.D.2.c contains additional facts related to Avantor's ongoing loss of key executives and employees, all of which represent apparent triggering events or circumstances facing Avantor during the Class Period.

#### d. The Sustained Decrease in Avantor's In Market Capitalization And Share Price

310. GAAP expressly indicates that a decline in stock price (and, therefore, often market capitalization) may be a triggering event. *See* ASC 350-20-35-3C(g). Indeed, Avantor stated that it identified the impairment recognized in October 2025 on the basis of an interim test conducted in part "as a result of sustained decreases in [Avantor's] publicly quoted share price and market capitalization." In fact, Avantor experienced comparable, ongoing declines in market capitalization by the start of and continuing throughout the Class Period:

| Avantor, Inc | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| *Summary of Market* | | | | | | | | |
| Market Cap. Drops Based | | | | | | | | |
| **Disclosure Date** | **Prior Date** | **Drop Date** | **Prior Closing Price** | **Post-Disclosure Price** | **Price Drop** | **Pct. Drop** | **Shares Outstanding** | **Market Cap. Drop** |
| 02/14/24 (Wed) | 02/14/24 | 02/15/24 | $24.40 | $24.05 | ($0.35) | (1.43%) | 678,281,383 | ($237,398,484) |
| 04/26/24 (Fri) | 04/25/24 | 04/26/24 | $25.15 | $23.94 | ($1.21) | (4.81%) | 679,266,323 | ($821,912,251) |
| 07/26/24 (Fri) | 07/25/24 | 07/26/24 | $22.82 | $25.60 | $2.78 | 12.18% | 679,840,443 | $1,889,956,432 |
| 10/25/24 (Fri) | 10/24/24 | 10/25/24 | $23.27 | $22.43 | ($0.84) | (3.61%) | 680,613,800 | ($571,715,592) |
| 02/07/25 (Fri) | 02/06/25 | 02/07/25 | $21.70 | $19.16 | ($2.54) | (11.71%) | 680,902,572 | ($1,729,492,533) |
| 04/25/25 (Fri) | 04/24/25 | 04/25/25 | $15.50 | $12.93 | ($2.57) | (16.58%) | 681,429,663 | ($1,751,274,234) |
| 08/01/25 (Fri) | 07/31/25 | 08/01/25 | $13.44 | $11.36 | ($2.08) | (15.48%) | 681,738,675 | ($1,418,016,444) |
| 10/29/25 (Wed) | 10/28/25 | 10/29/25 | $15.08 | $11.58 | ($3.50) | (23.21%) | 681,814,859 | ($2,386,352,007) |
| 02/11/26 (Wed) | 02/10/26 | 02/11/26 | $11.16 | $9.64 | ($1.52) | (13.62%) | 682,055,932 | ($1,036,725,017) |
| Total: | | | | | | | | ($8,062,930,129) |

311. The chart below also graphically depicts Avantor's share price and declining market capitalization:



312. The massive declines in Avantor's stock price and market capitalization were key indicators of likely impairment in the Distribution unit's goodwill. The chart above demonstrates a regressional decline in Avantor's stock price and market capitalization throughout the Class Period, and while Avantor struggled to maintain step with the S&P 500 Health Care Index, Avantor's stock price took on a continued downward trajectory by not later than October 2024. Avantor's FY 2024 10-K at 29 selects the S&P 500 Health Care Index as its benchmark for stock performance as, according to Avantor, "we believe [it] closely aligns to us. . . ." As indicated in the above chart, over the period from approximately March 2024 to February 2026, Avantor had a -63.8% return compared to the 11.2% return of the S&P 500 Health Care total return.

### 3. Defendants Violated GAAP By Not Recording A Goodwill Impairment Charge In The Company's 2024 Quarterly Results

313. The triggering events and circumstances described in Section V.E.2 above, individually and collectively, clearly constituted indicators that it was more likely than not that the Company's reported goodwill was impaired no later than the first quarter of 2024. Accordingly, GAAP rules required Defendants to perform the full quantitative impairment test and to write down the value of its goodwill prior to filing the Company's quarterly report on Form 10-Q for the first quarter of 2024 (and thereafter).

314. Despite the clear language of ASC 350, its SEC disclosures, and its internal accounting controls, policies, and procedures, Defendants ignored the objective evidence of impairment. Instead, Defendants misleadingly stated that they had "reassigned goodwill as of January 1, 2024 to align to our new segment structure by using a relative fair value approach as required under GAAP" and had "tested goodwill for impairment immediately before and after the reorganization of our reporting structure; no impairment was identified," and otherwise identified only de minimis impairment charges.

315. These statements were false and misleading because the Company's goodwill was impaired at that point and Defendants did not have a reasonable basis to manufacture a rosy forecast reliant on revenue growth and profits to delay recording the impairment. Indeed, there are reasons to believe that Avantor's decision to realign its reporting segments and units was aimed at avoiding the very impairment charge it was forced to record in the third quarter of 2025. As explained above, Defendants were aware of several impairment triggers that made it clear that the Distribution reporting unit was impaired by the end of the first quarter of 2024. By failing to record goodwill impairment on a timely basis, Defendants violated GAAP rules as described herein and materially overstated the Company's goodwill in the Company's Q1, Q2, and Q3 2024 Quarterly Reports on Forms 10-Q, which in turn materially overstated Avantor's total assets, particularly given considering goodwill accounted for over 40% of the Company's total assets.

#### 4. Defendants Violated GAAP By Not Recording A Goodwill Impairment Charge In The Company's 2024 Annual Report

316. Defendants continued delaying the goodwill impairment charge through the fourth quarter of 2024. In February 2025, the Company filed with the SEC its annual report on Form 10-K for the fiscal year 2024, which also falsely claimed that goodwill was not impaired. Specifically, in the 2024 Annual Report, Defendants claimed that they conducted impairment testing based on "historical trends, management's knowledge and experience and overall economic factors, including projections of future earnings potential," and "[d]eveloping future cash flows [by] evaluat[ing] our intermediate to longer-term strategies, including, but not limited to, estimates about net sales growth, operating margins, capital requirements, inflation and working capital management." Based on this, Defendants stated that they determined that "each reporting unit had a fair value that was in excess of its carrying value," and no impairment charge was taken.

317. This, too, was false and misleading because had Defendants appropriately considered the impairment triggers and the underlying conditions reflected by those impairment triggers as alleged above, it would have been obvious that goodwill was significantly impaired by the start of the Class Period and certainly by the fourth quarter of 2024. Although it was clear to Defendants that Avantor's business had declined and its goodwill was impaired by December 31, 2024, Defendants nonetheless continuously reassured investors throughout the remainder of the Class Period that goodwill was not impaired. Indeed, that impairment existed is further corroborated by the fact that the conditions cited by Defendants as to the impairment charge taken in Q3 2025 existed ***throughout*** the Class Period—including as of any impairment testing undertaken throughout—and there is no cogent basis to distinguish the basis for impairment recognized in Q3 2025 from likewise requiring impairment earlier in the Class Period.

**5. Ongoing Triggering Events Continued To Require Defendants Take A Goodwill Impairment Charge During The First And Second Quarters Of 2025**

318. Defendants should have performed the full quantitative goodwill impairment test and written down Avantor's goodwill in 2024, but did not do so, and thus Defendants should have performed impairment testing and recorded a goodwill impairment charge during each quarter of 2025 given that it had not already done so, as Defendants continued to ignore several red flags that put them on notice that goodwill was materially overstated.

319. Indeed, as detailed above, Avantor's financial performance and stock price continued their significant, sustained declines into 2025. What's more, conditions throughout 2025 were substantially the same as those that the Company ultimately admitted required an interim test and impairment in its October 2025 filing, further demonstrating that the same triggering events existed throughout 2025 that the Company admitted in October 2025.

### 6. Defendants Violated GAAP By Failing To Take A Goodwill Impairment Charge During The First Two Quarters Of 2025

320. The triggering events and circumstances described Section V.E.2 above, individually and collectively, clearly constituted indicators that it was more likely than not that goodwill continued to be impaired in 2025, without any write-downs having been reported during 2024. Despite the presence of these indicators of impairment, Defendants unreasonably concluded that no interim quantitative test was necessary and instead, Defendants continued to carry hundreds of millions of dollars in goodwill for the LSS segment and its associated Distribution reporting unit in Avantor's financial statements for the first and second quarters of 2025, resulting in material misstatements and omissions in Avantor's quarterly reports filed on Form 10-Qs for those quarters. *See infra* ¶¶498-99. As a result, the Company's quarterly reports for the first two quarters of 2025 all materially overstated the Company's assets and financial performance.

## VI. THE TRUTH GRADUALLY BEGINS TO EMERGE

321. As set forth below, Defendants' fraud triggered massive, statistically significant declines in the price of Avantor's common stock that were causally connected to the facts that Defendants misrepresented and omitted. The truth concerning these practices emerged through a series of partial disclosures beginning April 25, 2025 and continuing through the end of the Class Period. Notably, the price of Avantor common stock continued to be artificially inflated during this time, including because Defendants continued to make false and misleading statements and omissions until the truth was finally fully revealed at the end of the Class Period.

### A. The Truth Is Partially Revealed on April 25, 2025

322. On April 25, 2025, before the market opened, Defendants partially revealed the true state of Avantor's supply chain failures and operational deficiencies when the Company reported weak results for the first quarter of 2025. In connection with these disappointing numbers, Avantor

disclosed new efforts to "retain key accounts and aggressively pursue new accounts" and other new initiatives such as "improving data accuracy, accelerating fulfillment speeds and optimizing inventory." The Company also disclosed that it was "implementing a comprehensive strategy to strengthen our Lab Solutions segment and are committed to moving with urgency to improve performance across the business."

323. During the Company's earnings call that day before the market opened (the "Q1 2025 Earnings Call"), Defendant Stubblefield "acknowledge[d] that we are not satisfied with our first quarter performance" and that revenue "fell short of our expectations." Further, despite having touted the Company's supply chain operations, data accuracy, fulfillment processes, inventory management, and the e-commerce platform throughout the Class Period, Stubblefield announced "immediate and significant" changes being made by Avantor to drive growth in its Lab business related to those same operations, including "***improving data accuracy, accelerating fulfillment speeds and optimizing inventory***," stating:

> In addition to the work that Corey has initiated, we have recently implemented a range of actions that will strengthen our business. First, our Delivery Excellence initiative is focused on ensuring greater supply chain efficiency and resilience. By improving data accuracy, accelerating fulfillment speeds and optimizing inventory, we are enabling differentiated service levels to our customers that will drive growth across all channels.
>
> Second, we are accelerating digital enhancements to our platform, including the rollout of our new AI-enabled e-commerce platform to further streamline the customer experience. . . . . This transformation is expected to unlock new opportunities, maximize value and improve profitability and growth.

324. Also during the Q1 2025 Earnings Call, Defendant Jones revealed for the first time that Avantor "felt the impact of ***increased competitive intensity that reduced volumes at a handful of customers***," while Stubblefield likewise admitted that "we do see a heightened level of competition," adding that Avantor had "see[n] some shifting within a few of our accounts that did

lead to lower volumes" and "we certainly did see some movement at some of the accounts." Stubblefield further stated that these developments in the "macro and competitive backdrop . . . highlights ***the importance of the decisive actions that we are taking today to strengthen the business*** . . . ***of driving aggressively to retain and grow our key accounts***." Stubblefield also stated during that call that the Company was "making some additional investments to strengthen our pricing capabilities," including "leveraging the integration of a number of digital technologies."

325. Also on April 25, 2025, the Company announced in a separate press release before the start of trading that Defendant Stubblefield would be leaving the Company, staying on as Avantor's CEO, President, and Director on its Board of Directors until the appointment of a successor. Commenting on the CEO transition announcement, Stubblefield stated that "our board of directors and I agreed that now is the right time to initiate a transition in Avantor's leadership."

326. Securities analysts reacted negatively, with their commentary tying the disclosures to facts Defendants had previously misrepresented. Bernstein concluded that the question whether "'Avantor [is] actually losing share in the channel?' . . . has been an unanswerable question for some time, but ***management (basically) answered it this quarter: yes***," and noted that "aggressive pricing from competitors had played a role here"—contradicting Defendants' prior assurances about Avantor's competitive positioning and pricing power. Goldman Sachs likewise downgraded the Company on April 29, 2025, repudiating both the reorganization and cost-savings initiative Defendants had championed and stating: "***[w]e had wrongly assumed that an aggressive cost savings program on the back of a segment reorganization and a bioprocessing business in recovery mode would be enough to continue to drive increased margin expansion and growth***," and "***[i]ncreased competition has particularly impacted AVTR's Laboratory Solutions***

business[.]" TD Cowen similarly observed that Avantor cited "more ***competitive pressure (implied some share loss, price pressure)*** in its core Lab consumable business."

327. On this news, the price of Avantor stock declined $2.57 per share, or 16.6%, from a close of $15.50 per share on April 24, 2025, to close at $12.93 per share on April 25, 2025.

328. While the disclosures that day began to partially reveal the truth about Defendants' fraud, the full truth remained concealed, and Defendants also made additional false and misleading statements and omissions that prevented the artificial inflation in the stock price from fully dissipating.

329. For example, in response to an analyst question about the now-revealed "pricing dynamics," Defendant Stubblefield stated that "the increased competition for new accounts, new business" led to "printing at modestly lower margins than what we would typically see," but stated specifically, "***for the business that we have today and for the contracted customers, pricing has played out***." As Defendants would later admit, there continued to be intense competition even for current accounts necessitating pricing actions.

330. Likewise, Defendants also continued to falsely and misleadingly tout the reorganization and cost-savings initiative, with Defendant Stubblefield stating for example that Defendants' "***actions have been carefully designed and executed to ensure that our critical capabilities remain intact***." In addition, Defendant Jones falsely claimed that Defendants' cost-cutting "***hasn't led to any disruption***."

331. Defendant Stubblefield also continued to tout Avantor's competitive position, stating that Avantor was "***moving as aggressively as we can, not only to support the customers, but to strengthen and grow the business***," that Avantor was "***differentiated***" as compared to competitors because of "***the value proposition and strength of a supply chain that looks like ours,***

***unparalleled customer access that we provide, the agility, the choice and the ability to serve these customers the way we do***."

332. Further, in their Q1 2025 Form 10-Q also filed that day, Defendants reported only *de minimis* "impairment losses of $38.8 [million]" and that Goodwill was valued at ***$5,609.1 million*** as of March 31, 2025.

333. In the following months, Defendants continued to make further false and misleading statements and omissions around these issues. For example, on May 8, 2025, at Avantor's Annual General Meeting, Defendant Peacock stated that Avantor's operating model "***sharpened our focus on customers, laboratory and production needs and unlocking additional efficiencies and better positioning Avantor to focus on improving growth and performance***."

334. Additionally, during the Bank of America Global Healthcare Conference on May 13, 2025, Defendant Stubblefield touted the many different "***structural actions***" and "***record-level***" investments Avantor made as a part of the reorganization and cost-savings initiative, including in "differentiated supply chain performance" and "in our digital capabilities and pricing," noting that Avantor will "***continue to invest at record levels to continue to grow the business and position us for sustained growth over the long-term***." In addition, Defendant Stubblefield falsely told investors that day that customer "***destocking has essentially been eliminated***" and order patterns had normalized.

**B. The Truth is Further Partially Revealed on August 1, 2025**

335. Defendants' Q2 2025 earnings disclosures on August 1, 2025 further partially revealed the truth when Avantor disclosed unexpectedly disappointing financial results and reduced its guidance for 2025 performance.

336. Defendants attributed the disappointing results to, among other things, "***increased supply chain expense in the form of higher than expected freight expense and fixed cost under-***

***absorption***" and "***planned maintenance efforts at one of our manufacturing facilities that extended longer than planned and led to an increase in back orders***," directly contradicting Defendants' Class Period assurances that Avantor's supply chains had "largely normalized" and that the Company was making substantial supply chain investments.

337. In addition, during the their earnings call with investors that day, Defendant Jones revealed for the first time new information about the increased competition facing Avantor, revealing that Avantor took "***competitive actions to drive share***" that "***have come at the cost of margin***," and attributed Avantor's disappointing results in part to "***price actions***" to both "***protect and grow***" Avantor's share—contrary to Defendants' assurances in just the prior quarter that pricing had not been impacted and had "played out" with Avantor's current customers.

338. What's more, Defendants revealed that Avantor was slashing free cash flow guidance by ***$100 million*** to cover "***meaningful prepaid rebates***" to protect its market share and retain customers in its lab business.

339. Finally, Defendant Jones announced that guidance was further reduced for Avantor's growth based on 1H 2025 performance, both overall and with respect to LSS and BPS, based on both "first half performance and ***current visibility*** to the business."

340. Stunned, analysts pressed Defendants on the suddenly revealed "competitive intensity" and the cut to free cash flow guidance, with Defendant Stubblefield admitting on the call: "we have seen a step-up in competitive intensity, particularly in our Lab business . . . most pronounced with our larger biopharma accounts. And we've seen that kind of intensifying as we've moved through the year." Defendant Jones likewise admitted that "there has been some pressure on volume, but . . . [i]t's primarily on the price side . . . . the price headwind is the main drop-through." These admissions directly contradicted Defendants' Class Period statements that

Avantor was "differentiated" from competitors and that pricing had "played out" for the Company's contracted customers.

341. Analysts still pressed further on this issue, with a Jefferies analyst asking bluntly if Defendants can "help us bridge the free cash flow cut? How is that tied to $100 million wins on the lab side? Are there mechanics around the rebates here? Should we be worried about channel stuffing, effectively giving away some inventory here?" In response, Defendant Jones stated that "a significant piece of the free cash flow" guidance reduction "was related to that []rebate dynamic." The analyst pressed further, asking, "When you talked about $100 million benefits from new wins, are you giving away inventory upfront I guess is the question," and in response Defendant Stubblefield stated: "The contracts that go around that will incorporate significant upfront rebate payments. . . . that'll get paid here in the second half as those contracts are implemented, need to be taken into account."

342. Analysts reacted in terms tied directly to the falsity of Defendants' prior representations. For example, Jefferies wrote that the "***magnitude of price cuts being used to protect Lab share is jarring and likely puts a lid on margin expansion***," and an August 4, 2025 Bernstein analyst report noted that Avantor management had characterized itself as being "***in the mud of the worst of [the competition]***"—directly undermining Defendants' Class Period assurances about pricing discipline and competitive position.

343. On this news, the price of Avantor common stock declined $2.08 per share, or 15.5%, from a close of $13.44 per share on July 31, 2025, to close at $11.36 per share on August 1, 2025.

344. While this news partially revealed Defendants' fraud, these disclosures again still failed to fully reveal the truth and the full magnitude of the risks and harm Defendants had

concealed remained undisclosed, and the Company's common stock price continued to be artificially inflated. For example, the Q2 2025 10-Q also issued on August 1, 2025 reported again only de minimis impairment with goodwill valued at ***$5,762.2 million*** as of June 30, 2025.

345. On August 11, 2025, just ten days after the Q2 2025 Earnings Call, Avantor received a public letter from Engine Capital, which, as of that date, owned approximately 3% of outstanding shares of Avantor. In its public letter, Engine Capital explained it interviewed more than 20 senior employees to investigate and "better understand Avantor's subpar performance." On the basis of its own investigation, Engine Capital concluded Avantor must have known much earlier of its "self-inflicted" market share loss. Indeed, Engine Capital underscored that "[d]espite mounting evidence to the contrary, Avantor insisted it was not losing market share—only reversing its position after additional disclosures by Thermo forced the Company to acknowledge the issue on its 1Q 2025 earnings call," *i.e.*, referring to the Company's disclosures in April 2025.

346. Avantor responded to the Engine Capital letter the same day. In its reply, Avantor glossed over the claims in the Engine Capital letter and instead broadly "reiterate[d] shareholder value creation focus." Avantor's response noted the Board "regularly review[s] the Company's strategic priorities with an eye towards driving growth, expanding margins, and creating sustained shareholder value," and expressed confidence "in our ability to accelerate execution of our value creation initiatives under the leadership of [new CEO] Emmanuel Ligner."

### C. The Truth is Further Revealed on October 29, 2025

347. On October 29, 2025, before the market opened, Avantor reported its third quarter 2025 results in a Form 10-Q (the "Q3 2025 10-Q") and held a conference call with analysts (the "Q3 2025 Earnings Call"), the first earnings call at which new CEO Emmanuel Ligner addressed investors. During the Q3 2025 Earnings Call, Ligner disclosed that "[g]aps in sales and operating processes are contributed to inventory and forecasting challenges, preventing us from serving our

customers at the on-time rates they expect," and Defendant Jones attributed in part the decline in organic revenue to "operational headwinds that are impacting our throughput, including raw material availability and equipment uptime." These statements directly contradicted Defendants' Class Period assurances that Avantor's supply chains had "normalized" and that the Company had made "record" supply chain investments.

348. Ligner disclosed that, throughout the Class Period and under Stubblefield's leadership, the Company had "***dropped the ball***" and created numerous "***self-inflicted***" issues that had hollowed out Avantor's distribution business, supply chain, inventory, and e-commerce platform—including as a result of the reorganization and cost-savings initiative. Ligner specifically acknowledged that Avantor's "***business is overly complex with unnecessary centralization, which inhibits frontline staff from most effectively meeting our customers and supplier needs and expectations***." Ligner also highlighted the Company's operations and supply chain woes, stating that "***[o]n the operation and supply chain side, I believe we need to make some investment and process enhancement*** to improve our ability to consistently serve our customers." Ligner announced that he had developed a plan for fixing these "***self-inflicted***" issues, which he called the "Avantor Revival."

349. Defendants also reported a non-cash goodwill impairment charge of $785 million, erasing this amount from Avantor's balance sheet. Avantor also reported weak third quarter 2025 financial results and a net loss of $712 million, which Defendants primarily attributed to the $785 million goodwill impairment charge. Defendant Jones revealed that the large impairment charge was "associated with our Lab distribution business" (specifically, LSS), and "was necessitated in large part by the continued weakness in our share price as well as the ***margin headwinds this business is facing***." Because competitive intensity and operational failures had eroded Avantor's

margins, the Company's goodwill impairment was attributable to the very conditions Defendants had misrepresented during the Class Period.

350. Defendant Jones admitted that Avantor's adjusted gross margin had declined 100 basis points year-over-year "driven mainly by ***price actions in lab to protect and grow market share***," and revealed that LSS margins of 11.3% were depressed because "***[t]he softer demand environment has pressured our ability to get price, which has meaningfully impacted margins year-over-year***[,]" with the sequential decline driven by "***lower volumes and related absorption***." Jones further reported that LSS revenue of $1.1 billion represented a 5% organic decline, "below [Avantor's] expectations." These admissions of margin compression, demand weakness, and absorption losses directly contradicted Defendants' Class Period statements that Avantor was a "differentiated" competitor with superior pricing power and that destocking and demand weakness had "essentially been eliminated."

351. Jones also disclosed that Avantor's reported revenue was down 5% year-over-year on an organic basis, primarily due to weaker-than-expected performance in LSS, further contradicting Defendants' statements about differentiation, demand, and destocking. Jones disclosed that the Company's distribution channel, "which accounts for approximately two-third of segment revenue, was ***primarily impacted by weakness in consumables and equipment and instrumentation***," while its "services business, approximately 20% of segment revenue, saw greater-than-expected headwinds due to the ***aforementioned share loss***." In discussing the reasons for the poor performance, Defendant Jones again cited weak demand and stated: "While ***market softness*** is a key factor in the quarter's performance, ***we also continue to navigate competitive pressures. These need to be better mitigated by improved commercial and operational execution***[.]." Defendant Jones disclosed further guidance reductions, stating that Avantor now

expected full-year 2025 organic revenue growth of “negative 3.5% to negative 2.5%” compared to guidance of “negative 2% to flat” provided on August 1, 2025. Laboratory Solutions was expected to decline by mid-single to low-single digits organically, “down modestly from previous expectations of minus low-single digits,” with Jones citing weakened demand, particularly “***continued softness in consumables and in our lab services business***.”

352. Jones also informed investors about weakened demand in BPS. He announced that Bioscience Production’s full-year revenue was now expected to be “minus low-single digits organically, down from previous expectations of approximately flat,” with bioprocessing “expected to be down low-single digits for the year organically, down from previous expectations of flat to plus low-single digits,” stating further that the “business is being impacted by the competitive pressures and the general demand weakness we are seeing in consumables.”

353. Jones also revealed continued operational issues at the Company’s plants, citing “***operational headwinds*** that are impacting our throughput, including raw material availability and ***equipment uptime***,” and acknowledging that “***downtime at several of our plants prevented us from shipping several orders***” that were due in Q3—contradicting Defendants’ prior assurances of “normalized” supply chain operations, robust investments in supply chain operations, and “continued improvement” to supply chain efficiency.

354. Moreover, Ligner revealed in response to an analyst’s question about market share that Avantor had “***lost a couple of large accounts***.” Defendant Jones also admitted that “we’re seeing the impact of the contract losses on share there” and that “[i]t will take time, both on the defense and the new contract wins to see those come in there.”

355. Ligner further admitted to numerous failures that directly contradicted Defendants’ Class Period assurances. Specifically, he conceded that Avantor needed to “***refocus attention to***

***our distribution business and our value proposition to supplier and customers," "evolve [its] customer service and commercial organization***," and "***enhance [its] e-commerce platform***"—directly contradicting Defendants' Class Period claims of operating a "leading e-commerce platform" and a "differentiated" distribution business. To do so, Ligner announced that Avantor was hiring "a new Chief Operating Officer, a critical role that will report to me and our help reinforce consistent manufacturing, supply chain excellence, and lean operations across the organization" and "a new Chief Digital Officer to help strengthening digital commerce capabilities with our Laboratory Solutions segments."

356. Ligner further admitted that Avantor needed to ***"invest strategically in our manufacturing and supply chain organization***" because the current state ***"varies with some facilit[ies] that are world class, while others are in need of investment,"*** and that Avantor was not ***"better positioned to meet that demand*** at all times"—directly contradicting Defendants' Class Period statements that Avantor had made purposeful and aggressive investments in supply chain and that supply chains had "normalized."

357. Ligner further admitted that the cost-savings initiative was "***not adequately falling through to the bottom line***," with ***"gaps in sales and operating processes . . . contribut[ing] to inventory and forecasting challenges***." These admissions directly contradicted Defendants' Class Period statements that Defendants' cost cutting, among other things, "hasn't led to any disruption," was generating savings, and was "ahead of schedule." Ligner also admitted the need for the Company to "strengthen our talent and improve accountability in a ***few key areas***," including roles to "help reinforce consistent manufacturing, ***supply chain excellence***, and ***lean operations*** across the organization" as well as to "strengthen[] ***digital commerce capabilities with our Laboratory Solutions segments***," underscoring the breadth of the Company's leadership deficits.

358. When asked when these issues arose, Ligner admitted: "***there's no excuses about the fact that we just dropped the ball***." Asked further about "deep share losses to your competitors" in the lab solutions and bioscience segments, Ligner admitted: "***we've lost some share, without any doubt***, in the lab services business," and that "***e-commerce is one of [the barriers]***" to retaining and gaining customers—directly contradicting Defendants' Class Period statements that Avantor had a "leading e-commerce platform" and was not losing market share.

359. Further, asked to "characterize … how much share you think VWR has lost over the last two or three years," Ligner admitted "***we've lost a couple of large accounts***, and we know them, and ***that's something which is striking***," and expanding further that some customers had told him that "***we didn't know that VWR was part of Avantor. And that's why I'm talking about brand revival and really making sure that we are improving our engagement with the customers.***"

360. Ligner also stressed, "***Service level is very, very important, okay. And this is why we are looking at what do we need to do in the plants which are in need of investment to make sure that we raise our service level on the bioprocessing***." Ligner also admitted that certain plants ***were "in need of upgrade***" resulting in "***unreliability of on-time delivery***" where "***service level for some plants are excellent, some are not where we should*** be"—directly contradicting Defendants' Class Period statements that Avantor had made "record" supply chain investments and that its supply chain had "largely normalized."

361. Analysts reacted to these stunning revelations in terms that connected the disclosures to Defendants' prior misstatements. Bank of America characterized Avantor's execution failures as "disappointing" and "self-inflicted," and stated that an action plan was needed "***to rebuild investor confidence and [management] credibility***." Wells Fargo highlighted in an

October 30, 2025 analyst report that "***savings today are not adequately falling through to the bottom line . . . because they are still operating with far too much complexity today***." Raymond James stated "***[t]o see a business decelerating when so many in the peer group appear more stable is disconcerting. How much is truly operational and near-term solvable should be a key focus***."

362. Several analysts also expressed deep skepticism about whether the Avantor Revival plan could meaningfully turn the Company around. Analysts from J.P. Morgan downgraded the Company's stock in an October 30, 2025 report, citing "***limited visibility and turnaround execution risk***." Barclays likewise downgraded the Company in a report issued the same day, dismissing the Company's turnaround plan as "***put[ting] it lightly with the lift needed to right this ship***." Barclays stated it "is likely going to take multiple years" for Avantor to "right the ship," stating "in the meantime, AVTR continues to miss the mark and underperform peers." Jefferies was equally unsparing about the "revival plan," stating that "***details on the cost and cadence to remedy legacy issues (there are multiple) were scant***," adding "[b]eyond a clear focus on immediate supply chain fixes, details were scant on streamlining operations (or drawing a line on OPMX) and, more crucially, holding under-performing segments accountable . . . the issues here, along with those in Labs (now better understood), require more clarity on remediation before a broader turnaround can be embraced."

363. On this news, the price of Avantor common stock declined $3.50 per share, or 23.2%, from a close of $15.08 per share on October 28, 2025, to close at $11.58 per share on October 29, 2025. The next day, Avantor's stock price continued to decline as the market digested the Company's disclosures, falling $0.53 per share, or 4.6%, to close at $11.05 per share on October 30, 2025.

364. Despite these disclosures, Avantor's stock price remained inflated as Defendants had not revealed the full magnitude of the Company's problems, and the worst was yet to come.

**D. The Full Truth is Revealed on February 11, 2026**

365. The truth was fully revealed on February 11, 2026, when Avantor announced that it would eliminate the LSS and BPS segments—*i.e.*, the same new segments into which Defendants had only recently reorganized the Company and whose success Defendants had championed throughout the Class Period. Now, Avantor announced it would undertake yet ***another*** fundamental reorganization, wiping the slate clean. Defendants further revealed that the cost-savings initiative was over and that Avantor had "cut too many specialists" from VWR through the layoffs that had powered that initiative.

366. On the Q4 2025 Earnings Call, Ligner disclosed that the LSS and BPS segments would be eliminated and Avantor re-reorganized into "***two new business units***, a product-agnostic channel and a channel-agnostic product business," effective in the first quarter of 2026***, and*** that the Company would be "***swapping certain business activities between the two segments***"—effectively conceding that the LSS-BPS reorganization Defendants had touted throughout the Class Period was fundamentally misaligned with how the Company needed to be operated.

367. In explaining the "rationale for our new go-to-market strategy and the corresponding re-segmentation of our business," Ligner stated that the re-reorganization was driven by globally widespread market and customer confusion about the Company's identity, revealing that during six months of customer engagement, he had "too frequently . . . encountered confusion and misunderstanding about who Avantor is and what we do." In doing so, Ligner announced that the Company would be renaming its channel business unit "VWR," to align with VWR's global brand power and recognition, stating, "One of my earliest observations when meeting with supplier, customers and our associates, was that everyone refers to the channel as

VWR. So as of a few weeks ago, ***the distribution channel of Avantor is once again known as VWR***. We intend to capitalize on VWR's tremendous brand recognition and longstanding goodwill with customers around the world."

368. Ligner also announced that the Company would "***no longer report progress related to [its] previously discussed cost transformation initiative***," effectively abandoning the cost-savings program Defendants had repeatedly touted throughout the Class Period as "ahead of schedule" and on track to deliver $400 million in run-rate savings.

369. Ligner also revealed that Avantor's aggressive layoffs had stripped the Company of critical talent. Asked how he would have done things differently with respect to the cost-savings initiative, Ligner admitted that Avantor had "cut too many specialists" in VWR—directly contradicting Defendants' Class Period statements that the cost-savings initiative "hasn't led to any disruption" and that critical capabilities "remain[ed] intact."

370. During the call, Ligner also admitted to mass customer confusion about the initial reorganization. A securities analyst commented that "You got the re-segmentation. We've seen this kind of revitalization story before with you guys," asking "what are the difference in the go to market strategy here?" In response, Ligner explained "***the change in the go to market and the re-segments business is really coming from customers***. ***And it's really about the confusion that I heard*** when I spent six months on the road." Ligner stated that the reorganization "helps us to just better organize ourselves, really being much more focused on the customer's needs" adding it was "about better organization. ***It's really about making sure that we can compete***, that we can be more nimble and more agile," and emphasized that "better accountability across the organization" was "extremely important." Ligner continued, stating "[i]n terms of investment, again, we'll make investment in both segments where we see the opportunity. I'll give you an example in VWR book,

there are plenty of other opportunities in the [BMP] segment. So we'll make investment against where we need to go after opportunity. Again, the goal is to really drive sustainable, profitable top line growth for us."

371. During the call, Defendant Jones also reported on the Company's finances, informing investors that adjusted gross profit for the quarter was $524 million, representing a 31.5% adjusted gross margin, a decline of 190 basis points year-over-year. Jones stated the decline was "driven mainly by unfavorable segment mix and product mix, as well as, again, ***price actions in lab to protect and grow market share***." Jones also disclosed that adjusted EBITDA of $252 million "came in at the low end of our expectations."

372. Defendant Jones also disclosed that the Company anticipated EBITDA margins would "contract by as much as 100 to 150 basis points in 2026" and that the Company expected Q1 2026 EPS of only $0.15 to $0.16 per share, reflecting the full weight of margin headwinds, mix shifts, "price cost spread," "Revival investments," and "incentive compensation reload."

373. Analysts reacted in terms tied to the Class Period misrepresentations. William Blair characterized 2026 as a "***transition year***" requiring "***stepped-up investments in go-to-market, e-commerce, and operations***." Deutsche Bank also commented in a February 12, 2026 report "that ***the turnaround story is likely to be one that takes multiple years before meaningful progress is realized***, and that it is likely to evolve over time as management identifies areas of need / additional investment to allow Avantor to compete on a meaningful scale with peers," further stating "[a]s such, we currently believe that 2027 will likely be another year of muted growth / performance for Avantor in what should be a stronger operating environment for the broader Tools space."

374. Barclays also stated that "[l]onger term, we see this as ***a show-me story*** w/in a business that has been through ***revitalization/transformation/resegmentation before, so investors clearly have doubts on these investments stemming the share losses***."

375. On this news, the price of Avantor stock declined $1.52 per share, or 13.6%, from a close of $11.16 per share on February 10, 2026, to close at $9.64 per share on February 11, 2026.

## VII. MATERIALLY FALSE OR MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD[30]

### A. Defendants' Materially False Or Misleading Statements And Omissions About The Company's Supply Chain And Distribution

376. On March 5, 2024, Defendants attended the TD Cowen Health Care Conference, where Defendant Stubblefield responded to an analyst's question about the "strategic priorities" for the Laboratory Solutions business. Defendant Stubblefield stated:

> ***[W]e'll continue to invest aggressively not only in the physical infrastructure to maintain the service levels that our customers have come to expect from us, but also in the digital infrastructure that can create so many efficiencies and further ingrain us in our customers' workflows.***

377. Defendant Stubblefield's March 5, 2024 statements at the TD Cowen Health Care Conference, including that Avantor would "***continue to invest aggressively not only in the physical infrastructure to maintain the service levels that our customers have come to expect from us, but also in the digital infrastructure that can create so many efficiencies and further ingrain us in our customers' workflows***" were materially false or misleading when made, or failed to disclose material information necessary to make the statements not misleading, because, far from "invest[ing] aggressively" in physical and digital infrastructure, as of March 5, 2024, the Company's supply chain and distribution operations suffered from known flaws, including that

---

[30] Attached hereto as Appendix A is a chart displaying the alleged false and misleading statements and omissions.

Avantor was still using a twenty-five-year-old version of SAP (¶97) (FE-7); financial reporting and inventory data had to be collected from multiple reports over different systems that could be tricky to compare (¶92 (FE-1)); and required, for example, FE-3—a senior Supply Chain Business Analytics Partner—to manually pull data each morning from approximately ten different systems in order to pull the data necessary for reports monitoring key performance indicators that he reported on since beginning in 2021 and through the end of his tenure in March 2025 (¶93). *See generally* Section V.D.1.a. Further, contrary to Stubblefield's statement that Defendants were "invest[ing] aggressively," by this time, the Company's reorganization and cost-savings initiative announced in December 2023 had resulted in the cancellation of critical and necessary investments; for example, FE-6, who led Global Supply Chain through May 2024, had personally led investment pitches to advocate for improvements at Avantor's supply chain and distribution facilities, including meetings with former CEO Defendant Stubblefield, former CFO Tom Szlosek, and former Executive Vice President and Chief Information Officer Michael Wondrasch, including a "major project" for renovation of Avantor's site in Leuven Belgium, which had not been upgraded in approximately 25 years. According to FE-6, Stubblefield had spoken positively about the project in Belgium and personally acknowledged that facilities in Leuven were severely lacking. While FE-6 stated that, in his experience, Stubblefield, Szlosek, and Wondrasch had typically been open to these and other proposals for investment in distribution infrastructure prior to the December 2023 announcement of the Company's reorganization into Laboratory Solutions and Bioscience Production business units and the cost-savings initiative, after that announcement, however, investment in distribution "abruptly" ended. ¶194. *See generally* Section V.D.3.a. Further, Stubblefield's reference to the "service levels" experienced by Avantor's customers misleadingly concealed supply chain issues led to long lead times and drove customers away; for

example, FE-7 explained that Avantor did not keep inventory in warehouses near where top purchasing customers were located, and in Europe, the Company's European Central Planning group did not have visibility into inventory levels in local distribution centers, and inventory could not be moved between local distribution centers without first going to a central distribution center; FE-7 recalled instances where an item had been in stock for 10 years in one location but still purchased in another country because of the difficulty in moving stock country to country. ¶¶98; *see generally* Section V.D.1.a.

378. The fair inference of these and the other accounts and allegations above is that statements are false and misleading, as corroborated when Defendants were ultimately forced to admit, *e.g.*, that "***immediate and significant***" remedial changes to its supply chain, fulfillment, and inventory operations were needed, and new CEO Ligner later admitted the existence of "inventory and forecasting challenges" and other "***self-inflicted***" problems, including that facilities were "***in need of investment***."

379. On April 26, 2024, the Company conducted its earnings call for the first quarter of 2024 (the "Q1 2024 Earnings Call"), during which Defendant Stubblefield stated:

> ***Our supply chains have largely normalized in both segments. So we're back to pretty healthy levels of service in our Lab segment, which means we can satisfy most orders in a day or two. On the production side, we're two to three months out, which is kind of pre-COVID levels of performance there***.

380. Defendant Stubblefield's April 26, 2024 statements during Avantor's Q1 2024 Earnings Call, including that "***[o]ur supply chains have largely normalized in both segments***," that the Lab segment was "***back to pretty healthy levels of service***" capable of satisfying "***most orders in a day or two***," and that the production side was operating at "***pre-COVID levels of performance***," were materially false or misleading when made, or failed to disclose material information necessary to make the statements not misleading, because as of April 26, 2024,

Avantor's supply chain and distribution systems were not, *e.g.*, "normalized" but had been plagued with issues for years, including outdated infrastructure (¶96), fragmented technology and data systems (¶¶91-93), inefficient warehousing (¶¶98-99, 107, 115), and long lead times (¶98); *see* ¶¶377-78. For example, FE-10 recalled that during the middle of his tenure, towards the end of 2023, U.S. operations made the decision, following a manufacturing closure in the U.S., to move all remaining stock to the Netherlands, even though employees in the U.S. were aware of concerns around expiration dates, change notifications, and instances where inventory was left over from old customers that were not customers in Europe. FE-10 explained that the stock system was "not connected" to the Dutch engineering system and the inventory was "totally lost" as engineers could not check inventory levels in their system without having to use a third system (in addition to administrative system), which was a quality system. ¶108. *See generally* Section V.D.1. The fair inference of these and the other accounts and allegations above is that statements are false and misleading, as corroborated by Defendants' admissions, including, *e.g.*, the admission by Avantor's new CEO in October 2025 that Avantor had suffered from "a bit of an unreliability of on-time delivery" in part because "some of the tool[s] are a bit older"; that Avantor's supply chain "processes . . . [t]o make sure that the product will be delivered as the customers requested [and] at the quality which is requested . . . are not as simple as they should be, not as smooth as they should be . . . [and] lack [] accountability," needing "strategic investment."

381. On May 9, 2024, the Company held its 2024 Annual Meeting of Stockholders of Avantor, Inc. (the "2024 Annual Shareholder Meeting"), during which Defendant Peacock discussed the Company's supply chain investments:

> [I]n 2023, we earned new and expanded multi-year customer relationships that reflect that value at every stage of the scientific journey from research to commercialization. ***We've also made purposeful strategic investments in manufacturing capacity,***

> ***supply chain innovation and digital capabilities to drive efficiencies and position the company for future growth. The new operating model we unveiled during our December 2023 Investor Day is designed to enhance operational efficiency and sharpen our focus on further building our Bioscience Production and Lab Solutions businesses.***

382. Defendant Peacock's May 9, 2024 statements at Avantor's 2024 Annual Shareholder Meeting were materially false or misleading when made, or failed to disclose material information necessary to make the statements not misleading, because the fair inference from the accounts of former employees discussed above is that as of this date the Company had not in fact made "strategic investments" but instead had recklessly cut costs by ***cancelling*** long-contemplated and needed investments around supply chain and beyond (¶¶194-99); *see generally* Section V.D.3); *see* ¶¶377-78. The inference from these accounts as to the false and misleading nature of Peacock's statements on this date that, *e.g.*, Defendants had "***made purposeful strategic investments in manufacturing capacity, supply chain innovation and digital capabilities to drive efficiencies and position the company for future growth***," is further corroborated by the Company's subsequent admissions that that its supply chain and inventory operations needed "***immediate and significant***" remedial changes, among others.

383. On October 25, 2024, Defendant Stubblefield participated in a conference call to discuss Avantor's third quarter earnings release ("Q3 2024 Earnings Call"), during which he stated that "***We continue to improve the efficiency and productivity of our supply chain operations***." Stubblefield also stated during that call that Defendants had "[i]mportantly . . . ***significantly advanced our long-term growth strategy [by] achieving key milestones in . . . supply chain infrastructure***."

384. Defendant Stubblefield's statements during the October 25, 2024 Earnings Call above were materially false or misleading when made, or failed to disclose material information

necessary to make the statements not misleading, because the reasonable inference from the accounts of former employees and other sources, as further corroborated by the Company's admissions, is that in fact the Company had for years and still as of the date of this statement suffered from years of supply chain issues; for example, the accounts of FE-3 (¶93), FE-7 (¶¶96-99), and FE-4 (¶¶89-90, 120) describing ongoing issues that continued until 2025, and FE-6 describing how, by this time, the Company's reorganization and cost-cutting initiative announced in December 2023 had resulted in the cancellation of critical and necessary investments ¶¶193-97; *see* ¶¶377-78. Further, by this time the Company had retained at least two highly-paid external consulting firms to address ongoing supply chain issues—including, as FE-4 explained, hiring McKinsey in approximately August or September 2024, by no later than which time it was clear internally that the supply chain organization was not aligned (¶120)—with each firm diverting employee resources, and ultimately advancing unworkable proposals that failed to address the problems. *See generally* Section V.D.1.a.5. The inference of falsity from these accounts is further corroborated by the Company's subsequent admissions that that its supply chain and inventory operations needed "***immediate and significant***" remedial changes, among others.

385. On December 3, 2024, Defendant Stubblefield spoke to investors at the Evercore ISI HealthCONx Conference, stating Avantor had "***a leading supply chain that supports a really agile, global business model***."

386. Defendant Stubblefield's December 3, 2024 statement was materially false or misleading when made, or failed to disclose material information necessary to make the statements not misleading, because the reasonable inference from the accounts of former employees—and corroborated by the Company's subsequent admissions—is that as of this date the Company's supply chain suffered from years of issues and that Defendants' reckless cost-cutting resulted in

indiscriminate layoffs and stopped anticipated infrastructure investment, including for example the accounts of FE-3 (¶93), FE-7 (¶¶96-99), and FE-4 (¶¶89-90, 120) describing ongoing issues that continued until 2025, and FE-6 describing how, by this time, the Company's reorganization and cost-cutting initiative announced in December 2023 had resulted in the cancellation of critical and necessary investments (¶¶193-97). *See generally* Section V.D.1; V.D.3; ¶¶377-78.

387. On January 15, 2025, Defendant Stubblefield spoke at the JP Morgan Healthcare Conference, stating:

> ***The digital offerings that we have, whether it be making sure that the transaction that they do with us is as efficient as possible, being able to find what they need on our platform and to facilitate that checkout and delivery with as few clicks and as little time as possible is important. . . .***
>
> And then, ***the last element of how we make that customer experience really streamlined for our customers, is making sure that when they place an order with us, this is a same-day, next-day type model*** . . . [to] ***give us the credibility that when we give you a date that we can actually hit that and we think that with the investments that we're making in that regard and the focus we have in 2025, that this will be a real differentiator for us***.

388. On February 7, 2025, in connection with a conference call to discuss Avantor's fourth quarter earnings release ("Q4 2024 Earnings Call"), Avantor published a slideshow presentation. In a slide titled "Q4 & FY highlights" Avantor highlighted "***Record investments in supply chain and bioprocessing efficiency and capacity***."

389. On March 5, 2025, Defendant Stubblefield spoke at the TD Cowen Health Care Conference, during which he touted the ***"strength of the supply chain and the leading digital platform***" for the Company's Lab Solutions segment, and stated further: ***"we continue to make the right investments in this business."***

390. Defendants statements above were materially false or misleading when made, or failed to disclose material information necessary to make the statements not misleading because

Avantor was not making the "differentiating" supply chain investments described. In fact, the Company had for years and still as of the date of this statement suffered from years of supply chain issues; for example, the accounts of FE-3 (¶93), FE-7 (¶¶96-99), and FE-4 (¶¶89-90, 120) describing ongoing issues that continued until 2025, and FE-6 describing how, by this time, the Company's reorganization and cost-cutting initiative announced in December 2023 had resulted in the cancellation of critical and necessary investments (¶¶193-97); *see* ¶¶377-78. Further, by this time the Company had retained at least two highly-paid external consulting firms to address ongoing supply chain issues—including, as FE-4 explained, hiring McKinsey in approximately August or September 2024, by no later than which time it was clear internally that the supply chain organization was not aligned (¶120)—with each firm diverting employee resources, and ultimately advancing unworkable proposals that failed to address the problems. *See generally* Section V.D.1.a.5; V.D.1; V.D.3; ¶¶377-78. The inference of falsity from these accounts is further corroborated by the Company's subsequent admissions, including just one month after Stubblefield's March 5, 2025 statement, that that its supply chain and inventory operations needed "***immediate and significant***" remedial changes, among others.

391. On May 13, 2025, Avantor participated in the Bank of America Global Healthcare Conference (the "2025 Bank of America Conference"), during which Defendant Stubblefield stated that Defendants had "***a supply chain that enables us to serve more than 300,000 customers reliably around the world***," and continued further that "[t]he ***last two or three years have all been record levels of investments*** in footprint, optimizations and expansions, investments in digitization, robotics, automation to help combat some of the inflationary factors that we see then that enable significant rooftop consolidation and footprint optimization. . . . ***We're making significant investments to change the way work is getting done, to make it sustainable, all the***

***while, we continue to invest at record levels to continue to grow the business and position us for sustained growth over the long-term.***"

392. Defendant Stubblefield's May 13, 2025 statements at the Bank of America Global Healthcare Conference were materially false or misleading when made, or failed to disclose material information necessary to make the statements not misleading because as of the date of this statement, Avantor's supply chain had not "reliably" served customers globally but instead continued to suffer from issues that had plagued it for years, including for example that is that as of this date the Company's supply chain suffered from years of issues and that Defendants' reckless cost-cutting resulted in indiscriminate layoffs and stopped anticipated infrastructure investment, including for example the accounts of FE-3 (¶93), FE-7 (¶¶96-99), and FE-4 (¶¶89-90, 120) describing ongoing issues that continued until 2025, and FE-6 describing how, by this time, the Company's reorganization and cost-cutting initiative announced in December 2023 had resulted in the cancellation of critical and necessary investments (¶¶193-97). *See generally* ¶¶377-78; V.D.1; V.D.3. Further, contrary to Stubblefield's statement that Defendants had made "record levels of investments" in the "last two or three years," Defendants had during that time engaged in reckless cost-cutting that resulted in the cancellation of critical and necessary investments and involved mass layoffs that created numerous inefficiencies and harmed the Company. *See* Section V.D.3. The fair inference of these and the other accounts and allegations above is that statements are false and misleading, as further corroborated as Defendants were ultimately forced to admit, beginning just months later, that additional investment in supply chain was necessary, with Avantor's new CEO Ligner admitting in October 29, 2025 that, "on the operations and supply chain side, I believe we need to make investment and process enhancement to improve our ability to consistently serve our customers"; that Avantor suffered from "a bit of an unreliability of on-

time delivery" in part because "some of the tool[s] are a bit older"; that Avantor's supply chain "processes . . . [t]o make sure that the product will be delivered as the customers requested [and] at the quality which is requested . . . Are not as simple as they should be, not as smooth as they should be . . . [and] lack [] accountability," needing "strategic investment," and that those issues were "also about talent" and thus the Company was recruiting "a Chief Operating Officer…that will really help as well the team to drive and improve plant performance."

**B. Defendants' Materially False Or Misleading Statements and Omissions About the Effects and Success of the Company's Reorganization**

393. On April 26, 2024, the Company issued its First Quarter 2024 Earnings Release ("Q1 2024 Earnings Release"), in which Defendant Stubblefield stated:

> ***We made significant progress in implementing our new operating model and accelerating our multi-year cost transformation initiative, unlocking efficiencies and strengthening alignment with customer needs.***

394. That same day, during the Company's Q1 2024 Earnings Call, Defendant Stubblefield further stated:

> ***Our new business segments enhance our focus on customers' needs in the lab and production environments, position us for accelerated long-term growth and unlock significant operating efficiencies***. We are early in our journey, but are out of the gate strong and are already realizing benefits from the new model.
>
> ***During the first quarter, we aligned our organization with the new business segments*** and initiated several work streams ***to optimize the Avantor customer experience.***
>
> [...]
>
> ***With our new operating model in place, we're well positioned to realize accelerated long-term growth and unlock significant operating efficiencies. We are seeing the benefits of our new business segments and driving commercial momentum with our research and production customers, as well as enhancing our operational rigor and forecasting.***

395. In another exchange with an analyst during the Q1 2024 Earnings Call, Defendant Stubblefield answered a question about "how you think visibility in the business has evolved over the last 90 days" and "[a]re you seeing any improvement in regards to the team's ability to forecast sales here in the near or medium term to forecast," stating:

> ***[S]ome of the early returns we're getting from our new operating model. And one of those certainly is the operational rigor and improved forecasting that comes from a more simplified and in a more logical, in my opinion, structure to the business***. It's easier to think about these businesses from a customer needs, research or production environment than ***it certainly aligns better with how our customers think about it as opposed to our historical approach from a geographic standpoint***.
>
> ***So our operating reviews have become a lot more streamlined and a lot more straightforward, which, from our perspective, is certainly a helpful improvement***.

396. On May 14, 2024, Avantor participated in the Bank of America Health Care Conference. At that conference, Defendant Stubblefield stated that the reorganization of Avantor's operating model into LSS and BPS "***allows us or enables us to better align our business with our customers' needs both in the lab as well as in the production environment,***" continuing:

> ***. . . to have the organization on a global basis lined up behind our lab customers as well, then as our production customers, it just gives you better alignment with them. I think it gives you a crisper view into their requirements, makes your capital allocation decisions probably a bit more pronounced. It allows portfolio decisions to be a bit more pointed and specific to what your customers are doing.***
>
> . . .
>
> ***So all that is really working well, and I'm really pleased with how we're out of the gates there. It's also unlocked in a pretty meaningful way these transformation synergies that we're working on and we're able to pull forward a lot of those synergies into Q1, which helped with margin expansion.***

397. Later at the Bank of America Conference held on May 14, 2024, Defendant Stubblefield stated the following:

> ***Some of the organizational efficiency work that helped stand up the 2 new operating segments is one of the categories that's probably delivering a little earlier than anticipated. The team has done a really nice job pivoting and getting the organization lined up behind the 2 segments.***

398. Defendant Stubblefield's statements above were materially false or misleading when made, or failed to disclose material information necessary to make the statements not misleading, because, contrary to his claims that, *e.g.*, purported "***progress in implementing our new operating model***" had "***strengthen[ed] alignment with customer needs***"; that the "***new business segments enhance our focus on customers' needs in the lab and production environments, position us for accelerated long-term growth and unlock significant operating efficiencies***" and "***[w]e are seeing the benefits of our new business segments and driving commercial momentum with our research and production customers, as well as enhancing our operational rigor and forecasting***"; the reorganization had "aligned our organization with the new business segments . . . to optimize the Avantor customer experience"; that the "***early returns we're getting from our new operating model***" include "***the operational rigor and improved forecasting that comes from a more simplified and in a more logical, in my opinion, structure to the business***"; that the reorganization "***unlocked in a pretty meaningful way these transformation synergies that we're working on and we're able to pull forward a lot of those synergies into Q1, which helped with margin expansion***"; and "***the organizational efficiency work that helped stand up the 2 new operating segments is one of the categories that's probably delivering a little earlier than anticipated***"; the change from regional to global operations caused customer frustration by this time; for example, FE-2 explained that there was a "major effect" and relationships "dwindled" following the restructuring, with FE-2 recalled manufacturing customers asking him, "what is

going on at Avantor?" and expressing to him that they were becoming nervous, but FE-2 recalled having to provide customers with the same "smoke and mirror" explanations about how the restructuring will be good just as management had been saying to him. ¶143. Further, FE-13 stated that Avantor's reorganization announced in December 2023 suffered significant operational difficulties from the very start because, among other things, it imposed a fundamentally United States-centric approach onto a geographical and regional business that had been built by inorganic growth. ¶135; *see generally* Section V.D.2.a. In addition, contrary to Stubblefield's claims of "***improved forecasting***," in fact the reorganization suffered from inefficiencies that created confusion with unclear operational divisions and obscured performance reporting; for example, FE-12 recalled that, while LSS and BPS were introduced as the two reporting segments in early 2024, the changes in reporting at a management level were not implemented ***until approximately January or February 2025***. ¶149. Further, FE-1 explained that following the reorganization into LSS and BPS that there were no digital "tags" available and no tagging process in place to mark sales as belonging to one of the new verticals. ¶152. FE-1 described further complications that existed, such as "a lot of haggling" between LSS and BPS to get higher margin and attractive items into a business unit while trying to limit low margin and unattractive items, and added that it was also difficult to assign some units into either LSS or BPS that did not fit directly or immediately. ¶155. According to FE-1, the process of making those determinations takes time, during which there is a chunk of revenue and costs that it is not clear which unit they should be assigned to. *Id*. FE-1 continued to say that the division of the business units was ultimately arbitrary, all of which created "confusion" and "uncertainty." *Id*. FE-1 explained further that Avantor's previous and current monthly reports were not comparable for at least five or six months following the reorganization, because Avantor's internal mechanisms for financial reporting remained the same

during that time as the systems had been pre-reorganization, *i.e.*, not based around the new BPS and LSS reporting units. ¶160. *See generally* Section V.D.2.b. In addition, the reorganization had by this time already created a leadership vacuum; for example, FE-7 explained the new leadership had "no clue" about business in Europe after the VP of Logistics role moved to the US in connection with the reorganization announced in December 2023—according to FE-7, there was no communication with reporting lines in the US following the reorganization and there was "no leadership anywhere." ¶166. *See generally* Section V.D.3.c; *see also, e.g.*, Section V.D.2.d. Avantor also suffered from overly complex, error-prone forecasting and processes, including fragmented forecasting systems and, as FE-1 explained, forecasts were then more so determined by "intuition." ¶126; *see generally* Section V.D.1.a.(6). Further, the Company relied on manipulated forecasting to obscure deteriorating conditions, including, as FE-8 explained, that following the reorganization, he was required to provide more forecasting information, adding that this information was "never verified" and did not need to be proven. ¶241; *see generally* Section V.D.4.c. Additionally, forecasting capabilities were further obscured by the Company's overstocked inventory and lack of governance, *see generally* V.D.1.a.(2)-(5).

399. The fair inference of these and the other accounts and allegations above is that the statements are false and misleading, as further corroborated when Avantor's new CEO admitted at the end of the Class Period that he had immediately encountered widespread customer confusion "***about who Avantor is and what we do***" such that the Company needed yet another re-segmentation in order to "***clarify our identity***" and "***better organize the company to meet customer needs***," stating further—"***it's all about clarity***" and that, at bottom, "***[i]t is simpler for the customers to know which product is served by which team***." Additionally, new CEO Ligner

admitted to ***"gaps in sales and operating processes . . . contribut[ing] to inventory and forecasting challenges***."

400. On May 30, 2024, Defendant Stubblefield spoke at the Sanford C. Bernstein Strategic Decisions Conference (the "Bernstein Conference"), stating about the Company's reorganization:

> It was an important transition for the company as in my perspective, having run the platform as you introduced me for 10 years, to me, it was really a natural evolution of how we've built out the model. And ***I think it recognizes the strength and positioning that we have within the laboratory environment as well as within our production capabilities***. ***And it's a better alignment of our capabilities with our customers' needs and it brings I think better focus and accountability for us in that regard. So, we're super excited to make the move. And not only is it I think better-aligned with how our customers think about our capabilities and how we can better serve them, but in a unique way it also unlocks significant operating efficiencies***.

401. Defendant Stubblefield's statements during the Bernstein Conference above were materially false or misleading when made, or failed to disclose material information necessary to make the statements not misleading, because the reasonable inference from the accounts of former employees and other sources, as further corroborated by the Company's admissions, is that the reorganization had ignored customer needs and worsened accountability. *See* ¶¶398-99; *see generally* Section V.D.2. Further, the reasonable inference from these accounts is that Stubblefield's claims that, *e.g.*, the reorganization brought "better focus and accountability" were false as of this date; for example, the leadership vacuum created by the reorganization intensified when, just the prior month, Sheri Lewis, Executive Vice President Global Operations and Supply Chain, left Avantor, and according to FE-4, "nobody replaced her [Lewis]" and there was not a "one-to-one" replacement brought in. ¶165. That the reality continued to contradict Stubblefield's statements as of this date is further corroborated by the admissions of Avantor's new CEO at the

end of the Class Period that the reorganization needed to be wiped clean because, simply, "***it's all about clarity***" so that "***the customers . . . know which product is served by which team***." Section VIII.C.3.

402. On June 11, 2024, Defendant Stubblefield had the following exchange with an analyst at the Goldman Sachs Healthcare Industry Conference:

> Q – Matt Sykes: You saw some margin benefits in Q1 as you unlock synergies from the new business segmentation. Can you talk a little bit about the continued developments there and the additional benefits you're looking to achieve across the business with this revenue segmentation?
>
> A – Michael Stubblefield: So it is a pretty exciting time in the business to be transitioning from a regional structure to this two business unit structure of lab and production. That's something I wanted to do for a while. ***And we had to make some pretty significant investments in the data architecture to enable us to run the business this way. But it is a natural evolution of the business. And I think strategically is the right way to think about the business. It leverages the strengths that we have in the lab and in production. It's a better alignment with our customers and one of things I like about it is it gives us much clearer line of sight to performance accountability and certainly much more streamlined way to run the business***.
>
> […]
>
> So, the approach here is really driven by the desire to run the business differently and not just to temporarily take cost out now to have to add it all back just to support the business as it grows. ***The model should be scalable because of the way we're fundamentally changing the way the work gets done in the in the business.*** And so, it'll structurally reset the cost base for the business. ***And as you know, we get the traditional impact of price over COGS and the mix benefits and the operational leverage as the business starts to grow again, the incremental margin should be pretty impressive.***

403. Defendant Stubblefield's statements during the June 11, 2024 Goldman Sachs Healthcare Industry Conference above were materially false or misleading when made, or failed to disclose material information necessary to make the statements not misleading, because the

reasonable inference from the accounts of former employees and other sources, as further corroborated by the Company's admissions, is that the reorganization had ignored customer needs and worsened accountability. *See* ¶¶398-99; *see generally* Section V.D.2. Further, the reasonable inference from these accounts is that Stubblefield's claims that, *e.g.*, the reorganization brought "better alignment with our customers" and "much clearer line of sight to performance accountability" were false as of this date; for example, FE-1 explained that at the time of his departure in December 2025 there was still carryover from the previous reporting structure in terms of inventory and the Company was not yet fully looking at inventory from a LSS/BPS perspective, and FE-1 noted that this transition was particularly complicated for revenue, margin, and inventory value. ¶161. That the reality continued to contradict Stubblefield's statements as of this date is further corroborated by the admissions of Avantor's new CEO at the end of the Class Period that, for example, the reorganization had caused customer confusion "***about who Avantor is and what we do***" such that the Company needed yet another re-segmentation in order to "***clarify our identity***" and "***better organize the company to meet customer needs***," stating further—"***it's all about clarity***" and that, at bottom, "***[i]t is simpler for the customers to know which product is served by which team***." Section VIII.C.3.

404. On July 26, 2024, during the Company's Second Quarter 2024 Earnings Call ("Q2 2024 Earnings Call"), Defendant Stubblefield stated:

> ***We continue to make good progress with the implementation of our new operating model and are seeing early benefits of aligning our teams with our customers' needs in the Lab and Production environments. In addition to unlocking significant operating efficiencies and streamlining execution of our operating plan, we're also realizing benefits from ongoing commercial intensity. . . .***

405. Defendant Stubblefield's statements during the Q2 2024 Earnings Call above were materially false or misleading when made, or failed to disclose material information necessary to

make the statements not misleading, because the reasonable inference from the accounts of former employees and other sources, as further corroborated by the Company's admissions, is that the reorganization had ignored customer needs and worsened accountability. *See* ¶¶398-99; *see generally* Section V.D.2. Further, the reasonable inference from these accounts is that Stubblefield's claims that, *e.g.*, the Company "continue[s] to make good progress with the implementation of our new operating model," is "seeing early benefits of aligning our teams with our customers' needs in the Lab and Production environments," and is "unlocking significant operating efficiencies and streamlining execution of our operating plan" were false as of this date; for example, FE-1 explained that at the time of his departure in December 2025 there was still carryover from the previous reporting structure in terms of inventory and the Company was not yet fully looking at inventory from a LSS/BPS perspective, and FE-1 noted that this transition was particularly complicated for revenue, margin, and inventory value. ¶161. The reorganization created a glaring leadership vacuum, as the head of LSS, Randy Stone, departed after only six months, and his replacement, Corey Walker, was enjoined from joining the Company, as Defendants knew, and did not assume his position until March or April 2025—leaving LSS, the Company's largest segment, without a leader for more than nine months during a critical period of implementation. *See* Section V.D.2.c. That the reality continued to contradict Stubblefield's statements as of this date is further corroborated by the admissions of Avantor's new CEO at the end of the Class Period that, for example, the reorganization had caused customer confusion "***about who Avantor is and what we do***" such that the Company needed yet another re-segmentation in order to "***clarify our identity***" and "***better organize the company to meet customer needs***," stating further—"***it's all about clarity***" and that, at bottom, "***[i]t is simpler for the customers to know which product is served by which team***."

406. On October 25, 2024, during the Q3 2024 Earnings Call, Defendant Stubblefield touted the progress with the new operating model, stating:

> ***We continue to make progress with our new operating model, realizing significant commercial and operational benefits just 10 months in. We are now a leaner, more agile and more efficient organization. This new model is also enhancing both our internal processes and the way our customers -- our platform. Importantly, we have significantly advanced our long-term growth strategy, achieving key milestones in the areas of*** innovation, new product introductions, sustainability and ***supply chain infrastructure***.

407. Defendant Stubblefield's statements during the Q3 2024 Earnings Call above were materially false or misleading when made, or failed to disclose material information necessary to make the statements not misleading, because the reasonable inference from the accounts of former employees and other sources, as further corroborated by the Company's admissions, is that the reorganization had ignored customer needs and worsened accountability. *See* ¶¶398-99; *see generally* Section V.D.2. Further, the reasonable inference from these accounts is that Defendants claims that, *e.g.*, the Company is "***realizing significant commercial and operational benefits just 10 months in***," is "***now a leaner, more agile and more efficient organization***," and has "***significantly advanced our long-term growth strategy***" were false as of this date; for example, FE-4 explained that Avantor hired McKinsey in approximately August or September 2024, by no later than which time it was clear internally that the supply chain organization was not aligned. ¶¶90, 120. Further, FE-1 explained that at the time of his departure in December 2025 there was still carryover from the previous reporting structure in terms of inventory and the Company was not yet fully looking at inventory from a LSS/BPS perspective, and FE-1 noted that this transition was particularly complicated for revenue, margin, and inventory value. ¶161. The reorganization created a glaring leadership vacuum, as the head of LSS, Randy Stone, departed after only six months, and his replacement, Corey Walker, was enjoined from joining the Company, as

Defendants knew, and did not assume his position until March or April 2025—leaving LSS, the Company's largest segment, without a leader for more than nine months during a critical period of implementation. *See generally* Section V.D.2.c. That the reality continued to contradict Stubblefield's statements as of this date is further corroborated by the admissions of Avantor's new CEO at the end of the Class Period that, for example, the reorganization had caused customer confusion "***about who Avantor is and what we do***" such that the Company needed yet another re-segmentation in order to "***clarify our identity***" and "***better organize the company to meet customer needs***," stating further—"***it's all about clarity***" and that, at bottom, "***[i]t is simpler for the customers to know which product is served by which team***."

408. On January 15, 2025, in connection with the January 2025 JP Morgan Healthcare Conference, Avantor published a slideshow presentation. This presentation contains a slide titled "***Operating model transformation is strengthening performance and productivity***," which includes "2024 proof points" listed in bullet form, including: "***Share gains in laboratory solutions***, including Education & Gov't growth of +HSD in Q3 2024," and "***Streamlined accountability and operating rhythm***."

409. The Company's statements during the JP Morgan Healthcare Conference above were materially false or misleading when made, or failed to disclose material information necessary to make the statements not misleading, because the reasonable inference from the accounts of former employees and other sources, as further corroborated by the Company's admissions, is that the reorganization had ignored customer needs and worsened accountability. *See* ¶¶398-99; *see generally* Section V.D.2. Further, the reasonable inference from these accounts is that Avantor's claims that, *e.g.*, the Company's "***Operating model transformation is strengthening performance and productivity***" and had enabled "***Streamlined accountability and***

***operating rhythm***" were false as of January 2025; for example, FE-4 explained that Avantor hired McKinsey in approximately August or September 2024, by no later than which time it was clear internally that the supply chain organization was not aligned. ¶¶90,120. Further, FE-1 explained that at the time of his departure in December 2025 there was still carryover from the previous reporting structure in terms of inventory and the Company was not yet fully looking at inventory from a LSS/BPS perspective, and FE-1 noted that this transition was particularly complicated for revenue, margin, and inventory value. ¶161. Additionally, FE-2 stated that an observable correlation between reduction in personnel and declining sales was materializing by no later than the end of 2024, that his opinion was that the correlation was clear between declining sales performance and the insufficient staffing following the reorganization and cost- transformation initiative, and further that it is difficult for him to believe that Avantor's leadership did not grasp that correlation. ¶209. The reorganization created a glaring leadership vacuum, as the head of LSS, Randy Stone, departed after only six months, and his replacement, Corey Walker, was enjoined from joining the Company, as Defendants knew, and did not assume his position until March or April 2025—leaving LSS, the Company's largest segment, without a leader for more than nine months during a critical period of implementation. *See generally* Section V.D.2.c. That the reality continued to contradict Stubblefield's statements as of this date is further corroborated by the admissions of Avantor's new CEO at the end of the Class Period that, for example, the reorganization had caused customer confusion "***about who Avantor is and what we do"*** such that the Company needed yet another re-segmentation in order to "***clarify our identity***" and "***better organize the company to meet customer needs***," stating further—"***it's all about clarity***" and that, at bottom, "***[i]t is simpler for the customers to know which product is served by which team***."

410. Further, the Company's statements above were also false and misleading because, contrary the assertion the Company was experiencing "***[s]hare gains in laboratory***," Defendants were facing weak demand and competition by this time; these accounts are further corroborated by the independent conclusions of investment firm Engine Capital, which concluded in its public letter that "in 2023" Avantor's Board (including Defendants Stubblefield and Peacock) possessed "***internal knowledge of operational underperformance and market share losses at LSS***." *See generally* Section V.D.4.d; Section VII.D.

411. On March 5, 2025, Defendant Stubblefield stated at the TD Cowen Health Care Conference that "***we continue to make the right investments in this business. We've launched a new e-commerce platform that will further enhance the experience with our customers***. . . . ***That's an offering that's pretty compelling for our customers and embeds us more strongly there as well***."

412. Defendant Stubblefield's statements during the TD Cowen Health Care Conference above were materially false or misleading when made, or failed to disclose material information necessary to make the statements not misleading, because the reasonable inference from the accounts of former employees and other sources, as further corroborated by the Company's admissions, is that, contrary to Stubblefield's assertions that "***we continue to make the right investments in this business***" including that the Company "***launched a new e-commerce platform that will further enhance the experience with our customers***" which is "***an offering that's pretty compelling for our customers and embeds us more strongly there as well***," Avantor's e-commerce platform, rolled out in tandem with the reorganization, was plagued with serious functionality problems that threatened customer retention. For example, as FE-8 explained, from a customer's perspective, it became hard to trust any numbers that they were seeing on the website.

¶186. FE-8 recalled the high list prices prompting customers to look elsewhere for more competitive prices. ¶186. FE-12 also recalled functionality problems, such as customers logging in and not being shown correct prices based on their contracts and incorrect search results being returned. ¶184. Further, the reasonable inference from these accounts is that the Company's weak demand and competitive positioning continued as of the date of Stubblefield's statement; for example, to FE-8, the website was still a problem at the time of his departure [in April 2025] (¶189); FE-2 specifically recalled attending meetings as late as mid-2025 in which customers voiced complaints about the website, and FE-2 was informed that the website was now worse than it had been before. ¶183. That the reality continued to contradict Stubblefield's statements as of this date is further corroborated by Defendants' later admissions, including that "***e-commerce is one of [the barriers]***" to retaining and obtaining customers, and that it was ultimately forced to recruit a new "Chief Digital Officer" and invest millions more to try to salvage the e-platform. *See generally* Section V.D.2.d.

413. On May 8, 2025, Avantor hosted its 2025 Annual General Meeting, at which Defendant Peacock made the following misleading statement:

> Throughout 2024, the enterprise took action to improve our cost structure and to prioritize growth opportunities. ***We implemented a new operating model based around two global segments, Laboratory Solutions and Bioscience Production, which has sharpened our focus on customers, laboratory and production needs and unlocking additional efficiencies and better positioning Avantor to focus on improving growth and performance***.

414. Defendant Peacock's statements during Avantor's 2025 Annual General Meeting above were materially false or misleading when made, or failed to disclose material information necessary to make the statements not misleading, because the reasonable inference from the accounts of former employees and other sources, as further corroborated by the Company's admissions, is that the reorganization had ignored customer needs and worsened accountability.

*See generally* V.D.2; *see also* ¶¶398-99. Further, the reasonable inference from these accounts is that Peacock's claims that, *e.g.*, the reorganization is "***has sharpened our focus on customers, laboratory and production needs and unlocking additional efficiencies and better positioning Avantor to focus on improving growth and performance***" were false as of this date; for example, FE-4 explained that Avantor hired McKinsey in approximately August or September 2024, by no later than which time it was clear internally that the supply chain organization was not aligned. ¶120. Further, FE-1 explained that at the time of his departure in December 2025 there was still carryover from the previous reporting structure in terms of inventory and the Company was not yet fully looking at inventory from a LSS/BPS perspective, and FE-1 noted that this transition was particularly complicated for revenue, margin, and inventory value. ¶161. Additionally, FE-2 stated that an observable correlation between reduction in personnel and declining sales was materializing by no later than the end of 2024, that his opinion was that the correlation was clear between declining sales performance and the insufficient staffing following the reorganization and cost- transformation initiative, and further that it is difficult for him to believe that Avantor's leadership did not grasp that correlation. ¶209. The reorganization created a glaring leadership vacuum, as the head of LSS, Randy Stone, departed after only six months, and his replacement, Corey Walker, was enjoined from joining the Company, as Defendants knew, and did not assume his position until March or April 2025, just prior to this statement being made—leaving LSS, the Company's largest segment, without a leader for more than nine months during a critical period of implementation. *See generally* V.D.2.c. That the reality continued to contradict Peacock's statements as of this date is further corroborated by the admissions of Avantor's new CEO at the end of the Class Period that, for example, the reorganization had caused customer confusion "***about who Avantor is and what we do***" such that the Company needed yet another re-

segmentation in order to "***clarify our identity***" and "***better organize the company to meet customer needs***," stating further—"***it's all about clarity***" and that, at bottom, "***[i]t is simpler for the customers to know which product is served by which team***." *See* Section VIII.C.3.

### C. Defendants' Materially False Or Misleading Statements And Omissions About The Company's Cost-Cutting Initiative

415. On April 10, 2024, at the New York Stock Exchange's "Floor Talk" Program, Defendant Stubblefield responded to a question about the Company's "business transformation," stating: "So we're three or four months into this, ***we have the new model up and running, we're making considerable headway on a lot of the cost savings initiatives that were linked to this. And so I'd say we're off to a great start and out of the gate strong***."

416. Defendant Stubblefield's statements during the April 10, 2024 program were materially false or misleading when made, or failed to disclose material information necessary to make the statements not misleading, because, contrary to the impression that Avantor, for example, was "making considerable headway on a lot of the cost savings initiatives," in reality, Defendants engaged in reckless cost-cutting that crippled Avantor's already-strained operations. *See generally* Section V.D.3. As FE-6 explained, the Company did not have a "serious plan" for achieving the cost-savings initiative aside from layoffs or holding off on infrastructure improvements or upgrades. ¶192. Indeed, the Company's cost-cutting initiative resulted in the cancellation of critical investments, including, according to FE-6, investment in distribution "abruptly" ending after the announcement of the cost-savings initiative. FE-6 recalled that one such investment was a "major project" for the renovation of Avantor's site in Leuven, Belgium; FE-6 further stated that Stubblefield had spoken positively about the project in Belgium and personally acknowledged that facilities in Leuven were severely lacking. FE-6 recalled that he tried to make the project work within the new framework of the cost cutting initiative, but it was not approved. ¶¶193-97.

Additionally, according to FE-1, following the reorganization, some of the spending programs for planning tools and platforms were cut back. ¶199; *see generally* Section V.D.3.a. In addition, the cost-cutting resulted in mass layoffs, gutting institutional knowledge and creating numerous operational inefficiencies that harmed the Company. For example, according to according to FE-2, following the cost-savings initiative the Portfolio Team was reduced from six Product Specialists to three and the remaining three were responsible for double the territory and double the number of customers than they had been previously, and this reduction along with the relocation of back-office roles offshore created an environment where there was not enough support for customers and the workloads for Product Specialists had become "insane." ¶¶206-09. Further, according to FE-2, other regions experienced similar reductions in product specialists. *Id*. FE-2 also noted that an observable correlation between reduction in personnel and declining sales was materializing by no later than the end of 2024. ¶209; *see generally* Section V.D.3.b. Additionally, critical data analyst and customer service functions were offshored to India, where replacement staff lacked the supply chain experience to effectively interpret the data they handled. For example, FE-3 recalled that while offshored employees in India had "technical expertise," they struggled explaining what the data meant and did not have the necessary supply chain and distribution experience to effectively understand key metrics and explain the data they were handling, and FE-7 explained that the entire accounting department was fired simultaneously and further recalled that part of the IT function at Avantor was relocated to India and while employees in these roles were proficient in the technology aspects of their role that they did not understand the business. ¶¶212-13; *see generally* Section V.D.3.c.

417. The fair inference of these and the other accounts and allegations above is that statements are false and misleading, as further corroborated when Defendants were ultimately

forced to admit, among other things, the need for "***investment and process enhancement***" in supply chain operations, that the purported savings from the cost-cutting initiative were "***not adequately falling through to the bottom line***," and that Avantor "c***ut too many specialists***." At the end of the Class Period, Defendants pulled the plug on the cost-cutting initiative altogether, stating that "***will no longer report progress related to our previously discussed cost transformation initiative, nor will we continue to target those goals internally as a strategic objective***."

418. On April 26, 2024, Defendants participated in a conference call to discuss Avantor's financial results from the first quarter of 2024 ("Q1 2024 Earnings Call"). On the Q1 2024 Earnings Call, Defendant Stubblefield touted the progress of the cost-savings initiative:

> ***We also advanced our multi-year cost transformation initiative,*** including footprint optimization, ***organizational efficiency***, go-to-market and procurement savings. ***Our disciplined execution*** enabled us to accelerate the realization of some savings into the first quarter, contributing to our margin and profitability outperformance . . .
>
> ***I am pleased with the progress we've made on our multi-year cost transformation initiative. We are ahead of plan and are already seeing the impact in our cost structure and margins***.

419. Defendant Stubblefield's statements during the April 26, 2024 Q1 Earnings Call above were materially false or misleading when made, or failed to disclose material information necessary to make the statements not misleading, because the reasonable inference from the accounts of former employees and other sources, as further corroborated by the Company's admissions, is that, contrary to the impression that, for example, Avantor's "cost-transformation initiative" was "***ahead of plan" and that the Company was "already seeing the impact in our cost structure and margins***," Avantor was engaged in reckless cost-cutting that crippled the Company's already-strained operations at the direct expense of operational capabilities and

performance, including through the loss of key personnel and other mass layoffs, the cancellation of critical and necessary investments, and offshoring critical data and customer service functions. *See generally V.D.3*; *see also* ¶416. That the reality continued to contradict Stubblefield's statements as of this date is further corroborated by Defendants' later admissions, including that the Company needed "***investment and process enhancement***" in supply chain operations, that the purported savings from the cost-cutting initiative were "***not adequately falling through to the bottom line***," and that Avantor "***cut too many specialists***." At the end of the Class Period, Defendants pulled the plug on the cost-cutting initiative altogether, stating that "***will no longer report progress related to our previously discussed cost transformation initiative, nor will we continue to target those goals internally as a strategic objective***."

420. On April 26, 2024, Avantor hosted its Q1 2024 Earnings Call, during which Defendant Stubblefield was asked by an analyst about whether "you [are] managing the business with an assumption that the improvement in activity that you've described translates into an increase in the need for product support and ultimately revenue generation in the back half of the year?" Defendant Stubblefield responded:

> Yeah. I'd say a couple of things about that, Doug, is ***we're laser focused on executing our long-term growth strategy, which means we're investing*** in innovation, new product introductions, strategic marketing, ***a lot of investments in our digital platform to position our business for sustained long-term growth and to build on our leading position in both of our segments***.
>
> ***When I think about the cost transformation initiative that we're driving, it's a multi-year effort, quite strategic in nature, linked to the rollout of our new operating segments, which, in a very unique way, do unlock significant efficiencies***. So these come with investments in capability that strengthen the footprint, ***investments in technology that allow us to do things a bit more efficiently.*** So, we'll benefit from the savings associated with that in the near term, which is helpful in an environment of maybe a little bit muted volumes. ***But there's nothing that we're doing here that prevents us from growing the business as it returns***.

421. Defendant Stubblefield also made the following representation regarding cost-cutting measures: "***We're out of the gate strong with our cost transformation initiative***. ***We're able to accelerate some savings into the first quarter here***."

422. Defendant Stubblefield's statements during the Q1 2024 Earnings Call above were materially false or misleading when made, or failed to disclose material information necessary to make the statements not misleading, because the reasonable inference from the accounts of former employees and other sources, as further corroborated by the Company's admissions, is that, contrary to the impression that, for example, "***there's nothing that we're doing here that prevents us from growing the business as it returns***" with respect to the "cost-transformation initiative," and that Avantor was "***out of the gate strong with our cost transformation initiative*** **[and]** ***able to accelerate some savings into the first quarter here***" Avantor was engaged in reckless cost-cutting that crippled the Company's already-strained operations at the direct expense of operational capabilities and performance, including through the loss of key personnel and other mass layoffs, the cancellation of critical and necessary investments, and offshoring critical data and customer service functions. *See generally* V.D.3; *see also* ¶416. That the reality continued to contradict Stubblefield's statements as of this date is further corroborated by Defendants' later admissions, including that the Company needed "***investment and process enhancement***" in supply chain operations, that the purported savings from the cost-cutting initiative were "***not adequately falling through to the bottom line***," and that Avantor "***cut too many specialists***." At the end of the Class Period, Defendants pulled the plug on the cost-cutting initiative altogether, stating that "***will no longer report progress related to our previously discussed cost transformation initiative, nor will we continue to target those goals internally as a strategic objective***."

423. Further, contrary to the assurance that Defendants were, for example, making "***a lot of investments in our digital platform to position our business for sustained long-term growth and to build on our leading position in both of our segments***" by this time, the Company's reorganization and cost-cutting initiative announced in December 2023 had resulted in the cancellation of critical and necessary investments; for example, FE-6, who led Global Supply Chain through May 2024, had personally led investment pitches to advocate for improvements at Avantor's supply chain and distribution facilities, including meetings with former CEO Defendant Stubblefield, former CFO Tom Szlosek, and former Executive Vice President and Chief Information Officer Michael Wondrasch, including a "major project" for renovation of Avantor's site in Leuven Belgium, which had not been upgraded in approximately 25 years. According to FE-6, Stubblefield had spoken positively about the project in Belgium and personally acknowledged that facilities in Leuven were severely lacking. While FE-6 stated that, in his experience, Stubblefield, Szlosek, and Wondrasch had typically been open to these and other proposals for investment in distribution infrastructure prior to the December 2023 announcement of the Company's reorganization into Laboratory Solutions and Bioscience Production business units and the cost-savings initiative, after that announcement, however, investment in distribution "abruptly" ended. ¶¶193-97.

424. Further, contrary to the assertions that Avantor, for example, was making "***investments in technology that allow us to do things a bit more efficiently***," Avantor's e-commerce platform, rolled out in tandem with the reorganization and cost-savings initiative, was plagued with serious functionality problems that threatened customer retention. For example, as FE-8 explained, from a customer's perspective, it became hard to trust any numbers that they were seeing on the website. FE-8 recalled the high list prices prompting customers to look elsewhere

for more competitive prices. ¶¶186-89. FE-12 also recalled functionality problems, such as customers logging in and not being shown correct prices based on their contracts and incorrect search results being returned. ¶184. Further, the reasonable inference from these accounts is that the Company's weak demand and competitive positioning continued as of the date of Stubblefield's statement; for example, to FE-8, the website was still a problem at the time of his departure [in April 2025], and FE-2 specifically recalled attending meetings as late as mid-2025 in which customers voiced complaints about the website, and FE-2 was informed that the website was now worse than it had been before. ¶¶183, 189. That the reality continued to contradict Stubblefield's statements as of this date is further corroborated by Defendants' later admissions, including that "e-commerce is one of [the barriers]" to retaining customers, and that it was ultimately forced to recruit a new "Chief Digital Officer" and invest millions more to try to salvage the e-platform. *See generally* Section V.D.2.d.

425. On May 14, 2024, Avantor participated in the Bank of America Global Healthcare Conference (the "2024 Bank of America Conference"). Defendant Stubblefield said the following at that conference that "***We're out of the gates probably a little bit ahead of the curve [in cost-cutting], which give us some upside in Q1***," continuing:

> And then I would say the go-to-market work that's being ***enabled by a lot of the technology investments we're making in digital, for example, will play out as we move throughout this year*** . . . ***This isn't just simply, oh, let's just go cut 5% of the workforce and reset cost instantly. We are fundamentally changing the way that the business is working and taking work out of the system and finding smarter and better ways to do it***.

426. Defendant Stubblefield also stated during the 2024 Bank of America Conference that "***And then as you saw from the margin outperformance, really good traction with our cost transformation initiative where we were able to pull forward some of the savings into Q1 and then deliver, some nice expansion on that front***."

427. Defendant Stubblefield's statements during the 2024 Bank of America Conference above were materially false or misleading when made, or failed to disclose material information necessary to make the statements not misleading, because the reasonable inference from the accounts of former employees and other sources, as further corroborated by the Company's admissions, is that, contrary to Stubblefield's assertions that, for example, the cost-cutting initiative "***isn't just simply, oh, let's just go cut 5% of the workforce and reset cost instantly***" and was "***taking work out of the system and finding smarter and better ways to do it***," as well as that Avantor's cost-cutting initiative was driving "***margin outperformance***" and the Company was making "***really good traction with our cost transformation initiative where we were able to pull forward some of the savings into Q1 and then deliver, some nice expansion on that front***" "***out of the gate strong with our cost transformation initiative* [and] *able to accelerate some savings into the first quarter here***," Avantor was engaged in reckless cost-cutting that crippled the Company's already-strained operations at the direct expense of operational capabilities and performance, including through the loss of key personnel and other mass layoffs, the cancellation of critical and necessary investments, and offshoring critical data and customer service functions. *See generally* V.D.3; *see also* ¶416. That the reality continued to contradict Stubblefield's statements as of this date is further corroborated by Defendants' later admissions, including that the Company needed "***investment and process enhancement***" in supply chain operations, that the purported savings from the cost-cutting initiative were "***not adequately falling through to the bottom line***," and that Avantor "***cut too many specialists***." At the end of the Class Period, Defendants pulled the plug on the cost-cutting initiative altogether, stating that "***will no longer report progress related to our previously discussed cost transformation initiative, nor will we continue to target those goals internally as a strategic objective***."

428. Further, contrary to the assertions that, for example, "go-to-market work" was "being ***enabled by a lot of the technology investments we're making in digital***," Avantor's e-commerce platform, rolled out in tandem with the reorganization and cost-savings initiative, was plagued with serious functionality problems that threatened customer retention. For example, as FE-8 explained, from a customer's perspective, it became hard to trust any numbers that they were seeing on the website. FE-8 recalled the high list prices prompting customers to look elsewhere for more competitive prices. ¶¶186-89. FE-12 also recalled functionality problems, such as customers logging in and not being shown correct prices based on their contracts and incorrect search results being returned. ¶184. Further, the reasonable inference from these accounts is that the Company's weak demand and competitive positioning continued as of the date of Stubblefield's statement; for example, to FE-8, the website was still a problem at the time of his departure [in April 2025], and FE-2 specifically recalled attending meetings as late as mid-2025 in which customers voiced complaints about the website, and FE-2 was informed that the website was now worse than it had been before. ¶¶183, 189. That the reality continued to contradict Stubblefield's statements as of this date is further corroborated by Defendants' later admissions, including that "***e-commerce is one of [the barriers]***" to retaining customers, and that it was ultimately forced to recruit a new "Chief Digital Officer" and invest millions more to try to salvage the e-platform. *See generally* Section V.D.2.d.

429. On May 30, 2024, Defendant Stubblefield spoke at the Sanford C. Bernstein Strategic Decisions Conference (the "Bernstein Conference"), where he discussed cost-cutting as enhancing customers' experiences in response to an analyst question:

> Question – Eve Burstein: Are there any early proof points either on execution against cost savings or perhaps on the strategic growth and better serving customer needs side that you can point to?

> Answer – Michael Stubblefield: … There's – ***and we've got the full transformation program that's in flight that'll save us the $300 million. We hadn't necessarily anticipated savings in the first quarter from that. But as you saw from our first quarter results, we're able to bring some of that forward as we're moving quickly to put things in place here. So, starting to already realize benefits from that, for sure.***

430. Defendant Stubblefield's statements during the Bernstein Conference above were materially false or misleading when made, or failed to disclose material information necessary to make the statements not misleading, because the reasonable inference from the accounts of former employees and other sources, as further corroborated by the Company's admissions, is that, contrary to Stubblefield's assertions that, for example, with respect to the cost-cutting initiative, "***[w]e hadn't necessarily anticipated savings in the first quarter from that. But as you saw from our first quarter results, we're able to bring some of that forward as we're moving quickly to put things in place here. So, starting to already realize benefits from that, for sure***," Avantor was engaged in reckless cost-cutting that crippled the Company's already-strained operations at the direct expense of operational capabilities and performance, including through the loss of key personnel and other mass layoffs, the cancellation of critical and necessary investments, and offshoring critical data and customer service functions. *See generally* V.D.3; *see also* ¶416. That the reality continued to contradict Stubblefield's statements as of this date is further corroborated by Defendants' later admissions, including that the Company needed "***investment and process enhancement***" in supply chain operations, that the purported savings from the cost-cutting initiative were "***not adequately falling through to the bottom line***," and that Avantor "***cut too many specialists***." At the end of the Class Period, Defendants pulled the plug on the cost-cutting initiative altogether, stating that "***will no longer report progress related to our previously discussed cost transformation initiative, nor will we continue to target those goals internally as a strategic objective***."

431. On July 26, 2024, during the Company's Second Quarter 2024 Earnings Call ("Q2 2024 Earnings Call"), Defendant Stubblefield told investors the following about the progress of the cost-cutting initiative:

> ***[O]ur team continues to execute our multi-year cost transformation initiative***, including aligning our manufacturing and distribution footprint with current and future areas of growth and improving our organizational efficiency.

432. Defendant Stubblefield's statements during the Q2 2024 Earnings Call above were materially false or misleading when made, or failed to disclose material information necessary to make the statements not misleading, because the reasonable inference from the accounts of former employees and other sources, as further corroborated by the Company's admissions, is that, contrary to Stubblefield's assertions that, for example, the Company "***continues to execute our multi-year cost transformation initiative***," Avantor was engaged in reckless cost-cutting that crippled the Company's already-strained operations at the direct expense of operational capabilities and performance, including through the loss of key personnel and other mass layoffs, the cancellation of critical and necessary investments, and offshoring critical data and customer service functions. *See generally* V.D.3; *see also* ¶416. That the reality continued to contradict Stubblefield's statements as of this date is further corroborated by Defendants' later admissions, including that the Company needed "***investment and process enhancement***" in supply chain operations, that the purported savings from the cost-cutting initiative were "***not adequately falling through to the bottom line***," and that Avantor "***cut too many specialists***." At the end of the Class Period, Defendants pulled the plug on the cost-cutting initiative altogether, stating that "***will no longer report progress related to our previously discussed cost transformation initiative, nor will we continue to target those goals internally as a strategic objective***."

433. Also during the Q2 2024 Earnings Call on July 26, 2024, Defendant Jones responded to an analyst question about whether the Company was on track to hit its guidance:

> Question – Luke Sergott: Got it. And then, just the last one here for Brent. Great, great margin progression and plenty of questions on this. I guess, what I'm thinking about it is, you're on track here to hit your guide or at least to the low end for the back half through the year. Just like how much of this is due when you guys are doing the cost out and kind of rightsizing that cost structure, are you finding – you're finding more than what you thought was there or is this more just kind of things are kind of progressing faster than we expected it? Just trying to get a sense of like, how much juice is left in that squeeze versus though it's a timing issue.
>
> Answer – R. Brent Jones: Yeah. No, Luke, thanks, and I think it's a really good point to highlight there. ***I would definitely put it to the latter there that it's around execution. I think we had dimensionalized the opportunity here very well.*** When you dig into a program like this, you always find places that are a little larger than you would expect and places that the juice is and what the squeeze is there. ***But I think what I'd really emphasize on it is, not only are we getting at it faster, which is allowing us to derisk the margin for the year. But the question we've gotten is, okay, is this much transformation that it caused confusion in the business? And I think what I'd say is, it's not an easy thing to do, but not only are we getting at the cost, but we're also getting at the top line. So, I think it's proof that we're hitting the right areas at the right times, and we're being really prudent about it*. *And you're seeing it both in the P&L on the expense side as well as on the revenue side that [] still really focused.***

434. Defendant Jones's statements during the Q2 2024 Earnings Call above were materially false or misleading when made, or failed to disclose material information necessary to make the statements not misleading, because the reasonable inference from the accounts of former employees and other sources, as further corroborated by the Company's admissions, is that, contrary to Jones's assertions that, for example, with respect to the cost-cutting initiative, the Company was "***getting at the cost***" and ***"the top line***," which was "***proof that we're hitting the right areas at the right times, and we're being really prudent about it***," as well as the impression that the cost-cutting initiative had not "***caused confusion in the business***," Avantor was engaged

in reckless cost-cutting that crippled the Company's already-strained operations at the direct expense of operational capabilities and performance, including through the loss of key personnel and other mass layoffs, the cancellation of critical and necessary investments, and offshoring critical data and customer service functions. *See generally* V.D.3; *see also* ¶416. That the reality continued to contradict Jones's statements as of this date is further corroborated by Defendants' later admissions, including that the Company needed "***investment and process enhancement***" in supply chain operations, that the purported savings from the cost-cutting initiative were "***not adequately falling through to the bottom line***," and that Avantor "***cut too many specialists***." At the end of the Class Period, Defendants pulled the plug on the cost-cutting initiative altogether, stating that "***will no longer report progress related to our previously discussed cost transformation initiative, nor will we continue to target those goals internally as a strategic objective***."

435. On April 25, 2025, Defendants hosted an earnings call to discuss the first quarter of 2025 earnings (the "Q1 2025 Earnings Call"), during which Defendant Jones stated:

> Finally, an update on our cost transformation. ***This initiative has not only made a material impact on our financial results, but it has also sharpened our focus on conversion to the bottom line and to cash. Our actions have been carefully designed and executed to ensure that our critical capabilities remain intact***.
>
> As a reminder, we exited 2024 with over $130 million of in-year savings and an exit run rate of approximately $165 million, well ahead of plan. In 2025, we expect to generate an incremental $75 million of in-year gross savings and exit 2025 with run rate savings in excess of $250 million. We have clear line of sight to exiting 2026 with the promised $300 million of run rate cost savings.

436. During the Q1 2025 Earnings Call, Defendant Jones also announced the expansion of the cost-cutting initiative:

> ***As we more deeply live into our new segments and operating model, we continue to identify further opportunities for***

> ***productivity. As a result, we are expanding the initiative and now expect to exit 2027 with at least $400 million of run rate cost savings*.**

437. Defendant Jones's statements during the Q1 2025 Earnings Call above were materially false or misleading when made, or failed to disclose material information necessary to make the statements not misleading, because the reasonable inference from the accounts of former employees and other sources, as further corroborated by the Company's admissions, is that, contrary to Jones's assertions that, for example, with respect to the cost-cutting initiative, the Company's cost-cutting "***initiative has not only made a material impact on our financial results, but it has also sharpened our focus on conversion to the bottom line and to cash***," that the Company's "***actions have been carefully designed and executed to ensure that our critical capabilities remain intact***," and that Avantor "***continue[s] to identify further opportunities for productivity***" warranting "***expanding the initiative and now expect to exit 2027 with at least $400 million of run rate cost savings***," Avantor was engaged in reckless cost-cutting that crippled the Company's already-strained operations at the direct expense of operational capabilities and performance, including through the loss of key personnel and other mass layoffs, the cancellation of critical and necessary investments, and offshoring critical data and customer service functions. *See generally* V.D.3; *see also* ¶416. That the reality continued to contradict Stubblefield's statements as of this date is further corroborated by Defendants' later admissions, including that the Company needed "***investment and process enhancement***" in supply chain operations, that the purported savings from the cost-cutting initiative were "***not adequately falling through to the bottom line***," and that Avantor "***cut too many specialists***." At the end of the Class Period, Defendants pulled the plug on the cost-cutting initiative altogether, stating that "***will no longer report progress related to our previously discussed cost transformation initiative, nor will we continue to target those goals internally as a strategic objective***."

438. Also, during the Q1 2025 Earnings Call held on April 25, 2025, Defendant Jones had the following exchange with an analyst:

> Question – Luke Sergott: All right. Great. And then just a follow up here, talk about the incremental $100 million on the cost out. Brent, you talked about trying to do what you can and front-load that in the earlier years. Like, what can you do? Just dig in a little bit more there on specifics that you run the risk there or have to strike a balance without disrupting your overall sales force or the momentum you're trying to build within the two segments.
>
> Answer – R. Brent Jones: Yeah. Luke, that's absolutely very well-taken and we tried to address a little bit of that directly in the prepared remarks. ***I mean, I think the first thing I'd start with there is the program today we think has been done really clean, hasn't led to any disruption. I mean, look, at the end of the day, even though we want to rationalize the cost base, job one is growth, absolutely focused on growth across both sides of the business.***
>
> ***And I think another reason we've executed so rapidly or a consequence of that is you want to minimize the disruption to the org. So, moving to the left, so to speak, is really valuable there. Some of these things – I mean, these really are the insights. Corey's leadership is going to be really helpful forward as well. But just as you understand the segment structure is better here that unlocks sort of more of what we have existing***.

439. Defendant Jones's statements during the Q1 2025 Earnings Call above were materially false or misleading when made, or failed to disclose material information necessary to make the statements not misleading, because the reasonable inference from the accounts of former employees and other sources, as further corroborated by the Company's admissions, is that, contrary to Jones's assertions that, for example, with respect to the Company's cost-cutting initiative, "***the program today we think has been done really clean, hasn't led to any disruption***," and that "***even though we want to rationalize the cost base, job one is growth, absolutely focused on growth across both sides of the business***," Avantor was engaged in reckless cost-cutting that crippled the Company's already-strained operations at the direct expense of operational capabilities and performance, including through the loss of key personnel and other mass layoffs,

the cancellation of critical and necessary investments, and offshoring critical data and customer service functions. *See generally* V.D.3; *see also* ¶416. Additionally, the head of LSS, Randy Stone, departed after only six months, and his replacement, Corey Walker, was enjoined from joining the Company, as Defendants knew, and did not assume his position until March or April 2025—leaving LSS, the Company's largest segment, without a leader for more than nine months during a critical period of implementation. ¶¶169-79; *see generally* V.D.2.c. That the reality continued to contradict Jones's statements as of this date is further corroborated by Defendants' later admissions, including that the Company needed "***investment and process enhancement***" in supply chain operations, that the purported savings from the cost-cutting initiative were "***not adequately falling through to the bottom line***," and that Avantor "***cut too many specialists***." At the end of the Class Period, Defendants pulled the plug on the cost-cutting initiative altogether, stating that "***will no longer report progress related to our previously discussed cost transformation initiative, nor will we continue to target those goals internally as a strategic objective***."

440. On May 13, 2025, Avantor participated in the Bank of America Global Healthcare Conference (the "2025 Bank of America Conference"), during which Defendant Stubblefield stated:

> And thinking about our financial results over the – certainly the first quarter and even back into 2024, I think ***you see, strong margin execution***, best-in-class free cash flow conversion and earnings in line with our plans and our targets. ***And I think that's notable. And I think it speaks to our team's ability to execute in a relatively challenging environment. And it also underscores the impact of the structural cost actions that we have taken***.

441. Defendant Stubblefield also had the following exchange with an analyst at the Bank of America Conference:

> Question – Michael Ryskin: I want to talk a little bit about the cost actions you've announced. Both, more recently, just over the last couple of years. You've expanded your cost savings plan to $400

> million exiting 2027. Just sort of where are the areas, were you able to take out the most cost? And how do you balance that between sort of staying nimble in this environment? Make sure you're not cutting too far?
>
> Answer – Michael Stubblefield: So a couple of things I think to highlight here. ***Firstly, this has been an important aspect of us being able to deliver on our margin, cash flow and profitability targets last year as well as in the first quarter. And it does underscore, I think, the team's ability to execute. We announced the original $300 million program in connection with the new operating model, and there were a lot of costs that just fell out of the model when you went from three regions to just two business units to take brands finance function for example, you no longer had three reporting segments and now just two. And so you're able to cut proportionally. And that played out really across the organization, coming off a number of years of high inflation, the procurement lever has been a really solid contributor to our targets over the last couple of years.***

442. Defendant Stubblefield's statements during the 2025 Bank of America Conference above were materially false or misleading when made, or failed to disclose material information necessary to make the statements not misleading, because the reasonable inference from the accounts of former employees and other sources, as further corroborated by the Company's admissions, is that, contrary to Stubblefield's assertions that, for example, "***strong margin execution***" "***underscores the impact of the structural cost actions that we have taken***," the cost cutting initiative "***has been an important aspect of us being able to deliver on our margin***," "***there were a lot of costs that just fell out of the model when you went from three regions to just two business units***," and that "***you're able to cut proportionally. And that played out really across the organization***," Avantor was engaged in reckless cost-cutting that crippled the Company's already-strained operations at the direct expense of operational capabilities and performance, including through the loss of key personnel and other mass layoffs, the cancellation of critical and necessary investments, and offshoring critical data and customer service functions. *See generally* V.D.3; *see also* ¶416. That the reality continued to contradict Stubblefield's statements as of this date is

further corroborated by Defendants' later admissions, including that the Company needed "***investment and process enhancement***" in supply chain operations, that the purported savings from the cost-cutting initiative were "***not adequately falling through to the bottom line***," and that Avantor "***cut too many specialists***." At the end of the Class Period, Defendants pulled the plug on the cost-cutting initiative altogether, stating that "***will no longer report progress related to our previously discussed cost transformation initiative, nor will we continue to target those goals internally as a strategic objective***."

### D. Defendants' Materially False Or Misleading Statements and Omissions About the Company's Demand, Destocking, Competitive Position, And Market Share

443. During the Q1 2024 Earnings Call on April 26, 2024, Defendant Stubblefield stated:

> We're starting to see some nice acceleration [in LSS], which I think is ***reflective of the destocking trends that we're seeing and the improvement of inventory health, as well as just a good indicator of funding and activity levels, engagement with our customers across the board***.

444. During that same earnings call, Defendant Stubblefield also responded to an analyst question for "any more context" around pricing and market share, stating:

> ***On the pricing side, I would say, the team has delivered another solid year of execution on this, in executing on that playbook.*** We expect kind of 1 to 2 points of contribution coming from price, primarily offsetting the COGS inflation that we are seeing. So pretty close to historical levels of contribution, I would say, coming from price.
>
> ***And I think the teams did a nice job putting that through, and not a lot of noise around that at this stage***. We'll see a little bit of step-up in revenue in the second quarter as those price increases. We get the full phasing of those in the quarter. So, ***pretty pleased about where we're at from a pricing standpoint and certainly, one of the favorable drivers of margin that we do see. Share is a great story for us and certainly, excited to talk about that***.

445. Defendant Stubblefield's statements during the April 26, 2024 Earnings Call were materially false or misleading when made, or failed to disclose material information necessary to make the statements not misleading, because, contrary to the impression that, for example, "***destocking trends***" were improving, in reality customer destocking was still ongoing at this time, as described in the accounts of, for example, FE-2, ¶¶234-38, and FE-11, ¶239. *See generally* Section V.D.4.b. Further, Defendant Stubblefield's statements above were also false and misleading because, in referring to, for example, purported "***improvement of inventory health***," "***activity levels***," and "***engagement with our customers***," Stubblefield gave investors the impression of improving demand when in fact Avantor was experiencing and had experienced by this time declining demand; for example, FE-3 noted the volume of lines observed in 2024 were below figures from 2018 and below the ten-year average prior to COVID, and the volume of product that moved through the distribution centers just kept dropping and was "always dropping" from this point until his departure in March 2025. ¶¶217-22. Likewise, FE-9 recalled that demand "fell off a cliff" after approximately the first quarter of 2023. ¶228. FE-4 saw a decline in orders due to fulfillment issues from the time he joined the Company in May 2023, and explained that he was aware orders had declined based on the order volume figures that he had access to given his role at Avantor. ¶229. And FE-10 explained that demand changed post-COVID in approximately October 2023 and was visible in sales data beginning in December 2023. ¶230. Also, in reality, Avantor leadership obscured deteriorating demand conditions with manipulated forecasting; for example, FE-12 explained that the forecasts returned to his region were then approximately "double or more" in comparison to the forecasts produced at the region level. According to FE-12, targets were "totally unobtainable" and "we just couldn't meet them." ¶240; *see generally* Section V.D.4.c. Further, Defendant Stubblefield's statements above were also false and misleading

because, contrary to his assurances that "pricing" was "***one of the favorable drivers of margin that we do see***" and that "***[market] [s]hare is a great story***, in reality, Defendants were facing weak demand and competition by this time, forcing significant pricing discounts; for example, FE-2 recalled that, in Europe, former Executive Vice President, Europe, Global Portfolio and Sourcing Frederic Vanderhaegen issued a directive at the end of 2023 to shift product and "sell for what you can" and FE-2 often recalled selling products at negative profit margins. ¶¶245-46. In addition, FE-12 recalled discounts as steep as 90% to move product that had been in high demand during COVID. ¶247. These accounts are further corroborated by the independent conclusions of investment firm Engine Capital, which concluded in its public letter that "in 2023" Avantor's Board (including Defendants Stubblefield and Peacock) possessed "***internal knowledge of operational underperformance and market share losses at LSS***." *See generally* Section V.D.4.d.

446. The fair inference of these and the other accounts and allegations above is that statements are false and misleading, as further corroborated when Defendants were ultimately forced to admit, among other things, that Avantor needed to reduce free cash flow guidance by $100 million to cover "prepaid rebates" to protect market share for key existing accounts, that "competitive actions to drive share" had come "at the cost of margin," that a "softer demand environment" had negatively impacted Avantor's performance and that "lower volumes and related absorption" had driven margin declines; and ultimately CEO Ligner admitted that "we've lost some share, without any doubt, in the lab services business.".

447. On July 26, 2024, during Avantor's Q2 2024 Earnings Call, an analyst asked Defendant Stubblefield whether there was "any sign you're potentially losing share to one of your competitors," to which Stubblefield stated that Avantor's "***lab business stacks up well against every number that certainly that we've seen***," that "***we've got a lot of data to support that, that***

***we continue to enhance our position***," and that "***we're really confident in our value proposition and our competitive position***."

448. Defendant Stubblefield's statements during the July 26, 2024 Earnings Call above were materially false or misleading when made, or failed to disclose material information necessary to make the statements not misleading, because the reasonable inference from the accounts of former employees and other sources, as further corroborated by the Company's admissions, is that in fact Avantor's "competitive position" was in fact strained and eroding, as Defendants faced weak demand and intense competition and were forced to rely on pricing concessions, discounting, and rebating in their attempts to drive share. *See generally V.D.4.d*; *see also* ¶445. Further, the reasonable inference from these accounts is that the Company's weak demand and competitive positioning continued as of the date of Stubblefield's statement; for example, according to FE-3 the volume of product moved through the distribution centers just kept dropping and was "always dropping" from this point until his departure in March 2025—well past Stubblefield's statement. ¶218. That the reality continued to contradict Stubblefield's statements as of this date is further corroborated by Defendants' later admissions that the Company's demand did not rebound, and this "***softness***" indeed impaired performance, including by "***pressur[ing] our ability to get price, which . . . meaningfully impacted margins*** **[by causing]** ***lower volumes and related absorption***." Leadership also admitted that Avantor had been forced to implement "***competitive actions to drive share***" and revealed that such actions "***have come at the cost of margin***."

449. During the same call, an analyst asked "[c]ould you maybe quantify what the pricing was in the quarter and what benefit you saw?" In response, Defendant Jones stated: "***we typically look to get 100 basis points to 200 basis points of price there. I would say, everything***

***is rolling really exactly to plan there and there wasn't significant*** — you do have more of the pricing impact into Q2 just due to timing of the year, ***but I wouldn't say it was a dramatic story there, that's really just executing against plan***."

450. Defendant Stubblefield's statements during the July 26, 2024 Earnings Call were materially false or misleading when made, or failed to disclose material information necessary to make the statements not misleading. The reasonable inference from the accounts of former employees and other sources, as corroborated by the Company's admissions, is that Avantor was neither "***get[ting]...price***" nor "***executing against plan.***" Avantor's competitive positioning was in reality strained and eroding, as Defendants faced weak demand and intense competition and were forced to rely on pricing concessions, discounting, and rebating in their attempts to drive share. *See generally* V.D.4.d; *see also* ¶445. Further, the reasonable inference from these accounts is that the Company's weak demand and competitive positioning continued as of the date of Stubblefield's statement. For example, according to FE-3, the volume of product moved through the distribution centers just kept dropping and was "always dropping" from this point until his departure in March 2025—well past Stubblefield's statement. ¶218. Stubblefield's representations contradicted what was happening in July 2024—and this was corroborated by Defendants' later admissions that the Company's demand did not rebound. Defendants ultimately revealed that market "***softness***" indeed impaired performance, including by "***pressur[ing] our ability to get price, which . . . meaningfully impacted margins*** **[by causing]** ***lower volumes and related absorption***." Leadership also admitted that Avantor had been forced to implement "***competitive actions to drive share***" and revealed that such actions "***have come at the cost of margin***."

451. On October 25, 2024, Defendant Stubblefield participated in a conference call hosted by Avantor to discuss the Company's earnings for the third quarter for fiscal year 2024 ("Q3 2024 Earnings Call"). During that call, Defendant Stubblefield stated:

> ***We've got high confidence in where things are going to go for Q4 based on our order book. And the fundamentals are strong. We've talked about that all year. Demand remains great. . . . And the production rates are continuing to improve as the destocking subsides.***

452. Defendant Stubblefield's statements during the October 25, 2024 Earnings Call were materially false or misleading when made, or failed to disclose material information necessary to make the statements not misleading. The reasonable inference from the accounts of former employees and other sources, as further corroborated by the Company's admissions, is that demand was not "***great***" and production rates were a far cry from "***continuing to improve***." In truth, Defendants faced weak demand and intense competition and were forced to rely on pricing concessions, discounting, and rebating in their attempts to drive share. *See generally V.D.4.d*; *see also* ¶445. Further, the reasonable inference from these accounts is that the Company's weak demand and competitive positioning continued as of the date of Stubblefield's statement. For example, according to FE-3, the volume of product that moved through the distribution centers just kept dropping and was "always dropping" from this point until his departure in March 2025—well past the time that Stubblefield made the above statement. ¶218. Defendants' subsequent admissions further corroborate the falsity of Stubblefield's statements as of October 2024, admitting the existence of market "***softness***" that ***had*** impaired performance, including by "***pressur[ing] our ability to get price, which . . . meaningfully impacted margins* [by causing] *lower volumes and related absorption***."

453. Also during the Q3 2024 Earnings Call, Defendant Stubblefield had the following exchange with an analyst:

> Question – Dan Arias: . . . I'm curious if just sort of conceptually, when you think about the beginning of next year and 1Q consumables orders, do you think they could have a bit of a catch-up feel to them, maybe a little bit larger than normal if just spending into the end of the year was muted to a degree and now these companies are working with a fresh budget and maybe need to restock a bit? Does that seem plausible deal at all or just not really?
>
> Answer – Michael Stubblefield: Yeah. I'm not exactly sure. ***When you look at a consumables portfolio, which we benefit from, that inventories from our perspective, I think we would agree with your view that the destocking is pretty much behind us, and for the most part inventories have normalized. And so, we see our customers managing their inventories in line with their activity levels. So, it feels like we have consumption and demand matching the orders that we're seeing at the moment. And certainly, the activity levels continue to improve***. So, I think that's encouraging.

454. Defendant Stubblefield's statements during the October 25, 2024 Earnings Call were materially false or misleading when made, or failed to disclose material information necessary to make the statements not misleading. The reasonable inference from the accounts of former employees and other sources, as further corroborated by the Company's admissions, is that destocking was not "***behind***" Avantor nor had inventories "***normalized***." In truth, Defendants faced weak demand and intense competition and were forced to rely on pricing concessions, discounting, and rebating in their attempts to drive share. *See generally* V.D.4.d; *see also* ¶445. The reasonable inference from these accounts is that the Company's weak demand and competitive positioning existed ***at the time*** Stubblefield made the above statement. For example, according to FE-3, the volume of product that moved through the distribution centers just kept dropping and was "always dropping" from this point until his departure in March 2025—well past Stubblefield's statement. ¶218. Defendants' subsequent admissions further corroborate the falsity of Stubblefield's representations, because Defendants ultimately admitted demand for Avantor's products did not rebound, and this market "***softness***" indeed impaired performance, including by "***pressur[ing] our ability to get price, which . . . meaningfully impacted margins* [by causing]**

***lower volumes and related absorption***." Leadership also admitted that Avantor had been forced to implement "***competitive actions to drive share***" and revealed that such actions "***have come at the cost of margin***."

455. Also during Avantor's Q3 2024 Earnings Call, Defendant Stubblefield stated:

> As we've said in a lot of the different occasions, ***pricing for us in the Lab has played out in line with our expectations***, which means we've been able to offset the COGS inflation that we do see. ***And fortunately, the environment on pricing and COGS has largely normalized compared to where it's been over the last couple of years, where we've been having to take outsized price increases to the market. . . . And there's nothing that we see here that would give us a pause for concern that we're not going to be able to drive our normal pricing relative to the COGS environment into the market.***

456. Defendant Stubblefield's statements during the October 25, 2024 Earnings Call were materially false or misleading when made, or failed to disclose material information necessary to make the statements not misleading. The reasonable inference from the accounts of former employees and other sources, as further corroborated by the Company's admissions, is that the pricing environment had not "***normalized***." The pricing environment should have given Defendants "***pause for concern***" because, in truth, Defendants faced weak demand and intense competition and were forced to rely on pricing concessions, discounting, and rebating in their attempts to drive share. *See generally* V.D.4.d; *see also* ¶445. The reasonable inference from these accounts is that the Company's weak demand and competitive positioning existed ***<u>at the time</u>*** Stubblefield made the above statement. For example, according to FE-3, the volume of product that moved through the distribution centers just kept dropping and was "always dropping" from this point until his departure in March 2025—well past Stubblefield's statement. ¶218. Defendants' subsequent admissions further corroborate the falsity of Stubblefield's representations, because Defendants ultimately admitted demand for Avantor's products did not

rebound, and this market "***softness***" indeed impaired performance, including by "***pressur[ing] our ability to get price, which . . . meaningfully impacted margins* [by causing] *lower volumes and related absorption***." Leadership also admitted that Avantor had been forced to implement "***competitive actions to drive share***" and revealed that such actions "***have come at the cost of margin***."

457. Later during the Q3 2024 Earnings Call, Defendant Stubblefield answered the following question from an analyst:

> Question – Dan Leonard: Understood. And as a follow-up, Michael, can you give your updated view on the competitive environment in Lab Solutions and the market share picture there?
>
> Answer – Michael Stubblefield: Yeah. Great question. Dan, first, I would just reiterate how encouraged we were to see our Lab business return to growth for the first time in a couple of years. The activity levels there have been improving and we – finally, we're able to push that into the – into growth territory. ***The sustained commercial intensity that we've referenced in a number of different forums here over the last a year or so, I think is certainly collated to the outperformance we're seeing in that segment. And when I compare our disclosures here around Lab to other disclosures that others are making on Lab, I think you see a platform here that continues to outperform. We're confident we certainly have a leading platform here. And we remain focused on leveraging our capabilities to continue to grow share.*** And I think there's certainly a lot of data points here to support our view here ***that we've got a nice share story***.

458. Defendant Stubblefield's statements during the October 25, 2024 Earnings Call were materially false or misleading when made, or failed to disclose material information necessary to make the statements not misleading. The reasonable inference from the accounts of former employees and other sources, as further corroborated by the Company's admissions, is that Avantor's LSS segment did not have a "leading platform" that "continue[d] to outperform." In truth, Defendants faced weak demand and intense competition and were forced to rely on pricing concessions, discounting, and rebating in their attempts to drive share. *See generally* V.D.4.d; *see*

*also* ¶445. The reasonable inference from these accounts is that the Company's weak demand and competitive positioning existed ***at the time*** Stubblefield made the above statement. For example, according to FE-3, the volume of product that moved through the distribution centers just kept dropping and was "always dropping" from this point until his departure in March 2025—well past Stubblefield's statement. ¶218. Defendants' subsequent admissions further corroborate the falsity of Stubblefield's representations, because Defendants ultimately admitted demand for Avantor's products did not rebound, and this market "***softness***" indeed impaired performance, including by "***pressur[ing] our ability to get price, which . . . meaningfully impacted margins*** **[by causing]** ***lower volumes and related absorption***." Leadership also admitted that Avantor had been forced to implement "***competitive actions to drive share***" and revealed that such actions "***have come at the cost of margin***." Further, contrary to the statements that the Company was "continu[ing] to outperform" or "grow share," Engine Capital's investigation found that LSS had lost approximately 4% of relative market share since 2018 as competitors Merck and Thermo Fisher "grew by roughly 3-5x as much as LSS," and new CEO Ligner subsequently admitted "we've lost some share, without any doubt, in the lab services business." ¶258.

459. On December 3, 2024, Defendant Stubblefield attended the Evercore ISI HealthCONx Conference, during which he had the following exchange with an analyst:

> Question – Vijay Kumar: . . . Can you talk about any particular customer segment or geographic region which stood out within biopharma?
>
> Answer – Michael Stubblefield: Yeah. So we think about bioprocessing, which just, for context, is our content we supply into the commercial platforms. ***We've seen over the last year just nice, steady, gradual improvement across the board, both from a geographic standpoint as well as from a customer segment standpoint. So nothing really unique to call out there. We see broad-based recovery as destocking has essentially got behind us and we're seeing production levels better match demand. And of course, the end market fundamentals have been strong***

> ***throughout. And we see that continue – pipelines continue to be very strong, regulatory approvals continue at record levels*.**
>
> So, I think there's a lot to like about the setup here and we're encouraged by the improvements that we've seen throughout the year.

460. Defendant Stubblefield's statements during the December 3, 2024 Evercore ISI HealthCONx Conference were materially false or misleading when made, or failed to disclose material information necessary to make the statements not misleading. The reasonable inference from the accounts of former employees and other sources, as further corroborated by the Company's admissions, is that pipelines were not "***very strong***," nor was Avantor experiencing "***production levels better match demand***." In truth, Defendants faced weak demand and intense competition and were forced to rely on pricing concessions, discounting, and rebating in their attempts to drive share. *See generally* V.D.4.d; *see also* ¶445. The reasonable inference from these accounts is that the Company's weak demand and competitive positioning existed ***at the time*** Stubblefield made the above statement. For example, according to FE-3, the volume of product that moved through the distribution centers just kept dropping and was "always dropping" from this point until his departure in March 2025—well past Stubblefield's statement. ¶218. Defendants' subsequent admissions further corroborate the falsity of Stubblefield's representations, because Defendants ultimately admitted demand for Avantor's products did not rebound, and this market "***softness***" indeed impaired performance, including by "***pressur[ing] our ability to get price, which . . . meaningfully impacted margins* [by causing] *lower volumes and related absorption***." Leadership also admitted that Avantor had been forced to implement "***competitive actions to drive share***" and revealed that such actions "***have come at the cost of margin***."

461. Also on December 3, 2024, Defendant Stubblefield touted Avantor's competitive positioning in the following exchange with an analyst:

> Question – Vijay Kumar: Then maybe switching gears to on the lab side, one of the questions we get is competitive dynamics within that end market. Can you just give some details around how concentrated is this market? What is Avantor's market share? And has Avantor held its own from a competitive standpoint?
>
> Answer – Michael Stubblefield: . . . ***When I look at the performance of our business against the other public company lab data that you can see, I think you'll see a platform that's performing at the top of our peer set in the lab business***. And if you take some of the data I shared with you earlier around our academic exposure, for example, that end market isn't growing anywhere near the levels that we've been growing our academic revenues over the last six or seven quarters. ***And so the business has had another really terrific year here of executing on our growth strategy across many facets, whether it's innovation from a product standpoint and the technologies that we've brought to our customers to a lot of innovations and investments in our digital capabilities as well as in our supply chain capabilities.***

462. Defendant Stubblefield's statements during the December 3, 2024 Evercore ISI HealthCONx Conference were materially false or misleading when made, or failed to disclose material information necessary to make the statements not misleading. The reasonable inference from the accounts of former employees and other sources, as further corroborated by the Company's admissions, is that Avantor had anything but "***a platform that's performing at the top of our peer set in the lab business***." In truth, Defendants faced weak demand and intense competition and were forced to rely on pricing concessions, discounting, and rebating in their attempts to drive share. *See generally* V.D.4.d; *see also* ¶445. The reasonable inference from these accounts is that the Company's weak demand and competitive positioning existed ***at the time*** Stubblefield made the above statement. For example, according to FE-3, the volume of product that moved through the distribution centers just kept dropping and was "always dropping" from this point until his departure in March 2025—well past Stubblefield's statement. ¶218.

Defendants' subsequent admissions further corroborate the falsity of Stubblefield's representations, because Defendants ultimately admitted demand for Avantor's products did not rebound, and this market "***softness***" indeed impaired performance, including by "***pressur[ing] our ability to get price, which . . . meaningfully impacted margins*** **[by causing]** ***lower volumes and related absorption***." Leadership also admitted that Avantor had been forced to implement "***competitive actions to drive share***" and revealed that such actions "***have come at the cost of margin***."

463. Also on December 3, 2024, Defendant Stubblefield stated Avantor had "***a leading e-commerce platform that drives transaction efficiency for our customers***[.]"

464. The representations in the previous paragraphs were materially false and misleading because Avantor's e-commerce platform, rolled out in tandem with the reorganization and cost-savings initiative, was plagued with serious functionality problems that threatened customer retention. For example, as FE-8 explained, from a customer's perspective, it became hard to trust any numbers that they were seeing on the website. FE-8 recalled the high list prices prompting customers to look elsewhere for more competitive prices. ¶¶186-89. FE-12 also recalled functionality problems, such as customers logging in and not being shown correct prices based on their contracts and incorrect search results being returned. ¶184. Further, the reasonable inference from these accounts is that the Company's weak demand and competitive positioning continued as of the date of Stubblefield's statement; for example, to FE-8, the website was still a problem at the time of his departure [in April 2025], and FE-2 specifically recalled attending meetings as late as mid-2025 in which customers voiced complaints about the website, and FE-2 was informed that the website was now worse than it had been before. ¶¶183, 189. That the reality continued to contradict Stubblefield's statements as of this date is further corroborated by

Defendants' later admissions, including that "e-commerce is one of [the barriers]" to retaining customers, and that it was ultimately forced to recruit a new "Chief Digital Officer" and invest millions more to try to salvage the e-platform. *See generally* Section V.D.2.d.

465. On January 15, 2025, Defendant Stubblefield attended the JP Morgan Healthcare Conference, during which he answered the following question about BPS demand:

> ***Order rates continued to improve as we move through the year***. And with our lead time in our portfolio, which is roughly two to three months, ***we're starting to see real time that conversion of a growing order book into revenue.*** And we saw that steady improvement each quarter in our bioprocessing growth rates and set the expectation that we should do mid- to high-single digits in the fourth quarter, which should provide a really meaningful jump-off point as we head into 2025.
>
> The end-market fundamentals have been really strong there. ***We've talked a lot about destocking of the consumables in various categories, particularly some of the single-use components. We've seen virtually all of that kind of work through the system. So, I don't think that's going to be a big headwind that we'll have to deal with in 2025. Our customers' production levels are better starting to match their demand levels with their patients, which is encouraging***. And the rate of new therapies coming into the market is also encouraging.
>
> ***So, I think, strong favorable macro backdrop for this space should lead to, in our view, continued improvement in this space. We're getting close. For us, we view this as a double-digit platform and if we can do mid- to high-single digits in Q4, we're getting close.***

466. Defendant Stubblefield's statements during the January 15, 2025 JP Morgan Global Healthcare Conference were materially false or misleading when made, or failed to disclose material information necessary to make the statements not misleading. The reasonable inference from the accounts of former employees and other sources, as further corroborated by the Company's admissions, is that customers' production levels were not "***better starting to match their demand levels***." In truth, Defendants faced weak demand and intense competition and were forced to rely on pricing concessions, discounting, and rebating in their attempts to drive share.

*See generally* V.D.4.d; *see also* ¶445. The reasonable inference from these accounts is that the Company's weak demand and competitive positioning existed ***at the time*** Stubblefield made the above statement. For example, according to FE-3, the volume of product that moved through the distribution centers just kept dropping and was "always dropping" from this point until his departure in March 2025—after Stubblefield's statement. ¶218. Defendants' subsequent admissions further corroborate the falsity of Stubblefield's representations in January 2025, because Defendants ultimately admitted demand for Avantor's products did not rebound, and this market "***softness***" indeed impaired performance, including by "***pressur[ing] our ability to get price, which . . . meaningfully impacted margins*** **[by causing]** ***lower volumes and related absorption***." Leadership also admitted that Avantor had been forced to implement "***competitive actions to drive share***" and revealed that such actions "***have come at the cost of margin***."

467. On February 7, 2025, Defendant Stubblefield participated in a conference call to discuss Avantor's fourth quarter earnings for fiscal year 2024 ("Q4 2024 Earnings Call"). On that conference call, Defendant Stubblefield answered the following analyst question about destocking:

> Question – Vijay Kumar: I guess at a high level, when I look at bioprocessing, some pretty good trends here in Q4. What were order trends in the quarter? And then, when you look at the guidance mid to high singles, there is a range when your exit rate is high single. So I'm curious, was there any pull-forward of orders ahead of tariffs or any macro uncertainty? Just if you can elaborate on bioprocessing assumptions.
>
> Answer – Michael Stubblefield: Yeah. Good morning, Vijay. Thanks for the question. Yeah, we agree. We had a really strong finish to the year in bioprocessing with high-single digit growth in the quarter, which builds on four consecutive quarters of outperformance for us. Nothing really unusual in terms of how the quarter developed. I don't think we have, any evidence, that there was a significant pull-forward, the quarter played out pretty much in line with our expectations. ***And I would just indicate that the underlying market fundamentals continue to be quite strong. Destocking has largely subsided. Production levels have improved.*** We continue to see record levels of approvals. ***So strong order***

> ***intake, another great quarter there, with two months to three months lead times, we're seeing that translated to revenue real-time.*** Our experience in 2024, Vijay was, one of kind of gradual improvement and that's kind of what we planned on for 2025. ***And we enter the year with good momentum and an order book that sets us up for sustained recovery as we move through the year***.

468. Defendant Stubblefield's statements on February 7, 2025 at the Q4 2024 Earnings Call were materially false or misleading when made, or failed to disclose material information necessary to make the statements not misleading. The reasonable inference from the accounts of former employees and other sources, as further corroborated by the Company's admissions, is that destocking had not "***largely subsided***" nor were production levels "***improved***." In truth, Defendants faced weak demand and intense competition and were forced to rely on pricing concessions, discounting, and rebating in their attempts to drive share. *See generally* V.D.4.d; *see also* ¶445. The reasonable inference from these accounts is that the Company's weak demand and competitive positioning existed ***at the time*** Stubblefield made the above statement. For example, according to FE-3, the volume of product that moved through the distribution centers just kept dropping and was "always dropping" from this point until his departure in March 2025—after Stubblefield's statement. ¶218. Defendants' subsequent admissions further corroborate the falsity of Stubblefield's representations in January 2025, because Defendants ultimately admitted demand for Avantor's products did not rebound, and this market "***softness***" indeed impaired performance, including by "***pressur[ing] our ability to get price, which . . . meaningfully impacted margins* [by causing] *lower volumes and related absorption***." Leadership also admitted that Avantor had been forced to implement "***competitive actions to drive share***" and revealed that such actions "***have come at the cost of margin***."

469. On April 25, 2025, during the Q1 2025 Earnings Call, Defendant Stubblefield was asked by an analyst about "pricing dynamics," specifically what the Company's ability was "to

take price" and whether pricing would still align with "your prior assumption within guidance [which] was 1% to 2% pricing contribution for the year." Defendant Stubblefield responded: "So, as you know, pricing is an important part of our algorithm here . . . [a]nd as we got into the year and got through contracting season and price administration, ***I think it's played out largely as we had expected and in line with the guidance that we had given there***. . . . ***[F]or the business that we have today and for the contracted customers, pricing has played out***."

470. Defendant Stubblefield's statements during the April 25, 2025 Q1 2025 Earnings Call were materially false or misleading when made, or failed to disclose material information necessary to make the statements not misleading. The reasonable inference from the accounts of former employees and other sources, as further corroborated by the Company's admissions, is that pricing had not "***played out***" according to expectations. In truth, Defendants faced weak demand and intense competition and were forced to rely on pricing concessions, discounting, and rebating in their attempts to drive share. *See generally* V.D.4.d; *see also* ¶445. Defendants' subsequent admissions further corroborate the falsity of Stubblefield's representations, because Defendants ultimately admitted demand for Avantor's products did not rebound, and this market "***softness***" indeed impaired performance, including by "***pressur[ing] our ability to get price, which . . . meaningfully impacted margins*** **[by causing]** ***lower volumes and related absorption***." Leadership also admitted that Avantor had been forced to implement "***competitive actions to drive share***" and revealed that such actions "***have come at the cost of margin***."

471. At the May 13, 2025 Bank of America Conference, Defendant Stubblefield stated:

> Question – Michael Ryskin: And you just touched on the order book, it sounds like visibility remains pretty solid. Is there really besides or are we talking about in the controlled environment, any sign that bioprocessing is now sort of back to normal operating environment, it's been a very choppy last couple of years.

> Answer – Michael Stubblefield: So lead times for our platform are roughly two to three months. And that's been in place now for well over a year as supply chains have normalized. ***We've seen order patterns for our customers as destocking has essentially been eliminated, return to normal in terms of – they're providing new orders, respecting your lead times***. And so, when we think about visibility in that business, it's current quarter, as we sit here in the middle of May, we're starting to see orders flow into the third quarter as well. And we look at it on a daily basis and orders continue to outpace revenues as we move forward here. So visibility is within at least in that context of our lead times continues to be good. And the fundamentals continue to be quite strong.

472. Defendant Stubblefield's statements during the May 13, 2025 Bank of America Conference were materially false or misleading when made, or failed to disclose material information necessary to make the statements not misleading. The reasonable inference from the accounts of former employees and other sources, as further corroborated by the Company's admissions, is that pricing had not "***seen order patterns for our customers as destocking has essentially been eliminated, return to normal***." In truth, Defendants faced weak demand and intense competition and were forced to rely on pricing concessions, discounting, and rebating in their attempts to drive share. *See generally* V.D.4.d; *see also* ¶445. Defendants' subsequent admissions further corroborate the falsity of Stubblefield's representations, because Defendants ultimately admitted demand for Avantor's products did not rebound, and this market "***softness***" indeed impaired performance, including by "***pressur[ing] our ability to get price, which . . . meaningfully impacted margins*** **[by causing]** ***lower volumes and related absorption***." Leadership also admitted that Avantor had been forced to implement "***competitive actions to drive share***" and revealed that such actions "***have come at the cost of margin***."

473. On August 1, 2025, Defendants hosted an earnings call to discuss the Company's second quarter 2025 earnings (the "Q2 2025 Earnings Call"), during which, in response to an analyst question about "siz[ing] the different headwinds . . . really just trying to figure out what

was in your control," Stubblefield characterized the headwinds and their "impact" as "***discrete***," and touted that Avantor's "***value proposition…remains fully intact***."

474. Defendant Stubblefield's statements during the Q2 2025 Earnings Call were materially false or misleading when made, or failed to disclose material information necessary to make the statements not misleading. The reasonable inference from the accounts of former employees and other sources, as further corroborated by the Company's admissions, is Defendants had not faced "***discrete***" headwinds and Avantor's "***value proposition***" was not "***fully intact***." In truth, Defendants faced weak demand and intense competition and were forced to rely on pricing concessions, discounting, and rebating in their attempts to drive share. *See generally* V.D.4.d; *see also* ¶445. Defendants' subsequent admissions further corroborate the falsity of Stubblefield's representations, because Defendants ultimately admitted demand for Avantor's products did not rebound, and this market "***softness***" indeed impaired performance, including by "***pressur[ing] our ability to get price, which . . . meaningfully impacted margins*** **[by causing]** ***lower volumes and related absorption***." Leadership also admitted that Avantor had been forced to implement "***competitive actions to drive share***" and revealed that such actions "***have come at the cost of margin***."

## E. Defendants' Materially False Or Misleading Statements and Omissions About the Company's Goodwill

### 1. Materially False Statements About The Value of Goodwill Reported In 2024 Quarterly And Annual Reporting

475. On April 26, 2024, the Company filed the Q1 2024 10-Q, which reported that goodwill "net of accumulated impairment losses of $38.8 [million]" was valued at ***$5,762.0 million*** as of March 31, 2024.

476. On July 26, 2024, the Company filed the Q2 2024 10-Q, which reported that goodwill "net of accumulated impairment losses of $38.8 [million]" was valued at ***$5,659.6 million*** as of June 30, 2024.

477. On October 25, 2024, the Company filed the Q3 2024 10-Q, which reported that goodwill "net of accumulated impairment losses of $38.8 [million]" was valued at ***$5,670.6 million*** as of September 30, 2024.

478. On February 7, 2025, the Company filed the 2024 10-K, and provided guidance for fiscal year 2025. The 2024 10-K reported that net goodwill was valued at ***$5,539.2 million*** as of December 31, 2024.

479. On March 28, 2025, the Company published its 2024 Annual Report, which repeated the statements discussed above in Avantor's 2024 Form 10-K.[31]

480. In connection with the Form 10-K listed above, the Company stated, "The accompanying financial statements have been prepared in accordance with the rules and regulations of the SEC for annual reports and GAAP." Similarly, for the Forms 10-Q above, the Company stated, "The accompanying condensed consolidated financial statements have been prepared pursuant to SEC regulations."

481. In failing to timely record an impairment loss as to Avantor's net goodwill balances in each of the SEC filings set forth in ¶¶475-79, including specifically Defendants' improper failure to timely report the $785 million impairment alleged herein (Section VI.C.), Defendants

[31] The Q1 2024 10-Q, Q2 2024 10-Q and Q3 2024 10-Q's, were each signed by Eck, and included certifications signed by Stubblefield and Jones pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (the "SOX Act"). Stubblefield, Eck, Jones and Peacock signed the 2024 10-K, and Stubblefield and Jones signed certifications included therewith pursuant to the SOX Act.

also materially overstated Avantor's goodwill, operating income, net income and earnings per share ("EPS") in each respective filing as well.

482. Defendants' statements about the carrying value of Avantor's net goodwill balances in the 2024 Form 10-K and the quarterly reports on Form 10-Q identified above (¶¶475-79) were each materially false and misleading when made, and also omitted material facts, the disclosure of which were required in order to make statements made, not materially misleading half-truths.[32]

483. Specifically, the aforementioned net goodwill balances were principally from goodwill Avantor recognized as a result of three massive acquisitions undertaken, collectively, for more than $10.4 billion between 2017 and 2021. The goodwill recorded by Avantor for these three acquisitions represented nearly all of the $5.7 billion in net goodwill on Avantor's balance sheet as of fiscal year end 2023, immediately prior to the start of fiscal year 2024, and just prior to the Class Period commencing on March 5, 2024.[33]

484. Each of these acquisitions, or acquired lines of business, were financially and/or operationally disastrous for Avantor, even before the start of the Class Period, such that the

---

[32] Further, as set forth herein, Defendants' assertions of the value of the net goodwill on Avantor's balance sheet fails to comport with SEC guidelines that registrants disclose either the percentage by which the fair value of the reporting unit currently exceeds the carrying value, or that the reporting unit is not at risk of impairment. *See* SEC Division of Corporation Finance Financial Reporting Manual, TOPIC 9 – Management's Discussion and Analysis of Financial Position and Results of Operations (MD&A), Section 9500 – Critical Accounting Estimates [S-K 303(b)(3)], Subsection 9510 - Goodwill Impairment (the "Manual"), available at: https://www.sec.gov/divisions/corpfin/cffinancialreportingmanual.pdf (last visited April 24, 2026). In addition, 17 CFR 229.303(b)(3) notes that, for critical accounting estimates, the registrant should, among other things, disclose "how much each estimate and/or assumption ha[ve] changed over a relevant period . . . ").

[33] According to the FY 2023 Form 10-K, Ritter's goodwill balance at the end of fiscal 2023 was $807 million and Masterflex's net goodwill was $2,169 million. *See also* FY 2023 10-K at F-22 to F-24 (goodwill for Ritter and Masterflex "represents intellectual capital and the acquired assembled workforce . . . ."). Avantor described the $2,581.3 million in VWR goodwill at the time of its IPO as including "the value of anticipated commercial and cost synergies."

representation that any net goodwill balances were collectively at, or in excess of, $5 billion in fair value, were materially false statements when made. In addition to the facts set out in Sections V.E.2-6, Plaintiffs highlight the following facts that support their assertion of falsity as to these net goodwill balances at the time Defendants made these representations:

485. ***First*****,** Avantor's financial results from the operation of three acquisitions (**VWR, Ritter, and Masterflex**), completed before the Class Period, were in material decline even prior to the start of the Class Period, such that hundreds of millions of dollars in goodwill from those acquisitions that the Company reported as the single-largest asset on Avantor's balance sheet was in excess of fair value. By way of examples from the accounts of former Avantor employees:

i) According to FE-2, Avantor "100%" eroded **VWR's** reputation and its ability to generate future revenue. FE-2 noted that he observed VWR's reputational erosion happening during his tenure.

ii) FE-7, who was employed at Avantor and previously at VWR in a variety of roles, most recently as Distribution Excellence Manager, from September 2013 until March 2025, explained that **VWR** had a twenty-five-year-old system that was "tailor-made" for the business, while Avantor came in with no system and "no clue" about the distribution side of the business.

iii) FE-9 was told that the **Masterflex** acquisition was "one of the worst acquisitions ever" and came with approximately $250 million in inventory, most of which was "dead inventory."

iv) FE-12 explained that **Ritter** was one of the least successful acquisitions during her tenure and that Ritter had a "broken portfolio." FE-12 explained that by 2024, discussions on selling Ritter products had just been "done away with" and no targets were established for Ritter products in 2024 or 2025.

v) FE-8 explained that pushing **Ritter** products on customers was like "beating a dead horse."

486. ***Second***, particularly as to **Ritter** and **Masterflex**, those acquisitions were completed in 2021, and as outlined by Engine Capital (*see, e.g.*, ¶233), "near the peak of COVID demand levels and at exceptionally high multiples." In other words, Avantor overpaid for these acquisitions and once the demand for COVID products waned and customers had excessive

inventory and were reducing orders, it was well past time for Avantor to reduce the carrying value of its assigned goodwill in connection with such acquisitions, in the form of an impairment charge, well before the start of the Class Period.

487. As the reasonable inference from the accounts of former employees corroborate, order demand was in severe decline even prior to the Class Period:

i) FE-3 observed a "drop" in business in approximately 2023 because customers had bought so much inventory during COVID that they no longer needed to place additional orders and were undertaking destocking. FE-3 also recalled routinely being told that customers had bought so much inventory during COVID that they no longer needed to place additional orders. According to FE-3, during the period of time that followed the December 2023 reorganization announcement, the key performance indicator that was most negatively impacted was total volume.

ii) FE-4 saw a decline in orders due to fulfillment issues from the time he joined the Company in May 2023. FE-4 explained that he was aware orders had declined based on the order volume figures that he had access to given his role at Avantor. FE-4 explained that he had access to order volume data for 2023 and 2024. FE-4 continued to explain that in this data he was able to see order figures declining over those two years.

iii) FE-10 recalled that approximately one year after he joined the Company [he joined in October 2022] demand had changed in the post-COVID market. FE-10 explained that demand changed post-COVID in approximately October 2023 and was visible in sales data beginning in December 2023. FE-10 further recalled the "biggest" customers reducing orders or stopping altogether. FE-10 added that a "few" big customers followed this trajectory. FE-10 explained that orders were going down. FE-10 recalled that when he joined Avantor in October 2022 and began conducting forecasts he brought two assistant buyers with him when he joined because there was so much work. FE-10 further recalled that business performance declined from there, after backlogs had been worked through by the end of 2023 and demand declined. FE-10 explained that demand was "skyrocketing" and then "stopped" and "huge" customers were there one day and gone the next.

488. ***Third***, specific to Ritter, Avantor's auditor flagged for Defendants the carrying value of the Ritter assets as a "critical audit matter" in the FY 2023 Form 10-K, citing "sustained

revenue declines at Ritter"—consistent with and corroborating the accounts of former Avantor employees and conclusions reached by Engine Capital set out in the preceding paragraphs. (Other "critical audit matters" for goodwill and/or goodwill impairment for the Americas and Europe segments, pre-reorganization and dating back to Avantor's first year as a public company, also flagged for Defendants the risks related to the significant carrying value of goodwill for the lines of business within those units, of which VWR, Ritter and Masterflex were all a part. *See generally* Section VIII.K.

489. Further, in 2023, with regard to Ritter, Avantor took a $160 million non-cash impairment expense to reflect a reduction in the fair value of its long-lived Ritter assets, admitting that the impairment was "driven by persistently high customer inventory in the end markets served by Ritter" and Ritter's "revenues declin[ing] in 2023 compared to prior expectations, primarily from reduced customer demand for medical fluid handling tips due to a decrease in COVID-19 testing," with "sustained declines" in revenues.

490. ***Fourth***, the net $5 billion in goodwill reported on Avantor's balance sheet at the start of the Class Period was tied at least in part to the value of the "assembled workforce" of Masterflex and Ritter (along with the Company's transformative acquisition of VWR and otherwise). Yet, even prior to the Class Period starting, Defendants were causing Avantor to reduce workforces, primarily through layoffs. For example, according to FE-2 an hour after Stubblefield had addressed attendees about how well Avantor was doing, a global e-mail was sent announcing that employees in America were going to be impacted by layoffs. Then, in May 2024, FE-2 was informed that he had to choose half of his team to be made redundant. *See* ¶205. Indeed, at the

Bank of America Global Healthcare Conference on May 14, 2024, Stubblefield discussed a workforce reduction. ¶425.[34]

491. ***Fifth***, Avantor was plagued by unwanted or unused inventory even before the start of the Class Period. These adverse facts include the following:

i) FE-10, who joined Avantor in October 2022, confirmed there was a "big" stock of inventory at Avantor and there was a "lot of inventory we [Avantor] couldn't sell." FE-10 recalled "huge" stocks at the end of his tenure in December 2024 that could not be used.

ii) FE-7 also has provided information concerning Avantor's growing inventory situation, including a companywide inventory scrapping initiative that began in 2023. FE-7 explained that there were millions of tons of product in Europe, totaling approximately €100 million, that needed to be sold off.

iii) Avantor hired third-party consultants to address Avantor's supply chain and inventory issues, with one, EY, being engaged by at least October 2023, and work commencing by approximately February 2024 (*see* ¶116; *see also* VIII.A.3);

iv) FE-9 was told that the 2021 Masterflex acquisition included $250 million worth of mostly "dead" inventory.

492. ***Sixth***, among many of the events and circumstances set out in Section V.E.2. that were triggers which should have caused undertaking an impairment analysis, Avantor (and the lines of business it acquired) faced extensive competition and losing market share. As Engine Capital's independent investigation found, for example, since at least 2018, Merck and Thermo Fisher's competing businesses "grew by roughly 3-5x as much," resulting in the Company's reporting units losing approximately 4% of relative market share, and Engine Capital concluded that "a significant portion of LSS's historical underperformance and market share loss has been

[34] As set out in ¶209 herein, by the end of 2024, there was an observable correlation between the reduction in personnel and declining sales performance.

self-inflicted and driven by organizational dysfunction." ¶258. Indeed, Defendants ultimately admitted competitive deterioration. *See generally* VIII.C.4.

493. Accordingly, Defendants' statements as to figures of $5 billion or more in fair value of the net goodwill on Avantor's balance sheets were materially false when issued because the above adverse and existing facts plagued the three acquisitions and acquired business lines upon which the goodwill balances were purportedly based, were of such massive magnitude that they were material to a reasonable investor and overshadowed, if not negated, any claimed valuation analysis (whether discounted cash flows or the guideline public company method) that would support an asserted fair value in the range of $5 billion.

### 2. Additional Materially False Statements About "No Impairment" Being Identified "Before and After the Reorganization" in the Company's 2024 Annual and Quarterly Filings

494. Between April 26, 2024, and February 7, 2025, spanning the period that Defendants caused Avantor to file its Q1 2024 Form 10-Q, Q2 2024 Form 10-Q, Q3 2024 Form 10-Q, and 2024 Form 10-K, Defendants also made the following statement about Avantor's goodwill in these SEC filings:

> We have reassigned goodwill as of January 1, 2024 . . . We tested goodwill for impairment immediately before and after the reorganization of our reporting structure; no impairment was identified.[35]

495. This statement is false and misleading for the same reasons as the statements in ¶¶475-79 about the fair value of the net goodwill as of the date of the SEC filings referenced therein. Specifically, at the time that each of those SEC filings were issued, there were a myriad of adverse events and circumstances already adversely impacting the goodwill recorded for the

[35] As noted above, the 2024 Form 10-K also stated that the reassignment was done by using a relative fair value approach "to align to our new segment structure by using a relative fair value approach as required under GAAP."

VWR, Ritter, and Masterflex acquisitions – such that the suggestion that its carrying value was the same as when initially recorded is indefensible. Further, the representation that goodwill was tested "immediately before and after the reorganization" is materially misleading to the extent it indicates that any testing was done subsequent to or a result reached other than as of January 1, 2024. These statements were false and misleading because it was misleading to purport to have tested for impairment and have identified "no impairment" while omitting that Avantor experienced triggering events that necessitated interim goodwill testing and suffered widespread destruction in value that caused goodwill to require impairment. *Supra* Sections V.E.2-6.

**3. Materially False Statements About the Carrying Value of the Company's Goodwill Balances in FY 2024 Annual Reporting**

496. In the 2024 10-K, Defendants represented that:

> On January 1, 2024, in connection with the Company's reporting segment structure change, we performed quantitative impairment testing of goodwill for each of our reporting units. We did not record any impairment charges as each reporting unit had a fair value that was in excess of its carrying value.
>
> On October 1, 2024, we performed quantitative annual impairment testing of goodwill for each of our reporting units. We did not record any impairment charges. Each reporting unit had a fair value that was in excess of its carrying value.

497. This statement, issued on February 7, 2025 in the 2024 Form 10-K, is false and misleading for the same reasons as the statements in ¶478 about the fair value of the net goodwill in this same 2024 Form 10-K, including that, at the time that the 2024 Form 10-K was issued, there were a myriad of adverse events and circumstances already adversely impacting the goodwill recorded for the VWR, Ritter and Masterflex acquisitions such that any suggestions its carrying value at this time was materially the same as when initially recorded was indefensible. *Supra* Section V.E.4; *see generally* Section V.E.

### 4. Materially False Statements About the Company's Goodwill In Form 10-Q Filings for the First Two Fiscal Quarters of 2025

498. The Q1 2025 10-Q reported that goodwill "net of accumulated impairment losses of $38.8 [million]" was valued at ***$5,609.1 million*** as of March 31, 2025.

499. The Q2 2025 10-Q reported that goodwill "net of accumulated impairment losses of $38.8 [million]" was valued at ***$5,762.2 million*** as of June 30, 2025.[36]

500. In connection with each of the Forms 10-Q listed above, the Company stated: "The accompanying unaudited condensed consolidated financial statements have been prepared pursuant to SEC regulations."

501. Defendants' statements identified in ¶¶498-500 were materially false, misleading, and omitted material facts. None of the adverse facts plaguing Avantor that are set out in Section V.E.3 had disappeared, and indeed, adverse issues were continuing, including among other things that destocking by customers of their COVID product backlogs had not ended and were continuing into approximately mid- to- late-2025. ¶¶234-239.

502. Similarly, declining sales, loss of market share, increased competition and the other factors, present before the Class Period, were continuing into the first two fiscal quarters of 2025. *Supra* Section V.E.5. These internal accounts of former Avantor employees are corroborated by the fact that, by these first two quarters of 2025, Defendants were forced to start making selective disclosures about adverse facts, as set out in Sections VI.A., B. above, including the April 25, 2025 announcement of "immediate and significant" remedial changes to Avantor's supply chain, fulfillment, and inventory operations, and noting heightened competition for new accounts that led

---

[36] The Q1 and Q2 2025 10-Q's were signed by Eck, and included certifications signed by Stubblefield and Jones pursuant to the SOX Act.

to lost volume and slashing full-year guidance, and the August 1, 2025 announcement of reduced guidance and reported year-over-year declines in net sales, among other facts.

503. Accordingly, not only was Avantor experiencing continuing adverse events and circumstances that necessitated interim goodwill testing throughout the Class Period, and was experiencing widespread destruction in value, particularly in the lines of business acquired from VWR, Ritter, and Masterflex, but Defendants nevertheless continued to misleadingly state that the only impairment charges required to be reported through the reporting dates were *de minimis* impairments. *See* Sections V.E.2-5.

504. Further, in failing to timely record an impairment loss as to Avantor's net goodwill balances in each of the SEC filings set forth in ¶¶498-99, including specifically Defendants' improper failure to timely report the $785 million impairment alleged herein (*see* Section VI.C.), Defendants also materially overstated Avantor's goodwill, operating income, net income and earnings per share ("EPS") in each respective filing as well.

505. To the extent any of Defendants' misrepresentations above in this section concerning the goodwill, the carrying value of the goodwill, or whether an impairment was needed are viewed as "opinion" statements, these misrepresentations are actionable because these statements by Defendants were: (i) not sincerely believed when made; (ii) contained expressly embedded, untrue factual assertions; or (iii) reasonably implied untrue facts and omitted appropriate qualifying language. Notably, in making the assertions as to the carrying value of Avantor's goodwill on the balance sheet being a specific value, or being recoverable relative to its true value, Defendants implied untrue facts and omitted appropriate qualifying language. In view of the deep degradation of financial condition and results of each of the acquired lines of business from VWR, Ritter, and Masterflex that formed the lion's share of the $5.7 billion in goodwill at

the start of the Class Period, Defendants implied untrue facts concerning the financial condition of the acquired entities forming the source of the $5.7 billion in goodwill, and did not provide any qualifying language to inform the market of the status of any degradation of customer demand in those lines of business, nor to address the scores of Critical Audit Matters related to goodwill that the Company's auditors had been issuing since the time of the IPO going forward.

506. Moreover, although Avantor's SEC Filings during the Class Period contained generic warnings about, among other things, the "adverse impact of impairment charges on our goodwill and other intangible assets" such boilerplate warnings were meaningless because Defendants had artificially kept such charges to a de minimis level, despite that Defendants were aware of numerous events and circumstances indicating that goodwill was presently impaired – *i.e.*, that risk had already materialized – and thus Defendants were required under GAAP to have already taken an impairment charge no later than the end of the first quarter of 2024. *See generally* Section V.E.

### F. Defendants' Materially False Or Misleading Statements and Omissions About the Company's SOX Certifications

507. Avantor's Q1 2024 10-Q, Q2 2024 10-Q, Q3 2024 10-Q, 2024 10-K, Q1 2025 10-Q, and Q2 2025 10-Q each contained certifications signed by Defendant Stubblefield and Defendant Jones pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX," and each certification a "SOX Certification"). These SOX Certifications attested to the accuracy of the Company's financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud. In particular, Defendants Stubblefield and Jones certified in their official capacities in each filing that "the information contained in the [filing] fairly presents, in all material respects, the financial condition and results of operations of the Company."

508. These sections of the Q1 2024 10-Q, Q2 2024 10-Q, Q3 2024 10-Q, 2024 10-K, Q1 2025 10-Q, and Q2 2025 10-Q were materially false or, at a minimum, misleading when made and omitted material facts necessary to make the statements not misleading because, although Defendants knew that the value of the Company's reporting units had declined substantially, they unreasonably delayed and avoided an impairment charge for over a year and a half during the Class Period. As a result of Defendants' unreasonable failure to properly conduct goodwill impairment testing, Defendants materially overstated Avantor's goodwill, operating income, net income and EPS in the Company's Q1 2024 10-Q, Q2 2024 10-Q, Q3 2024 10-Q, 2024 10-K, Q1 2025 10-Q, and Q2 2025 10-Q SEC Filings, and, contrary to the SOX certifications, the financial statements otherwise failed to accurately convey the financial position of the Company.

## VIII. ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER

509. As alleged herein, Defendants acted with scienter in that Defendants: (i) knew or were reckless as to whether the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; (ii) knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public, and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

510. As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Avantor, their control over, receipt, and/or modification of Avantor's allegedly materially misleading statements and omissions, and/or their positions with the Company, which made them privy to confidential information concerning Avantor, participated in the fraudulent scheme alleged herein.

511. In addition to the facts discussed above, the following facts further support a strong inference that Defendants knowingly or recklessly made false statements during the Class Period.

### A. Defendants Knew Or Had Access To Information Contradicting Their Public Statements And Indicating Damage To Avantor's Goodwill And Brand Equity, Including From Defendants' Own Cost-Cutting And Other Practices

512. Defendants repeatedly learned, had access to, and/or were provided with information—through meetings, direct reports, and other data flows—that contradicted their public claims and demonstrated that the Company's supply chain, distribution, and operations had been harmed as the direct result and byproduct of Defendants' own cost-cutting, reorganization, and other business practices. As described further below, the Individual Defendants and other members of senior management that reported directly to the Individual Defendants received reports and/or attended regular meetings in which they were presented with accurate information that materially contradicted public statements made by Defendants.

#### 1. Defendant Stubblefield and Other Senior Leadership Knew, Or Had Information Sufficient To Inform Them, That The Cost-Cutting Initiative Resulted In The Cancellation of Needed Infrastructure Projects

513. FE-6 personally led investment pitches to advocate for improvements at Avantor's supply chain and distribution facilities. These pitches included meetings in Microsoft Teams with former CEO Defendant Stubblefield, former CFO Tom Szlosek, and former Executive Vice President and Chief Information Officer Michael Wondrasch. FE-6 further recalled pitches that he made during his tenure involving Stubblefield and former CFO Tom Szlosek concerning a site in Bruschsal (Germany), involving the implementation of a new conveyor belt; Autostore, a new warehouse in Sweden; renovations to the Company's site in Lutterworth (United Kingdom); and a new pharma warehouse in Dublin, Ireland. FE-6 also met on short-notice with members of the C-suite and current CFO Defendant Jones at an in-person meeting at Avantor's headquarters in

Pennsylvania in September or October 2023 to discuss the Company's goal to cut $300 million in costs.

514. FE-6 stated that, in his experience, Stubblefield, Szlosek, and Wondrasch had typically been open to these and other proposals for investment in distribution infrastructure prior to the December 2023 announcement of the Company's reorganization into Laboratory Solutions and Bioscience Production business units and the cost-savings initiative. After that announcement, however, investment in distribution "abruptly" ended.

515. FE-6 recalled a "major project" for the renovation of Avantor's site in Leuven, Belgium. FE-6 explained that the inside of the warehouse had not been upgraded in approximately 25 years, including from a technology perspective, and FE-6 noted that it was his perspective that these upgrades at Leuven were critical. According to FE-6, Stubblefield personally acknowledged that this Leuven facility was facing challenges. FE-6 further stated that Stubblefield had spoken positively about the project in Belgium and personally acknowledged that facilities in Leuven were severely lacking. FE-6 added that, for example, the facility had cranes that were over thirty years old and relied on parts that were no longer available in the event that parts needed replacing. FE-6 explained that his pitch for the Leuven facility had been well received; however, the Leuven project was one of multiple projects that was not completed due to lack of investment following the December 2023 announcement of the cost-savings initiative. FE-6 recalled that he tried to make the project work within the new framework of the cost cutting initiative, but it was not approved. FE-6 further explained that cost-savings from the upgrades at Leuven would have been realized in two-and-a-half to three years, but in stopping the project, the Company instead took a shorter-term approach and prioritized more immediate savings.

516. According to FE-6 subsequent meetings occurred with former Executive Vice President Laboratory Solutions Randy Stone,[37] and "everyone" tried to present projects, but they did not represent the immediate savings being sought by Avantor leadership.

### 2. Defendants And Other Senior Avantor Leadership Attended Regular Monthly Meetings Informing Them Of Inventory Issues And Still Ongoing Efforts To Report Performance After The Reorganization

517. FE-1 explained he was aware of monthly inventory reviews that had been established via a business review that began prior to his arrival and through the end of his tenure. FE-1 was aware that finance employees, leaders from finance, manufacturing, supply chain, and commercial teams were attending the meetings, including in particular former CFO Szlosek and his replacement, CFO R. Brent Jones, a Defendant in this Action.

518. Specifically, FE-1 was aware that both former Szlosek as well as Jones attended or at least called into monthly inventory review meetings in which reorganization efforts were discussed. FE-1 was aware that they discussed during these meetings a project being carried out following the reorganization to reflect financial reporting under LSS and BPS; this project was the responsibility of the finance department, was still underway after the reorganization, and took at least 12 months.

519. FE-1 further was aware that Jones was present for discussions on how close the Company was to being able to discuss reporting in terms of LSS and BPS and the problems that accompanied the mapping efforts. FE-1 was aware that Jones called into these meetings while the reorganization processes were underway, including discussions around progress towards being able to report performance in terms of LSS and BPS. FE-1 was aware that one of the ideas of the

[37] As noted elsewhere, Stone reported directly to Defendant Stubblefield.

project was to report the business in different ways and then translate that work to financial reporting.

520. FE-1 also explained that he was aware of meetings with Sheri Lewis[38] and members of the Portfolio and Sourcing Teams in late 2022 or early 2023 that focused on Avantor's approach to stocking strategy. FE-1 stated that he was aware that these meetings focused on an approach to stocking volume and efficiency while considering stocking levels in different locations. FE-1 stated that he was aware that Sheri Lewis received feedback from the C-Suite that was delivered to the stocking strategy meetings, and the feedback was that those meetings with the C-Suite had gone well, and that there was interest in the stocking strategy plan that the group was putting together.

521. Additionally, FE-2 explained that he attended regular monthly calls with former Executive Vice President, Laboratory Solutions Randy Stone (until his departure), Country Portfolio Leaders and Managers, as well as specialists, including specialists that reported directly to FE-2. Stone reported to CEO Stubblefield. FE-2 stated that the messaging on these calls that was communicated to Stone and leadership was that "we're [Avantor] overstocked" on gloves. FE-2 also recalled discussing during these regular calls promotions, leaflets, and sales incentives for employees in determining ways to reduce inventory. FE-2 explained that such information (*i.e.*, inventory overstock and needs to reduce inventory) and other similar sorts of information from these meetings was then reported upward to Vanderhaegen. FE-2 explained that Vanderhaegen reported to Defendant Stubblefield.

[38] According to her publicly filed employment agreement, Lewis reported to CEO Stubblefield.

### 3. The Company's Retention Of Consulting Firms To Address Supply Chain And Other Issues Later Admitted To Plague Avantor Further Evidences Defendants' Knowledge Or Access To Knowledge

522. As the Company's supply chain and inventory issues worsened, Defendants retained multiple external consultants, including EY and McKinsey, throughout the Class Period in a desperate attempt to remediate the Company's supply chain and inventory operational deficiencies, even at the same times as Defendants publicly boasted about those same operations. For example, at the same times as Defendants publicly assured investors that "[o]ur supply chains have largely normalized" and that Avantor had "a leading supply chain that supports a really agile, global business model," Avantor engaged ***multiple*** highly-paid, external consultants to address misalignment within its supply chain organization and its ongoing need for inventory optimization, among other issues. What's more, as indicated by FEs who had direct interactions with these firms, these consultants failed to resolve these issues, which continued to be concealed by Defendants throughout the Class Period.

523. FE-1 was aware of initial engagement conversations with EY beginning in October or November 2023, with EY's work beginning in approximately February 2024. According to FE-1, EY was hired to assist with Avantor's sales and inventory strategies, including how to address obsolete inventory. FE-1 recalled that initially Lewis and the Portfolio and Sourcing Teams' recommendations regarding inventory were expanded through EY and then suspended when McKinsey was brought in and took things in a different direction. According to FE-1, EY was working on ways to measure the commercial importance of an item; previously, Avantor could only measure the number of times an item was purchased. According to FE-1, the work on addressing Avantor's inventory with respect to measuring commercial importance was stopped when McKinsey replaced EY.

524. FE-4 explained that Avantor hired McKinsey in approximately August or September 2024, by no later than which time it was clear internally that the supply chain organization was not aligned. FE-4 recalled that similar data was presented to McKinsey.as was presented to Pizov—who reported under Executive Vice President, BPS Gourdier—and other manufacturing/BPS attendees at an S&OE meeting in Spring or Summer 2025 to help convince leadership that the distribution and supply chain organization needed additional resources allocated to it. FE-4 explained that the data presented by the distribution team was trying to display the size of orders and when they were placed and the impact of the smaller orders that are occurring routinely and the cumulative value versus single large orders. He explained that nothing changed as a result of this presentation.

525. FE-1 explained that McKinsey had their own "inventory optimizer tool" and the commercial importance element that EY and Lewis's team had worked on was dropped. According to FE-1, the McKinsey software was "very clunky" and not easily integrated in SAP. Further, according to FE-1, the McKinsey tool related to inventory management but did not easily link with sales strategy and would have been unlikely to be adopted completely. FE-1 explained that Avantor was missing a "cohesive" strategy to link sales and inventory management, and had been since he started at the Company. McKinsey's software did not address this missing link, and it is his understanding that it was never adopted. Indeed, at the time of FE-1's departure in the first quarter of 2025, Guckenberger was pushing to apply the same principles with another platform, different than McKinsey's. The fair and reasonable inference of this account is that the inventory issues continued to persist at least through this time, as corroborated by the Company's later admissions of supply chain issues. *Supra* Section VII.C.1.

### 4. Senior Leadership Knew, Or Had Information Sufficient To Inform Them Of, Documented Issues With Avantor Customers

526. FE-5, a former Avantor Global Relationship Manager, described his role as the "escalation point" just below the executive level concerning customer complaints that had progressed through customer service, managers, division leaders, and regional leaders. FE-5 explained that those customer complaints escalated to him included deliveries not being on time; quality not meeting expectations; Avantor not responding to customers in a timely manner; invoicing issues; purchase order alignment; and other issues.

527. FE-5 said that executive leadership from customers sought meetings with Avantor's executive leadership to discuss complaints. According to FE-5, he was required to prepare executive summaries that were provided to Avantor executives in advance of these meetings as well as in connection with other interactions with customers. FE-5 explained that he was responsible for working with the admins of leadership to arrange meetings and facilitate talking points.

528. FE-5 explained that the executive summaries he prepared contained a "snapshot" of the relationship with the customer and included the past, present, and where the relationship was going in the future, and FE-5 also explained that the executive summaries summarized customer issues. FE-5 stated that he would spend hours every week trying to get whoever needed to be on the meeting. FE-5 added that reports were provided to whoever had requested them, including at times administrative assistants to the C-Suite.

529. FE-5 explained that the meetings between Avantor executives and customer executives did not have happy endings, and that during those meetings action items were established. FE-5 further explained that specific employees were then assigned "ownership over those items" and a directive to follow up in a few weeks. FE-5 noted that promises were made to

customers and Avantor either delivered or did not, and that this process served as a way to "kick the can down the road." FE-5 added that he did hear that some customers had left Avantor as a result of complaints not being adequately resolved.

530. According to FE-5, customer complaints were escalated to the C-Suite "all the time" and that it was a "constant." FE-5 explained that same customers had the same problems "over and over." FE-5 recalled preparing weekly reports documenting customer problems that were provided to his boss, the Senior Director of Relationship Management, and then escalated upwards from there. FE-5 explained that the C-Suite was "very aware" of problems facing customers. According to FE-5, problems with customers were "common knowledge" and were acknowledged by current CEO Emmanuel Ligner during approximately two or three Town Hall Meetings that FE-5 attended. FE-5 noted that with Ligner's appointment there was a "lot" of focus on meeting customer expectations and an acknowledgement internally at the Company that the customer issues "wasn't how it was supposed to go," as customer issues had been met with a "shrug" and a "good luck."

**5. Defendants Implemented And Oversaw Key Performance Indicators**

531. The accounts of multiple FEs raise the inference that Defendants implemented and closely tracked numerous KPIs around customers, order fulfillment, demand, and supply chain infrastructure, among others—and that these KPIs contradicted Defendants' public statements. For example, as a part of his role, FE-3 provided data to senior leadership related to distribution activities for weekly, monthly, quarterly, and yearly reviews. According to FE-3, the senior leadership that was provided with this data included former Senior Vice President, Global Supply Chain Operations Brian Magerkurth, and the two regional directors responsible for most of Avantor's larger distribution centers, current Senior Director, Distribution Eric Doss and current

Director of Distribution Operations Michael Gibson. FE-3 explained that a lot of these reports were also used daily by leadership at the individual distribution centers.

532. FE-3 also explained that his role required monitoring a number of KPIs, including labor related productivity data that looked at how effectively the Company was moving product out the door without sacrificing service and quality. FE-3 explained that other KPIs included DPMO (defective per million opportunities) that focused on quality, and OTIF (On time in Full). FE-3 added that OTIF related to, for example, if a customer ordered 10 different lines of product, will these products all be able to be sent out at the same time. FE-3 explained that this data was shared with same members of senior leadership as the daily, monthly, quarterly, and yearly reports, including Magerkurth, Doss, and Gibson. According to FE-3, during the period of time that followed the December 2023 reorganization announcement, the KPI that was most negatively impacted was total volume.

533. FE-3 recalled that the "lines per day" volume declines were discussed in meetings with Magerkurth, and that the "lines per day" and other Key Performance Indicators that were reported to Magerkurth were then "cascaded up" to the Executive Leadership Team.

534. FE-7 participated in a monthly meeting for the final two years of his tenure that included manager and director level employees to discuss progress on key performance indicators. FE-7 explained that these meetings were referred to as "Bowler" meetings where goals and development strategies to implement tools were discussed but were not effective. According to FE-7, there was an Excel file that included monthly columns tracking targets versus actual results for KPIs. FE-7 explained that KPIs included a happiness meter, accidents, and complaint rate and "more and more" KPIs were added over time. According to FE-7, complaint rate was one of the

"main" KPIs and was based on completed sales orders versus the number of complaints received. FE-7 advised that he and a colleague were responsible for creating reports for the meetings.

#### 6. It Is Further Reasonable To Infer That Stubblefield Had Knowledge Of Or Access To The Truth From His Direct Reports

535. Because Stubblefield's executive-level direct reports had knowledge of the Company's supply chain and inventory deficiencies, as well as Avantor's diminished demand, customer destocking, and falling order volumes, it is reasonable to infer that Stubblefield learned about or had access to these issues from them. Executive Vice President, Global Operations and Supply Chain Sheri Lewis; Executive Vice President, LSS Randy Stone; Executive Vice President, Europe Frederic Vanderhaegen; and Executive Vice President and Chief Information Officer Michael Wondrasch each directly reported to CEO Stubblefield. Likewise, with respect to Defendants' e-commerce platform, testimony under oath from Avantor's Executive Vice President of Strategy and Corporate Development stated that the head of the e-commerce function in charge of the Company's website reported directly to Defendant Stubblefield.[39] Further, during the Class Period, Former Employees recalled direct interactions with Lewis and Stone where the Company's supply chain and inventory issues were discussed, as well as instances where these supply chain, inventory, and demand issues were reported upwards to Lewis, Wondrasch, and Vanderhaegen.

536. FE-6 explained that he reported directly to the former Executive Vice President Global Operations and Supply Chain Sheri Lewis, who reported to the C-Suite, and he was primarily responsible for the shipment of goods to customers. According to FE-6, following the reorganization into LSS and BPS, the Company used one supply chain to support both segments. It was FE-6's perspective that the Company needed separate supply chains and distribution teams

---

[39] *Ingersoll-Rand et al. v. Walker et al.*, 2024-cv-31985, August 26, 2024 Temporary Injunction Hearing Tr., p. 336, available at https://bit.ly/3OqUEAh.

for each segment, and FE-6 explained that LSS required more flexibility. FE-6 stated that he raised his concerns about the need for LSS to have greater flexibility to Lewis at every relevant opportunity.

537. FE-6 recalled that Lewis "tried to help" with the need for LSS to have greater flexibility and had organizational meetings with Wondrasch where FE-6's complaints that LSS needed more flexibility were raised.

538. FE-6 also recalled specifically that the decreased workload was discussed in meetings with Lewis. FE-6 stated that he started to observe the workload for distribution decreasing beginning in 2022, as COVID waned. FE-6 observed and measured the decreased workload by looking at a number of data points, including the number of delivery lines through the warehouses and the sales value of order entry lines. FE-6 explained that the correlation between these figures and the decrease in workload was apparent and was "known and seen by everyone." FE-6 further explained that this was discussed with leadership and the sales team, and it was known that customers were destocking and orders were decreasing.

539. Additionally, FE-2 recalled that information (*i.e.*, inventory overstock and needs to reduce inventory) and other similar sorts of information from regular monthly calls with Stone (¶¶238) was reported upward to Vanderhaegen. FE-2 also explained that he attended regular monthly calls with Stone and stated that the messaging on these calls that was communicated to Stone and leadership was that "we're [Avantor] overstocked" on gloves. FE-2 also recalled discussing during these regular calls promotions, leaflets, and sales incentives for employees in determining ways to reduce inventory.

540. FE-7 explained that a project to address the Company's growing inventory situation (¶¶113) was known on a "high level" within Avantor, reaching at minimum Lewis.

### B. The Nature, Size, And Timing Of The Goodwill Impairment Further Bolsters The Strong Inference Of Scienter

541. As alleged above, Defendants improperly delayed recognizing a $785 million impairment charge to the value of Avantor's goodwill despite the fact that Defendants knew or of recklessly disregarded triggering events that should have required Avantor to conduct a goodwill impairment test beginning in 2024. The size, magnitude, and timing of Avantor's $785 million write-down of goodwill raises a strong inference that the impairment was not the product of a sudden, unexpected or short-term disruption in the Company's business or a mere forecasting error.

542. ***First***, Avantor's goodwill balance constituted the largest asset on the Company's balance sheet throughout the Class Period, thus representing a critical amount of the Company's purported value and its accurate reporting was therefore of paramount importance to the Company and its investors. By its own admission, Avantor carried "significant amounts" of goodwill on its balance sheet. Indeed, the bulk of Avantor's balance sheet during the Class Period consisted of goodwill and other intangible assets. *See e.g.* FY 2024 10-K at 45 (net goodwill and other intangible assets reported as $8,899.4 million, or 73%, of total assets); FY 2025 10-K at 43 (net goodwill and other intangible assets reported as $8,180.7 million, or 69%, of total assets). Even breaking out the evaluation on goodwill alone, at December 31, 2023, Avantor reported a net goodwill balance of $5,716.7 million out of a total $12,972.7 million in total assets. FY 2023 10-K at pages F-6 and F-31. Accordingly, the $5,716.7 million in net goodwill balance at December 31, 2023 represented 44.07% of Avantor's reported total assets, just prior to the start of the Class Period. When Defendants belatedly revealed this $785 million impairment in the Q3 2025 10-Q, Avantor's LSS incurred a ***decrease equal to 21.5% of the total beginning net goodwill balance of $3,651.2 million allocated to LSS as of September 30, 2025.***

543. ***Second***, in announcing the impairment, Defendant Jones admitted during the October 29, 2025 earnings calls for the Q3 2025 results that the $785 million impairment charge "***was necessitated in large part*** by the continued weakness in our share price ***as well as the margin headwinds this business is facing***."[40] In its FY 2025 10-K filed in February 2026, Avantor likewise stated that the impairment was "primarily driven by sustained decreases in our publicly quoted share price and market capitalization, as well as changes in operating results." The existence of margin headwinds so significant as to necessitate wiping hundreds of millions of dollars from the Company's balance sheet must have occurred on a scale that could not have reasonably escaped Defendants' notice, particularly given Avantor's lab distribution business accounted for two-thirds of revenue in the LSS and comprised two-thirds of the Company's total revenues. The fact that Avantor recognized the impairment within the ***first*** quarter under new-CEO Ligner's leadership further bolsters this inference, strongly indicating that the margin headwinds identified as "necessitating" the write-down were already readily apparent when Defendant Stubblefield left the Company and Ligner assumed control.

544. ***Third***, the magnitude of Avantor's goodwill impairment charge supports a strong inference of scienter. During the Class Period, and until it announced the goodwill impairment charge, the Company reported net income as follows:

| Q1 2024 Net Income | Q2 2024 Net Income | Q3 2024 Net Income | Q4 2024 Net Income | Q1 2025 Net Income | Q2 2025 Net Income | Q3 2025 Net Income | Total Net Income |
|---|---|---|---|---|---|---|---|
| $60 million | $93 million | $57.8 million | $500.4 million | $64.5 million | $65 million | $57.8 million | $898.5 million |

[40] In the Q3 2025 10-Q, Avantor, Jones, and Eck stated that the interim test for this $785.0 million impairment charge was done as a "result of ***sustained decreases in [Avantor's] publicly quoted share price and market capitalization as well as changes in the operating results of our Distribution reporting unit***, formerly referred to as our Buy Sell Lab reporting unit. . . ." (emphasis added).

545. The Company's reported net income up to the third quarter of 2025, when Avantor announced the impairment charge, compared to the amount of the write-down reveals its magnitude. Between the first quarter of 2024 and the third quarter of 2025, the Company reported total net income of $898.5 million. As stated above, the Company revealed a $785 million impairment charge in the third quarter of 2025. In other words, Avantor's impairment charge effectively erased more than 87% of the net income the Company reported in seven of the eight quarters comprising the Class Period. Thus, both the nature and magnitude of Avantor's goodwill impairment charge support a strong inference of scienter.

546. Further, the Company's independent public auditor expressly confirmed the significance of the Company's goodwill in the Company's financial reporting, repeatedly communicating both directly to Defendants and in its public audit reports that impairment testing over the areas ultimately recognized as impaired constituted a "critical audit matter" that was "material to the financial statements."[41] Further, in identifying these issues around impairment testing, the auditor expressly disclaimed that it was not "providing a separate opinion on the critical audit matter or on the accounts or disclosures to which it relates," made clear the issues involved "especially challenging, subjective, [and] complex ***auditor*** judgment" including in particular its limitations in relying on "management's estimates" of factors such as future profitability, cash flows, net sales growth (and forecasts thereof), discount rates, the selection of peer groups and market multiples—*i.e.*, several areas known within the Company, but concealed from investors by Defendants, as being deficient and flawed (*see, e.g.*, Sections V.D.1.a.(6), V.D.2); and expressly reaffirmed that the "financial statements are the responsibility of the Company's management."

---

[41] PCAOB, *Staff Guidance*, https://pcaobus.org/Standards/Documents/Implementation-of-Critical-Audit-Matters-The-Basics.pdf (last visited April 24, 2026).

### C. Admissions By Defendants Further Bolster The Strong Evidence of Scienter

547. Numerous admissions made by Avantor leadership—including both Defendants and, later, its new CEO—revealed that the reality of Avantor's operations and financial performance had been contrary to Defendants' assurances throughout the Class Period, further bolstering the strong inference of scienter, including as follows:

#### 1. Admissions About Supply Chain and Distribution Issues

548. Defendants made several admissions contradicting their earlier assurances throughout the Class Period as to Avantor's supply chain throughout the Class Period, including (but not limited to):

(a) On April 25, 2025, Defendant Stubblefield admitted that the Company needed to undertake "***immediate and significant***" actions related to "***improving data accuracy, accelerating fulfillment speeds and optimizing inventory***."

(b) On August 1, 2025, Defendant Jones admitted that the Company's disappointing performance related in part to "***increased supply chain expense***."

(c) On October 29, 2025, Avantor's new CEO Ligner admitted that, "***on the operations and supply chain side***, I believe we need to make investment and process enhancement to improve our ability to consistently serve our customers"; that Avantor suffered from "a bit of an unreliability of on-time delivery" in part because "some of the tool[s] are a bit older"; that Avantor's supply chain "processes . . . [t]o make sure that the product will be delivered as the customers requested [and] at the quality which is requested . . . Are not as simple as they should be, not as smooth as they should be . . . [and] lack [] accountability," needing "strategic investment" and that those issues were "also about talent" and thus the Company was recruiting "a Chief Operating Officer…that will really help as well the team to drive and improve plant performance."

(d) Also on October 29, 2025, Defendant Jones admitted that "***downtime at several of our plants prevented us from shipping several orders***."

(e) On February 11, 2026, Defendants acknowledged "***the need to invest about $20 million***;" in particular, Defendants "***identified $20 million of investment to enhance our ability to serve customers***." Defendants told investors "***enhancing our digital capabilities is one of our highest priority***" and committed "***$10 million to $15 million in 2026 to upgrade [] customers' interface***."

**2. Admissions About Failed And Harmful Cost-Cutting**

549. Despite having claimed they were "already seeing the impact" of the cost-savings initiative by April 2024, Defendants and Ligner ultimately made numerous concessions about the issues associated with it. These admissions revealed that Defendants had not engaged in a "disciplined execution" of cost-cutting, and their actions were not "carefully designed and executed to ensure that [Avantor's] critical capabilities remain intact." Defendants' representations that the cost-savings initiative "isn't simply, oh, let's just go cut 5% of the workforce and reset" or that it was "taking work out of the system and finding smarter and better ways to do it" were materially and patently untrue. Ultimately, Defendants' admissions revealed their claim that "in connection with the new operating model,… there were a lot of costs that just fell out of the model when you went from three regions to just two business units" was untethered to reality.

550. For example, on October 29, 2025, Ligner conceded the "***need to make some investment and process enhancement***" in supply chain operations. He also acknowledged, with respect to the cost-saving initiative, "***we recognize that those savings…are not adequately falling through to the bottom line***" because "***we are still operating with far too much complexity***" and because "[*w*]***e need to simplify our operating processes to remove barrier[s] that prevent us from executing efficiently***." And on February 11, 2026, Ligner made the ultimate admission when he

stated that Avantor "***will no longer report progress related to our previously discussed cost transformation initiative, nor will we continue to target those goals internally as a strategic objective***." CEO Ligner further revealed on February 11 that Avantor "***cut too many specialists***" and underscored the "***many opportunities to make important growth investments***." Finally, Ligner announced Avantor Revival, explaining the initiative was "***about driving urgency to grow the business top line sustainably but also profitably***." Evidencing the inefficacy of the previous cost-cutting initiative, Ligner further revealed that "***the goal that we have is to really make sure that we take cost out. We reinvest***."

#### 3. Admissions That The Reorganized Operating Structure Confused Customers And Inhibited Accountability

551. On February 11, 2026, new CEO Ligner revealed that he had traveled for six months around the globe to engage with Avantor's customers, during which time he learned that the initial reorganization caused widespread confusion "***about who Avantor is and what we do.***" Ligner also admitted the need for yet another re-segmentation in order to "***clarify our identity***" and "***better organize the company to meet customer needs***." Pressed by analysts about the elimination of the previous BPS and LSS segments, Ligner explained that "***it's all about clarity***" and that, at bottom, "***[i]t is simpler for the customers to know which product is served by which team***."

#### 4. Admissions As To Avantor's Market And Competitive Weakness

552. On April 25, 2025, Defendants admitted that demand was not as robust as previously portrayed: they explained on the Q1 2024 Earnings Call—after acknowledging their "***disappointment with the performance of the*** [LSS] ***platform***"—that the Company was "***taking aggressive actions to reignite the top line***." Defendants furthermore admitted Avantor was facing "***heightened competition***," and explained Corey Walker was "***working very, very closely with the***

***commercial team in the near term*** ” for the “***retention of existing accounts***.” When pressed by analysts about the aforementioned “***competitive dynamics***,” Defendant Stubblefield admitted Avantor experienced “***some shifting within a few of our accounts that did lead to lower volumes***.”

553. On August 1, 2025, Defendants admitted Avantor faced an incredibly competitive environment. Defendant Jones admitted Avantor had to implement “***competitive actions to drive share***” and revealed such actions “***have come at the cost of margin***.” Defendant Stubblefield revealed that with respect to LSS, “***we are committed to protecting key accounts and competing hard to win market share***.”

554. On October 29, 2025, Defendants’ admissions revealed competitive intensity and reduced demand levels not previously disclosed. For example, Defendant Jones admitted “***we continue to navigate competitive pressures***” and explained “***customer activity continues to be at lower levels***.” Jones furthermore revealed there was a need to protect market share—telling investors that Corey Walker and his team (leading LSS) were “***defending and expanding business at our largest accounts***.”

555. On February 11, 2026, after revealing yet another quarter of disappointing financial results, Defendants admitted “***[p]ricing also contributed to the margin decline*** and revealed that Avantor had “***a new pricing leader, which is very important for us***.”

### D. The Public Letter From Engine Capital Further Bolsters The Strong Inference Of Scienter

556. The conclusions reached by investment firm Engine Capital in its August 2025 public letter further support a strong inference of scienter. Based on its own investigation, including interviews “***with more than 20 former senior employees and industry participants***,” Engine Capital concluded that Defendant Stubblefield’s statements that Avantor was not losing market share on October 25, 2024 (¶457), among others, was made “***[d]espite mounting evidence***

***to the contrary***" known directly by Defendants, including specifically ***"internal knowledge of operational underperformance and market share losses at LSS***" and that, by no later than 2023, "the Board should have known that Avantor's LSS segment was losing share even before it became apparent to the market."

557. Engine Capital further concluded that, contrary to Defendants' public statements, Avantor had been suffering from decreasing market share that was "***self-inflicted and driven by organizational dysfunction***," including that Avantor segment leaders "lacked ultimate authority over pricing, marketing spend and other key business decisions."

558. These findings by Engine Capital corroborate Defendants' knowledge and further bolster the strong inference of scienter. *See also, e.g.*, ¶¶180, 190, 233, 258-261, 345.

**E. The Departures of Avantor Senior Executives Support a Finding of Scienter**

559. The unusual timing and circumstances of departures by several key senior executives throughout and just after the Class Period, including three of the four Individual Defendants, further bolsters the inference of scienter.

560. Specifically, on April 25, 2025—when the truth concealed by Defendants' fraud first began to be revealed—Avantor announced that Defendant Stubblefield was stepping down after having served as the Company's CEO for more than a decade.[42] The sudden news startled the market, with analysts at Morgan Stanley commenting in a report that "***the upcoming CEO transition introduces a new variable to an already uncertain environment***." In fact, as the Company admitted in its subsequently filed 2026 Proxy Statement, the departure was a

[42] Press Release, Avantor, Inc., *Avantor® Announces CEO Transition* (Apr. 25, 2025), https://ir.avantorsciences.com/investors/news-and-events/news/news-details/2025/Avantor-Announces-CEO-Transition/default.aspx.

termination, stating "[i]n April 2025, ***Avantor determined to end the employment of Mr. Stubblefield***."

561. Just months later, on October 13, 2025, Avantor again surprised the market by unexpectedly announcing that Defendant Peacock would leave his roles as Chairman of Avantor's Board and Director by the end of 2025.[43] This abrupt announcement came just weeks before Avantor announced it would recognize a $785 million impairment amid still worsening performance, further revealing the reality that had been concealed by Defendants' fraud and that hundreds of millions of dollars in value from the acquisitions undertaken under the leadership of Peacock and Stubblefield had been destroyed.

562. Finally, just after the Class Period ended, Avantor announced on April 1, 2026 that Defendant Jones, the Company's CFO throughout the Class Period, would be leaving the Company within weeks.[44]

563. The unexplained nature and circumstances, and suspicious timing, of these departures by Defendants Stubblefield, Peacock, and Jones further bolster the strong inference of scienter.

564. In addition, the exodus of key executives and management throughout the Class Period reinforces a strong inference of scienter by Defendants. For example, Sheri Lewis, Avantor's executive in charge of supply chain, left the Company in April 2024 as a result of the reorganization and was not replaced. Frederic Vanderhaegen, Avantor's executive in charge of

---

[43] Press Release, Avantor, Inc., *Avantor® Announces Board Chairman Transition* (Oct. 13, 2025), https://ir.avantorsciences.com/investors/news-and-events/news/news-details/2025/Avantor-Announces-Board-Chairman-Transition/default.aspx.

[44] Press Release, Avantor, Inc., *Avantor® Announces CFO Transition* (Apr 1, 2026), https://ir.avantorsciences.com/investors/news-and-events/news/news-details/2026/Avantor-Announces-CFO-Transition/default.aspx.

Europe, left the Company in June 2024 as a result of the reorganization. Randy Stone, who led LSS for only six months post-reorganization, was pushed out in June 2024 without a legitimate successor. Jim Bramwell, Avantor's Executive Vice President, Sales and Customer Excellence, left the Company in June 2025 just as the truth was being revealed about Avantor's dire competitive positioning and weakening demand. And Michael Wondrasch, Avantor's Chief Information Officer—responsible for the Company's e-commerce platform and operational technology—left in August 2025, just as the truth was being revealed about deficiencies in Avantor's e-commerce platform and the need for substantial supply chain investment. *See generally* Section V.D.2.c. Far from routine turnover, these departures, many without replacement, further bolster the reasonable inference that Defendants were aware of the reorganization's destabilizing impact and the Company's deteriorating operational performance, despite their repeated public assurances to the contrary.

### F. Defendants' Personal Involvement In Causing LSS To Lack Leadership At A Crucial Time Further Bolsters The Inference Of Scienter

565. Defendants' personal involvement in the Company's disastrous recruitment of Corey Walker, which caused the new LSS business segment to operate for nearly a year without a legitimate leader and exposed the Company to operational risks during a crucial time, further bolsters their inference of scienter.

566. On June 21, 2024, Defendants announced that Corey Walker would be joining the Company as President of LSS to much fanfare, replacing Randy Stone. Almost immediately, however, a federal district court enjoined Walker from working at Avantor for a year as precluded by a non-compete agreement that expressly prohibited Walker from working at Avantor that Walker had only just entered into weeks earlier. As a result, LSS went without leadership for nearly

a year, contributing to rampant operational issues and value destruction, as described above. *See* ¶¶169-79; *see generally* Section V.D.2.c, V.D.1-3.

567. In fact, Defendants had personal knowledge and involvement in this catastrophic—and entirely foreseeable—series of events. Indeed, the Colorado Court's Findings of Facts and Conclusions of Law and Order enjoining Walker from working at Avantor reveals that Defendant Peacock was directly involved in the Company's disastrous recruitment of Walker as early as April 5, 2024—a week and a half after Walker signed his non-competition agreement—with Peacock even promising Walker, that if he returned to Avantor, he would be a candidate for CEO when Stubblefield left. Walker sent his non-competition agreement to Avantor on April 24, 2024. By May 15, 2024, knowing that Walker was bound by his non-competition agreement, Defendant Stubblefield personally offered Walker the role of President of Laboratory Solutions.[45]

568. The Company did not publicly announce or discuss the fact that LSS operated without a head from Stone's departure in June 2024 until Walker's return to the Company in March or April 2025. *Supra* ¶¶169-79; *see generally* Section V.D.2.c. Nor did Defendants appoint a replacement during this more than nine-month leadership vacuum, during which the operational breakdowns and value destruction discussed *supra* Section V.D manifested and intensified. Accordingly, Defendants' direct knowledge of—and role in causing—the leadership vacuum supports a compelling inference of scienter.

### G. Defendants' Fraud Concerned The Most Significant Initiative And Pressing Issues Facing The Company

569. That Defendants' false and misleading statements concerned the Company's most significant initiatives and core business operations further bolsters the strong inference of scienter.

---

[45] *See* Findings of Fact and Conclusions of Law and Order, Ingersoll-*Rand et al. v. Walker et al.*, 2024-cv-31985, Dkt. No. 320, ¶¶28-32, available at https://bit.ly/4vDN8T4.

Given the importance of the subjects at hand, it was incumbent on the Individual Defendants to ensure they understood the true nature and full facts concerning the matters on which they spoke.

570. ***First***, given that the Company's business depended on the efficient movement of products, investors understood the condition and functionality of its supply chain to be critical to the Company's financial performance; in turn, Defendants throughout the Class Period touted the state of Avantor's supply chain infrastructure and operations. As a few examples of statements:

(a) On March 5, 2024, Defendant Stubblefield stated that "we'll continue to invest aggressively not only in the physical infrastructure to maintain the service levels that our customers have come to expect from us, but also in the digital infrastructure that can create so many efficiencies and further ingrain us in our customers' workflows."

(b) On May 9, 2024, during the Company's 2024 Annual Shareholder Meeting, Defendant Peacock stated that the Company "made purposeful strategic investments in manufacturing capacity, supply chain innovation and digital capabilities to drive efficiencies and position the company for future growth."

(c) On January 15, 2025, with respect to supply chain investments, Defendant Stubblefield stated, "we think that with the investments that we're making in that regard and the focus we have in 2025, that this will be a real differentiator for us."

(d) On May 13, 2025, Defendant Stubblefield stated, "We're making significant investments to change the way work is getting done, to make it sustainable, all the while, we continue to invest at record levels to continue to grow the business and position us for sustained growth over the long-term. . . . I think about our Lab Solutions segment, we have differentiated capabilities, a broad and expanding portfolio and a supply chain that enables us to serve more than 300,000 customers reliably around the world."

571. ***Second***, throughout the Class Period, Defendants repeatedly emphasized to investors that the implementation of Company's reorganization and cost-savings initiative were critical to Avantor's present-day success and long-term growth—and would spur the turnaround of a stock price in the midst of a tailspin. In turn, Defendants consistently and repeatedly focused on the reorganization and cost-savings initiative in their investor communications during the Class Period, including by continuously updating investors as to their purported progress. As a few examples:

(a) On April 10, 2024, in response to a question about Avantor's "business transformation," Defendant Stubblefield stated "we're three or four months into this, we have the new model up and running, we're making considerable headway on a lot of the cost savings initiatives that were linked to this. And so I'd say we're off to a great start and out of the gate strong."

(b) On October 25, 2024, during the third quarter 2024 earnings call, Stubblefield touted that "[w]e continue to make progress with our new operating model, realizing significant commercial and operational benefits just 10 months in. We are now a leaner, more agile and more efficient organization. This new model is also enhancing both our internal processes and the way our customers -- our platform. Importantly, we have significantly advanced our long-term growth strategy, achieving key milestones in the areas of innovation, new product introductions, sustainability and supply chain infrastructure."

(c) On May 13, 2025, during the 2025 Bank of America Conference, responding to a question about the cost-savings initiative, Stubblefield stated that cost-cutting "has been an important aspect of us being able to deliver on our margin, cash flow and profitability targets last year as well as in the first quarter.

572. In turn, analysts and investors focused intently on the reorganization and cost-savings initiatives, and repeatedly pressed Defendants on these subjects and how they were progressing both during conferences and earnings calls during the Class Period. For example, on the first day of the Class Period on March 5, 2024, when speaking at the TD Cowen Health Care Conference, Defendant Stubblefield was asked "how do we think about the benefits of this new reporting structure? And particularly, do you think it'll translate in an impact on growth and margins?" On the April 26, 2024 Q1 2024 Earnings Call, the first earnings call following the reorganization and launch of the cost-savings initiative, Defendant Jones was asked about the "progress on the cost saves." On the July 26, 2024 Q2 2024 Earnings Call, Defendants were asked, with respect to the cost-savings initiative, "How is that going?" On the April 25, 2025 Q1 2025 earnings call, Defendants were asked about "the business transformation" and Defendants' "cost-out . . . you run the risk there or have to strike a balance without disrupting your overall sales force or the momentum you're trying to build within the two segments." On the August 1, 2025 earnings call, Defendants were asked about "how integrated [is] the manufacturing between the two segments?" Indeed, Defendants were asked about the reorganization or the cost-savings initiative during every earnings call held during the Class Period.

573. In addition, Defendants repeatedly emphasized to investors the importance of the other subjects misrepresented by their statements and omissions, including: Avantor's e-commerce platform—for example, Stubblefield stating on December 3, 2024, that the Company had "a leading e-commerce platform that drives transaction efficiency for our customers;" competitive positioning—for example, Stubblefield stating on April 26, 2024 that he was "pretty pleased about where we're at from a pricing standpoint and certainly, one of the favorable drivers of margin that we do see. Share is a great story for us;" and forecasting capabilities—for example, touting on

April 26, 2024 "the operational rigor and improved forecasting that comes from a more simplified and in a more logical, in my opinion, structure to the business."

574. ***Finally***, the Company's reported goodwill comprised the most significant portion of the Company's reported assets throughout the Class Period.

**H. Given Their Importance, Defendants Publicly Touted Their Visibility Into And Closely Monitored The Operations At Issue**

575. Defendants publicly touted their visibility into, and close monitoring of, the subjects of their misstatements, including the reorganization and cost-cutting. As already discussed, Defendants participated in regular meetings and maintained data flows that kept them constantly informed on these issues. *Supra* Section VIII.A.

576. In public statements throughout the Class Period, the Individual Defendants repeatedly touted and confirmed their close monitoring and visibility into the subjects at hand. For example, Defendant Stubblefield informed investors repeatedly that Defendant Jones was spearheading the implementation of the cost-savings initiative. On May 14, 2024 Defendant Stubblefield stated that "Brent [Jones] and his team are doing a really nice job, partnering with the EVPs that are running the segments to bring us better insights than probably what we've had before." Likewise, on June 11, 2024, at the Goldman Sachs Healthcare Industry Conference, Stubblefield stated that "Brent [Jones] is point for us on leading" the cost-cutting initiative.

577. Further, both Defendants Stubblefield and Jones each touted their own personal involvement with and monitoring of operations. For example, On May 14, 2024, Defendant Stubblefield stated during the Bank of America Global Healthcare Conference that "to have the organization on a global basis lined up behind our lab customers as well, then as our production customers, it just gives you better alignment with them. I think it ***gives you a crisper view*** into

their requirements, makes your capital allocation decisions probably a bit more pronounced. It allows portfolio decisions to be a bit more pointed and specific to what your customers are doing."

578. On July 26, 2024, Defendant Stubblefield told investors that "we're ***working with our suppliers*** to create a more sustainable supply chain," and "we're seeing good momentum across the portfolio . . . one of the things that ***we watch pretty closely there*** is, again, just activity levels and opportunity pipelines and we continue to be encouraged by what we're seeing there."

579. Again, on January 15, 2025, Defendant Stubblefield responded to an analyst's question around demand, stating "We've talked a lot about destocking of the consumables in various categories, particularly some of the single-use components. ***We've seen virtually all of that kind of work through the system***."

580. As another example, on April 25, 2025, Defendant Jones responded to an analyst question for "additional color on where cost actions are coming", stating: "***It' s obviously a big focus we have here. We have clear line of sight. . . .***"

581. Later, Analysts credited Defendants' representations regarding strong customer engagement and visibility into Avantor's production. For example, in a report dated April 26, 2024, Evercore ISI noted that "***Accelerating order book gives more forward visibility on production side of biz…confidence in outlooks***."

582. Defendants also touted their personal interactions with customers. For example, Defendant Stubblefield referenced having had direct communications with customers, such as referring on August 1, 2025 to "***conversations [that] revealed opportunities for improvement and ways we can strengthen our offerings for our customers.***" On May 14, 2024, Defendant Stubblefield discussed "having more specific and dedicated conversations with your customers' needs in the lab and getting your solution to better match what they need. That's certainly the focus

and where we're headed." As another example, on May 20, 2025, Defendant Jones told the market that "***we're working very closely with our customers***."

583. Defendants' statements concerning their visibility raise the reasonable inference that either Defendants possessed information indicating that Avantor's reorganization and cost-savings initiative created new operational failures and exacerbated existing ones, in which case they knew their statements were false, misleading, or omitted material information, or that they lacked the knowledge they claimed to have regarding such matters, in which case their conduct was severely reckless. Thus, Defendants' statements emphasizing their visibility into Avantor's important initiatives and the resulting effects on the Company are indicative of their scienter.

**I. The Individual Defendants' Fraudulent Conduct Allowed Them to Retain Their Executive Positions and Collect Millions in Incentive Compensation**

584. That Defendants Stubblefield and Jones made millions of dollars pursuant to compensation plans that uniquely incentivized the fraud further supports the strong inference of scienter. Just before the start of the Class Period, the Company "modified its cash-based incentive compensation plan to include segment goals . . . with a focus on a combination of performance measures that align closely with those that are used by management to set business goals and evaluate our financial results."[46]

~~585.~~ ***First*****,** this cash-based incentive compensation structure turned on, among other things, Avantor "***executing on the enterprise cost transformation initiative to achieve an exit run-rate savings exceeding 50% of the 3-year target within the first year of the program***" (as to Stubblefield) and "***leadership of the enterprise transformation program realizing 180% of the***

[46] Avantor, Inc., *Schedule 14A (Proxy Statement)*, at 41 (Mar. 28, 2025); Avantor, Inc., *Schedule 14A (Proxy Statement)*, at 47 (Mar. 27, 2026), indicating the 2024 cash-based incentive compensation plan was maintained for 2025.

***first year savings target***" (as to Jones). These cost-savings targets were central to Defendants Stubblefield's and Jones's Individual Strategic Goals, which accounted for a material portion of their performance-based cash incentive compensation. Indeed, Stubblefield's and Jones's individual goals carried a 20% weighing for their total performance-based compensation.

586. Unknown to investors, Defendants achieved these compensation payouts in part from reckless cost-cutting, including crippling layoffs and systemic underinvestment in the Company's facilities and supply chain. *Supra* Section V.D.3.

587. ***Second***, the "segment goals" included performance targets "for Revenue and Operating Income in the Performance-Based Cash Incentive Compensation Plan" for Defendants Stubblefield and Jones, pursuant to which revenue carried a 40% weighting. In fact, revenue was the highest weighted financial metric for calculating Stubblefield's and Jones's performance-based cash incentive compensation.[47] If fully achieved at the maximum payout level, the revenue target alone would have generated more than $1.9 million per year in combined cash incentive compensation for Defendants Stubblefield and Jones, or approximately $3.8 million over the Class Period.

588. As investors learned only later, during the Class Period Defendants engaged in reckless cost-cutting and other practices that jeopardized Avantor's financial performance. As a result, on August 1, 2025, Defendants stunned investors by revealing that the Company needed to reduce its expected free cash flow by ***$100 million*** to account for "***prepaid rebates***" in order to lock in contract renewals. While this lost free cash flow came at the expense of the Company and

[47] Avantor, Inc., *Schedule 14A (Proxy Statement)*, at 51 (Mar. 27, 2026), listing the weighting of the performance-based cash award is 40% Enterprise Revenue, 20% on Enterprise Operating Income, 10% Free Cash Flow, 5% GHG Emissions Reduction, 5% Inclusion Index, and 20% on Individual Strategic Goals.

its investors, it nonetheless benefitted Defendants because the ***revenue*** generated by the renewed contracts impacted their compensation (weighted at 40%) far more than Free Cash Flow (weighted at only 10%).

589. That Defendants benefitted from this fraudulent incentive is also substantiated by the findings reached by Engine Capital, which stated in a public letter sent in August 2025 that its own investigation (including interviews with former Avantor employees) had found (among other things) "***reports of contracts being entered into at unattractively low renewal rates simply to meet revenue and EBITDA targets – at the expense of appropriate return on capital***." *See* ¶233.

590. To further illustrate how the Company's executive compensation plans uniquely incentivized the fraud, Defendant Stubblefield earned $1,126,846 in annual salary in 2024 and $1,140,000 in 2025. Yet Stubblefield received performance-based cash awards, dependent in part on meeting revenue and Individual Strategic Goals targets, in the amount of $2,085,069 in 2024 and $1,022,795 in 2025. And for long-term incentive compensation, Stubblefield received $8,651,135 in stock awards and $2,625,038 in option awards in 2024, and $8,125,784 in stock awards and $2,749,997 in options awards in 2025. In other words, Defendant Stubblefield's ***stock-based and incentive compensation made up 91% of his total compensation*** during the Class Period.

591. Defendant Jones's total compensation was also heavily stock-based and skewed towards incentives. Jones earned an annual salary of $611,519 in 2024 and $653,269 in 2025. However, Jones received performance-based cash awards, dependent in part on meeting revenue and Individual Strategic Goals targets, in the amount of $554,220 in 2024 and $272,288 in 2025. For long-term incentive compensation, Jones received $2,059,777 in stock awards and $625,020 in option awards in 2024, and $4,823,755 in stock awards and $749,999 in options awards in 2025.

As such, Defendant Jones's ***stock-based and incentive compensation accounted for approximately 87% of his total compensation*** during the Class Period.

592. The table below summarizes total compensation for Defendants Stubblefield, Jones, Peacock in 2024-2025.

| Defendant | Salary/Fees | Stock Awards | Option Awards | Performance -Based Cash Incentives | Total[48] | Percentage Incentive and/or Stock Awards |
|---|---|---|---|---|---|---|
| Michael Stubblefield | $2,266,846 | $16,776,919 | $5,375,035 | $3,107,864 | $27,603,569 | 91% |
| R. Brent Jones | $1,264,788 | $6,883,532 | $1,375,019 | $826,508 | $10,425,118 | 87% |
| Jonathan Peacock | $545,000 | $419,963 | - | - | $964,963 | 44% |

593. Engine Capital also criticized Defendant Stubblefield's outsized 2024 compensation award, stating in a public letter sent to Avantor's Board "despite organic revenue declining by 2%, consolidated operating margins contracting by 134 basis points and the share price falling by 7% (below most benchmarks), the Board awarded Mr. Stubblefield 110% of his target annual bonus." As Engine Capital explained, "[t]his type of compensation framework corroborates what we have heard from former employees regarding a complacent, self-congratulatory culture in the face of poor results." Engine Capital also stated that it was "concerned that Avantor's executive compensation program does not include any return on capital metrics," adding "it is essential to incorporate at least one such metric to ensure that the Company's

[48] Though not separately listed in the chart above, total compensation amounts also include "All Other Compensation" comprised of "[c]ompany [c]ontributions to pension," "[c]ompany savings plan employer contributions," "[r]elocation expenses," and "[m]iscellaneous" compensation. *See* Avantor, Inc., *Schedule 14A (Proxy Statement)*, at 67 (Mar. 27, 2026).

resources are being allocated efficiently. This is especially important given Avantor's recent shift toward a more aggressive competitive posture in LSS."

594. Defendant Peacock was also financially motivated to issue and/or not correct the false statements identified above (¶¶381, 413) to maintain Avantor's inflated stock price, and correspondingly increase the value of his holdings of Avantor common stock. Indeed, during the Class Period, the Company's stock ownership guidelines required Defendant Peacock to "own shares of Avantor common stock in an amount equal to five times (5x) his or her base annual cash retainer." Accordingly, in 2024-2025, Defendant Peacock's stock awards accounted for approximately 44% of his total compensation.

### J. Suspiciously Timed Changes In Goodwill Disclosures Further Bolsters The Strong Inference Of Scienter

595. The strong inference of scienter is further bolstered by the suspiciously timed changes in Avantor's disclosures specific to goodwill.

596. First, in its quarterly Form 10-Q filings during 2024, Avantor included a separate section and discussion for "Goodwill," which stated among other things that the Company had "reassigned goodwill as of January 1, 2024, to align to our new segment structure by using a relative fair value approach. We tested goodwill for impairment immediately before ***and after*** the realignment; no impairment was identified." Likewise, in its 2024 Form 10-K filed in February 2025, Defendants similarly stated, "On January 1, 2024, in connection with the Company's reporting segment structure change, we performed quantitative impairment testing of goodwill for each of our reporting units. We did not record any impairment charges as each reporting unit had a fair value that was in excess of its carrying value."[49]

---

[49] These representations do not meet the standards of SEC guidance to registrants to disclose either the percentage by which the fair value of the reporting unit currently exceeds the carrying value, or that the reporting unit is not at risk of impairment. This is covered in the SEC Division of

597. However, beginning with its Q1 2025 Form 10-Q filed on April 25, 2025—the same day as the truth first began to be revealed—and then again in its Q2 2025 Form 10-Q filed on August 1, 2025—the second corrective disclosure—Defendants did ***not*** include any comparable discussion whatsoever and instead disclosed only de minimis goodwill impairments alongside repeating a nonspecific and boilerplate disclosure around hypothetical "adverse impact of impairment charges on our goodwill and other intangible assets."[50]

**K. Defendants' Carousel of Reporting Segments and Reporting Units Further Bolsters The Strong Inference Of Scienter**

598. The inference of scienter is further bolstered by Defendants' carousel of restructurings since becoming a public company, which Defendants Avantor, Stubblefield, and Peacock had admitted in the prospectus for the Company's initial public offering involve "fundamental[] changes" to financial reporting that could "mitigate . . . indicators of impairment."

> . . .***Determining one basis of segmentation versus another fundamentally changes the way economic and other changes will impact individual reporting units; an impairment could be recognized under one basis but not another, or the impairment could be of different magnitudes***.

---

Corporation Finance Financial Reporting Manual, TOPIC 9 – Management's Discussion and Analysis of Financial Position and Results of Operations (MD&A), Section 9500 – *Critical Accounting Estimates [S-K 303(b)(3)]*, Subsection 9510 - *Goodwill Impairment* (the "Manual"). Among other provisions, the SEC Manual covers issues related to disclosure of critical accounting estimates pursuant to S-K 303(b)(3) The Manual is available at: https://www.sec.gov/divisions/corpfin/cffinancialreportingmanual.pdf (last visited April 24, 2026). *See also* 17 CFR 229.303(b)(3) (noting that for critical accounting estimates, the registrant should, among other things, disclose "how much each estimate and/or assumption ha[ve] changed over a relevant period . . . "). Additional disclosures requirements are noted in ASC 350-20-50-1 through 50-3.

[50] These quarterly financial statements were issued during the timeframe that ASU 2023-07 phased in for quarterly reporting (*i.e.*, to improve segment disclosures), targeting Stubblefield as the CODM, and were, not perhaps surprisingly, the last two quarterly reports issued while he was the CEO and bearing his signature on SOX certifications. By the time of the issuance of the Q3 2025 10-Q, Stubblefield had exited Avantor.

> If we make a judgment that reporting units are economically dissimilar when in fact they are similar, we will establish more reporting units than necessary.
>
> This would ***put us at a greater risk of goodwill impairment because there will be a smaller portfolio to potentially mitigate*** specific types of business downturns or other indicators of impairment.

599. In fact, Defendants were already undertaking such efforts, stating that prior to the IPO, Avantor had "three reporting units aligned to product groups," but that as part of the IPO, Avantor established "three new reporting units aligned to geographic operating segments based on customer location"—"Americas", "Europe" and "AMEA."

600. Significantly, as stated in Amendment No. 7 to the Form S-1 for the IPO, Avantor referred interchangeably to the "Americas", "Europe" and "AMEA" as both "segment[s]" and as "reporting unit[s]" at page F-24, which acknowledges the one to one correlation between the segments and reporting units before the Class Period reorganization, which then obscured and removed this correlation.

601. As stated in the Amendment No. 7 to Form S-1 at F-24 (emphasis added):

> Effective October 1, 2018, we established three new **reporting units aligned to geographic operating segments** based on customer location: Americas, Europe and AMEA. Upon the establishment of these new reporting units, we allocated goodwill to each reporting unit based on its relative fair value. Prior to this date, goodwill was not allocated to any specific reporting unit.

602. Although the segments and reporting units were, by Avantor's admission, aligned at the time of the IPO, Avantor would continue to make adjustments that served to obfuscate the alignment, and thus making consideration of financial performance over time (*i.e.*, comparing one period to prior periods) increasingly less comparable and thus providing less and less accountability for performance changes. For example, as of October 1, 2019, Avantor made yet another change, dividing the Americas **reporting unit** into two product-based units: Americas

sciences and Americas silicones. Then, less than two years later, however, Avantor made yet another change, now referring to the four **reporting units** as Americas, NuSil, Europe and AMEA.

603. Then, just before the Class Period begins, Defendants announced they were changing from a regional-based operations to two new, purportedly customer-based business operating segments, LSS and BPS. Yet the Company did ***not*** allocate the goodwill on its balance sheets to these new segments, but instead allocated its reported goodwill opaquely across six new reporting units: (1) Manufactured Products; (2) Buy Sell Production; (3) NuSil; (4) Buy Sell Lab; (5) Proprietary Lab; and (6) Services. Defendants provided no clarity or specificity on these reporting units, and these new and opaque reporting units potentially masked indicators of impairment.

604. That customers in fact directly expressed confusion around the Company's new operating segments (as described above from both the accounts of former employees and even admitted by Avantor's new-CEO) further strengthens the fraudulent inference around Defendants' carousel of changing reporting units.

605. Indeed, the audit reports included in Defendants' public SEC filings further corroborates that Defendants' shell game of reorganizations potentially concealed indicators of impairment, even from Avantor's auditor itself. Specifically, in Avantor's 2023 Form 10-K, the auditor states that the "Critical Audit Matter" of goodwill impairment for the "Americas and Europe Reporting Units" required "evaluat[ing] management's ability to accurately forecast net sales growth by comparing management's forecasts reflected in the prior period ***Americas and European reporting unit forecasts to actual results***." Notably, for each year that Avantor was a public company, its auditor issued a CAM related to goodwill issues, particularly for the Americas and Europe reporting units, as noted as follows:

- FY 2020 10-K at F-2 to F-4 (CAM in February 16, 2021, audit opinion related to Goodwill —**Americas sciences and Europe Reporting Units**);[51]

- FY 2021 10-K at F-2 to F-4 (CAM in February 11, 2022, audit opinion related to Goodwill —**Americas and Europe Reporting Units**);

- FY 2022 10-K at F-2 to F-4 (CAM in February 14, 2023, audit opinion related to to Goodwill – **Americas and Europe Reporting Units and for a Long-Lived Asset Impairment for Ritter GmbH**);

- FY 2023 10-K at F-3 to F-4 (CAM in February 14, 2024, audit opinion related to Goodwill – **Americas and Europe Reporting Units and for a Long-Lived Asset Impairment for Ritter GmbH**);

606. However, in the 2024 Form 10-K, the Critical Audit Matter now relates to goodwill impairment of the "Buy Sell Lab and Proprietary Lab reporting units"—units which, as noted above, into which Defendants provided little public insight—and states that the auditor was required to "evaluate[] management's ability to accurately forecast net sales growth by comparing management's forecasts reflected in ***these reporting units*** recasted prior period forecasts to actual results." In other words, the auditor did not examine the prior period forecasts as the units were actually operated, but instead assessed those forecasts as "recasted" under the new reporting units. However, as noted above, the composition of those new reporting units was highly susceptible to manipulation.[52]

---

[51] According to the Form 10-K for 2019 at F-31, as of October 1, 2019, Avantor "determined that the Americas reporting unit should be divided into Americas sciences and Americas silicones." Avantor represented that the change did not affect the allocation of goodwill to the Americas segment.

[52] In addition, pursuant to ASC 350-20-35-45, when reorganizing a reporting structure in "a manner that changes the composition of one or more of its reporting units," Avantor was required to consider additional ASC provisions [ASC 350-20-35-39 through 35-40] to "reassign assets and liabilities to the reporting units affected" with goodwill being "reassigned" using a "relative fair value allocation approach similar to that used when a portion of a reporting unit is to be disposed of (see paragraphs 350-20-40-1 through 40-7)."

### L. Enhanced Reporting Requirements Imposed Just Before The Start Of The Class Period Further Bolster The Strong Inference Of Scienter

607. Defendants' strong inference of scienter is further bolstered by the timing of the Company's transformational reorganization of the Company's operating segments, which was announced just one month after the Company became subject to new FASB requirements of ASU 2023-07, "*Improvements to Reportable Segments Disclosures*." As Avantor described, ASU 2023-07 required the Company to identify its "Chief Operating Decision Maker" ("CODM") and make "enhanced disclosures about significant segment expenses that are regularly provided to the CODM and included within each reported measure of segment profit or loss, an amount for other segment items by reportable segment and a description of its composition, the title and position of the CODM and an explanation of how the CODM uses the reported measure(s) of segment profit or loss in assessing segment performance and deciding how to allocate resources."

608. In connection with its reorganization, Defendants identified Defendant Stubblefield as the Company's CODM and stated that the reorganized structure "align[ed]" with how Stubblefield "measures segment operating performance and allocates resources across our operating segments." At the same time, the Company revealed that it was changing its metric for measuring the segments from Adjusted EBITDA **to** Adjusted Operating Income.[53] ASU 2023-07 impacted fiscal 2024 reporting, and quarterly reporting commencing in fiscal 2025.

---

[53] As set out in the FY 2024 10-K at 30, Avantor's CEO was the CODM, or Chief Operating Decision Maker As further stated in the FY 2024 10-K, at 30, "[i]n connection with the operating model and reporting structure change, our CODM changed the measure used to evaluate segment profitability from Adjusted EBITDA to Adjusted Operating Income. All disclosures relating to segment profitability, including those for comparative periods, have been revised as a result of this change."

### M. Defendant Eck Sold Avantor Shares at Prices Inflated by the Alleged Fraud[54]

609. Defendant Eck entered the Class Period with 38,091 shares of Avantor common stock available to trade. Between March 28, 2022 and the start of the Class Period, Eck reduced his position in the Company by 7,577 shares. Thereafter, during the Class Period, Defendant Eck sold more than 16,600 of his Avantor shares at prices as high as $25.63 per share, for proceeds in excess of $325,000. These sales were suspicious as compared to his pre-Class Period trading practices. Defendant Eck's insider sales of his Avantor shares during the Class Period are shown in the table below:

| Defendant | Trade Date | Shares | Price | Gross Proceeds |
|---|---|---|---|---|
| Steven W. Eck | 03/08/2024 | 3,685 | $25.63 | $94,446.55 |
| Steven W. Eck | 09/05/2024 | 3,525 | $25.06 | $88,336.50 |
| Steven W. Eck | 02/26/2025 | 4,907 | $17.53 | $86,019.71 |
| Steven W. Eck | 02/27/2025 | 1,033 | $17.00 | $17,561.00 |
| Steven W. Eck | 08/05/2025 | 3,476 | $11.39 | $39,591.64 |
| **Total** | | **16,626** | | **$325,955.40** |

610. Specifically, on March 8, 2024, Eck sold over 3,600 shares at the artificially inflated price of $25.63 per share. These sales occurred just days after the beginning of the Class Period when Defendants began making their materially false and misleading statements and omissions, as described above. *Supra* Section VII. Eck's trades on March 8, 2024 were impeccably timed—not only were they made shortly after the Class period began, but they also comprise his largest divesture of the Company's common stock for the largest amount of proceeds.

611. Eck's subsequent trades on February 26 and 27, 2025 are also suspicious in magnitude and timing. These sales, which took place just two months before the first corrective disclosure, which revealed among other things Avantor faced increased competition, needed to

[54] Ownership figures alleged herein are taken from available holdings reported by Avantor in Forms 4 filed with the SEC, which report insiders' purchases and sales of a company's equity securities.

improve operations, and suffered from other issues which impacted the Company's margins. *Supra* Section VI.A. As the Company's CAO, Eck would have been privy to information about the Company's performance and financial condition, including the Company's financial statements and the adverse information that ultimately drove the decline in the Company's share price on April 25, 2025. And finally, Defendant Eck's sales in August 2025 came just days after Avantor filed its 2Q 2025 Form 10-Q—signed by Eck—which falsely reported only de minimis impairments to the Company's significant amounts of goodwill; just months later, Avantor was forced to admit that in fact it needed to wipe out hundreds of millions of dollars from that asset. *See* Section V.D.E.

612. Further, Defendant Eck's trading during the Class Period increased two-fold from his pre-Class Period trading. In the two years preceding the Class Period, Eck sold only 7,577 shares of Avantor common stock, collecting trading proceeds of $156,389.28. During the Class Period, a comparable two-year period, Eck sold 16,626 shares of Avantor common stock – reflecting a sales increase of ***nearly 120%*** compared to the comparable pre-Class Period. In doing so, Eck collected proceeds of $325,955.40.

613. Accordingly, the nature, timing, and extent of Defendant Eck's trading are indicative of his scienter since he collected the aforementioned illicit trading proceeds while he was in possession of material, non-public information regarding the truth about the Company's deteriorating conditions and market positioning.

## IX. LOSS CAUSATION/ECONOMIC LOSS

614. The fraud alleged herein was the proximate cause of the economic loss suffered by Plaintiffs and the Class. There was "a causal connection between the material misrepresentation and the loss" (*i.e.*, stock price declines), as described herein. *See, e.g.*, *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005); *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 277 (3d Cir. 2010).

The truth was revealed by a series of partial disclosures through which the truth gradually leaked out. *Dura*, 544 U.S. at 342.

615. During the Class Period, Lead Plaintiffs and other Class members purchased or otherwise acquired Avantor common stock at artificially inflated prices, and were damaged thereby when the price of Avantor common stock declined in response to the partial disclosures. Throughout the Class Period, the price of Avantor common stock was artificially inflated and/or maintained as a result of Defendants' materially false and misleading statements and omissions. The price of Avantor common stock significantly declined, causing investors to suffer losses, in response to a series of partial disclosures concerning or connected to the facts misrepresented or concealed by Defendants, which are described more fully above in Section VI. Throughout the disclosure period, Defendants mitigated Avantor's stock price declines by making additional false assurances concerning the alleged fraud. As the result of the disclosures described herein on April 25, 2025, August 1, 2025, October 29, 2025, and February 11, 2026, Avantor common stock declined from a Class Period high of $28.00 per share to a closing price of $9.64 per share on February 11, 2026 after the final corrective disclosure, a decline of over 65%. Each of these disclosures was associated with a statistically significant "abnormal" decline, meaning they were not explained by broader market or industry price declines. As a result of their purchases of Avantor common stock during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

616. The below chart summarizes Defendants' disclosures and the impact of such disclosures on Avantor's stock price:

| **Date** | **Corrective Disclosure** | **Closing Stock Price Trading Day Prior** | **Closing Stock Price** | **Price Change** | **Percent Change** |
|---|---|---|---|---|---|

| | | | | | |
|---|---|---|---|---|---|
| April 25, 2025 | Defendant Stubblefield revealed the Company was implementing "immediate and significant" changes to drive growth in the Lab business—including numerous supply chain operations such as "improving data accuracy, accelerating fulfillment speeds and optimizing inventory." Defendant Jones disclosed the "increased competitive intensity that reduced volumes at a handful of customers" and Defendant Stubblefield revealed the need to "retain and grow our key accounts." Avantor also announced Defendant Stubblefield's departure from the Company. *See generally* Section VI.A. | $15.50 | $12.93 | – $2.57 | **– 16.6%** |
| August 1, 2025 | Defendants attributed another quarter of disappointing financial results to, among other things, "increased supply chain expense[s]." Furthermore, Avantor slashed free cash flow guidance by $100 million to cover "prepaid rebates" to protect its share and stated that "competitive actions to drive share" had come "at the cost of margin." *See generally* Section VI.B. | $13.44 | $11.36 | – $2.08 | **– 15.5%** |
| October 29, 2025 | Defendants erased $785 million from the Company's balance sheet, citing "margin headwinds." Ligner also admitted that the Company had "dropped the ball" and needed to "invest strategically in [its] manufacturing and supply chain organization." Ligner further disclosed that the cuts made in furtherance of the cost-savings initiative were "not adequately falling through to the bottom line." Ligner and Defendant Jones additionally admitted that "soft" demand was negatively impacting Avantor's performance. *See generally* Section VI.C. | $15.08 | $11.05 | – $4.03 | **– 26.7%** |

| | | | | | |
|---|---|---|---|---|---|
| February 11, 2026 | Ligner revealed that Avantor was eliminating the LSS and BPS segments, undertaking yet another reorganization, and renaming its channel business "VWR," driven by widespread customer confusion. He also announced that Avantor would no longer report progress related to the cost-savings initiative and that the Company had "cut too many specialists" in its distribution business. *See generally* Section VI.D. | $11.16 | $9.64 | – $1.52 | **– 13.6%** |

## X. APPLICABILITY OF PRESUMPTION OF RELIANCE

617. Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) the omissions and misrepresentations were material;

(c) the Company's common stock traded in an efficient market;

(d) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e) Plaintiffs and other members of the Class purchased Avantor common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

618. At all relevant times, the markets for Avantor common stock were efficient for the following reasons, among others:

(a) as a regulated issuer, Avantor filed periodic public reports with the SEC;

(b) Avantor regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(c) Avantor was followed by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms and that were publicly available and entered the public marketplace (including as alleged herein); and

(d) Avantor common stock was actively traded in an efficient market, the New York Stock Exchange, under the ticker symbol "AVTR."

619. As a result of the foregoing, the market for Avantor common stock promptly digested current information regarding Avantor from publicly available sources and reflected such information in Avantor's common stock prices. Under these circumstances, all purchasers of Avantor common stock during the Class Period suffered similar injury through their purchase of Avantor common stock at artificially inflated prices and the presumption of reliance applies.

620. Further, to the extent that the Defendants concealed or improperly failed to disclose material facts, Plaintiffs and the Class are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

## XI. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

621. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when

made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, or the forward-looking statement was authorized or approved by an executive officer of Avantor who knew that the statement was false when made.

## XII. CLASS ACTION ALLEGATIONS

622. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons and entities that purchased or otherwise acquired the publicly traded common stock of Avantor, Inc. during the Class Period and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer, director or control person of Avantor during the Class Period and their immediate families; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling or beneficial interest; (v) the subsidiaries and affiliates of Avantor; (vi) Avantor's employee retirement and benefit plan(s), if any, and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vii) the legal representatives, heirs, successors-in-interest, or assigns of any such excluded person, in their capacities as such.

623. The members of the Class are so numerous that joinder is impracticable. Avantor common stock is actively traded on the New York Stock Exchange. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through discovery,

Plaintiffs believe there are hundreds, if not thousands, of members in the Class. Record owners and other Class members may be identified from records procured from or maintained by the Company or its transfer agent and may be notified of the pendency of this action using a form of notice similar to that customarily used in securities class actions.

624. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

625. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

626. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Avantor;

(c) whether the Individual Defendants caused Avantor to issue false and misleading financial statements during the Class Period;

(d) whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e) whether the prices of Avantor common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

627. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it exceedingly difficult, if not impossible and impracticable, for Class members to individually redress the wrongs alleged. There will be no difficulty in managing this action as a class action.

## COUNT I

### For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Against Avantor and the Individual Defendants

628. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

629. During the Class Period, the Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

630. Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a) Employed devices, schemes, and artifices to defraud;

(b) Made untrue statements of material facts and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c) Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Avantor stock during the Class Period.

631. Plaintiffs and Class members have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Avantor stock. Plaintiffs and Class members would not have purchased Avantor stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

632. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Avantor stock during the Class Period.

## COUNT II

## For Violations of Section 20(a) of the Exchange Act Against the Individual Defendants

633. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

634. This Count is asserted pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a), on behalf of Plaintiffs and the Class, against each of the Individual Defendants.

635. As set forth above, each of the Individual Defendants were controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act. The Individual Defendants acted as controlling persons of Avantor within the meaning of Section 20(a) of the Exchange Act by virtue of their executive positions and their culpable participation, as alleged above. The Individual Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements that Plaintiffs contend were false and misleading. The Individual Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading

prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

636. In particular, the Individual Defendants had direct involvement in and responsibility over the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and had the power and ability to control public statements about Avantor and the actions of Avantor and its employees. Moreover, the Individual Defendants were each directly involved in providing false information and certifying and/or approving materially false or misleading statements disseminated by Avantor during the Class Period. As a result of the foregoing, the Individual Defendants each were controlling persons of Avantor within the meaning of Section 20(a) of the Exchange Act.

637. As alleged above, Avantor violated Section 10(b) of the Exchange Act by its material misrepresentations and omissions as alleged in this Complaint. By virtue of their positions as controlling persons of Avantor and as a result of their own aforementioned conduct, the Individual Defendants are each liable pursuant to Section 20(a) of the Exchange Act of Rule 10b-5 promulgated thereunder, to Plaintiffs and the other members of the Class who purchased or otherwise acquired Avantor common stock. Moreover, as alleged above, during the respective times that the Individual Defendants served as officers or high-level executives of Avantor or spoke directly to Avantor investors during analyst conference calls, each of the Individual Defendants culpably participated in the material misstatements and omissions made by Avantor, as set forth above.

638. As a direct and proximate results of the wrongful conduct by the Individual Defendants, Plaintiffs and other members of the Class suffered damages in connection with their purchases or acquisitions of Avantor common stock during the Class Period.

## COUNT III

### For Violations of Section 20A of the Exchange Act Against Defendant Eck

639. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

640. While Avantor's securities traded at artificially inflated and distorted prices, Defendant Eck personally profited by selling 4,907 shares of AVTR common stock at a weighted average price of $17.53 on February 26, 2025, while in possession of adverse, material non-public information about AVTR, pocketing over $86,019.71 in illegal insider trading proceeds, and by selling 1,033 shares of AVTR common stock at a weighted average price of $17.00 on February 27, 2025, while in possession of adverse, material non-public information about AVTR, pocketing over $17,561.00 in illegal insider trading proceeds, a total of $103,580.71 in illegal insider trading proceeds, as detailed above (Section VIII.M).

641. Contemporaneously with Defendant Eck's insider sales, Lead Plaintiff Macomb County ERS purchased a total of 2,584 shares of AVTR common stock for a total of more than $44,470.64 on February 26, 2025, and a total of 4,021 shares of AVTR common stock for a total of more than $68,155.95 on February 27, 2025.

| Defendant Eck's Sales | | | Macomb's Contemporaneous Purchases | | |
|---|---|---|---|---|---|
| **Sales Dates** | **Shares Sold** | **Price Per Share** | **Purchase Dates** | **Shares Purchased** | **Price Per Share** |
| 2/26/2025 | 4,907 | $17.53 | 2/26/2025 | 2,584 | $17.21 |
| 2/27/2025 | 1,033 | $17.00 | 2/27/2025 | 4,021 | $16.95 |

642. Lead Plaintiff Macomb County ERS and other Class members who purchased shares of AVTR common stock contemporaneously with Eck's insider sales suffered damages because (i) in reliance on the integrity of the market, they paid artificially inflated prices for those shares as a result of the violations of Sections 10(b), 20(a), and 20A of the Exchange Act, as alleged

herein; and (ii) they would not have purchased Avantor common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by the false and misleading statements and omissions, as alleged herein.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, collectively and on behalf of the proposed Class, respectfully pray for judgment against Defendants as follows:

(A) Determining that this action is a proper class action, designating Plaintiffs as Plaintiffs and certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Lead Counsel;

(B) Awarding Plaintiffs and the Class compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, together with pre-judgment interest thereon;

(C) Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including, but not limited to, attorneys' fees and costs incurred by consulting and testifying expert witnesses; and

(D) Granting such other, further, and/or different relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

643. Plaintiffs demand a trial by jury.

Dated: April 24, 2026

Respectfully submitted,

By: */s/ Mark D. Richardson*

**LABATON KELLER SUCHAROW LLP**
Mark D. Richardson (#6575)
222 Delaware Avenue, Suite 1510
Wilmington, DE 19801
Telephone: (302) 573-2540
mrichardson@labaton.com

Lauren A. Ormsbee (admitted *pro hac vice*)
Jesse L. Jensen (admitted *pro hac vice*)
Danielle S. Lazarus (admitted *pro hac vice*)
Alexandra E. Forgione (admitted *pro hac vice*)
Jacqueline Lacovara (admitted *pro hac vice*)
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
lormsbee@labaton.com
jjensen@labaton.com
dlazarus@labaton.com
aforgione@labaton.com
jlacovara@labaton.com

Henry Rosen (admitted *pro hac vice*)
Brian O. O'Mara (admitted *pro hac vice*)
Anne Box (admitted *pro hac vice*)
Kathleen Herkenhoff (admitted *pro hac vice*)
Hani Farah (admitted *pro hac vice*)
Ruben Peña (admitted *pro hac vice*)
**DICELLO LEVITT LLP**
4747 Executive Drive, Suite 240
San Diego, CA 92121
Telephone: (619) 923-3939
hrosen@dicellolevitt.com
briano@dicellolevitt.com
abox@dicellolevitt.com
kherkenhoff@dicellolevitt.com
hfarah@dicellolevitt.com
rpena@dicellolevitt.com

***Co-Lead Counsel for Plaintiffs and the Proposed Class***

**CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that on April 24, 2026, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system.

*/s/ Mark D. Richardson*
Mark D. Richardson